# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

AMERICAN BAR ASSOCIATION,
321 N. Clark Street
Chicago, IL 60654,

      Plaintiff,

      v.

EXECUTIVE OFFICE OF THE
PRESIDENT,
1600 Pennsylvania Avenue NW
Washington, DC 20500

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, DC 20530

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

OFFICE OF MANAGEMENT AND
BUDGET,
725 17th Street NW
Washington, DC 20503

RUSSELL T. VOUGHT, in his official
capacity as Director,
725 17th Street NW
Washington, DC 20503

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
131 M Street NE
Washington, DC 20507

ANDREA R. LUCAS, in her official
capacity as Acting Chair,
131 M Street NE
Washington, DC 20507

OFFICE OF PERSONNEL

Civil Case No. 25-1888

MANAGEMENT,
1900 E Street NW
Washington, DC 20415

CHARLES EZELL, in his official capacity
as Acting Director,
1900 E Street NW
Washington, DC 20415

GENERAL SERVICES
ADMINISTRATION,
1800 F Street NW
Washington, DC 20405

STEPHEN EHEKIAN, in his official
capacity as Acting Administrator,
1800 F Street NW
Washington, D.C. 20405

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE,
1500 Tysons McLean Dr.
McLean, VA 22102

TULSI GABBARD, in her official capacity
as Director,
1500 Tysons McLean Dr.
McLean, VA 22102

CENTRAL INTELLIGENCE AGENCY,
Litigation Division
Office of General Counsel, Central
Intelligence Agency
Washington, DC 20505

JOHN RATCLIFFE, in his official capacity
as Director,
Central Intelligence Agency
Washington, DC 20505

CONSUMER FINANCIAL PROTECTION
BUREAU,
1700 G Street NW
Washington, DC 20552

RUSSELL VOUGHT, in his official capacity

as Acting Director,
1700 G Street NW
Washington, DC 20552

DEPARTMENT OF AGRICULTURE,
1400 Independence Avenue SW
Washington, DC 20250

BROOKE L. ROLLINS, in her official
capacity as Secretary of Agriculture,
1400 Independence Avenue SW
Washington, DC 20250

DEPARTMENT OF COMMERCE,
1401 Constitution Avenue NW
Washington, DC 20230

HOWARD LUTNICK, in his official
capacity as Secretary of Commerce,
1401 Constitution Avenue NW
Washington, DC 20230

DEPARTMENT OF DEFENSE,
1000 Defense Pentagon
Washington, DC 20301

PETER B. HEGSETH, in his official
capacity as Secretary of Defense,
1000 Defense Pentagon
Washington, DC 20301

DEPARTMENT OF ENERGY,
1000 Independence Avenue SW
Washington, DC 20585

CHRIS WRIGHT, in his official capacity as
Secretary of Energy,
1000 Independence Avenue SW
Washington, DC 20585

DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201

ROBERT F. KENNEDY, JR., in his official

capacity as Secretary of Health and Human
Services,
200 Independence Avenue SW
Washington, DC 20201

DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr Avenue SW
Mail Stop 0485
Washington, DC 20528

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
2707 Martin Luther King Jr Avenue SW
Mail Stop 0485
Washington, DC 20528

DEPARTMENT OF THE INTERIOR,
1849 C Street NW
Washington, DC 20240

DOUG BURGUM, in his official capacity as
Secretary of the Interior,
1849 C Street NW
Washington, DC 20240

DEPARTMENT OF LABOR,
200 Constitution Avenue NW
Washington, DC 20210

LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of Labor,
200 Constitution Avenue NW
Washington, DC 20210

DEPARTMENT OF STATE,
Suite 5.600, 600 19th Street NW
Washington, DC 20522

MARCO RUBIO, in his official capacity as
Secretary of State,
Suite 5.600, 600 19th Street NW
Washington, DC 20522

DEPARTMENT OF TRANSPORTATION,
1200 New Jersey Avenue SE

Washington, DC 20590

SEAN DUFFY, in his official capacity as
Secretary of Transportation,
1200 New Jersey Avenue SE
Washington, DC 20590

DEPARTMENT OF THE TREASURY,
1500 Pennsylvania Avenue NW
Washington, DC 20220

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury,
1500 Pennsylvania Avenue NW
Washington, DC 20220

DEPARTMENT OF VETERANS AFFAIRS,
810 Vermont Avenue NW
Washington, DC 20420

DOUGLAS A. COLLINS, in his official
capacity as Secretary of Veterans Affairs,
810 Vermont Avenue NW
Washington, DC 20420

FEDERAL BUREAU OF
INVESTIGATION,
935 Pennsylvania Avenue NW
Washington, DC 20535

KASH PATEL, in his official capacity as
Director,
935 Pennsylvania Avenue NW
Washington, DC 20535

ENVIRONMENTAL PROTECTION
AGENCY,
1200 Pennsylvania Avenue NW
Washington, DC 20460

LEE M. ZELDIN, in his official capacity as
Administrator,
1200 Pennsylvania Avenue NW
Washington, DC 20460

FEDERAL ENERGY REGULATORY

COMMISSION,
888 First Street NE
Washington, DC 20426

MARK C. CHRISTIE, in his official capacity
as Chairman,
888 First Street NE
Washington, DC 20426

DAVID ROSNER, in his official capacity as
Commissioner,
888 First Street NE
Washington, DC 20426

LINSAY S. SEE, in her official capacity as
Commissioner,
888 First Street NE
Washington, DC 20426

JUDY W. CHANG, in her official capacity
as Commissioner,
888 First Street NE
Washington, DC 20426

FEDERAL COMMUNICATIONS
COMMISSION,
45 L Street NE
Washington, DC 20554

BRENDAN CARR, in his official capacity as
the Chairman,
45 L Street NE
Washington, DC 20554

GEOFFREY STARKS, in his official
capacity as Commissioner,
45 L Street NE
Washington, DC 20554

NATHAN SIMINGTON, in his official
capacity as Commissioner,
45 L Street NE
Washington, DC 20554

ANNA M. GOMEZ, in her official capacity
as Commissioner,

45 L Street NE
Washington, DC 20554

FEDERAL TRADE COMMISSION,
600 Pennsylvania Avenue NW
Washington, DC 20580

ANDREW N. FERGUSON, in his official
capacity as Chairman,
600 Pennsylvania Avenue NW
Washington, DC 20580

MELISSA HOLYOAK, in her official
capacity as Commissioner,
600 Pennsylvania Avenue NW
Washington, DC 20580

MARK M. MEADOR, in his official
capacity as Commissioner,
600 Pennsylvania Avenue NW
Washington, DC 20580

INTERNAL REVENUE SERVICE,
1111 Constitution Avenue NW
Washington, DC 20224

WILLIAM HOLLIS LONG II, in his official
capacity as Commissioner,
1111 Constitution Avenue NW
Washington, DC 20224

THE SECURITIES AND EXCHANGE
COMMISSION,
100 F Street NE
Washington, DC 20549

PAUL S. ATKINS, in his official capacity as
Chairman,
100 F Street NE
Washington, DC 20549

HESTER M. PIERCE, in her official
capacity as Commissioner,
100 F Street NE
Washington, DC 20549

CAROLINE A. CRENSHAW, in her official
capacity as Commissioner,
100 F Street NE
Washington, DC 20549

MARK T. UYEDA, in his official capacity
as Commissioner,
100 F Street NE
Washington, DC 20549

THE UNITED STATES PATENT AND
TRADEMARK OFFICE,
P.O. Box 1450
Alexandria, Virginia 22313–1450

COKE MORGAN STEWART, in her official
capacity as Acting Director,
P.O. Box 1450
Alexandria, Virginia 22313–1450

U.S. POST OFFICE,
475 L'Enfant Plaza SW, Room 4012
Washington, DC 20260

DOUG TULINO, in his official capacity as
Acting Postmaster General,
475 L'Enfant Plaza SW, Room 4012
Washington, DC 20260

THE UNITED STATES OF AMERICA,
601 D Street NW
Washington, DC 20530

  Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      On August 21, 1878, a group of seventy-five lawyers from twenty states and the District of Columbia met in a courtroom in Saratoga Springs, New York, to establish the American Bar Association. The ABA's founding commitment was to advance the rule of law across the American nation. Over the nearly 150 years since its founding, the ABA has sought to fulfill that commitment through initiatives that have fundamentally changed the American legal landscape for the better. In 1908, the ABA adopted the first national ethical guidance for lawyers, the Canons of Professional Ethics, and followed that up in 1983 with the ABA Model Rules of Professional Conduct, which all fifty states have adopted in whole or substantial part. The ABA adopted the first national guidance for judges—the Canons of Judicial Ethics—in 1924, which was succeeded in 2007 by the revised ABA Model Code of Judicial Conduct. And in 1921, the ABA adopted standards for the professional education of prospective lawyers and their admission to the practice of law; those standards ultimately led to the development of a formal program of approval and, beginning in 1952, the accreditation of law schools.

2.      Over the years, the ABA has also repeatedly spoken out in defense of the rule of law and access to justice for all. In 1937, the ABA organized a national response to President Franklin D. Roosevelt's plan to "pack" the U.S. Supreme Court, including a survey of ABA members showing 86% opposed the plan, which was subsequently withdrawn. In 1973, ABA President Chesterfield Smith—who supported President Nixon's 1968 and 1972 presidential campaigns— declared in response to President Nixon's "Saturday Night Massacre" firing of the Watergate special prosecutor that "no man is above the law," and publicly called for appointment of an independent prosecutor to investigate President Nixon. And since 1920, when the ABA formed the Special Committee on Legal Aid Work, the ABA has worked to try to ensure that all people in this

country can access legal representation to defend their rights, regardless of their financial circumstances or the unpopularity of their causes or affiliations.

3.    Today, though, the American legal profession faces a challenge that is different from all that has come before. It is unprecedented and uniquely dangerous to the rule of law.

4.    Since taking office earlier this year, President Trump has used the vast powers of the Executive Branch to coerce lawyers and law firms to abandon clients, causes, and policy positions the President does not like. The Administration has carried out this policy (the "Law Firm Intimidation Policy" or "Policy") through a series of materially identical executive orders designed to severely damage particular law firms and intimidate other firms and lawyers (the "Law Firm Orders"); a series of similar "deals" or "settlements" between the Administration and certain law firms in order to avoid such Orders or have them rescinded; other related executive orders, letters, and memoranda described below; and public statements by the President and his Administration publicizing the objectives of the Law Firm Intimidation Policy. The President's attacks on law firms through the Law Firm Orders are thus not isolated events, but one component of a broader, deliberate policy designed to intimidate and coerce law firms and lawyers to refrain from challenging the President or his Administration in court, or from even speaking publicly in support of policies or causes that the President does not like.

5.    This Policy is ongoing. As reported by the Wall Street Journal, as of June 1, 2025, "Trump remains interested in the orders, and deputy White House chief of staff Stephen Miller and his allies want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration."[1]

---

[1] Erin Mulvaney, Emily Glazer, C. Ryan Barber, and Josh Dawsey, *The Law Firms That Appeased Trump—and Angered Their Clients*, The Wall Street Journal (June 1, 2025),

6.      Although the President has made examples of certain law firms that he particularly resented, the core purpose of the Law Firm Intimidation Policy is not merely to punish but to intimidate and coerce. The events involving the law firm Paul Weiss clearly illustrate this.

7.      Paul Weiss was the third law firm targeted by President Trump. The executive order issued against Paul Weiss claimed to be seeking retribution for the law firm's having previously employed two lawyers who had done work that angered President Trump, including a pro bono lawsuit against participants in the January 6 insurrection and the Manhattan District Attorney's criminal prosecution of President Trump. But the President quickly proved that retribution was never the sole—or even primary—purpose of his punitive order: he rescinded the order against Paul Weiss within a week of issuing it, once Paul Weiss was willing to conform its "client selection and attorney hiring" policies to the President's liking, and to dedicate $40 million in pro bono legal services to causes agreed to by the President.[2] In the end, the President was not simply punishing Paul Weiss; he was dragooning Paul Weiss into his service. Even more importantly, the President was sending a message in order to coerce Paul Weiss and other law firms into abandoning representations, speech, and other conduct the President dislikes (such as immigration cases or diversity initiatives).

8.      This same core purpose of coercion is reflected in the "settlements" the Administration entered into with eight other top law firms that were never subjected to an executive

---

https://www.wsj.com/us-news/law/law-firms-trump-deals-clients-71b3616d?gaa_at=eafs&gaa_n=ASWzDAiaRgUTx-SG2mdYMQR1ABDlkzV0SM3RmhAgUsp0Xcz3x3rYMVA84lDuIQci5OU%3D&gaa_ts=683e492b&gaa_sig=FZDeJu8Q3nhkjWrrtMZvt6OnJ0NirT5yOAWnT33uMYkCXZkWFxYUDaoGx8tNKAlMbsFZ3xveT63qKtG36uZAAA%3D%3D.

[2]  Executive Order, *Addressing Remedial Action by Paul Weiss* (Mar. 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-remedial-action-by-paul-weiss/.

order. To avoid such sanctions—and an "existential crisis" like the one Paul Weiss reported—these firms all agreed to represent clients in pro bono cases approved by the Administration, and to jettison hiring practices disdained by the President. These "settlements" are apparently not in writing or enforceable by the law firms, so the President can change his mind at any time and impose an executive order if the firms stray too far from the President's wishes—thus maintaining the coercive effect of the Policy even against "settling" law firms.

9.      The President said it most clearly in a March 24, 2025, press conference: "I just think that the law firms have to behave themselves."[3]

10.     Using the powers of the Executive Branch to target private citizens and private firms for destruction is unprecedented, and bad enough regardless of the President's motives. But the Administration's Law Firm Intimidation Policy is uniquely destructive because of the critical role that its targets—lawyers—fulfill in our constitutional system.

11.     As the court explained in its opinion striking down one of the President's Law Firm Orders as unconstitutional:

> The importance of independent lawyers to ensuring the American judicial system's fair and impartial administration of justice has been recognized in this country since its founding era. In 1770, John Adams made the singularly unpopular decision to represent eight British soldiers charged with murder for their roles in the Boston Massacre and "claimed later to have suffered the loss of more than half his practice." DAVID MCCULLOUGH, JOHN ADAMS 68 (2001). "I had no hesitation," he explained, since "Council ought to be the very last thing that an accused Person should want in a free Country," and "the Bar ought . . . to be independent and impartial at all Times And in every Circumstance." 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 293 (L.H. Butterfield et al. eds., 1961). When the Bill of Rights was ratified, these principles were codified into the Constitution: The Sixth Amendment secured the right, in "all criminal prosecutions," to "have the Assistance of Counsel for . . . defence," U.S. CONST. amend. VI, and the Fifth Amendment protected "the right to the aid of counsel when desired and provided by the party asserting the right," *Powell v. Alabama*, 287 U.S.

---

[3] The White House, *President Trump and the Governor of Louisiana Deliver Remarks*, YouTube (Mar. 24, 2025) at 19:06-40, https://www.youtube.com/live/qqgmQUbuGrg?t=1156s.

45, 68 (1932). This value placed on the role of lawyers caught the attention of Alexis de Tocqueville, who in reflecting on his travels throughout the early United States in 1831 and 1832, insightfully remarked that "the authority . . . intrusted to members of the legal profession . . . is the most powerful existing security against the excesses of democracy." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 301 (Henry Reeve trans., 2002) (1835).

The Supreme Court, too, has recognized the importance of lawyers to the functioning of the American judicial system, since "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). This is so because Congress may legislate, the President may implement, and courts may adjudicate, "but only the lawyers can prepare and submit the great issues of human justice under law in such manner and form that courts, in the ultimate, may be effective." *Williams v. Beto*, 354 F.2d 698, 706 (5th Cir. 1965).

*Perkins Coie LLP v. U.S. Dep't of Justice*, --- F. Supp. 3d ---, Case No. 25-cv-716, 2025 WL 1276857, at *1-2 (D.D.C. May 2, 2025) (footnote omitted) ("*Perkins v. DOJ*").

12.    President Trump now threatens to destroy the same attribute that John Adams and Alexis de Tocqueville recognized as essential to the rule of law in the early days of our Republic: the independence of the American bar.

13.    Without skilled lawyers to bring and argue cases—and to do so by advancing the interests of their clients without fear of reprisal from the government—the judiciary cannot function as a meaningful check on executive overreach. The "cornerstone of the American system of justice is an independent judiciary and an independent bar willing to tackle unpopular cases, however daunting." *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, --- F. Supp. 3d ---, Case No. 25-cv-917, 2025 WL 1502329, at *1 (D.D.C. May 27, 2025) ("*WilmerHale v. EOP*"). "'[T]he right to sue and defend in the courts' is 'the right conservative of all other rights, and lies at the foundation of orderly government.' Our society has entrusted lawyers with something of a monopoly on the exercise of this foundational right—on translating real-world harm into courtroom argument. Sometimes they live up to that trust; sometimes they don't. But in all events,

their independence is essential lest they shrink into 'nothing more than parrots of the views of whatever group wields governmental power at the moment.'" *Jenner & Block LLP v. U.S. Dep't of Justice*, --- F. Supp. 3d ---, Case No. 25-cv-916, 2025 WL 1482021, at *8 (D.D.C. May 23, 2025) ("*Jenner v. DOJ*") (quoting *Chambers v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907), and *Cohen v. Hurley*, 366 U.S. 117, 138 (1961) (Black, J., dissenting)).

14.    The President's Policy is working as designed. Even as federal judges have ruled over and over that the Law Firm Orders are plainly unconstitutional, law firms that once proudly contributed thousands of hours of pro bono work to a host of causes—including causes championed by the ABA—have withdrawn from such work because it is disfavored by the Administration, particularly work that would require law firms to litigate against the federal government. News reports and studies already show that most top firms are lying low, trying to avoid being hit with similar executive orders. Public-interest organizations (including the ABA) that have historically relied heavily on top law firms to bring pro bono cases—particularly against the federal government to challenge unlawful executive action—face serious and sometimes existential crises, as those same law firms are declining to represent these organizations. "This threat has a deliberately powerful chilling effect. Already, many firms are declining to take on cases that challenge the administration's policies. That's not a side effect of the crackdown. It was the purpose all along."[4]

15.    Many members of the ABA—including those whose experiences are detailed below—have been harmed in all these ways, and others. The ABA itself is also experiencing the effects, as it has had to forgo litigation against the Administration because counsel who previously were willing to take on such work are no longer willing to do so. *See infra* § VII. In short, the Law

---

[4] Scott Cummings, *There's a Darker Reason Trump Is Going After Those Law Firms*, N.Y. Times (May 15, 2025), https://www.nytimes.com/2025/05/15/opinion/trump-law-firms-attacks.html?smid=nytcore-ios-share&referringSource=articleShare.

Firm Orders and other components of President Trump's Law Firm Intimidation Policy have cast "a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government." *Jenner v. DOJ*, 2025 WL 1482021, at \*22.

16.    Under this Administration's Policy, lawyers and law firms face "peril" if they dare "cross[] the federal government." *Id*. When John Adams more than 250 years ago chose to defend British soldiers in prosecutions brought by the government, as unpopular as his choice was with the public, he did not have to worry about having the government try to destroy him and his law practice for litigating against it. What is happening today is not normal.

17.    The longer the Law Firm Intimidation Policy—and the resulting coercion and submission—persists, the more it will be normalized in our legal system. Whoever wins the next election will be free to squelch dissent based on policy disagreements. There is no limiting principle: The next Administration might threaten adverse Executive Branch actions against any lawyer or law firm that dares to represent an oil company, or a gun manufacturer, or the Federalist Society or Fox News.

18.    Four different federal judges have forcefully condemned the existing Law Firm Orders and eloquently explained the danger such orders pose to our constitutional system and the rule of law. Yet as shown below, the repeated victories of the litigants in these four cases have not stopped, or even slowed, the chilling "of blizzard proportions across the entire legal profession," including of ABA members. *Perkins v. DOJ*, Hearing Tr. (March 12, 2025) at 95:22-96. That should not be surprising, given this Administration's stated position that it reserves the right to keep advancing the same legal position against any parties who have not yet won their own relief in court, no matter how many times federal trial courts have declared the conduct unconstitutional in

specific cases. For many law firms, being hit with a Law Firm Order—even being threatened with one—risks quick and severe damage to their business. That is true even for the largest and most successful law firms in the country, which is why many of them have entered "deals" worth hundreds of millions of dollars in free legal work for the President's policy priorities to try to avoid being hit with their own Law Firm Orders.

19.    Because the threat that the President will continue to issue potentially devastating executive orders against law firms who do not "behave" remains urgent and outstanding—and because it is not merely a threat but a proven pattern—this chill "of blizzard proportions" continues to grip most of the top law firms and lawyers in the country. *Id.*

20.    That is why the ABA is filing this lawsuit. As the nation's largest voluntary association of lawyers (which counts lawyers from every AmLaw 100 firm among its membership), the ABA is uniquely situated to achieve meaningful and certain relief against this unconstitutional Policy on behalf of a substantial part of the American bar. Pursuing such relief furthers the mission of the ABA "[t]o serve equally our members, our profession and the public by defending liberty and delivering justice as the national representative of the legal profession."[5] Never before has there been as urgent a need for the ABA to defend its members, their profession, and the rule of law itself.

21.    The Law Firm Intimidation Policy is unlawful. Our Constitution does not vest the Executive Branch with the power to point to individual lawyers or law firms, declare by executive fiat that their work or their internal policies are "against the national interest" or otherwise illegal or improper, and direct (or threaten) executive action against that lawyer or law firm. Exercising such power—and threatening to do so—violates the First Amendment and purports to exercise

---

[5]    American Bar Association, *ABA Mission and Goals*, https://www.americanbar.org/about_the_aba/aba-mission-goals/.

power that the President does not have. "When the government draws legal scrutiny, its response must be to defend itself in court, not to intimidate those who would force it to do so." *Jenner v. DOJ*, 2025 WL 1482021, at *9.

22.     On behalf of itself and its members, the ABA asks the Court to declare this Law Firm Intimidation Policy unconstitutional and enjoin all the named Defendants from implementing and enforcing this Policy against the ABA or any of its members in the future.

## PARTIES

23.     Plaintiff the American Bar Association ("ABA") is a non-partisan non-profit organization founded in 1878. The ABA is the nation's largest voluntary association of legal professionals. Its goals include improving the legal profession, serving its members, and advocating for the rule of law. The ABA includes as members lawyers of all kinds (government lawyers, non-profit/public interest lawyers, judges, solo practitioners, and lawyers at firms of all sizes); law students; and other affiliated professionals. The ABA is headquartered in Chicago, Illinois, and has offices in Washington, D.C., California, and Texas.

24.     The named Defendants include the United States as well as (1) federal departments and agencies that under the Policy have been directed to implement a series of executive orders issued against law firms, and (2) the heads of those departments and agencies. The Law Firm Orders issued thus far expressly direct certain Defendants to obstruct the ability of lawyers at the targeted firms to practice law and serve those firms' clients. Other named Defendants have contracts with law firm clients and are likely to be directed by future Law Firm Orders to take actions (*e.g.*, cancelling or threatening cancellation of those contracts) that are aimed at harming those clients' relationships with one or more firms subject to future Law Firm Orders.

25.    The Executive Office of the President is a federal agency headquartered in Washington, D.C.

26.    The U.S. Department of Justice is a federal agency headquartered in Washington, D.C. Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity.

27.    The U.S. Office of Management & Budget is a federal agency headquartered in Washington, D.C. Russell T. Vought is Director of the U.S. Office of Management & Budget. He is sued in his official capacity.

28.    The Equal Employment Opportunity Commission is a federal agency headquartered in Washington, D.C. Andrea R. Lucas is Acting Chair of the Equal Employment Opportunity Commission. She is sued in her official capacity.

29.    The Office of Personnel Management is a federal agency headquartered in Washington, D.C. 31. Charles Ezell is Acting Director of the Office of Personnel Management. He is sued in his official capacity.

30.    The General Services Administration is a federal agency headquartered in Washington, D.C. Stephen Ehikian is the Acting Director of the General Services Administration. He is sued in his official capacity.

31.    The Office of the Director of National Intelligence is a federal agency headquartered in Washington, D.C. Tulsi Gabbard is U.S. Director of National Intelligence. She is sued in her official capacity.

32.    Central Intelligence Agency is a federal agency headquartered in Langley, Virginia. John Ratcliffe is its Director and is sued in his official capacity.

33.     Consumer Financial Protection Bureau is a federal agency headquartered in Washington, D.C. Russell Vought is its Acting Director and is sued in his official capacity.

34.     Department of Agriculture is a federal agency headquartered in Washington, D.C. Brooke L. Rollins is the Secretary of Agriculture and is sued in his official capacity.

35.     Department of Commerce is a federal agency headquartered in Washington, D.C. Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

36.     Department of Defense is a federal agency headquartered in Washington, D.C. Peter B. Hegseth is the Secretary of Defense and is sued in his official capacity.

37.     Department of Energy is a federal agency headquartered in Washington, D.C. Chris Wright is the Secretary of Energy and is sued in his official capacity.

38.     Department of Health and Human Services is a federal agency headquartered in Washington, D.C. Robert F. Kennedy, Jr. is the Secretary of Health and Human Services and is sued in his official capacity.

39.     The Department of Homeland Security is a federal agency headquartered in Washington, D.C. Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity.

40.     Department of the Interior is a federal agency headquartered in Washington, D.C. Doug Burgum is its Secretary and is sued in his official capacity.

41.     Department of Labor is a federal agency headquartered in Washington, D.C. Lori Chavez-Deremer is its Secretary and is sued in her official capacity.

42.     Department of State is a federal agency headquartered in Washington, D.C. Marco Rubio is its Secretary and is sued in his official capacity.

43.     Department of Transportation is a federal agency headquartered in Washington, D.C. Sean Duffy is its Secretary and is sued in his official capacity.

44.     Department of the Treasury is a federal agency headquartered in Washington, D.C. Scott Bessent is its Secretary and is sued in his official capacity.

45.     Department of Veterans Affairs is a federal agency headquartered in Washington, D.C. Douglas A. Collins is its Secretary and is sued in his official capacity.

46.     Federal Bureau of Investigation is a federal agency headquartered in Washington, D.C. Kash Patel is its Director and is sued in his official capacity.

47.     Environmental Protection Agency is a federal agency headquartered in Washington, D.C. Lee M. Zeldin is its Administrator and is sued in his official capacity.

48.     Federal Energy Regulatory Commission is a federal agency headquartered in Washington, D.C. Mark C. Christie is its Chairman and is sued in his official capacity. Commissioners David Rosner, Lindsay S. See, and Judy W. Chang are sued in their official capacity.

49.     The Federal Communications Commission is a federal agency headquartered in Washington, D.C. Brendan Carr is Chairman of the Federal Communications Commission. He is sued in his official capacity. Commissioners Geoffrey Starks, Nathan Simington, and Anna M. Gomez are sued in their official capacities.

50.     The Federal Trade Commission is a federal agency headquartered in Washington D.C. Andrew N. Ferguson is its Chairman and is sued in his official capacity. Commissioners Melissa Holyoak and Mark M. Meador are sued in their official capacities.

51.     Internal Revenue Service is a federal agency headquartered in Washington, D.C. William ("Billy") Hollis Long II is its Commissioner and is sued in his official capacity.

52.     The Securities and Exchange Commission is a federal agency headquartered in Washington, D.C. Paul S. Atkins is its Chairman and is sued in his official capacity. Commissioners Hester M. Pierce, Caroline A. Crenshaw, and Mark T. Uyeda are sued in their official capacities.

53.     The United States Patent and Trademark Office is a federal agency headquartered in Alexandria, Virginia. Coke Morgan Stewart is its acting Director and is sued in her official capacity.

54.     U.S. Post Office is a federal agency headquartered in Washington, D.C. Doug Tulino is its Acting Postmaster General and is sued in his official capacity.

55.     The United States of America is responsible for the exercise of executive action by the named Defendants and all other departments and agencies that are likely to be directed by the Policy to take action affecting the ABA or ABA members. The United States of America is included as a Defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to any federal agencies that are not specifically listed as Defendants.

## JURISDICTION AND VENUE

56.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the ABA's causes of action arise under the Constitution and laws of the United States. This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because Defendants are United States officials.

57.     The Court has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

58.     The ABA also has a right to non-statutory review of *ultra vires* executive action. *See*, *e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). Among other powers, this Court has inherent equitable power to enjoin executive conduct that violates the

13

Constitution, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010), and "the President's actions" therefore "may still be reviewed for constitutionality," *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

59.    This Court also possesses the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

60.    Venue lies in this District under 28 U.S.C. § 1391(e)(1) because at least one Defendant is an agency or officer or employee of the United States sued in his or her official capacity and resides in this District.

## FACTUAL ALLEGATIONS

**I.    The American Bar Association represents the interests of its hundreds of thousands of members and advocates for the rule of law.**

61.    The ABA was founded in 1878; today, the ABA is the largest voluntary association of attorneys, law students, and legal professionals in the world. Its members include lawyers in both the public and private legal sectors. ABA members range from solo practitioners to lawyers in every law firm listed in the "AmLaw 100," which is The American Lawyer's list of the 100 largest law firms in the United States. The ABA is guided by four goals: (1) to serve its members; (2) to improve the legal profession; (3) to eliminate bias and enhance diversity; and (4) to advance the rule of law.[6]

62.    The ABA works on behalf of its members to promote the best quality legal education, competence, ethical conduct and professionalism, and pro bono and public service work

---

[6]    American Bar Association, *ABA Mission and Association Goals*, https://www.americanbar.org/about_the_aba/aba-mission-goals.html.

in the legal profession. The ABA provides its members with high-quality continuing legal education programming, and hosts policy and education programs supported through the ABA Fund for Justice and Education. The ABA further promotes ethics and professionalism in the law through its Model Rules of Professional Conduct: All fifty states and the District of Columbia have adopted legal ethics rules based at least in part on the ABA's Model Rules.[7] Those Rules reflect the values that animate the profession, including—as particularly relevant here—the principle that "[a] lawyer's representation of a client . . . does not constitute an endorsement of the client's political, economic, social or moral views or activities." ABA Model Rule 1.2(b).

63.    The ABA has long been committed to ensuring access to legal representation for all individuals and to safeguarding the ability of lawyers to zealously advocate on behalf of their clients. For instance, the ABA has helped develop Access to Justice Commissions, which are collaborative entities that bring together courts, the bar, civil legal aid providers, and other stakeholders in an effort to remove barriers to civil justice for low-income and disadvantaged people. The ABA's Death Penalty Representation Project works to improve the quality and availability of legal representation for persons facing possible death sentences. The ABA's Standing Committee on Legal Assistance for Military Personnel promotes the provision of legal services to military personnel and their family members, working with other organizations to enhance the scope, quality, and delivery of free or affordable legal services to eligible legal assistance clients. And for more than twenty-five years, the ABA's Rule of Law Initiative has

---

[7] American Bar Association, *Alphabetical List of Jurisdictions Adopting Model Rules*, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_pr ofessional_conduct/alpha_list_state_adopting_model_rules/; UCLA School of Law Library, *Professional Responsibility and California Ethics*, https://libguides.law.ucla.edu/ethics.

worked to strengthen legal institutions, to support legal professionals, to foster respect for human rights, and to advance public understanding of the law and of citizen rights in over 100 countries.

II.   **The Trump Administration adopts the Law Firm Intimidation Policy and targets law firms with punitive executive orders based on President Trump's dislike for the individuals they have represented and the matters their attorneys have handled.**

64.   In President Trump's first 100 days in office, he and his Administration have adopted and implemented the Law Firm Intimidation Policy, pursuant to which he has used the power of the Executive to take aim at law firms that he disfavors based on whom they choose to hire and represent. As the court recently put it in striking down the Law Firm Order against Perkins Coie, such Orders are part of a "broader campaign" of "President Trump using the power of the presidency to target individual lawyers and law firms associated with them based on personal dislike of their legal work—in other words, for retribution." *Perkins v. DOJ*, 2025 WL 1276857, at *37.

65.   As described in greater detail in the sections below, pursuant to the Policy, the President is targeting law firms who have engaged in some expressive conduct disfavored by him or his Administration, with sanctions designed to cripple targeted firms' businesses.

66.   Based on the Administration's own statements and the executive orders issued pursuant to the Policy, targets of the Policy include, at minimum, lawyers who represented clients in matters seeking to vindicate the rights of immigrants; to preserve the results of the 2020 election or election integrity generally; to vindicate the rights of women or LGBTQ+ individuals; or in matters challenging the current Administration's policies. In addition, the Policy seeks to target lawyers who were involved in or associated with investigations or prosecutions of President Trump; made donations to or gave support for causes the Administration disfavors; or who engaged in other

disfavored forms of expression, such as advocating in favor of policies related to diversity in the legal profession.

67.    The sanctions issued pursuant to the Policy are intended to cripple each targeted law firm's business. The sanctions issued in the Law Firm Orders pursuant to the Policy have common features, directing the Attorney General, the Director of National Intelligence, and heads of executive departments and agencies to undertake the following actions:

    i.   <u>Security Clearance Termination</u>: immediately suspend any active security clearances held by individuals at a law firm, pending a discretionary review by the Administration; and cease provision of all government goods, property, material, and services provided for the benefit of the law firm;

    ii.   <u>Government Contracting</u>: mandate that Government contractors disclose any business they do with a law firm and whether that business is related to the subject of the Government contract; threaten termination of contracts held by Government contractors that do business with the law firm; and terminate any Government contract for which the law firm has been hired to perform services;

    iii.   <u>Federal Building and Employee Access</u>: limit law firm employees' access to federal government buildings, and restrict government employees acting in their official capacity from engaging with law firm employees; and

    iv.   <u>Federal Employment</u>: refrain from hiring employees of the law firm to jobs in the federal government absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management.

68.     The paragraphs that follow lay out in detail how the Trump Administration has implemented the President's Law Firm Intimidation Policy through executive orders, presidential memoranda, public statements, and "settlements" with some major law firms.

### A.     The Perkins Order

69.     On March 6, 2025, President Trump signed Executive Order 14230, "Addressing Risks from Perkins Coie LLP" ("Perkins Order").[8] The Perkins Order states, under the heading "Purpose," that:

> The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins Coie") has affected this country for decades. Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false "dossier" designed to steal an election. This egregious activity is part of a pattern. Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court.

> In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants. Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws. It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change.

Perkins Order § 1.

---

[8]     Executive Order, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/.

The Perkins Order followed the President's issuance on February 25, 2025 of a memorandum targeting the law firm Covington & Burling (1) revoking security clearances of certain Covington attorneys explicitly on the basis that they worked with former Special Counsel Jack Smith, (2) directing agencies to terminate engagements with Covington, and (3) directing agencies to review government contracts with Covington for potential termination. *See* The White House, *Suspension of Security Clearances and Evaluation of Government Contracts* (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/.

70. The Perkins Order directs the Attorney General and agency and department heads "to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest"; and directs heads of agencies to cease providing "Government goods, property, material, and services" to Perkins Coie. Perkins Order § 2.

71. The Perkins Order further requires "Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract" so that agency heads can perform a required "review of all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie," "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law," and "submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." Perkins Order § 3.

72. The Perkins Order also includes a "Racial Discrimination" provision directing the U.S. Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964," and directing the Attorney General—in coordination with the EEOC and State Attorneys General—to investigate large law firms doing business with Federal entities "for compliance with race-based and sex-based non-discrimination laws" and to "take any additional actions the Attorney General deems appropriate in light of the evidence uncovered." Perkins Order § 4.

73. Finally, the Perkins Order directs agency heads to "provide guidance limiting official access from federal government buildings to employees of Perkins Coie" when such access

would "be inconsistent with the interests of the United States," and to further "provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States." Perkins Order § 5. The Order bars agencies from hiring Perkins Coie employees absent a waiver from the agency head and the Director of the Office of Personnel Management. *Id.*

74.    The fact sheet issued by the White House the same day confirmed that security clearances held by Perkins Coie employees would be "immediately suspended," the federal government would halt all material and service access to Perkins Coie, and federal agencies would not hire Perkins Coie employees "unless specifically authorized."[9]

75.    The fact sheet provides examples of Perkins Coie's purportedly "unethical and discriminatory" actions justifying the Order, including, for example, that it "hired Fusion GPS to manufacture a false 'dossier' designed to steal an election while representing failed presidential candidate Hillary Clinton"; it "worked with activist donors, including George Soros, to judicially overturn enacted election laws"; and it "has filed lawsuits against the Trump Administration."[10]

76.    During the signing ceremony, President Trump reiterated his Administration's Policy of targeting lawyers and law firms disfavored by the Administration. As he was signing the Perkins Order, the President commented: "This is an absolute honor to sign what they've done is just terrible, it's weaponization . . . and it should never be allowed to happen again."[11] The President

---

[9] *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.
[10] *Id.*
[11] *President Trump Signs Executive Orders*, C-SPAN (Mar. 9, 2025)at 5:20-5:40, https://www.c-span.org/program/white-house-event/president-trump-signs-executive-orders/656830.

then said to his Staff Secretary: "And you're looking at about 15 different firms." The Staff Secretary responded: "That or more, sir, yes."[12]

77.     Later that day, a White House official told the Washington Post that "[t]he president doesn't believe [Perkins] should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that[.]"[13]

78.     On March 11, 2025, Perkins filed for a temporary restraining order ("TRO") in the District Court for the District of Columbia seeking to enjoin enforcement of the Perkins Order. *See Perkins v. DOJ*, ECF No. 2-1. Perkins' TRO motion states that "[i]n days, the Executive Order has already subjected the Firm to multiple millions of dollars in unrecoverable losses," citing to testimony from Perkins partner David J. Burman. *Id.* at 37.

79.     On March 12, the District Court granted the requested TRO against the Perkins Order. At the hearing, the court stated that the "retaliatory animus" of the Perkins Order is "clear on its face" and appears to violate constitutional restrictions on "viewpoint discrimination." *Perkins v. DOJ*, Hearing Tr. (March 12, 2025) at 75:12-13; 76:4-5; 78:18-21. As the court explained, "[t]he order here tells other law firms and lawyers that they engage in political work for certain candidates and for clients with causes unpopular with the political powers at their own peril with costs likely to include their livelihoods. This kind of clear retaliation chills First Amendment-protected activity, both for those retaliated against and others watching on the sidelines." *Id.* at 78:5-11. As the court went on to explain,

---

[12] *Id.* at 5:45-5:55.

[13] Perry Stein & Michael Birnbaum, *Trump Expands Retribution Campaign Against Law Firms That Aided His Foes*, Wash. Post (Mar. 6, 2025), https://www.washingtonpost.com/national-security/2025/03/06/trump-perkins-coie-hillary-clinton-steele-dossier/.

> [T]he order casts a chilling harm . . . of blizzard proportions across the entire legal profession. If not enjoined or restrained, the executive order will be understood by lawyers and law firms as an extreme dangerous and unprecedented effort to intimidate them and prevent them from representing clients whom the President does not wish to have access to legal counsel or to the courts or whose advocacy the President wishes to punish.

*Id*. at 95:22-96:5.

80.    It was not just the court that acknowledged the retaliatory nature of the Perkins Order, which echoes the prior Covington Memorandum. On March 13, former White House advisor Steve Bannon, who previously served as President Trump's chief strategist and senior counselor, stated in a television interview: "There's major law firms in Washington, D.C. and . . . what we are trying to do is put you out of business and bankrupt you."[14]

81.    Perkins filed a motion for summary judgment seeking to permanently enjoin the Perkins Order on April 16, 2025. The law firm Munger, Tolles & Olson filed a brief on behalf of more than 500 law firm amici in support of Perkins. *Perkins v. DOJ*, ECF No. 82. However, none of the twenty largest firms by revenue in the country signed the brief. Only eight of the firms in the top 100 by revenue signed. According to an article in The New York Times, "[t]he big New York firms that withheld their signatures were not necessarily opposed, according to people with knowledge of the matter."[15] Rather, they were concerned that "signing the document would draw Mr. Trump's ire and cost them clients. . . ."[16] Public reporting on the law firm amicus brief prior to its filing similarly stated that "Partners at Am Law 100-ranked firms have remained reluctant to

---

[14] Amanda O'Brien & Patrick Smith, *Paul Weiss—and Big Law—Face 'An Existential Threat' Amid Intensifying Trump Administration Pressure*, Am. Law. (Mar. 18, 2025), https://perma.cc/QZ3M-KVG3 (quoting 3/13/25 Bannon television appearance).
[15] Ben Protess, *More Than 500 Law Firms Back Perkins Coie in Fight With Trump*, N.Y. Times (Apr. 4, 2025), https://www.nytimes.com/2025/04/04/business/law-firms-perkins-coie-trump.html.
[16] *Id*.

speak publicly, concerned that their firm could see the next executive order from President Donald Trump."[17]

82.     The morning of the hearing on the parties' dispositive motions, President Trump took to his social media site Truth Social, stating that he was "suing" Perkins Coie "for their egregious and unlawful acts, in particular the conduct of a specific member of this firm."[18]



83.     On May 2, 2025, the court granted Perkins summary judgment, including granting Perkins' requests for declaratory and permanent injunctive relief. *Perkins v. DOJ*, 2025 WL 1276857. The court's order finds that the Perkins Order "Takes Retaliatory Actions Sufficient to Chill Speech," as evidenced by the fact that several other highly successful law firms opted to pay, in total, hundreds of millions of dollars rather than subject themselves to the risk of a similar order. *Id*. at *30.

---

[17] Amanda O'Brien, *Amicus Brief Supporting Perkins Coie Gets 170 Signatures so Far, but Few Am Law 100 Firms*, Am. Law. (March 31, 2025), https://www.law.com/americanlawyer/2025/03/31/amicus-brief-supporting-perkins-coie-gets-170-signatures-so-far-but-few-am-law-100-firms/.
[18]   Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 23, 2025, 6:53AM), https://truthsocial.com/@realDonaldTrump/posts/114387538306195784.

84.    As the court explained in ruling that the Perkins Order amounts to unconstitutional retaliation, the Perkins Order and surrounding context "demonstrate that EO 14230 targeted plaintiff because the Firm expressed support for employment policies the President does not like, represented clients the President does not like, represented clients seeking litigation results the President does not like, and represented clients challenging some of the President's actions, which he also does not like. That is unconstitutional retaliation and viewpoint discrimination, plain and simple." *Id*. at *38.

### B.    The Paul Weiss Order

85.    On March 14, 2025, President Trump signed Executive Order 14327, entitled "Addressing Risks From Paul Weiss" ("Paul Weiss Order").[19] Like the Perkins Order, the Paul Weiss Order has four sections—Security Clearance (§ 2), Contracting (§ 3), Racial Discrimination (§ 4), and Personnel (§ 5)—setting forth retaliatory and coercive directives. Sections 2, 3, and 5 are largely identical to the Perkins Order. With respect to Section 4, "Racial Discrimination," the Paul Weiss Order simply cross-references the Perkins Order.

86.    On the same day that the Paul Weiss Order was issued, the President delivered a speech at the Department of Justice in which he reinforced the existence of the Law Firm Retaliation Policy, denouncing "crooked law firms that aided" in the purportedly "partisan prosecutions" of the President.[20]

87.    At least one Paul Weiss client—an executive, Steven Schwartz, facing federal bribery charges—promptly fired his attorneys at the firm in response to the Paul Weiss Order. *See*

---

[19]    Executive Order, *Addressing Risks from Paul Weiss* (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.
[20] *Donald Trump Addresses the Staff at the Department of Justice*, Roll Call (Mar. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025/.

Memorandum in Support of Motion to Withdraw as Counsel, *United States v. Coburn*, Case No. 2:19-cr-120 (D.N.J. Mar. 19, 2025), ECF No. 1012-1. According to the firm's motion to withdraw as counsel, Mr. Schwartz was "concerned that the firm's continued representation of him may negatively affect his ability to obtain a favorable review of his case, or, due to the Executive Order, otherwise create potential conflicts of interest as between Mr. Schwartz and Paul, Weiss, that Mr. Schwartz is not prepared to waive. *See* [Paul Weiss Order] § 5(a) (providing that government attorneys acting in their official capacity may be prevented from engaging with Paul, Weiss attorneys)." *Id*. at 3.

88.    On March 20, 2025, President Trump posted on Truth Social that he had that day reached an agreement with Paul Weiss and would withdraw the Paul Weiss Order. According to the post, Paul Weiss pledged to abandon "any DEI policies" and to provide free legal representation equivalent to $40 million for clients with a "full spectrum of political viewpoints" on "mutually agreed projects."[21]

89.    On March 21, 2025, President Trump issued an executive order announcing his agreement with Paul Weiss and stating that the prior Order against that firm was revoked (the "Paul Weiss Revocation Order").[22]

90.    The Paul Weiss Revocation Order states that the Administration viewed the firm as among the "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles" and stated that it targeted Paul Weiss as "one of many law firms that have participated in this harmful activity" of acting contrary to the

---

[21] Donald J. Trump (@realDonaldTrump), Truth Social (March 20, 2025, 3:10 PM), https://truthsocial.com/@realDonaldTrump/posts/114197044617921519.
[22] Executive Order, *Addressing Remedial Action by Paul Weiss* (Mar. 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-remedial-action-by-paul-weiss/.

Administration's priorities. It made plain that coercing "the legal profession" in its entirety to realign with the Administration's goals was the animating feature of the Policy.

91.     To relieve the sanctions against the firm, Paul Weiss made several commitments to support the Administration's policies. According to the Paul Weiss Revocation Order, this included "adopting a policy of political neutrality with respect to client selection and attorney hiring; taking on a wide range of pro bono matters representing the full political spectrum"; committing to end "diversity, equity, and inclusion" practices; and performing the equivalent of $40 million in pro bono legal services to support causes favored by the President.[23]

92.     Paul Weiss Chairman Brad Karp sent a firmwide memorandum after the deal was announced, stating that the Paul Weiss Order had posed "an unprecedented threat to our firm" unlike anything in its history.[24] He characterized the Paul Weiss Order as "an existential crisis" that "could easily have destroyed our firm," bringing "the full weight of the government down on our firm, our people, and our clients."

93.     According to Mr. Karp, "It was very likely that our firm would not be able to survive a protracted dispute with the Administration."[25]

94.     None of the changes summarized in the Paul Weiss Revocation Order would appear to ameliorate any national security concern that served as a pretext for the Paul Weiss Order. Rather, the speedy reversal confirms that "national security" was never the issue. The Order was a tool bringing to bear the vast might of the Executive Branch to coerce one of the nation's top law firms

---

[23] *Id.*

[24] David Lat, *Brad Karp's Email To Paul Weiss About Its Deal With The Trump Administration*, Original Jurisdiction (Mar. 23, 2025), https://davidlat.substack.com/p/brad-karp-firmwide-email-to-paul-weiss-about-the-trump-administration-deal.

[25] *Id.*

into curtailing advocacy and other conduct disfavored by the President and supporting the President's policy priorities.

95.    As the court observed in granting summary judgment in Perkins' challenge to the Perkins Order, "[t]he fact that Paul, Weiss quickly negotiated a deal, including an agreement to provide 'the equivalent of $40 million' in free legal work, rather than face the potential injuries of the similar Executive Order targeting that firm . . . demonstrates the coercive power of such targeting by the Trump Administration." *Perkins v. DOJ*, 2025 WL 1276857, at *30. In other words, the Paul Weiss Order (and its subsequent revocation) does not just illustrate the existence of the Law Firm Intimidation Policy—it illustrates that the Policy works.

### C.    The March 17 EEOC Letter

96.    On March 17, 2025, the Acting Chair of the EEOC Andrea Lucas sent letters to twenty law firms requesting information about their employment practices related to diversity, equity and inclusion ("DEI"). The letters assert concerns that some firms' employment practices, including those that are part of firms' DEI efforts, may violate Title VII of the Civil Rights Act of 1964.[26]

97.    The Administration went even further to publicize the letters, issuing a press release on March 17, 2025, to announce the letters and their targets. According to one former general

---

[26] Press Release, *EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices*, EEOC (Mar. 17, 2025), https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei. The firms receiving these letters were: Allen Overy Shearman Sterling US LLP; Debevoise & Plimpton LLP; Cooley LLP; Freshfields Bruckhaus Deringer LLP; Goodwin Procter LLP; Hogan Lovells LLP; Kirkland & Ellis LLP; Latham & Watkins LLP; McDermott Will & Emery; Milbank LLP; Morgan, Lewis & Bockius LLP; Morrison & Foerster LLP; Perkins Coie; Reed Smith; Ropes & Gray LLP; Sidley Austin LLP; Simpson Thacher & Bartlett LLP; Skadden, Arps, Slate, Meagher & Flom LLP; White & Case LLP; and WilmerHale. *Id*.

counsel for the EEOC, investigations by the Committee are supposed to begin confidentially, so the public targeting of these law firms was a "breach in protocol."[27] *See also* 42 U.S.C. § 2000e-5(b), 6(e) (individual EEOC Commissioners may file a charge to begin an investigation, but this step must be taken "in writing under oath or affirmation" and may "not be made public by the Commission").

98.     At the April 23, 2025 hearing on Perkins' motion for summary judgment, the court pointed the attorney for the Department of Justice to the section of the Perkins Order directing the EEOC to review the practices of these "representative, large, influential, or industry-leading law firms," and asked what metrics were used to identify such firms—and specifically the twenty firms that received letters from the EEOC. *Perkins v. DOJ*, Hearing Tr. (April 23, 2025), 55:18-56:3. The DOJ attorney responded that he believed it to be based on the AmLaw 100, which ranks firm by revenue. *Id*. 56:4-13.

99.     In short: the Administration sent target letters outside the normal protocols of the EEOC; accompanied them with a press release referencing "our nation's elite law firms"; and issued them after the Executive directed the EEOC to review the practices of "large, influential, or industry leading law firms" as part of the facially retaliatory Perkins Order. These facts underscore that these letters are part of the Law Firm Intimidation Policy.

---

[27] Jessica Silver-Greenberg, Matthew Goldstein, Kenneth P. Vogel, *Angst Builds Inside Federal Agency Over Trump's Moves Against Law Firms*, N.Y. Times (Apr. 22, 2025), https://www.nytimes.com/2025/04/22/business/eeoc-trump-dei-law-firms.html.

### D.    The March 22 Memorandum

100.    On March 22, 2025, the White House issued a memorandum entitled "Preventing Abuses of the Legal System and the Federal Court" (the "March 22 Memorandum").[28] The Memorandum is directed to the Attorney General and the Secretary of Homeland Security, and claims that "grossly unethical misconduct [is] far too common" among lawyers and law firms.

101.    The Memorandum goes on to state:

> The immigration system — where rampant fraud and meritless claims have supplanted the constitutional and lawful bases upon which the President exercises core powers under Article II of the United States Constitution — is likewise replete with examples of unscrupulous behavior by attorneys and law firms. For instance, the immigration bar, and powerful Big Law pro bono practices, frequently coach clients to conceal their past or lie about their circumstances when asserting their asylum claims, all in an attempt to circumvent immigration policies enacted to protect our national security and deceive the immigration authorities and courts into granting them undeserved relief.[29]

102.    The Memorandum implements the Law Firm Intimidation Policy by seeking to penalize and chill lawyers who are "litigating against the Federal Government" or who, in the Administration's view, are "pursuing baseless partisan attacks."[30]

103.    In so doing, the Memorandum "direct[s] the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United

---

[28] The White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

[29] *Id.*

[30] *Id.*

States."[31] USA Today reported that: "It's not clear what kinds of lawsuits that refers to, but critics fear it could mean any challenge to the president's policies."[32]

104.    The Memorandum further directs that "when the Attorney General determines that conduct by an attorney or law firm in litigation against the Federal Government warrants seeking sanctions or other disciplinary action, the Attorney General shall . . . recommend to the President . . . additional steps that may be taken, including reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services."[33] In other words, the Memorandum contemplates imposing sanctions on lawyers or law firms separate and apart from the Rule 11 process in federal court, based solely on the Attorney General's recommendation and the President's determination.

105.    The Memorandum also directs the Attorney General "to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years" and, if the Attorney General identifies instances of what he determines to constitute "filing frivolous litigation or engaging in fraudulent practices" or other perceived misconduct, the Attorney General shall similarly recommend to the President any additional steps, such as the reassessment of security clearances or termination of government contracts, akin to the retaliatory and coercive actions taken in the Law Firm Orders.[34]

106.    The March 22 Memorandum confirmed that the Law Firm Intimidation Policy does not apply solely to those firms specifically identified in the executive orders that had issued thus

---

[31] *Id.*

[32] Aysha Bagchi, *An attack on the Constitution? Why Trump's moves to punish law firms are causing alarm*, USA Today (Apr. 5, 2025), https://www.usatoday.com/story/news/politics/2025/04/05/trump-executive-orders-law-firms-legal-system/82660074007/.

[33] March 22 Memorandum.

[34] *Id.*

far. Rather, its targets include other attorneys and law firms who engage in conduct that the Administration views as adverse to its preferred policies, including specifically "litigation against the Federal Government."

### E.    The Jenner & Block Order

107.    On March 25, 2025, President Trump issued Executive Order 14246, entitled "Addressing Risks From Jenner & Block" ("Jenner Order").[35] The Jenner Order explains that it is motivated by the Administration's disapproval of representations taken on by Jenner and by lawyers who were subsequently hired by Jenner. It states:

> Jenner & Block LLP (Jenner) is yet another law firm that has abandoned the profession's highest ideals, condoned partisan "lawfare," and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders. Moreover, Jenner discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

> In addition, Jenner was "thrilled" to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation. Andrew Weissmann's career has been rooted in weaponized government and abuse of power, including devastating tens of thousands of American families who worked for the now defunct Arthur Andersen LLP, only to have his unlawfully aggressive prosecution overturned by the Supreme Court. The numerous reports of Weissmann's dishonesty, including pursuit of nonexistent crimes, bribery to foreign nationals, and overt demand that the Federal Government pursue a political agenda against me, is a concerning indictment of Jenner's values and priorities.

Jenner Order § 1.

---

[35]    Executive Order, *Addressing Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

108.    The Jenner Order expressly acknowledges that it is part of the Administration's broader Policy of intimidating and coercing law firms. Section 1 states that the order carries out the Administration's "commit[ment] to addressing" what the President views as "the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests."

109.    The Jenner Order also contains sections like those in the other Law Firm Orders: Security Clearance Termination (§ 2), Contracting (§ 3), Racial Discrimination (§ 4), and Personnel (§ 5). Each provision is substantively the same as—and largely replicates verbatim—the analogous provisions in the prior Law Firm Orders.

110.    A fact sheet issued by the White House the same day also makes clear that the Executive Order was issued as part of the ongoing Policy by the President to retaliate against law firms for taking legal positions that the President disfavors.[36] Specifically, the fact sheet touts that "President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence. This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States. It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct. . . . In addition to Jenner, President Trump has also taken action to hold other major law firms accountable."

111.    The Jenner Order does not specify which of Jenner's representations the President views as "undermin[ing] justice and the interests of the United States," "the weaponization of

---

[36] *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-jenner-block/.

government," or "lawfare." However, the context makes clear that Jenner was targeted for representing clients and causes opposed to the Administration's agenda and the President personally. Jenner has taken on a number of matters adverse to the Administration: It was one of the law firms that won a court ruling blocking enforcement of an executive order from the President halting federal funding to healthcare providers that offer gender transition treatments to people under nineteen; it is on the legal team representing immigrant-rights groups challenging the Administration's efforts to limit asylum rights; and it is representing an environmental group in a lawsuit accusing the Environmental Protection Agency of illegally freezing grant money.[37]

112.    As Jenner's motion seeking a TRO explained, the Jenner Order inflicted significant harm on the firm: Like Perkins, Jenner's clients were reviewing their relationships with the firm in light of the Order and reconsidering their otherwise satisfactory engagements. *Jenner v. DOJ,* ECF No. 2-1, at 36.

113.    On May 23, 2025, after having granted a TRO, the District Court granted summary judgment in favor of Jenner, permanently enjoining enforcement of the Jenner Order. *See Jenner v. DOJ*, 2025 WL 1482021 (D.D.C. May 23, 2025). The court began by observing the commonalities behind all of the Law Firm Orders issued under the Policy—which the court described as "something of a modus operandi for the President"—noting that the case "arises from one of a series of executive orders targeting law firms that, in one way or another, did not bow to the current presidential administration's political orthodoxy." *Id*. at *1, *4. It likewise acknowledged the

---

[37] *Federal Judge Blocks Trump Order Targeting Medical Care for Transgender Youth* (Feb. 13, 2025),    https://www.aclu.org/press-releases/federal-judge-blocks-trump-order-targeting-medical-care-for-transgender-youth; Stephen Lee and Drew Hutchinson, *Judge Agrees to Maintain Green Bank Grants as Case Proceeds*, Bloomberg Law (Apr. 16, 2025), https://news.bloomberglaw.com/environment-and-energy/judge-agrees-to-maintain-green-bank-grants-as-case-proceeds.

"message the order sends to the lawyers whose unalloyed advocacy protects against governmental viewpoint becoming government-imposed orthodoxy." *Id*. at *1. In other words, the Jenner Order, "like the others, seeks to chill representation the administration doesn't like, thereby insulating the Executive Branch from the judicial check fundamental to the separation of powers." *Id*.

114.    The court went on to acknowledge that the Jenner Order does not function in isolation, but rather functions alongside the other Law Firm Orders to "threaten[] retaliation against all." *Id*. at *22. "Retaliation against Jenner," the court explained, "casts a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government." *Id*. The court concluded that the Jenner Order "violates the First Amendment's central command that the government may not use the power of the State to punish or suppress disfavored expression" and enjoined enforcement of the Order in full. *Id*. at *1, *26-27.

### F.  The WilmerHale Order

115.    On March 27, 2025, just two days after issuing the Jenner Order, President Trump signed Executive Order 14250, "Addressing Risks From WilmerHale" ("WilmerHale Order").[38] The Background section of the WilmerHale Order echoes the same chilling and retaliatory themes of the prior orders issued pursuant to the Law Firm Intimidation Policy:

> Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote. Moreover, WilmerHale itself discriminates against its

---

[38]    Executive Order, *Addressing Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/.

employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice. For example, WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's "top aide" and "closest associate," and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history. Mueller's investigation epitomizes the weaponization of government, yet WilmerHale claimed he "embodies the highest value of our firm and profession." Mueller's "investigation" upended the lives of public servants in my Administration who were summoned before "prosecutors" with the effect of interfering in their ability to fulfill the mandates of my first term agenda. This weaponization of the justice system must not be rewarded, let alone condoned.

WilmerHale Order § 1.

116.    Like the Jenner Order, the WilmerHale Order admits that it is part of the Administration's broader Law Firm Intimidation Policy. The Background section states that the Order is carrying out the Administration's "commit[ment] to addressing" what the President views as "the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests." It also states that the Order is penalizing WilmerHale because the firm "has abandoned the profession's highest ideals and abused its pro bono practice." *Id.*

117.    The WilmerHale Order then goes on to recite the same provisions found in the Perkins, Paul Weiss, and Jenner Orders regarding Security Clearance Termination (§ 2), Contracting (§ 3), Racial Discrimination (§ 4), and Personnel (§ 5).

118.    A fact sheet issued by the White House the same day reiterates that the WilmerHale Order was issued as part of the President's ongoing Policy to intimidate and retaliate against

35

lawyers.[39] The fact sheet announces the larger purpose behind the Executive Order: "ADDRESSING ROGUE LAW FIRMS: President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets." In other words, any law firms that cross President Trump and his personal conception of what is "detrimental to critical American interests" are threatened with the same sort of punitive measures set forth in the WilmerHale Order (and the other Law Firm Orders like it).

119.    On March 28, 2025, WilmerHale filed a complaint and sought a TRO enjoining enforcement of the WilmerHale Order. *WilmerHale v. Executive Office of the President*, Case No. 25-cv-917 (D.D.C) ("*WilmerHale v. EOP*"). The court granted the requested TRO the same day. *WilmerHale v. EOP*, --- F. Supp. 3d ---, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025). On May 27, the District Court issued an order granting summary judgment in favor of WilmerHale and enjoining the WilmerHale Order in full. *WilmerHale v. EOP*, --- F. Supp. 3d ---, 2025 WL 1502329 (D.D.C. May 27, 2025). In so doing, the court observed the "cornerstone of the American system of justice is an independent judiciary and an independent bar willing to tackle unpopular cases, however daunting." *Id*. at *1. The court then acknowledged that the Administration's string of executive orders issued pursuant to the Policy are the first in "nearly 250 years since the Constitution was adopted" that "directly challeng[e] these rights and that independence." *Id*. Because the court concluded that the WilmerHale Order in its entirety violates the First, Fifth, and

---

[39] *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale/.

Sixth Amendments, as well as accepted separation-of-powers principles, the court issued declaratory and permanent injunctive relief in favor of WilmerHale. *See id.* at *33-34.[40]

### G.  The Susman Godfrey Order

120.   On April 9, 2025, President Trump signed Executive Order 14263, entitled "Addressing Risks from Susman Godfrey" ("Susman Order").[41]

121.   During the signing of the Susman Order, President Trump and Staff Secretary Scharf explained that the Susman Order was again an implementation of the Policy of retaliating against and coercing law firms. Specifically, Scharf reminded the President that the Administration has "taken action against a number of law firms that have in one way or another been involved in the weaponization of government or lawfare. One of those law firms is Susman Godfrey. Similar to what we've previously done with other law firms, this is an Executive Order that takes certain measures against Susman Godfrey to ensure that they can't access government resources, government buildings."[42] Scharf stated that the purpose was "scrutinizing certain aspects of their practices as a law firm . . . given their previous activities."[43]

---

[40] The ABA has intended in this Complaint to name as Defendants the primary agencies and officers used or directed to implement the Policy, even though the ABA need not "list [all] the individual federal officers it seeks to enjoin . . . in the caption of the complaint." *Jenner*, 2025 WL 1482021, at *24.

[41] Executive Order, *Addressing Risks from Susman Godfrey* (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-susman-godfrey/.

[42] CBS News, *President Trump discusses tariff reversal and signs executive order in the Oval Office*, YouTube (Apr. 9, 2025), https://www.youtube.com/live/mYm7kmOC37s?t=649s (at 10:48-11:20).

[43] *Id.* at 11:25-32; 12:20-28.

122.    President Trump then explained that the Administration targeted law firms because of their prior activity, stating that it focused on "the ones we thought were inappropriate" but specifying that it targeted Susman because "this firm was very involved in the election."[44]

123.    The Susman Order states in a "Background" section:

> I have determined that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP (Susman). Susman spearheads efforts to weaponize the American legal system and degrade the quality of American elections. Susman also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology, and it supports efforts to discriminate on the basis of race. Susman itself engages in unlawful discrimination, including discrimination on the basis of race.

> For example, Susman administers a program where it offers financial awards and employment opportunities only to "students of color." My Administration is committed to ending such unlawful discrimination perpetrated in the name of "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

Susman Order § 1.

124.    The Susman Order then goes on to recite provisions the same as those found in the four prior Law Firm Orders regarding Security Clearance Termination (§ 2), Contracting (§ 3), Racial Discrimination (§ 4), and Personnel (§ 5).

125.    As in the case of prior Law Firm Orders, the fact sheet issued by the White House the same day repeats the same points set forth in the Susman Order's Background with regard to the basis for the Order.[45]

---

[44] *Id.*

[45] *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey* (Apr. 9, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-addresses-risks-from-susman-godfrey/.

126.    Susman filed a lawsuit challenging the Order on April 11, 2025, followed by a motion for a TRO on April 14. *See Susman Godfrey v. Executive Office of the President*, Case No. 25-cv-1107 (D.D.C.) ("*Susman v. EOP*"), ECF Nos. 1, 10.

127.    The court granted Susman's requested TRO, stating: "The government has sought to use its immense power to dictate the positions that law firms may and may not take. The executive order seeks to control who law firms are allowed to represent. And this immensely oppressive power threatens the very foundation of legal representation in our country." *Susman v. EOP*, Hearing Tr. (April 15, 2025) at 51:6-11. The court further found that "[w]e've already seen the effects of similar executive orders against other law firms. Law firms across the country are entering into agreements with the government out of fear that they will be targeted next, and that coercion is plain and simple." *Id.* at 51:22-52:1.

128.    Susman filed a motion for summary judgment seeking to enjoin the Susman Order on April 23, 2025, and the government filed a motion to dismiss Susman's complaint. *See Susman v. EOP*, ECF Nos. 51, 58. A hearing on the parties' dispositive motions was held on May 8.

III.    **Firms enter deals with the Administration to avoid being the next targets of Law Firm Orders.**

129.    While these four firms have challenged the Law Firm Orders issued against them, many more responded to the Law Firm Intimidation Policy by preemptively entering into deals with the Administration to attempt to avoid becoming the next target.

130.    On March 28, 2025, President Trump announced on Truth Social that he had reached an agreement with the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") pursuant to which Skadden would provide $100 million in pro bono legal services for causes agreed upon

by Skadden and the Trump Administration.[46] The deal also includes a commitment by Skadden to review its hiring practices and to not engage in DEI "discrimination" or preferences.[47] "This was essentially a settlement," Trump reportedly said of the deal.[48] Skadden entered into this preemptive "settlement" despite Perkins having already successfully obtained a court order two weeks earlier condemning the Perkins Order as plainly unconstitutional and temporarily enjoining most of its provisions.

131.   According to a firm-wide email sent by Skadden's executive partner Jeremy London, Skadden believed it would be the target of a forthcoming executive order and thus proactively engaged with the Administration.[49] London's email stated that "when faced with the alternatives, it became clear that it was the best path to protect our clients, our people and our Firm."[50]

132.   The same day that President Trump announced his deal with Skadden, two more federal judges issued TROs condemning the Jenner and WilmerHale Orders as plainly unconstitutional and enjoining most of their provisions. Yet those quick and resounding victories did not stop, or even slow down, the effectiveness of the Law Firm Intimidation Policy.

133.   A few days later, on April 1, 2025, President Trump announced that he had entered a deal with the law firm Willkie Farr & Gallagher LLP ("Willkie").[51] Like Skadden, Willkie committed to providing $100 million in pro bono legal services to causes agreed to by Willkie and

---

[46] Donald J. Trump (@realDonaldTrump), Truth Social (March 28, 2025, 10:57 AM), https://truthsocial.com/@realDonaldTrump/posts/114241348699704594.
[47] *Id.*
[48] Daniel Barnes, *Major law firm strikes preemptive deal with White House*, Politico (Mar. 28, 2025), https://www.politico.com/news/2025/03/28/skadden-arps-trump-law-deal-028324.
[49] *Id.*
[50] *Id.*
[51] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 1:47 PM), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553.

the President, and further confirmed it will not engage in "illegal DEI discrimination and preferences" and will review its hiring practices.[52]

134.    According to an email from Willkie's Executive Committee sent to the firm, Willkie had "learned that the President intended to issue an Executive Order targeting Willkie similar to the orders issued against multiple firms in the past weeks."[53] The email states that accepting a deal with the Administration would "avoid[] potentially grave consequences."[54]

135.    The next day, on April 2, 2025, President Trump announced yet another $100 million deal with a law firm—this time with Milbank LLP. Like Skadden and Willkie, Milbank committed to providing $100 million worth of pro bono services for causes agreed to by Milbank and the Administration; to end "illegal DEI discrimination and preferences"; and to review its hiring practices.[55]

136.    In a firmwide email announcing the deal, Milbank chair Scott Edelman referenced the previous Law Firm Orders and the March 17 EEOC letter requesting information about Milbank's DEI practices in employment and stated that Milbank was contacted by the Administration about a potential "Skadden-type" agreement.[56] Edelman's email further stated that "[t]he Administration's expressed concerns about big law firms, and in some cases its entry of

---

[52] *Id.*
[53] Kathryn Rubino, *Wilkie Farr Surrenders to Trump*, Above the Law (Apr. 1, 2025), https://abovethelaw.com/2025/04/willkie-farr-surrenders-to-trump/.
[54] *Id.*
[55] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025, 11:05 AM) https://truthsocial.com/@realDonaldTrump/posts/114269692330126501.
[56] Kathryn Rubino, *Milbank Joins List Of Pushover Biglaw Firms Bowing to Trump*, Above the Law (Apr. 2, 2025), https://abovethelaw.com/2025/04/milbank-joins-list-of-pushover-biglaw-firms-bowing-to-trump/.

Executive Orders against particular firms, have created uncertainty for law firms like ours. With this agreement, we believe we have gone a long way to putting these issues behind us."[57]

137.    By the time President Trump announced both the Willkie and Milbank deals, courts had already granted TROs enjoining the Orders against Perkins, Jenner, and WilmerHale. Despite these consistent court findings that the Law Firm Orders were plainly illegal, each of Willkie and Milbank calculated that the "grave consequences" of a Law Firm Order directed at them justified, among other things, a $100 million commitment to support President Trump's favored causes.

138.    The pervasive fear that the Law Firm Intimidation Policy has created in the legal profession has led law firms to enter deals with the Administration despite successful court challenges by other targeted firms. As the President stated at a White House press event on April 8:

> Have you noticed that lots of law firms have been signing up with Trump? $100 million, another $100 million for, uh, damages that they've done. They give you $100 million and then they announce that, "But we have done nothing wrong." And I agree, they've done nothing wrong. But what the hell, they give me a lot of money considering they've done nothing wrong.[58]

139.    The next day, during the signing ceremony for the Susman Order, Stephen Miller commented that the deals entered by the President were getting close to "six or seven hundred million now," and "we're going to be close to a billion, soon."[59]

140.    Also on April 9, 2025, the White House press secretary, Karoline Leavitt, indicated that President Trump sought not only to punish offending firms but also to use his power over such

---

[57] *Id.*

[58] Steve Benen, *As the White House's campaign against law firms continues, Trump says a bit too much*, MSNBC (Apr. 9, 2025), https://www.msnbc.com/rachel-maddow-show/maddowblog/white-houses-campaign-law-firms-continues-trump-says-bit-much-rcna200417.

[59] Forbes, *Trump Signs New Executive Order Targeting Law Firm Susman Godfrey*, YouTube (Apr. 10, 2025), https://www.youtube.com/watch?v=a27Ww3HMyeE.

firms to extract concessions to advance his political agenda. Leavitt issued a statement that explained, "Big Law continues to bend the knee to President Trump because they know they were wrong, and he looks forward to putting their pro bono legal concessions toward implementing his America First agenda."[60]

141.    Two days later, President Trump announced a deal with five more law firms: Kirkland & Ellis LLP ("Kirkland"), Allen Overy Shearman Sterling US LLP ("Shearman"), Simpson Thacher & Bartlett LLP ("Simpson"), and Latham & Watkins LLP ("Latham") each agreed to provide $125 million in pro bono and "other free Legal services";[61] and Cadwalader, Wickersham & Taft ("Cadwalader"), agreed to provide at least $100 million in pro bono work.[62] All five firms agreed they "will not engage in illegal DEI discrimination and preferences" and would review their hiring practices for compliance with anti-discrimination laws. The deal entered with Kirkland, Shearman, Simpson, and Latham—each of which received the March 17 EEOC letter—additionally states that the EEOC has withdrawn its letters from those firms and will take no further steps with respect to the claims addressed therein. The headline on the EEOC's press release proclaims that the "Four 'BigLaw' Firms Disavow DEI" moving forward.[63]

142.    As illustrated by these deals, the legal profession is well aware of the Law Firm Intimidation Policy, and its coercive effect has allowed the President to extract hundreds of millions

---

[60] Ben Protess, Maggie Haberman, Michael S. Schmidt, *How Trump Is Putting Law Firms in a No-Win Situation*, N.Y. Times (Apr. 9, 2025), https://www.nytimes.com/2025/04/09/us/politics/trump-law-firms-orders.html.
[61] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 11, 2025, 9:21 AM) https://truthsocial.com/@realDonaldTrump/posts/114320244770957852.
[62] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 11, 2025, 9:19 AM) https://truthsocial.com/@realDonaldTrump/posts/114320237164839938.
[63] Press Release, *In EEOC Settlement, Four 'BigLaw' Firms Disavow DEI and Affirm Their Commitment to Merit-Based Employment Practices*, EEOC (Apr. 11, 2025), https://www.eeoc.gov/newsroom/eeoc-settlement-four-biglaw-firms-disavow-dei-and-affirm-their-commitment-merit-based.

of dollars' worth of legal services in support of the President's preferred policies from firms seeking to avoid being its next target. Those firms that have made deals have obtained concrete benefits, including relief from one of the Policy's punitive sanctioning mechanisms: intrusive demands for information by the EEOC seeking detailed information about hiring, recruitment, compensation, and client diversity practices.[64]

143.    Even so, while firms have scrambled to enter deals with the Administration to avoid the immediate sanction of a Law Firm Order, those deals do not provide the firms with a guarantee of protection moving forward. As the court recognized in granting summary judgment in favor of Perkins Coie, "at least the publicized deal terms appear only to forestall, rather than eliminate, the threat of being targeted in an Executive Order." *Perkins v. DOJ*, 2025 WL 1276857, at *2 n.3. Similarly, the court recognized while entering a temporary restraining order in favor of Susman Godfrey that "even for the many firms that have entered into agreements with the Administration, there is nothing stopping the government from returning to target them in the future." *Susman v. EOP*, Hearing Tr. (April 15, 2025) at 52:5-8. Thus, even the firms that have entered deals in an effort to protect themselves are still subject to the chill imposed by the President's retaliatory Policy, and thus remain fully incentivized to avoid taking on representations that may draw the Administration's ire should they wish to remain out of its crosshairs. As a third court acknowledged when striking down another of the Law Firm Orders, "a firm that has acceded to the administration's demands by cutting a deal feels the same pressure to retain 'the President's ongoing approval.'" *Jenner v. DOJ*, 2025 WL 1482021, at *8 (quoting Br. of Legal Ethics Profs. as Amici Curiae in Supp. of Pl., ECF No. 113 at 6).

---

[64] Habiba Cullen-Jafar, *Big Law Firms Quietly Update Diversity Language, as Deadline Passes to Disclose Data*, Am. Law. (Apr. 16, 2025), https://www.law.com/americanlawyer/2025/04/16/big-law-firms-quietly-update-diversity-language-as-deadline-passes-to-disclose-data-/.

144.    In fact, the President has gone out of his way to publicize that he still has the settling firms under his thumb. In the last several weeks, the President has announced a series of policy initiatives in which he expects the settling firms to represent his interests. During the April 8 signing ceremony for an Executive Order titled "Reinvigorating America's Beautiful Clean Coal Industry," President Trump announced—citing the "law firms" that have been "signing up with Trump"—that "we're going to use some of those firms to work with you on your leasing and your other things, and they'll do a great job[.]"[65]

## IV.    The Administration is using the Policy to intimidate and coerce law firms.

145.    The Administration has indicated that its Policy of retaliation and coercion against attorneys, including ABA members, is not limited to the existing Law Firm Orders or the "settling" firms, and that it seeks to use those orders and deals to further coerce firms and chill the protected constitutional rights of attorneys at not-yet-targeted firms.

146.    As Press Secretary Leavitt explained, "President Trump's policy team is executing on his directive to hold Big Law accountable for their weaponization of justice and their lies, and the strategy has proven tremendously successful[.]"[66]

147.    President Trump has also acknowledged the coercive nature of the Administration's targeting of law firms.

148.    For example, on March 21, 2025, in response to a reporter's question about whether his "actions towards law firms amount to coercion," he responded: "Well, the law firms all want to

---

[65] The White House, *President Trump Participates in an Unleashing American Energy Executive Order Signing Event*, YouTube (Apr. 8, 2025) at 25:55-26:40, https://www.youtube.com/watch?v=yGoDK8bVB9k.
[66] Josh Dawsey and C. Ryan Barber, *Trump's $1 Billion Law Firm Deals Are the Work of His Personal Lawyer*, Wall St. Journal (Apr. 14, 2025), https://www.wsj.com/us-news/law/trumps-1-billion-law-firm-deals-are-the-work-of-his-personal-lawyer-77bd7b8c.

make deals." President Trump then acknowledged his retaliatory intent: "You mean the law firms that we're going after, that went after me for four years, ruthlessly, violently, illegally?"[67]

149.    During a press conference on March 24, in response to a question about whether the Administration seeks to coerce large business clients to "find new lawyers" if their current firm gets targeted, President Trump stated: "I just think that the law firms have to behave themselves. And we've proven that. We have others that want to make a settlement, also. They . . . having to do with the election and other things, they behaved very badly, very wrongly. And I appreciate the one, you know, these are the biggest firms and they all came back realizing that they did wrong, and that's why they're doing this. So I just think they have to behave. We have to straighten out our country."[68]

150.    The Administration's targeting of law firms and their attorneys is ongoing. On April 9, during the signing of the Susman Order, President Trump explained that the Administration would continue to target "the ones [firms] we thought were inappropriate," and that there were still more to go.[69]

151.    During the same signing ceremony, he expressed the belief that "when you look at all these lawyers and law firms" agreeing to contribute "hundreds of millions of dollars" in the form of pro bono settlements, the dealmaking proved the President's views about the 2020 election.[70]

---

[67] *Donald Trump and Pete Hegseth Discuss Defense in the Oval Office*, Transcript, Roll Call (Mar. 21, 2025)**,** https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-defense-hegseth-oval-office-march-21-2025/#156.

[68] The White House, *President Trump and the Governor of Louisiana Deliver Remarks*, YouTube (Mar. 24, 2025) at 19:06-40, https://www.youtube.com/live/qqgmQUbuGrg?t=1156s.

[69] CNBC, *President Trump discusses tariff reversal and signs executive order in the Oval Office*, YouTube, (Apr. 9, 2025) at 10:48-12:25, https://www.youtube.com/live/mYm7kmOC37s?t=649s.

[70] CNBC, *President Trump discusses tariff reversal and signs executive order in the Oval Office* (Apr.         9.         2025)         at         17:59-18:13, https://www.youtube.com/live/mYm7kmOC37s?feature=shared&t=1079.

46

152.    In a Time Magazine interview on April 25, in response to a question about how President Trump has "used threats and lawsuits, other forms of coercion -- " he responded, "[w]ell, I've gotta be doing something right, because I've had a lot of law firms give me a lot of money."[71]

153.    The Administration has made it clear that it intends to leverage the Policy of retaliating against and coercing law firms to force the private bar, including members of the ABA, to provide pro bono legal support for, in Press Secretary Leavitt's words, "the Administration's priorities."[72]

154.    To that end, on April 28, the President issued an Executive Order aimed at "Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens" by, among other things, "protect[ing] and defend[ing] law enforcement officers" accused of misconduct.[73] The Order directs Attorney General Pam Bondi to "create a mechanism to provide legal resources and indemnification to law enforcement officers" accused of wrongdoing in the performance of their official duties. The President further specifies: "This mechanism shall include the use of private-sector pro bono assistance for such law enforcement officers."[74]

155.    Similarly, during an April 10 cabinet meeting, in response to a reporter's question about tariffs, President Trump indicated that he planned to co-opt the coerced law firms to assist the Administration's tariffs policy: "we have a lot of law firms that have paid me a lot of money in

---

[71] *Time Magazine Conducts an Interview with Donald Trump*, Transcript, Roll Call (Apr. 25, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-interview-time-magazine-april-25-2025/#323.

[72] Josh Dawsey and C. Ryan Barber, *Trump's $1 Billion Law Firm Deals Are the Work of His Personal Lawyer*, Wall St. Journal (Apr. 14, 2025), https://www.wsj.com/us-news/law/trumps-1-billion-law-firm-deals-are-the-work-of-his-personal-lawyer-77bd7b8c.

[73] Executive Order, *Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens* (Apr. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

[74] *Id*.

the form of legal fees. We're going to probably use those firms, too, uh, if we can. I think we can."
He further stated: "I think we're going to try to use these—these very prestigious firms to help us
out with the trade."[75]

156.    The Administration has made similar statements about coercing law firms to assist
with its natural resources policy. During an April 8 speech on energy exploration, the President
explained how he planned to compel targeted law firms to provide support for the Administration's
coal policy in addition to the tariffs policy. He stated: "we're going to use some of those firms to
work with you on your leasing and your other things," and then reiterated in the context of
discussing tariffs that "we're going to have to use those great law firms, I think, to help us with that.
. . . Actually, we're going to use them and we're getting them for the right price because we need a
lot of talent."[76]

157.    The Department of Justice has also announced that law firms representing clients
suing the United States will be excluded from work (including paid work) for the Government. On
May 9, 2025, Deputy Attorney General Todd Blanche issued a memorandum prohibiting the
government, subject to limited exceptions, from hiring as private counsel any attorneys from any
law firm that represents clients in "active litigation against Administration policies."[77]

---

[75] *Donald Trump Attends a Cabinet Meeting at The White House*, Transcript, Roll Call (Apr. 10,
2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-april-
10-2025/#267.
[76] *Donald Trump Signs Executive Orders to Promote Coal Production*, Transcript, Roll Call (Apr.
8, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-energy-exploration-
executive-order-april-8-2025/#68.
[77] *Memorandum from Deputy Attorney General Todd Blanche to All Component Heads*, U.S. Dept.
of Justice (May 9, 2025), https://www.justice.gov/dag/media/1399976/dl?inline.

## V.    The Law Firm Intimidation Policy is ongoing.

158.    The Administration has demonstrated that it is continuing its Law Firm Intimidation Policy in order to intimidate lawyers and law firms from taking on cases adverse to the President's interests.

159.    The President has issued five Law Firm Orders—rescinding one—all but one section of which are essentially identical. The targets of these orders range from large full-service firms to a boutique litigation firm. The alleged sins of these firms have one principal thing in common: the firms represented clients with interests that the President considers adverse to him or his Administration.

160.    The President also threatened the eight "settling" law firms with executive orders. The President has never explained specifically what these firms did to draw his ire. In discussing the deals, the President offered the following explanation: "But they give you $100 million and then they announced that, 'But we have done nothing wrong.' And I agree they've done nothing wrong, but what the hell? They give me a lot of money considering they've done nothing wrong."

161.    Moreover, during the signing ceremonies for the Law Firm Orders, the President has clarified that his hit list is not limited to those that have already been targeted. For example, on March 6, 2025, President Trump turned to his Staff Secretary to reveal how many firms were in the crosshairs: "This is an absolute honor to sign what they've done is just terrible it's weaponization . . . and it should never be allowed to happen again. And you're looking at about 15 different firms." The White House Staff Secretary responded: "That *or more*, sir, yes."[78]

---

[78] *President Trump Signs Executive Orders*, C-SPAN (Mar. 9, 2025) at 5:20-5:40, https://www.c-span.org/program/white-house-event/president-trump-signs-executive-orders/656830.

162.    During a March 9 interview, President Trump emphasized that "we have a lot of law firms that we're going to be going after."[79]

163.    President Trump also stated, during an event on March 26, that civic institutions like colleges are "bending and saying 'sir, thank you very much,'" and specified that "nobody can believe it include[s] law firms that have been so horrible, law firms that nobody would believe, they are saying where do I sign? Where do I sign? Nobody can believe it. And there's more coming."[80]

164.    The Jenner Order and WilmerHale Order both open with a commitment by the Administration "to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests." Jenner Order § 1; WilmerHale Order § 1. The Orders go on to state that "[m]any firms" engage in such conduct, and that "law firms regularly conduct this harmful activity through their powerful pro bono practices[.]" Jenner Order § 1; WilmerHale Order § 1. These proclamations about "[m]any firms" and the "regular[]" practices of "law firms" make explicit that the Administration's bases for these Orders are not limited to Jenner or WilmerHale. The Order targeting Susman similarly begins by broadly referring to "[l]awyers and law firms that engage in activities" deemed by the Administration to be detrimental to American interests. Susman Order § 1.

165.    The March 22 Memorandum, "Preventing Abuses of the Legal System and the Federal Court," confirms that the Administration intends to investigate an array of law firms and lawyers for sanctions in line with those imposed on Perkins, Paul Weiss, Jenner, WilmerHale, and

---

[79] *Maria Bartiromo Interviews Donald Trump, Fox News Sunday Morning Futures*, Transcript, Roll Call (Mar. 9, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-interview-maria-bartiromo-fox-news-sunday-futures-march-9-2025/#228.

[80] The White House, *President Trump Participates in a Women's History Month Event*, YouTube (Mar. 26, 2025) at 36:39-37:01, https://www.youtube.com/live/37yfOP8cVPQ?feature=shared&t=2198.

Susman. In particular, it directs the Attorney General to "recommend to the President" any appropriate steps, "including reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services," to be taken against any law firm that the Attorney General deems has engaged in "conduct in Federal court or before any component of the Federal Government [that] appears to violate professional conduct rules[.]"[81] The Memorandum specifically directs the Attorney General to review the conduct of law firms that have litigated against the federal government over the last eight years. It does not take much imagination to conclude that the President and his Attorney General will deem any litigation against the President or his Administration to be sanctionable or violative of professional conduct rules.

166.    And the Susman Order illustrates that the Law Firm Intimidation Policy goes beyond the firms the Administration has called out by name in public statements and other Administration memoranda. The Administration had never mentioned Susman in any public statements (including, for instance, the March 17 EEOC Letter) before issuing the Susman Order, nor did the Administration reach out to or communicate with Susman in any way ahead of issuing the Order. Nor is Susman even a "Big Law" firm. This is further proof of the broad scope of the Law Firm Intimidation Policy.

167.    As of June 1, 2025, reporting by the Wall Street Journal confirmed that "Trump remains interested in the orders, and deputy White House chief of staff Stephen Miller and his allies

---

[81] The White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration."[82]

## VI.   The Law Firm Intimidation Policy has successfully coerced much of the profession to forego constitutionally protected activity, including litigation against the Administration.

168.    "These orders do more than just take revenge against particular lawyers who have crossed Donald Trump," said Walter Olson, a senior fellow at the Cato Institute in a CBS News report.[83] "They are meant to send the message that it is dangerous to oppose him in court, that you are apt to suffer not just yourself, but also law firms that you're associated with will suffer sweeping penalties that can threaten their very ability to go on existing."[84]

169.    Numerous outlets have reported that President Trump's orders targeting law firms are indeed having a chilling effect.

170.    On March 11, 2025, for instance, CNN reported that, according to the founder of a legal advisory firm that works with several large American law firms, the Administration's actions against law firms have "sent a 'chilling' tone across the legal industry . . . . It's created just an incredible amount of fear."[85] The article reports that firms want to avoid being targeted and have removed content from their websites to avoid being the next subject of a Law Firm Order.

---

[82] Erin Mulvaney, Emily Glazer, C. Ryan Barber, and Josh Dawsey, *The Law Firms That Appeased Trump—and Angered Their Clients*, Wall St. Journal (June 1, 2025), https://www.wsj.com/us-news/law/law-firms-trump-deals-clients-71b3616d?gaa_at=eafs&gaa_n=ASWzDAiaRgUTx-SG2mdYMQR1ABDlkzV0SM3RmhAgUsp0Xcz3x3rYMVA84lDuIQci5OU%3D&gaa_ts=683e492b&gaa_sig=FZDeJu8Q3nhkjWrrtMZvt6OnJ0NirT5yOAWnT33uMYkCXZkWFxYUDaoGx8tNKAlMbsFZ3xveT63qKtG36uZAAA%3D%3D.

[83] Melissa Quinn, *Trump's crusade against big law firms sparks fears of long-lasting damage*, CBS News (Apr. 2, 2025), https://www.cbsnews.com/news/trumps-big-law-firms-retribution/.

[84] *Id*.

[85] Katelyn Polantz, *The chilling effect of Trump's war against the legal establishment*, CNN (Mar. 11, 2025), https://www.cnn.com/2025/03/11/politics/chilling-effect-trump-legal-establishment/index.html.

171.    The court temporarily enjoined the Perkins Order on March 12, and over the following weeks, every judge to address a Law Firm Order has done likewise. Yet public reporting demonstrates that the chill on the legal profession—and particularly on "Big Law" firms—has not been relieved by these favorable rulings. 504 law firms filed an amicus brief in support of Perkins' motion for summary judgment. As was widely reported, though, none of the top twenty-five U.S. law firms by revenue signed the brief, and fewer than ten of the top 100 firms (the AmLaw 100) signed. By the time Susman filed its motion for summary judgment, four different judges had enjoined executive orders targeting law firms as likely unconstitutional. Yet still, fewer than ten of the AmLaw 100 firms signed the brief in support of Susman, and none of the top twenty-five firms did.

172.    A group called Law Firm Partners United Inc. ("LFPU") did file a brief in support of the most recent motion for summary judgment seeking to enjoin a Law Firm Order—and that brief highlights the chill cast by the President's executive orders targeting law firms. LFPU describes itself as a professional organization consisting of more than 700 partners and shareholders at AmLaw 200 firms, acting in their personal capacity. *Susman v. EOP*, ECF No. 92-1 (Brief of Amicus Curiae Law Firm Partners United Inc. in Support of Plaintiff's Motion for Summary Judgment). The LFPU brief explains, "[t]hroughout the legal industry, clients who previously had no difficulty finding representation are now being turned away by those who worry that taking the cases might risk Presidential disapproval." *Id*. at 2. Further, "many clients now worry that *they* will be targeted for retribution if they hire law firms who are or might become targets of a similar executive order." *Id*.

173.    The LFPU brief additionally confirms that "these orders have suppressed speech *even though* every court to consider them has held them to be unconstitutional." *Id*. at 8. Despite

those courts' findings, "some of amicus's members have continued to observe many lawyers declining representations they would otherwise take on, out of concern that those representations might trigger retaliation. . . . They have also continued to observe clients hesitate about hiring law firms that might become the President's next target. The orders are having their intended effect." *Id*.

174.    On March 26, The Washington Post published an article under the headline, "Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks," reporting that "President Donald Trump's crackdown on lawyers is having a chilling effect on his opponents' ability to defend themselves or challenge his actions in court, according to people who say they are struggling to find legal representation as a result of his challenges."[86] According to the article, "Biden-era officials" say they are having trouble finding lawyers willing to defend them, and volunteers and small nonprofits say that "the well-resourced law firms that once would have backed them are now steering clear."[87]

175.    On April 10, Law360 reported that various nonprofit leaders have seen the firms they would normally partner with now shy away from work that might be looked upon disfavorably by the Administration.[88] According to the article, Vanessa Batters-Thompson, executive director of the D.C. Appleseed Center for Law and Justice; Damon T. Hewitt, president and executive director at the Lawyers' Committee for Civil Rights Under Law; and Bridget Crawford, director of law and policy at the LGBT immigrant rights group Immigration Equality, all report that law firms that

---

[86] Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025) https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/.
[87] *Id*.
[88] Alison Knezevich, *BigLaw Shying Away From Some Pro Bono Work 'Out of Fear'*, Law360 (Apr. 10, 2025), https://www.law360.com/pulse/articles/2323753.

typically would work with them have recently declined to do so. Said Crawford: "We've definitely had a couple of firms that we've worked with in the past, who declined to work with us to even investigate a matter, out of fear[.]"[89]

176.    On April 13, NPR reported that it has spoken "with attorneys at a half-dozen organizations that regularly team up with big law firms that provide pro bono assistance to challenge government actions or policies. All of them say they have deep concerns that Trump's campaign against law firms will cause firms to pull back from pro bono work that is at odds with Trump's own views. Some of them say it's already happening."[90]

177.    On May 4, 2025, CBS's 60 Minutes aired a segment about the adverse effects of the Law Firm Intimidation Policy and explained that only one attorney was willing to speak publicly about being targeted.[91]

178.    On May 7, CNN reported that it had spoken with "[s]everal law firm partners who have done significant pro bono work in the past" who said that lawyers at large firms would "think twice before pitching cases that would step too far into politics."[92] One such partner confirmed that organizations reliant on pro bono work "are having a hell of a time finding firms to partner with," and that "[f]irms are really gun shy to take on cases that may upset the administration."[93]

---

[89] *Id.*

[90] Ryan Lucas, *Trump Attacks on Law Firms Begin to Chill Pro Bono Work on Causes He Doesn't Like*, NPR (Apr. 13, 2025), https://www.npr.org/2025/04/13/g-s1-59497/trump-law-firms-pro-bono.

[91] 60 Minutes, *Trump presidential orders target law firms. Here's how some lawyers say that threatens the rule of law*, CBS News (May 4, 2025), https://www.cbsnews.com/news/trump-orders-target-law-firms-some-lawyers-say-that-threatens-rule-of-law-60-minutes-transcript/.

[92] Katelyn Polantz, *Trump's crackdown on law firms is chilling the future of pro bono legal work*, CNN (May 7, 2025), https://www.cnn.com/2025/05/07/politics/trump-law-firm-crackdown-pro-bono-work.

[93] *Id.*

179.    As articulated in reporting by the Washington Post on June 1, 2025: "Lawyers say both the sanctions and the negotiated deals have had a chilling effect, with some firms declining to work on issues counter to the administration's goals, including on immigration. Despite the executive orders being blocked, attorneys and law firms may still worry that the administration will punish them if they challenge the president's agenda[.]"[94]

180.    Law firms have in some instances even changed the messages on their websites in an apparent effort to avoid scrutiny (or further scrutiny) from the Administration. For example, the Guardian published an article detailing changes to various law firm websites' descriptions of their own pro bono efforts.[95] According to that reporting, nearly two dozen law firms had changed their websites' language related to diversity and pro bono work to make those websites "more closely align with Donald Trump's priorities."[96] Similarly, Paul Weiss—even after the Law Firm Order against it was revoked—scrubbed several parts of its website describing the firm's prior pro bono work on issues disfavored by the Administration.[97]

181.    As all of this demonstrates, the Law Firm Intimidation Policy continues to achieve its intended effects despite the fate of the individual Law Firm Orders. The Policy exploits the sensitivities of clients and the potentially catastrophic nature of being subject to the sanctions set forth in the pattern of Orders. So long as there is a reasonable likelihood that the Administration will target any law firm which represents causes and clients the Administration dislikes with

---

[94] Mark Berman, *Trump's law firm sanctions, harshly rejected in court, still have impact*, Wash. Post (June 1, 2025), https://www.washingtonpost.com/politics/2025/06/01/trump-law-firms-punishment-sanctions/.

[95] Sam Levine, *US law firms quietly scrub DEI references from websites to appease Trump*, The Guardian (Apr. 11, 2025), https://www.theguardian.com/us-news/2025/apr/11/law-firms-dei.

[96] *Id.*

[97] Paul Weiss, *Pro Bono* (as of Mar. 1, 2025), *archived at*: https://web.archive.org/web/20250301071320/https://www.paulweiss.com/practices/pro-bono/practice-overview/defending-the-right-to-vote.

retaliatory sanctions that threaten to irreparably harm firms even before they have a chance to seek and obtain emergency relief in court, wide swaths of the legal profession—including many members of the ABA—will continue to be chilled in the exercise of their constitutional rights.

**VII.    The ABA and its members are harmed by the Law Firm Intimidation Policy.**

182.    The President's Law Firm Intimidation Policy has—by design—cast a deep chill over the legal profession. Understanding that certain kinds of expressions and representations pose a serious risk of making a firm the next target of the President's unconstitutional Law Firm Orders, many attorneys are no longer willing to take on representations that would require suing the federal government. Others have dropped ongoing representations; ended their participation in contemplated cases; or declined representations—even of clients with whom they had longstanding prior attorney-client relationships—not because the merits of the case were weak or the attorney had some substantive objection to taking the case, but because the representation was deemed too likely to result in severe retaliation from the President pursuant to the Intimidation Policy. Similarly, public interest attorneys who rely on their partnership with and representation by law firms— particularly in time- and resource-intensive pro bono cases—have not brought cases that they otherwise would have because their choice of counsel has been compromised. Still others have abstained from expression related to their prior representations that they would otherwise have engaged in, or even removed existing writings related to past representations from the public sphere. And those attorneys who *do* intend to proceed with work disfavored by the President now do so under the objective threat of potentially devastating retaliation pursuant to the Policy, with all the severe harm, expense, and distraction that accompany such threat. All such harms are already happening; are ongoing; and will continue in the absence of relief from the court.

183.    The ABA has numerous members who have been harmed by the Policy in all of these ways, and more. The ABA counts as members attorneys of every stripe—including, for example, law firm partners; in house counsel; and attorneys at public interest and non-profit organizations—all of whom rely on the ability of law firm lawyers to zealously represent their clients, uninhibited by the threat of retaliation by the Administration. Some of these ABA members are described below. These members are not named because many fear that even being identified in this lawsuit could lead to their firms being subjected to a retaliatory executive order or other punitive action. Other members interviewed by undersigned counsel confirmed that the Policy was chilling their and their firms' speech and practices but were too fearful of retaliation even to have their experiences described anonymously. The vast majority of partners at various AmLaw100 firms to whom undersigned counsel spoke expressed a strong initial desire to provide evidence in support of this Complaint. However, after seeking approval from their firm management to participate, these partners informed undersigned counsel that their firms had instructed them not to do so. They were unable to obtain approval from their firms to have their experiences described in this Complaint, even anonymously, because of an objectively reasonable fear by their law firms that doing so would result in retaliation against the firm under the Law Firm Intimidation Policy.

184.    **Harm to law firm members.** The President's Law Firm Intimidation Policy has already caused—and will continue to cause—harm to many members of the ABA who practice at law firms. By way of example:

185.    **ABA Member A** is an equity partner at an AmLaw 50 firm, a member of the firm's executive committee, and an ABA member. Before the President adopted the Law Firm Intimidation Policy, Member A and their firm:

    i.   Represented clients in litigation against the federal government in the last eight years.

    ii.   Performed pro bono work in matters adverse to the Administration, including challenging policies of the Administration related to immigration. The firm's procedure for accepting such cases was generally limited to consideration of whether there was partner interest in the case, and whether there were sufficient firm resources to take the case. The firm has a strong history of and reputation for doing pro bono work, including participating in significant public interest impact litigation.

    iii.   Represented clients in litigation related to social and political issues disfavored by the Administration, including cases in the immigration and reproductive rights spaces.

186.   Member A has personal knowledge that the firm:

    i.   Includes individuals who hold active security clearances;

    ii.   Represents clients who have contracts with the federal government;

    iii.   Has active contracts to perform services for the federal government;

    iv.   Represents clients in federal courts and requires access to federal courthouses for purposes of such representations, including Member A's own representations;

    v.   Represents clients in matters requiring access to federal government buildings, including Member A's own representations;

vi.   Represents clients in matters requiring interaction between employees of the firm and government employees acting in their official capacity, including Member A's own representations;

vii.  Represents more than one client who has expressed concerns over the possibility that the firm will be the target of a retaliatory executive order from the President; and

viii. Represents more than one client who has expressed that in the event the firm is targeted with an executive order, the client will be forced to find new representation and no longer be represented by the firm.

187.   Based on the credible possibility of being targeted with a retaliatory executive order pursuant to the Law Firm Intimidation Policy, Member A's firm has made changes to its case acceptance procedures. The Firm has established a committee to address the potential impact of an executive order should the Firm be targeted. Part of the work of the committee, of which Member A is a member, is to approve or reject representation requests for matters which are either (1) adverse to the federal government, or (2) present issues that are considered potentially disfavored by the Administration.

188.   Because of a concern that participating in such cases might result in a retaliatory executive order from President Trump, the Firm has expressed concern about participation in certain pro bono work, including matters adverse to the Administration's immigration-related policies and priorities. In one example, the committee did not authorize a request for the firm to participate in a pro bono matter adverse to the Administration's immigration-related policies which Member A personally supported and intended to work on. This represents a significant change in the manner in which the firm determines what representations to take on and was implemented not

based on the considerations that would have previously governed the standard case intake procedures for a pro bono matter, but rather was a result of the firm's credible fear of retaliation by the President.

189.    **ABA Member B** is a partner at a litigation firm, a member of the firm's executive committee, and an ABA member. Member B has personal knowledge that the firm:

    i.   Includes individuals who hold active security clearances.

    ii.   Represents clients who have contracts with the federal government.

    iii.   Represents clients in federal courts and requires access to federal courthouses for purposes of such representation, including Member B's own representations.

    iv.   Represents clients in matters requiring access to federal government buildings, including Member B's own representations.

    v.   Represents clients in matters requiring interaction between employees of the firm and government employees acting in their official capacity, including Member B's own representations.

190.    Before the Administration adopted the Law Firm Retaliation Policy, Member B:

    i.   Represented clients in litigation against the federal government in the last eight years, including representations adverse to policies of the Administration.

    ii.   Represented clients in litigation related to issues disfavored by the current Administration, including immigrants' rights, the rights of criminal defendants, sentencing reform, and national security matters.

iii. Filed amicus briefs on behalf of clients in a wide range of cases, including cases involving the issues set forth above.

191.    Member B intends to continue such expressive conduct. However, based on the credible possibility of being targeted with a retaliatory executive order pursuant to the Law Firm Intimidation Policy, Member B's firm (including Member B individually) has diverted time, energy, and other resources to preparing to defend itself—including by standing up a team of several firm attorneys who researched and drafted emergency litigation papers to file in the event the firm is targeted; consulting with outside counsel to represent the firm in the event the firm is targeted; consulting with a communications specialist about how to respond in the event the firm is targeted; and holding several discussions among partners about the firm's response plan in the event the firm is targeted.

192.    **ABA Member C** is a founding partner at a litigation firm, a member of the ABA, and an attorney focused on high-stakes complex civil litigation. Member C and their firm:

i. Represents clients who have contracts with the federal government.

ii. Represents clients in federal courts and requires access to federal courthouses for purposes of such representations, including Member C's own representations.

iii. Represents clients in matters requiring access to federal government buildings, including Member C's own representations.

iv. Represents clients in matters requiring interaction between employees of the firm and government employees acting in their official capacity, including Member C's own representations.

193.    Before the President adopted the Law Firm Retaliation Policy, Member C:

    i.  Represented clients in litigation against the federal government in the last eight years, including representations challenging Trump administration immigration policies.

    ii.  Performed pro bono work on behalf of clients asserting claims for asylum and otherwise defending against removal.

    iii.  Filed amicus briefs on behalf of clients in a wide array of cases, including briefs taking positions adverse to high-profile Trump Administration policies.

    iv.  Represented clients in litigation related to social and political issues disfavored by the current Administration, including litigation challenging the Administration's immigration and environmental policies.

    v.  Performed pro bono work alongside attorneys from "Big Law" firms as co-counsel in litigation against the federal government, including cases challenging the current Administration's immigration policies. In such cases, co-counsel from large law firms serve a critical role because they are able to commit significantly more time and resources than small firms and non-profit organizations.

194.    Member C intends to continue to engage in such expressive conduct notwithstanding the possibility of being targeted with a retaliatory executive order. Nonetheless, Member C and their firm have had to devote substantial resources to working to mitigate the impact of potential co-counsel's reluctance to take on representations adverse to the Administration. Specifically, since the implementation of the Law Firm Intimidation Policy, it has become much more difficult for Member C to find law firms willing to partner as co-counsel in matters adverse to the current

Administration. Such difficulty not only affects clients' selection of counsel of their choice but also affects the number and type of claims that can be asserted and strategies that can be pursued in the litigation.

195.    In one example of this chilling effect, Member C is working as counsel to a non-profit organization that has imminent plans to file litigation challenging certain immigration-related policies of the current Administration. Member C was working as co-counsel alongside an AmLaw 100 law firm on the matter. Following implementation of the Law Firm Intimidation Policy, the AmLaw 100 firm announced that it would not agree to appear as counsel in the matter. Based on the timing; the firm's prior willingness to appear as counsel; and the information available to Member C from conversations at the firm, the AmLaw 100 firm's refusal to appear as counsel in this matter is a result of its reasonable fear that it will be subjected to unlawful retaliation pursuant to the Policy.

196.    In another such example, during the first Trump Administration, Member C worked alongside counsel from another AmLaw 100 firm in an action challenging certain immigration policies of the Administration. Following implementation of the Law Firm Intimidation Policy, Member C sought to serve as co-counsel alongside the same firm in another action challenging current Administration policies. That firm has not agreed to serve as co-counsel in the case. Based on the information available to Member C from conversations with individuals at that firm, at least one significant reason for the firm's reluctance to be involved in the case as co-counsel is the firm's fear of retaliation by the President pursuant to the Law Firm Intimidation Policy.

197.    **ABA Member D** is a partner at a law firm with offices in the United States whose litigators include other ABA Members. A significant portion of the firm's practice is devoted to

64

representing plaintiffs in civil rights cases, in areas such as disability rights, housing discrimination, and police misconduct. Member D and/or their firm:

    i.   Have represented clients in litigation against the federal government in the last eight years.

    ii.   Represent multiple clients in lawsuits against federal agencies, many of which challenge policies or actions taken under President Trump's Administration, and relate to social and political issues disfavored by the Administration. The firm's clients in these cases include current and former federal employees, non-profit organizations that have had their federal grants abruptly ended, transgender individuals incarcerated in federal correctional facilities, and individuals with disabilities and older adults, along with organizations that represent them, who have been adversely impacted by personnel cuts to the Social Security Administration.

    iii.   Maintain a pro bono practice that includes representing immigrants seeking legal status in the United States.

198.   Member D has personal knowledge that:

    i.   The firm has litigators that handle cases of every stripe, civil and criminal.

    ii.   The firm maintains a criminal defense practice, which includes cases in which the firm is adverse to the United States government.

    iii.   The firm's recent and current representations include clients who have grants and/or contracts with the United States government.

iv.  The firm represents clients in federal courts, and its lawyers require access to federal courthouses for purposes of such representations, including Member D's own representations.

v.  The firm represents clients in matters requiring access to federal government buildings, including Member D's own representations.

vi.  The firm represents clients in matters requiring interaction between employees of the firm and United States government employees acting in their official capacity, including Member D's own representations.

199.  Given the President's retaliatory targeting of law firms because of the nature of the work they are or have been engaged in, and given the nature of the firm's practice and ongoing representations, Member D and lawyers at their firm are concerned that the firm may be subject to retaliation as well, whether such retaliation takes the form of an executive order or other, similar retaliatory actions. One example that has deeply worried lawyers at Member D's firm is the case of U.S. Customs and Border Protection detaining Michigan Attorney Amir Makled, a U.S. citizen, and seeking to search his cell phone upon his reentry of the United States from a family vacation. It appears Mr. Makled was detained for no other reason than his representation of protesters disfavored by the President. Member D and lawyers at their firm are concerned that the firm, its attorneys, and its staff members could, in a similar manner, be targeted for no other reason than as punishment or retaliation for the clients the firm represents and the positions the firm takes on their behalf.

200.  Based on the credible possibility of being targeted pursuant to the Law Firm Intimidation Policy, the firm has also invested both attorney and staff time and labor, including the time of Member D, as well as additional resources, preparing for the possibility of retaliation.

201.    **Direct harm to the ABA.** The ABA has also been harmed directly as a result of the Law Firm Intimidation Policy. The ABA often is involved as a party in litigation. In those cases, the ABA frequently relies on pro bono representation by law firms. Before the Law Firm Intimidation Policy was implemented, the ABA partnered with several law firms in the AmLaw100 in litigation, amicus advocacy, and other forms of legal work furthering the ABA's mission, including in litigation against the federal government; litigation related to social and political issues disfavored by the current Administration; and amicus briefs related to issues affecting the mission and policy of the ABA.

202.    Following the implementation of the Law Firm Intimidation Policy, the ABA intends to continue such advocacy and litigation, but has experienced difficulty finding previously willing law firms to represent it in litigation adverse to the federal government.

203.    For example, the ABA sought to participate as a party in litigation challenging certain of the President's policies affecting immigrants. However, the law firm that initially expressed interest in representing the ABA in the litigation declined to do so following the implementation of the Law Firm Intimidation Policy. Based on the firm's prior willingness to represent the ABA; the timing of its actions; and the lack of any other explanation, the ABA reasonably believes that the firm's unwillingness to represent the ABA in the matter is a result of the firm's reasonable fear of unlawful retaliation pursuant to the Policy. The ABA was unable to participate as a party in the litigation in significant part as a result of its inability to obtain its choice of counsel on the timeline required.

204.    The ABA was also previously represented by a major law firm over the course of decades—since the 1980s—in matters related to law school accreditation and litigation. Following the implementation of the Law Firm Intimidation Policy, that firm is no longer willing to represent

the ABA in any litigation against or potentially adverse to the Administration and its policies. Based on the firm's prior willingness to represent the ABA in similar matters; the timing of its actions; and discussions with lawyers at the firm, the ABA reasonably believes that the firm's unwillingness to represent the ABA is a result of the firm's reasonable fear of unlawful retaliation by the President.

205.    Similarly, in the time since the implementation of the Law Firm Intimidation Policy, the ABA sought pro bono representation in litigation challenging on First Amendment grounds the termination of certain grants to the ABA. This is the same sort of impact litigation for which the ABA was able to obtain pro bono representation by law firms prior to the Law Firm Intimidation Policy. The ABA was unable to obtain pro bono representation by <u>any</u> of the firms it contacted. Based on many firms' prior willingness to represent the ABA in similar matters and discussions with lawyers at several of the firms, the ABA reasonably believes that many firms' unwillingness to represent the ABA in the matter is a result of the firms' reasonable fear of unlawful retaliation by the President.

## <u>CLAIMS FOR RELIEF</u>

### COUNT I

### (Against All Defendants)

### *Violation of the First Amendment – Suppression of and Threatened Retaliation for Protected Activity*

206.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

207.    The Law Firm Intimidation Policy violates the First Amendment prohibition on government coercion to suppress disfavored speech, and on threatening retaliation for engaging in speech the government disfavors.

208.    Government officials are not permitted to make "coercive threats aimed at punishing or suppressing disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 197 (2024).

"The First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Id.* at 189 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (government may not exert undue pressure on First Amendment rights through a regime of "thinly veiled threats" and "informal censorship")); *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("The threat of sanctions may deter the[] exercise [of First Amendment freedoms] almost as potently as the actual application of sanctions.").

209.    The First Amendment also prohibits the Government from "subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474, (2022) (quoting *Nieves v. Bartlett*, 587 U. S. 391, 398 (2019) (internal quotation marks omitted)); *see also, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998) ("[T]he First Amendment bars retaliation for protected speech."). "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up).

210.    The Policy coercively threatens and operates to suppress disfavored First Amendment protected activity of the ABA and its members. Viewpoints and associations that fall within the scope of and are subject to the Government's coercive threats include, but are not limited to: association with, and advocacy on behalf of, the President's political opponents, or social or political causes disfavored by the President; association with prior investigations or prosecutions of the President; advocacy on behalf of clients who challenge actions of the federal government or have matters, including immigration-related matters, before executive departments and agencies of the United States; and speech or statements in favor of diversity.

211.    ABA members engage in First Amendment-protected conduct through their advocacy, advice to clients, and petitioning of courts, including by representing clients in litigation against the federal government; performing pro bono work in matters adverse to the current Administration; representing clients in litigation related to social and political issues disfavored by the current Administration; and filing amicus briefs on behalf of clients in matters adverse to the current Administration. *See supra* § VII.

212.    The ABA itself similarly engages in First Amendment-protected conduct through its own expression, advocacy, and petitioning of courts, including by pursuing litigation against the federal government; pursuing litigation related to social and political issues disfavored by the current Administration; and participating as amicus in matters affecting the mission of the ABA on issues disfavored by the current Administration. *See supra* § VII.

213.    The Government has taken retaliatory actions, including coercive threats of sanctions, sufficient to deter a person of ordinary firmness from engaging in First Amendment protected activity. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

214.    The Policy's sanctions, including as enacted in five Law Firm Orders, caused significant and well-publicized harms to those law firms, including immediate injury in the form of tangible losses of revenue and clients. *See supra* § II. The sanctions caused one firm to make commitments to change policy (political neutrality in client selection, hiring, and pro bono representation) and make financial resources available (millions of dollars in pro bono legal services for the benefit of causes approved of by President Trump) during the term of the current Administration. *See supra* § II.B. And the mere threat of sanctions caused numerous other law firms to make analogous commitments simply to avoid being targeted by similar executive orders. *See Perkins v. DOJ*, 2025 WL 1276857, at *30-32 (D.D.C. May 2, 2025) ("[E]ach additional deal

provides further evidence to satisfy the second element of plaintiff's retaliation claim, given that each of these firms, presumably possessing 'ordinary firmness,' sought successfully to avoid being targeted by similar Executive branch actions, with each law firm committing the equivalent of $100 million or more as part of the price to do so.").

215.    The Policy "constitutes a sufficiently adverse action to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

216.    The Policy dictates that the Government impede ABA members' ability to practice law, disrupt their relationships with clients, curtail their associations with attorneys viewed as in conflict with the Administration, and harm their business prospects. Threatening to target ABA members' law firms and lawyers for immediate suspension of security clearances undermines ABA members' ability to advocate for clients when clearances are required for the representation. Threatening to force ABA members' law firm clients who contract with the Government to disclose their representations with threatened law firms, and threatening to reassess and cancel those clients' government contracts, damages law firms' and their attorneys' relations with clients and ability to attract new clients. Threatening to revoke ABA members' law firms' and employees' access to federal buildings, such as federal agency buildings and federal courthouses, precluding access to federal employees, and ceasing provision of government goods, property, material, and services, undermines attorneys' ability to engage with government officials and to provide effective advocacy. Threatening to make ABA members' law firm employees presumptively ineligible for federal employment also is a severe sanction deterring protected First Amendment activity. Threatening targeted investigations by the EEOC and Attorney General, with the prospect of potential prosecution, harms ABA members' and their law firms' client relationships and business prospects.

217.    Each threat of punishment is a materially adverse action that deters the ABA and ABA members "from exercising [their] own right to speak." *Wilson*, 595 U.S. at 479.

218.    The threat of retaliatory sanctions has deterred ABA members and their law firms from engaging in First Amendment protected activity, including in ways that cause direct harm to the ABA. *See supra* § VII. The threat of retaliatory sanctions has caused ABA members to divert resources away from their ordinary business of representing clients, scrutinize representations that may be perceived as adverse to the Administration, and decline representations, including pro bono matters adverse to the Administration or in immigration-related matters. The threat of retaliatory sanctions has caused ABA members to reasonably and credibly fear being subjected to retaliatory actions after the fact for having engaged in First Amendment protected activity. And the threat of retaliatory sanctions has caused the ABA to experience difficulty finding previously willing law firms to represent the ABA in litigation adverse to the federal government (including on a pro bono basis), or in matters that are perceived as potentially adverse to the Administration and its policies. *See supra* § VII.

219.    Defendants have no compelling, legitimate, or even rational justification for such suppression of, and threatened retaliation for, the ABA and ABA members' protected First Amendment activity. There is no legitimate national security underpinning the Policy.

220.    Regardless, the Policy is not sufficiently tailored to any such governmental interest.

221.    Defendants' First Amendment violations are causing and will continue to cause ongoing harm to the ABA and its members.

## COUNT II

### (Against All Defendants)

### *Violation of the First Amendment – Viewpoint Discrimination*

222.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

223.    Under the First Amendment's Free Speech Clause, "viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. "Viewpoint discrimination is poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (Alito, J., concurring). "The government" therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 706 (2010) (Alito, J., dissenting) (cleaned up) ("The proudest boast of our free speech jurisprudence is that we protect the freedom to express [even] the thought that we hate.").

224.    The First Amendment's prohibitions on viewpoint discrimination extend to government actions that "prohibit advice or argumentation" by lawyers, particularly to any restrictions "designed to insulate the Government's interpretation of the Constitution from judicial challenge." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547-48 (2001).

225.    The Law Firm Intimidation Policy violates the First Amendment's prohibition on viewpoint discrimination. It threatens retaliatory sanctions, including unequal enforcement of laws, based on viewpoints held by the ABA and by ABA members and their law firms. The Policy targets for coercion and threatens sanctions against the ABA and ABA members based on positions that the ABA or ABA members (or ABA members' firms) have taken or plans to take. And the effects of the Policy sweep so broadly that they inflict punishment not only on the ABA and ABA

members, but on every individual at the ABA or at a threatened or sanctioned firm, from all of its attorneys to all of its staff.

226.    The viewpoint discriminatory nature of the Policy is evident from the prior implementation of the Policy in the prior Law Firm Orders, the recission of the Paul Weiss Order, and in numerous statements by the President and close advisors and Administration officials.

227.    For example, the Paul Weiss Revocation Order—issued after Paul Weiss agreed to criticize Mark Pomerantz, eliminate DEI policies, and undertake pro bono representations that support the Administration's initiatives and policy positions—demonstrate that the Policy aims to suppress particular viewpoints expressed by law firms that are at odds with the President's views and policy priorities, in an effort to induce them to align with the President's own political views.

228.    Because the Policy effectuates viewpoint discrimination, strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015). The Policy may be sustained "only if the government proves" that the Policy is "narrowly tailored to serve compelling state interests." *Id.* at 163. But there is no compelling interest in punishing lawyers (or threatening to punish lawyers) for, or suppressing them from, advocating for clients whose interests are adverse to the Administration. Instead, there is a compelling interest in *permitting* lawyers to challenge the government. *See Velazquez*, 531 U.S. at 545-48; *Button*, 371 U.S. at 440.

229.    Regardless, the Policy's viewpoint discrimination is not sufficiently tailored to any governmental interest Defendants may attempt to identify.

230.    Defendants' First Amendment violations are causing and will continue to cause ongoing harm to the ABA and its members.

## COUNT III

### (Against All Defendants)

### *Violation of the First Amendment – Right to Petition the Government*

231.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

232.    The Law Firm Intimidation Policy violates the First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has "recognized the right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (cleaned up). The Petition Clause of the First Amendment "protects the right of individuals to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). "Petitions to the courts and similar bodies can . . . address matters of great public import" and "may facilitate the informed public participation that is a cornerstone of democratic society." *Id.* at 397. "[T]he right to petition extends to all departments of the Government," including "administrative agencies" and "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

233.    The Policy impermissibly violates the ABA's and ABA members' petition rights by, among other things, threatening to punish the ABA and ABA members for past representation of clients in litigation, and by threatening to undermine the ABA's and ABA members' law firms' ability to pursue litigation in the future—including by threatening immediate suspension of security clearances, threatening to revoke access to federal agency buildings (even federal courthouses), and threatening to prohibit government employees from engaging with the ABA or ABA members.

234.    The Policy has also impeded ABA members' and their clients' exercise of their First Amendment rights to petition, including by causing ABA members and their law firms to refrain from bringing litigation in matters adverse to the Administration. *See supra* § VII. And the Policy

has inhibited and chilled the ABA's own exercise of its petitioning rights, including by inhibiting the ABA's ability to find law firms to represent the ABA in litigation adverse to the federal government or in matters that are perceived as potentially adverse to the Administration and its policies (including on a pro bono basis). *See supra* § VII.

235.    The ABA and ABA members have standing to assert this First Amendment right on their own behalf, and ABA members have standing to assert the right on behalf of existing clients based on attorney-client relationships. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

236.    Defendants' First Amendment violations are causing and will continue to cause ongoing harm to the ABA and its members.

## COUNT IV

### (Against All Defendants)

### *Violation of the First Amendment – Free Association and Compelled Disclosure*

237.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

238.    The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (citation omitted). The government may not impose punishments based on protected association. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990). "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606-07 (2021) (cleaned up).

239.    The Law Firm Intimidation Policy violates the First Amendment rights of ABA members and their law firms' clients to engage in private associations by threatening to direct the

government to require government contractors to disclose any business they do with targeted law firms.

240.    ABA members' clients who have government contracts exist under an ever-present threat that they will face economic reprisal (or other sanctions) merely for having retained an attorney who works at a disfavored law firm, regardless of whether the law firm's work for those clients is related to the clients' government contracts. Any government-contractor client who has associated with a disfavored ABA member's law firm can expect economic consequences and other repercussions as a result of retaining their preferred counsel.

241.    The risk of compelled disclosure has caused ABA members and their law firms to, among other things, divert resources away from their ordinary business of representing clients, scrutinize representations that may be perceived as adverse to the Administration, and decline representations, including pro bono matters adverse to the administration or in immigration related matters; and it has had the effect of chilling clients' willingness to continue doing business with law firms of ABA members. *See supra* § VII.

242.    The Government has not articulated a relationship between the Policy's disclosure requirement and any Government interest, nor has the Government articulated how its disclosure requirement advances and is narrowly tailored to any such interest. *Bonta*, 594 U.S. at 608; *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).

243.    Defendants' First Amendment violations are causing and will continue to cause ongoing harm to ABA members.

## COUNT V

## (Against All Defendants)

### *Violation of the First Amendment – Overbreadth*

244.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

245.    First Amendment rights "may not be so inhibited" by unduly vague and overbroad government prohibitions whose "indefinite language" can be followed only by "restricting . . . conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). Government policies or enactments are "unconstitutionally vague" when they subject the "exercise of [First Amendment] right[s] . . . to an unasertainable [sic] standard," and are "unconstitutionally broad" when they "authorize[] the punishment of constitutionally protected conduct." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971); *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1196-97 (11th Cir. 1991).

246.    The overbreadth of the Law Firm Intimidation Policy's prohibitions is substantial. As exemplified by the Law Firm Orders issued to date, the Policy purports to direct adverse agency action against law firms for unspecified and unproven findings of racial discrimination; for support for or implementation of "diversity, equity, and inclusion" policies; for "grossly unethical misconduct," "pursuing baseless partisan attacks," "frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments," and any other "conduct" that, in the eyes of the executive, "appears to violate professional conduct rules." The Policy is also unconstitutionally overbroad because it targets firms for what it deems un-American behavior or "conduct detrimental to critical American interests."

247.    The Policy's overbreadth has caused ABA members and their law firms to divert resources away from their ordinary business of representing clients, and to scrutinize and decline

representations that may be perceived as falling afoul of any of these vaguely and ambiguously described categories of "misconduct," including representations, including pro bono matters, adverse to the administration or in immigration-related matters. The Policy's overbreadth has left ABA members unable to discern what conduct must be avoided to remain free of severe government sanctions, including loss of security clearances, intrusive investigations, loss of access to federal buildings and courthouses, loss of access to federal employees, and loss of government contracts and government contractor clients. *See supra* §§ II.A-G, VII.

248.    Additionally, the Policy is overbroad because it unconstitutionally abridges "a substantial amount of protected speech relative to [any purportedly] legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (citation and quotations omitted). The intent of the Policy, and its effect, is to broadly intimidate its targets and deter them from engaging in speech and activities protected by the First Amendment. The unlawful applications of the Policy far exceed its lawful applications, if any.

249.    Defendants' First Amendment violations are causing and will continue to cause ongoing harm to the ABA and its members.

## COUNT VI

### (Against All Defendants)

### *Ultra Vires* Presidential Action – Separation of Powers

250.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

251.    "The President's power, if any, to issue" an executive order "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Such orders lack legal effect if not justified by an "express constitutional or statutory authorization." *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942); *see also*,

*e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 193-95 (1999); *Trump v. Hawaii*, 585 U.S. 667, 683 (2018).

252.    No act of Congress authorizes the Law Firm Intimidation Policy nor any of the Law Firm Orders that have been issued pursuant to and in furtherance of the Policy. Congress has not authorized the President to exact retribution against disfavored law firms or attorneys by making findings about law firm conduct, impose punishments on law firms for the personnel they hire or the causes or clients they take on, require that government contractors disclose their confidential relationships with their counsel of choice and potentially have their government contracts terminated because of those relationships, or revoke all access to federal buildings and restrict future employment opportunities based on law firm associations.

253.    Congress also has not authorized any policy of allowing the government to negotiate for commitments of free legal work in exchange for avoiding unconstitutional threats and government sanctions.

254.    To the contrary, Congress has prohibited such actions. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

255.    By way of example, the Hobbs Act prohibits "the obtaining of property from another, with his consent . . . under color of official right." 18 U.S.C. § 1951.

256.    The Anti-Deficiency Act prohibits "An officer or employee of the United States Government" from "accept[ing] voluntary services . . . exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342; *see* 31 U.S.C. §§ 1349, 1350.

257.    Congress's anti-corruption statutes prohibit directly or indirectly "demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value personally or for any other person or entity, in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2).

258.    The forced-labor statute prohibits "knowingly . . . obtain[ing] the labor or services of a person . . . by means of . . . threats of serious harm[,] . . . [or] the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589.

259.    The Miscellaneous Receipts Act requires that government officials record and deposit all contributions provided to the government. *See, e.g.*, 31 U.S.C. § 3302.

260.    The Merit Systems Protection Act prohibits "discriminat[ing] for or against" any "applicant for [federal] employment" based on factors—including perceived "political affiliation"—that are not related to the applicant's job-readiness. *See*, *e.g.*, 5 U.S.C. § 2302(b)(1)(E), (2), (3), (10), (12).

261.    Title VII limits the manner in which EEOC investigations may be threatened, initiated, and performed. *See*, *e.g.*, 42 U.S.C. §§ 2000e-5, 2000e-6, 2000e-8.

262.    Moreover, the threatened wholesale denial of access to federal agency buildings and personnel is incompatible with Congress's will for those agencies to function because "[a]dministrative agencies are creatures of statute" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022).

263.    The Constitution does not independently authorize the Policy. Article II does not authorize the President to retaliate against or unlawfully coerce disfavored lawyers or law firms. Neither the Policy nor the Law Firm Order provisions by which it has been carried out are an

exercise of the President's powers as Commander in Chief, *see, e.g.*, *Ex parte Quirin*, 317 U.S. 1, 26 (1942), in foreign policy, *see, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015), or in overseeing subordinate officials, *see Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).

264.    The Policy's issuance of executive orders containing the Government Contracting Provision (§ 3) and the Federal Building Access Provision and Federal Employment Provision (§ 5) also are not an exercise of the President's responsibility to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, as the President executes no law in imposing those punishments. No President in our history has attempted to wield the power of his office to attack law firms for their advocacy on behalf of clients. The Constitution does not permit, much less authorize, such action. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010); *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014).

265.    The Policy is also independently *ultra vires* and violates the separation of powers by usurping the judiciary's inherent power to "discipline attorneys who appear before" federal courts by threatening and imposing sanctions on attorneys who take disfavored positions. *Chambers v. NASCO*, 501 U.S. 32, 43 (1991) (citing *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531 (1824)). Article III grants courts "the ability to fashion an appropriate sanction" for attorney misconduct, which ensures that courts may prevent "abuse[]" of the "judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (citation omitted). Separation of powers principles do not permit the Policy's intrusion on and interference with "the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545; *see Stern v. Marshall*, 564 U.S. 462, 482-84 (2011).

266.    The Policy also seeks to punish disfavored law firms in the manner of an unconstitutional bill of attainder. In targeting disfavored firms for sanction, the Policy functions as a "prepared and proclaimed governmental blacklist[]" and "possess[es] almost every quality of" an

unlawful "bill[] of attainder." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). From the Founding, such measures have been "forbidden to both national and state governments." *Id.* at 144. It cannot be that the Founders, "who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.* There is no history supporting a constitutional authority of any kind supporting the Policy or its manifestation in the Law Firm Orders that have issued.

267.    The Policy is *ultra vires* because it violates the separation of powers.

268.    The *ultra vires* nature of the Policy is causing and will continue to cause ongoing harm to the ABA and its members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter declaratory and injunctive relief against the Defendants jointly and severally as follows:

269.    Declare any Security Clearance Termination Provision[98] unconstitutional;

270.    Declare any Government Contracting Provision[99] unconstitutional;

271.    Declare any Federal Building and Employee Access Provision[100] unconstitutional;

272.    Declare any Federal Employment Provision[101] unconstitutional;

---

[98] As used herein, a "Security Clearance Termination Provision" is any executive order provision materially similar in language, purpose, or effect to Section 2 of the Law Firm Orders.

[99] As used herein, a "Government Contracting Provision" is any executive order provision materially similar in language, purpose, or effect to Section 3 of the Law Firm Orders.

[100] As used herein, a "Federal Building and Employee Access Provision" is any executive order provision materially similar in language, purpose, or effect to Section 5(a) of the Law Firm Orders.

[101] As used herein, a "Federal Employment Provision" is any executive order provision materially similar in language, purpose, or effect to Section 5(b) of the Law Firm Orders.

273.    Enjoin Defendants from enforcing a Security Clearance Termination Provision against any ABA member or ABA member's law firm based on the individual's law firm or legal organizational affiliation, or based on the individual's or individual's law firm's client representations;

274.    Enjoin Defendants from enforcing a Government Contracting Provision against any ABA member or ABA member's law firm based on the individual's law firm or legal organizational affiliation, or based on the individual's or individual's law firm's client representations;

275.    Enjoin Defendants from enforcing a Federal Building and Employee Access Provision against any ABA member or ABA member's law firm based on the individual's law firm or legal organizational affiliation, or based on the individual's or individual's law firm's client representations;

276.    Enjoin Defendants from enforcing a Federal Employment Provision against any ABA member or ABA member's law firm based on the individual's law firm or legal organizational affiliation, or based on the individual's or individual's law firm's client representations;

277.    Enjoin Defendants from initiating attorney conduct and disciplinary proceedings, or making a referral for disciplinary action, of any ABA member or ABA member's law firm based on the individual's law firm or organizational affiliation, or based on the identity of the individual's or individual's law firm's client representations; and

278.    Grant such other relief as the Court deems just and proper, including costs.

Dated: June 16, 2025                          Respectfully Submitted,

*/s/ Stephen Shackelford*

Stephen Shackelford (D.C. Bar #NY0443)
Beatrice Franklin*
Jillian Hewitt*
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
(212) 336-8330

Neal Manne (D.C. Bar #357012)
Barry Barnett*
Harry Susman*
Justin A. Nelson (D.C. Bar #490347)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366

Davida Brook*
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100

Jordan Connors*
Steve Seigel (D.C. Bar #D00473)
Katherine Peaslee*
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
(206) 516-3880

**pro hac vice* forthcoming

*Counsel for the American Bar Association*