# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN BAR ASSOCIATION,

        *Plaintiff*,

    v.

EXECUTIVE OFFICE
OF THE PRESIDENT, *et al.*,

        *Defendants*.

Case No. 1:25-cv-01888-AHA

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 4

    A.    The Law Firm Executive Orders............................................................ 4

    B.    This Litigation...................................................................................... 7

LEGAL STANDARD............................................................................................ 8

ARGUMENT ........................................................................................................ 9

    I.    THE ABA LACKS STANDING TO BRING THIS CASE................................. 11

        A.    The ABA lacks standing to seek prospective relief because it does not plausibly allege certainly impending injury caused by hypothetical future Presidential action...................................................... 11

        B.    The ABA also fails to satisfy other requirements to establish organizational standing, associational standing, or third-party standing. ............................................................................................... 20

    II.    THE ABA'S CLAIMS ARE UNRIPE. .............................................................. 30

CONCLUSION...................................................................................................... 33

CERTIFICATE OF SERVICE

**INTRODUCTION**

Between March 6 and April 9, 2025, the President issued five Executive Orders ("EOs") addressing risks posed by specific named law firms, based on individualized assessments of actions of those firms or their lawyers. Those individual law firms have either settled with the Government or brought lawsuits raising as-applied challenges to the EOs in order to enjoin the implementation of the EOs (and other firms reached agreements absent any EO).

That is not this case. Plaintiff, the American Bar Association ("ABA")—"the nation's largest voluntary association of lawyers"—is not a law firm, has no members that are law firms, has never been named in any such EO, and has not sought intervention in any of the cases involving the EOs. Yet it now brings a lawsuit of its own. The ABA's sprawling Complaint names as defendants vast swaths of the federal government, including the Executive Office of the President, and 29 agencies and their agency heads. Relying substantially on the previous five EOs, the ABA speculates the existence of a separate, unstated, and undocumented "Law Firm Intimidation Policy," which it alleges has cast "a chill over the whole of the legal profession." Accordingly, the ABA asks "the Court to declare this Law Firm Intimidation Policy unconstitutional and enjoin all the named Defendants from implementing and enforcing this Policy against the ABA or any of its members in the future." In essence, the ABA seeks to prospectively prevent the issuance or implementation of any future EOs like the ones the President issued over four months ago in the spring of 2025. Indeed, the ABA also goes further than any EO, requesting this Court to prevent Defendants from initiating or referring its members to disciplinary proceedings based on their law-firm affiliations, despite such actions being beyond the scope of any past government action.

Article III does not authorize such extraordinary, prospective relief, and this Court should dismiss this suit for lack of standing and because this case is not ripe. First, the ABA lacks standing. Article III requires that plaintiff plausibly alleges an injury in fact that is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[A]llegations of *possible* future injury" are constitutionally inadequate. *Id.* Here, however, the ABA seeks to enjoin a potential future EO that has not been promulgated—and that may never be promulgated. That is not enough. Nor is the fact that EOs were issued in the past—past injury, without more, cannot be the basis for future injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983). The ABA cannot evade those long-established principles by baldly asserting that the EOs are part of the so-called Law Firm Intimidation Policy that they allege is ongoing. Simply put, "more than a nebulous assertion of the existence of a 'policy' is required to establish standing." *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987). And as for the ABA's requested relief that seeks to insulate any of its members from disciplinary proceedings, such relief is inappropriate because it is disconnected from any of the provisions contained in the EOs that the President has issued so far. After all, any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Compounding these problems, the President cannot be enjoined, and thus the ABA's claim must go against agencies that may be tasked in the future with implementing future EOs against unidentified future law firms. Such claims are speculative and unripe and not cognizable under Article III.

Thus, the ABA itself cannot demonstrate organizational standing, associational standing, or third-party standing. The ABA premises its claim of organizational standing on its purported difficulties in securing representation for itself because the entities from which it would normally

secure legal work from are supposedly chilled from providing such services. This claim of standing doubly fails. It is well established that allegations of a "chilling effect" on alleged constitutionally-protected activities without more—and the ABA fails to allege more—is not cognizable. And even if these sorts of chilling injuries could support Article III standing, the ABA has grounded those injuries in vague, speculative, broadbrush allegations. Nor can the ABA invoke associational standing. Its theory of associational standing suffers from the same Article III defects. The ABA, therefore, cannot show that its members would have standing to sue in their own right. At the outset, the ABA's members appear to be individual lawyers, not law firms—even though the previous EOs targeted specific law firms (that do not themselves appear to be ABA members). Moreover, the ABA cannot show how the involvement of its members in such litigation could be excused given the fact-specific nature of the EOs. And third-party standing is another dead end. The ABA purports to sue on behalf of law firms, as well as on behalf of non-member lawyers, that might be the subject of EOs in the future but cannot show why those firms or lawyers cannot bring suit on their own.

Second, the ABA's case is also unripe. The ABA's case turns on whether the President will issue another EO against a law firm. Although the ABA seems to know that it cannot seek to enjoin the President from issuing another EO, it seeks to enjoin the agencies from implementing the President's order. But because such an action has not happened in four months and may never happen, the ABA's complaint is premature and amounts to a request for an advisory opinion that this Court cannot provide.

For these reasons, and those set out in more detail below, this Court should dismiss the ABA's Complaint for lack of jurisdiction.

# BACKGROUND

## A.    The Law Firm Executive Orders

Over the course of about five weeks between early March and mid-April 2025, the President issued EOs addressing the past conduct and future risks posed by specific law firms.

On March 6, 2025, the President promulgated EO 14230, "*Addressing Risks from Perkins Coie LLP.*" 90 Fed. Reg. 11781.

Section 1 provides the purpose and background of the EO, including identifying various Perkins Coie-specific conduct. *E.g.*, EO 14230 § 1 (citing firm's engagement with opposition research firm, Fusion GPS, in its representation of Hillary Clinton during her 2016 presidential campaign).

Section 2, titled "Security Clearance Review," instructs the Attorney General and other agency heads to "take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie pending a review of whether such clearances are consistent with the national interest." EO 14230 § 2(a). It also directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie," and instructs agency heads to "expeditiously cease such provision." *Id*. § 2(b).

Section 3, titled "Contracting," directs "Government contracting agencies" to "require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract." *Id*. § 3(a). Agency heads are then instructed to "review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie," "terminate any contract, to the maximum extent permitted by applicable law, . . . for which Perkins Coie has been hired to perform any service," and "otherwise align their agency funding decisions with the interests of the citizens of the United States." *Id*. § 3(b).

Section 4, titled "Racial Discrimination," instructs the chair of the Equal Employment Opportunity Commission to "review the practices of representative large, influential, or industry leading law firms for consistency with" antidiscrimination law. *Id*. § 4.

Section 5, titled "Personnel," instructs agency heads, "to the extent permitted by law, [to] provide guidance limiting official access [to] Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id*. § 5(a). And it instructs agencies to "refrain from hiring employees of Perkins Coie absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id*. § 5(b).

Finally, Section 6, titled "General Provisions," contains limiting provisions, stating that nothing in the EO shall be construed to impair (1) "the authority granted by law to an executive department or agency, or the head thereof"; or (2) OMB's functions "relating to budgetary, administrative, or legislative proposals." *Id*. § 6(a). It also mandates that the Order be implemented consistent with applicable law. *Id*. § 6(b).

Since then, the President has issued similar EOs addressing risks posed by four other law firms, namely, Paul Weiss, Jenner & Block, WilmerHale, and Susman Godfrey. *Addressing Risks From Paul Weiss*, EO 14237, 90 Fed. Reg. 13039 (Mar. 14, 2025); *Addressing Risks from Jenner & Block*, EO 14,246, 90 Fed. Reg. 13997 (Mar. 25, 2025); *Addressing Risks From WilmerHale*, EO 14250, 90 Fed. Reg. 14549 (Mar. 27, 2025); *Addressing Risks From Susman Godfrey*, EO 14263, 90 Fed. Reg. 15615 (Apr. 9, 2025). Each EO involved an individualized assessment of the named law firm in the first section, with the remaining operative sections

materially identical across the EOs. *See* Paul Weiss EO, § 1; Jenner & Block EO, § 1; WilmerHale EO, § 1; Susman Godfrey EO, § 1.

Four law firms challenged these EOs in court. Perkins Coie filed suit on March 11, 2025, obtained a TRO on March 12, and then prevailed on summary judgment on May 2, obtaining a permanent injunction of EO 14230. *Perkins Coie LLP v. U.S. Dep't of Just.*, Civ. A. No. 25-716 (BAH), --- F.Supp.3d ---, 2025 WL 1276857, at *13–15, 49–51 (D.D.C. May 2, 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. Jul. 2, 2025). Three other law firms soon followed. As of now, courts have entered permanent injunctions enjoining all four of the Law Firm EOs that were challenged in court. *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 25-cv-916 (JDB), 2025 WL 1482021, at *5, 25–27 (D.D.C. May 23, 2025), *appeal docketed*, No. 25-5265 (D.C. Cir. Jul. 22, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President* ("*WilmerHale*"), No. 25-cv-917 (RJL), 2025 WL 1502329, at *4, 33–34 (D.D.C. May 27, 2025), *appeal docketed*, No. 25-5277 (D.C. Cir. Jul. 27, 2025); *Susman Godfrey LLP v. Exec. Off. of President*, No. 25-cv-1107 (LLA), 2025 WL 1779830, at *4, 26–27 (D.D.C. Jun. 27, 2025).

Paul Weiss did not challenge the Paul Weiss EO in court but instead reached a settlement; the President, in turn, revoked the Paul Weiss EO. *See Addressing Remedial Action by Paul Weiss*, E.O. No. 14,244 § 1, 90 Fed. Reg. 13685 (Mar. 26, 2025). Several other law firms have proactively reached settlement agreements with the Government along similar terms. These include Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"); Willkie Farr & Gallagher LLP ("Willkie"); Milbank LLP ("Milbank"); Kirkland & Ellis LLP ("Kirkland"); Allen Overy Shearman Sterling US, LLP ("Shearman"); Simpson Thacher & Bartlett LLP ("Simpson"); Latham & Watkins LLP ("Latham"); and Cadwalader, Wickersham & Taft LLP ("Cadwalader"). *See*, *e.g.*, *Susman Godfrey LLP*, 2025 WL 1779830, at *5 (summarizing

settlements). The President announced the settlements with Kirkland, Shearman, Simpson, Latham, and Cadwalader on April 11, 2025. Compl. ¶ 141. Since that date, there have been no further EOs or settlement announcements.

## B.     This Litigation

Asserting that it feared additional EOs targeting law firms, the ABA filed suit on June 16, 2025, to challenge the "Law Firm Intimidation Policy"—"a series of materially identical executive orders designed to severely damage . . . and intimidate . . . firms and lawyers" to "abandon clients, causes, and policy positions the President does not like." Compl. ¶ 4. It did not identify any document or written policy reflecting this purported "Policy," only the law-firm specific EOs. The ABA has asked the court to declare the "Policy" unconstitutional and enjoin the federal government from implementing and enforcing it against the ABA or its members. *Id.* ¶¶ 269–78. According to its website, the ABA's membership appears to be composed of individuals, mostly lawyers, rather than law firms. *Membership FAQ*, Am. Bar Ass'n (last visited Aug. 8, 2025), https://www.americanbar.org/membership/faq/.

The Complaint names, as defendants, the Executive Office of the President, 29 federal agencies, the heads of those agencies in their official capacities, and the United States. *Id.* ¶¶ 24–55. Specifically, in its six-count complaint, the ABA alleges that the purported policy violates the First Amendment because it retaliates against the ABA and its members for protected expression (Count I), *id.* ¶¶ 206–21; constitutes impermissible viewpoint discrimination (Count II), *id.* ¶¶ 222–30; interferes with the ABA's and its members' right to petition the government (Count III), *id.* ¶¶ 231–36; interferes with the ABA's and its members' right of free association (Count IV), *id.* ¶¶ 237–43; is unconstitutionally overbroad (Count V), *id.* ¶¶ 244–49; and that it violates the Constitution's separation of powers and is ultra vires (Count VI), *id.* ¶¶ 250–68.

The Complaint seeks declaratory and injunctive relief. *Id.* ¶¶ 269–77. Specifically, the Complaint requests the Court to declare unconstitutional, "any Security Clearance Termination Provision," "any Government Contracting Provision," "any Federal Building and Employee Access Provision," and "any Federal Employment Provision" of any future EOs. *Id.* ¶¶ 269–72; *see also id.* ¶ 269 n.98 (defining these terms as referring to "any executive order provision materially similar in language, purpose, or effect" to the comparable provisions of the previous EOs). The Complaint further asks the Court to "[e]njoin Defendants from enforcing" those provisions of future, hypothetical EOs "against any ABA member or ABA member's law firm based on the individual's law firm or legal organization affiliation, or based on the individual's or individual's law firm's client representation." *id.* ¶¶ 273–76. And it requests that the Court "[e]njoin Defendants from initiating attorney conduct and disciplinary proceedings, or making a referral for disciplinary action, of any ABA member or ABA member's law firm based on the individual's law firm or organizational affiliation, or based on the identity of the individual's or individual's law firm's client representation. *Id.* ¶ 277.

## LEGAL STANDARD

To survive a Rule 12(b)(1) motion, a plaintiff must establish that the court has subject-matter jurisdiction. *Physicians Comm. for Responsible Med. v. Dep't of Agric.*, 656 F. Supp. 3d 158, 162 (D.D.C. 2023). While the Court will accept factual allegations in the Complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 25 (D.D.C. 2016).

**ARGUMENT**

The Constitution grants Article III courts the power to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. The Supreme Court has "long understood that constitutional phrase to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020). The "case or controversy" requirement mandates that plaintiffs have (1) Article III standing at the time the plaintiff files their complaint, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and (2) that the case is ripe, *i.e.*, it is "not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) (internal quotation marks omitted).

Here, the ABA alleges that "President Trump has used the vast powers of the Executive Branch to coerce lawyers and law firms to abandon clients, causes, and policy positions the President does not like." Compl. ¶ 4. The ABA's complaint chronicles the President's EOs against law firms Perkins Coie, Paul Weiss, Jenner & Block, WilmerHale, and Susman Godfrey. *Id*. ¶¶ 69–84 (Perkins Coie); *id*. ¶¶ 85–95 (Paul Weiss); *id*. ¶¶ 107–14 (Jenner & Block); *id*. ¶¶ 115–19 (WilmerHale); *id*. ¶¶ 120–28 (Susman Godfrey). From those episodes, and even though those EOs were issued over four months ago, the ABA posits that the Executive Branch is carrying out a purported, unwritten policy—in its telling, the "Law Firm Intimidation Policy"—"through a series of materially identical executive orders designed to severely damage particular law firms" and through strong-arm deals with other law firms that wished to avoid being the next subject of a similar executive order. *Id*. ¶ 4. Fearing additional EOs against unspecified law firms—the lawyers of which the ABA alleges are among its members—the

ABA urges this Court to declare unconstitutional and enjoin the issuance or implementation of EOs similar to the ones issued in the spring of 2025. *Id*. ¶¶ 22, 269–77.

Importantly, the ABA does not appear to be challenging the EOs the President has already issued against Perkins Coie, Paul Weiss, Jenner & Block, WilmerHale, and Susman Godfrey. *See, e.g.*, *id*. ¶ 269 n.98 (defining terms as referring to "any executive order provision materially similar in language, purpose, or effect" to the comparable provisions of the previous EOs). Nor could they because, even assuming the ABA had standing to challenge such orders, those orders have already been either enjoined or rescinded. *See* EO 14,244 § 1 (revoking previous EO against Paul Weiss); *Perkins Coie LLP*, 2025 WL 1276857, at *4 (granting summary judgment to the law firm and permanently enjoining the relevant EO); *Jenner & Block LLP*, 2025 WL 1482021, at *26 (same); *WilmerHale*, 2025 WL 1502329, at *33–34 (same); *Susman Godfrey LLP*, 2025 WL 1779830, at *26–27 (same).

Instead, the ABA's complaint focuses on seeking prospective relief against hypothetical future actions by agencies to implement a hypothetical EO by the President against a hypothetical law firm. Compl. ¶¶ 22, 269–76. The ABA also seeks relief that extends more broadly than the provisions of the existing EOs. *Id*. ¶ 277 (requesting court to "[e]njoin Defendants from initiating attorney conduct and disciplinary proceedings, or making a referral for disciplinary action, of any ABA member or ABA member's law firm based on the individual's law firm or organizational affiliation"). "Whether viewed as a question of standing—requiring 'an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical'—or of ripeness—requiring an injury that is 'not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all'"—the ABA's complaint falls short of pleading these jurisdictional requirements, and so this Court must

dismiss this case for lack of subject-matter jurisdiction. *DNC v. Trump*, No. 25-cv-00587 (AHA), 2025 WL 1573181, at *4 (D.D.C. June 3, 2025) (citing *Trump v. New York*, 592 U.S. at 131).

## I.  THE ABA LACKS STANDING TO BRING THIS CASE.

To establish standing, a plaintiff must plausibly allege: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. "[S]tanding is not dispensed in gross," and "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs seeking injunctive relief must establish a "'real and immediate threat of repeated injury' demonstrated by more than 'past exposure to illegal conduct.'" *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). In assessing a plaintiff's standing, although the Court may "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," the Court need not "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

### A.  The ABA lacks standing to seek prospective relief because it does not plausibly allege certainly impending injury caused by hypothetical future Presidential action.

The ABA lacks standing to enjoin a hypothetical future EO or hypothetical future agency action. "[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). To claim standing based on "[a]n allegation of future injury," a plaintiff must show that "the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409, 414 n.5). In other words, a plaintiff cannot achieve standing by simply

"stack[ing] speculation upon hypothetical upon speculation." *Irregulators v. FCC*, 953 F.3d 78, 84 (D.C. Cir. 2020) (quoting *Kansas Corp. Comm'n v. FERC*, 881 F.3d 924, 931 (D.C. Cir. 2018)); *see also Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (rejecting "'speculative chain of possibilities' to establish a likelihood of future harm traceable to" the government).

The ABA's theory of standing is irremediably speculative. At the outset, the ABA cannot even allege an action that this Court can enjoin. The ABA's theory assumes that the President will issue an executive order, *and* that such an executive order will be substantially similar to the Spring 2025 executive orders, *and* that an ABA member's firm will be the focus of such an order. But a court generally "may not enjoin the President in the performance of his official duties," and certainly not as to the issuance of an executive order. *Severino v. Biden*, 71 F.4th 1038, 1042 (D.C. Cir. 2023); *see also id.* (allowing only for a potential exception as to "ministerial" duties). Thus, the ABA in reality is asking this Court to enjoin not the hypothetical EO, but agencies from hypothetical actions *implementing* a hypothetical EO. That is imagination squared, and it only serves to illustrate the importance of Article III's requirement that courts weigh in only on real disputes.

Even putting that threshold problem aside, the ABA's bases for its supposed future injury demonstrates that its claims fail at the threshold. The ABA claims "certainly impending" injury because, in its view, there are "still more [executive orders] to go." Compl. ¶ 15. That bare assertion is based substantially on an alleged exchange that took place during the signing of EO 14230 (the Perkins Coie EO) between the President and the Staff Secretary indicating that the White House was looking at about 15 different law firms. *Id*. ¶¶ 76, 161. But that argument fails on its own terms. As the ABA acknowledges in its complaint, thirteen firms became subject to EOs or ended up choosing to reach agreements. Compl. ¶¶ 69–84 (Perkins Coie); *id*. ¶¶ 85–95

(Paul Weiss); *id.* ¶¶ 107–14 (Jenner & Block); *id.* ¶¶ 115–19 (WilmerHale); *id.* ¶¶ 120–28 (Susman Godfrey); *id.* ¶ 130 (Skadden); *id.* ¶ 130 (Willkie); *id.* ¶ 135 (Milbank); *id.* ¶ 141 (Kirkland, Shearman, Simpson, Latham, and Cadwalader). In other words, that is already in the ballpark of about 15 law firms. Accordingly, based on the ABA's own allegations, there is no reason to expect that more EOs are forthcoming.

Regardless, those alleged remarks took place on March 6, 2025, and the President has not issued any additional EOs since the Susman Godfrey EO on April 9—four months ago (as of the date of this filing), and over two months before this complaint was filed. And the ABA seems to acknowledge that the President has made no further settlement announcements with any law firms since April 11, 2025. *Id.* ¶ 141. "This limited pattern . . . undermines the inference that actions against" other law firms "are imminent." *See Mennonite Church USA v. DHS*, No. 25-cv-00403 (DLF), 2025 WL 1094223, at *4 (D.D.C. Apr. 11, 2025) (citing *Murthy*, 603 U.S. at 59).

Indeed, Judge Bates recently rejected a substantially similar request for prospective injunctive relief by Jenner & Block regarding its concerns about potential future actions by federal officials pursuant to Section 1 of EO 14246. *Jenner & Block LLP*, 2025 WL 1482021, at *25. Although sympathetic to Jenner & Block's desire to "head [any future action] off at the pass," Judge Bates recognized that "[n]either standing doctrine nor equity generally permits such judicial prophylaxis." *Id.* That is because, as Judge Bates concluded, "Jenner lacks standing to challenge hypothetical future actions taken pursuant to Section 1" as such actions "are purely conjectural or hypothetical because agencies have not been instructed to take them." *Id.* (internal citations and quotation marks omitted). In *Jenner & Block* there was an existing EO that applied to the specific plaintiff by name. But even that was not enough for standing in the abstract with respect to potential future action pursuant to that order because the defendant agencies "have not

been instructed" to take any concrete action against Jenner. *Id.* Here, not only have the agencies not been instructed to take "concrete" action, they have not been instructed to take *any* action, against *anyone*. Under such circumstances, it follows *a fortiori* that the ABA lacks standing to seek prospective relief premised on the mere anticipation that the President will issue additional executive orders. *See id.* ("Article III requires this Court to place its faith in future courts to prevent harm from befalling Jenner if and when that occurs. At this juncture, the Court cannot take that role for itself.").

That leaves the ABA dependent on past executive orders to establish standing. But it is hornbook law that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Littleton*, 414 U.S. at 495; *see also Berni v. Barilla S.p.A.*, 964 F.3d 141, 146–48 (2d Cir. 2020) ("If the injury occurred in the past—or if some future injury is merely conjectural or hypothetical—then plaintiffs will lack the kind of injury necessary to sustain a case or controversy, and necessary to establish standing, under Article III."). "The past is relevant only insofar as it is a launching pad for a showing of imminent future injury," *Murthy*, 603 U.S. at 69, and—because "past is not always prologue," *Doe v. OPM.*, No. 25-cv-234 (RDM), 2025 WL 513268, at *6 (D.D.C. Feb. 17, 2025)—courts in this district have routinely rejected for lack of standing requests for prospective relief when they are based substantially on injuries stemming from past unlawful actions. *See, e.g.*, *McCoy v. Kollar-Kotelly*, No. 23-cv-2695 (AHA), 2025 WL 928611, at *2 (D.D.C. Mar. 27, 2025) ("Because McCoy alleges only '[p]ast exposure to illegal conduct' and not a 'real and immediate threat of repeated injury,' she cannot satisfy the injury in fact requirement and does not have standing to seek prospective injunctive relief."); *Halley v. Blinken*, No. 24-cv-571 (RDM), 2024 WL

4853874, at *4 (D.D.C. Nov. 21, 2024) ("But those *past* injuries are insufficient to establish standing to seek *prospective* relief.").

This Court should do the same. In *Lyons*, the Supreme Court applied these principles to hold that the plaintiff lacked standing to obtain an injunction against the city's use of chokeholds. 461 U.S. at 105. Although the plaintiff had alleged he was illegally choked in a traffic stop, that allegation did "nothing to establish a real and immediate threat that *he* would again be stopped for a traffic violation . . . by an officer or officers who would illegally choke *him*." *Id.* (emphasis added). Here, the ABA has done even less than the plaintiff in *Lyons*; the ABA has not even shown that it was *ever* subjected to an executive order in the past. If the *Lyons* plaintiff had to do more than show that *he* suffered injury in the past, it follows *a fortiori* that the ABA must do more than show that *someone else* was subject to executive orders in the past.

Even if this Court were to somehow conclude that past EOs directed at *other* law firms is enough to demonstrate future injury as to the ABA (which is not even a law firm), the ABA still fails to demonstrate standing for all of its requested relief. *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."). The ABA seeks to enjoin Defendants from initiating or referring disciplinary proceedings against its members or its members' law firms. Compl. ¶ 277. That requested relief has nothing to do with the EOs, which make no reference to any policy of initiating disciplinary proceedings. Article III "requires that any remedy be tailored to redress the plaintiff's particular injury," and thus any remedy must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2563 (2025). To be clear, the ABA has not established *any* injury in fact. But even if its invocation of past EOs did suffice to establish some injury, it cannot possibly

justify this superfluous ask. That add-on request—with not even an echo in past executive orders or litigation—shows this case for what it is: a request for the Court to give an advisory opinion on a wish list.

The ABA attempts to evade the obstacle of showing future harm by claiming that, in fact, it is somehow suffering *present* harms that "are already happening," "are ongoing," and "will continue in the absence of relief from the court," Compl. ¶ 182—despite the lack of any executive order, to say nothing of any (hypothetical) downstream agency actions. According to the ABA, there is a so-called Law Firm Intimidation Policy, through which the President means to systematically issue executive orders to pressure law firms. *Id.* ¶ 4. This policy, says the ABA, currently causes injury by requiring the ABA's members and their firms to "devote substantial resources to working to mitigate the impact of" the purported "Law Firm Intimidation Policy," *id.* ¶ 194, and by "cast[ing] a deep chill over the legal profession," *id.* ¶ 182. This theory is little more than an attempt to dress up a fear of a hypothetical *possibility* of future action as a cognizable present Article III injury, and it has little to commend it.

To begin, it does the ABA no good to allege the existence of some unofficial Law Firm Intimidation Policy based on little more than a handful of EOs and some negotiated agreements with certain law firms. The ABA's allegations amount to mere "labels and conclusions," which are insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Absent "further factual enhancement," *id.*, the ABA's inference that there is a systemized plan to churn out additional executive orders would not even suffice a court's ordinary review under Rule 12(b)(6)—let alone the "closer scrutiny" that attends 12(b)(1) motions to dismiss for lack of jurisdiction. *Common Purpose USA, Inc.*, 227 F. Supp. 3d at 25.

And under such review, the ABA's allegation of some unofficial policy cannot succeed. Article III requires "more than a nebulous *assertion* of the existence of a 'policy'"—the plaintiff must "not only *demonstrate* its existence but also that [he is] likely to be subjected to the policy again." *Haase*, 835 F.2d at 911 (emphases added). In *Haase*, the D.C. Circuit held, based on the complaint before it, that the plaintiff lacked standing to seek declaratory relief predicated on an alleged government policy of subjecting travelers from Nicaragua to intrusive border searches. *Id.* at 905. The plaintiff had produced an affidavit recounting other travelers' experiences of being searched, newspaper articles describing past searches, and his own affidavit describing his intent to travel to Nicaragua. *Id.* Nonetheless, the court of appeals described the plaintiff's allegations and evidence as "exceedingly weak," and remanded the case for the plaintiff to amend his pleadings. *Id.* at 908.

The ABA's allegations are no stronger. All the ABA has produced is past examples of executive orders it does not like. If that were enough to allege a policy that would likely be applied to the ABA, it would render the Supreme Court's repeated instructions that standing requires more than "[p]ast exposure to illegal conduct" a dead letter, *Littleton*, 414 U.S. at 495— especially so given that past executive orders have not applied to the ABA, and thus the ABA was never "expos[ed]" to illegal conduct *at all*. It would replace the "traditional" and "normal[]" mode of operation of the courts"—in which plaintiffs challenge, and courts evaluate, discrete and concrete actions—with a regime of standing-by-label. *Cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–94 (1990) (rejecting plaintiff's attempt to set aside "the continuing (and thus constantly changing) operations of" an agency by labeling them collectively as a "program"). And, to repeat, even if the ABA could plausibly allege the existence of the purported Law Firm Intimidation Policy, it must also show that it is "likely to be subjected to the policy." *Haase*, 835

F.2d at 911. The ABA cannot make that showing when any application to any particular law firm (to say nothing of any particular lawyer, who might or might not be an ABA member) will depend on the downstream implementation by the *agencies* of the President's hypothetical executive order.

Thus, ABA's twin theories of resource expenditure (to combat a hypothetical executive order) and chilling effect (from fear of a hypothetical order) falter. The ABA claims that "Member B's firm (including Member B individually) has diverted time, energy, and other resources to preparing to defend itself." Compl. ¶ 191. But the Supreme Court is clear that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. And for good reason. Even when there *is* government action, an organization cannot claim to have "suffered a concrete injury" merely because it "expend[ed] money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. Were that the case, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies"—a result completely at odds with Article III's limits on federal court jurisdiction. *Id.* at 395. The ABA's theory, however, would create an even more absurd outcome: a scenario in which any organization can challenge an *imaginary* government action just by "making an expenditure based on a nonparanoid fear." *Clapper*, 568 U.S. at 416. The ABA cannot spend its way to an advisory opinion in this way.

For similar reasons, the ABA's allegations of a "chilling effect" cannot support standing either. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14

(1972). Indeed, "chilling effect" is generally "cited as the *reason* why the governmental imposition is invalid rather than as the *harm* which entitles the plaintiff to challenge it." *See United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984). Here, any future government action is completely speculative, and the ABA cannot "chill" itself into standing to challenge agency actions pursuant to a nonexistent executive order.

Furthermore, even as to *existing* government action, plaintiffs cannot rely on a mere "chilling effect" to establish standing when the governmental policy at issue "does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419; *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (noting it is "substantially more difficult" to establish standing when "the plaintiff is not himself the object of the [challenged] government action"). Courts have consistently refused to find standing on "chilling effect" grounds when the challenged executive order did not impose any direct constraint upon the plaintiffs. *See Tatum*, 408 U.S. at 11 ("chilling effect" has only sufficed for standing where "the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging"); *United Presbyterian Church in the U.S.A.*, 738 F.2d at 1378–80 (no standing because the executive order "issues no commands or prohibitions to these plaintiffs, and sets forth no standards governing their conduct"); *DNC*, 2025 WL 1573181, at *6 (no standing to challenge an executive order because it "does not presently or prospectively subject the committees to any regulations, proscriptions, or compulsions"); *cf. Saline Parents v. Garland*, 88 F.4th 298, 300–01, 305, 308 (D.C. Cir. 2023) (challenge was not ripe for judicial review because, "[a]lthough [plaintiffs] complain of a chilling effect on their speech, the Government has not in any way restricted or regulated [their] activities"). The same is obviously true in a case

such as this one, where there is *no* executive order imposing constraints on *anyone*, and where even past executive orders have never purported to directly regulate the ABA.

At bottom, the President has not issued any further EOs against any law firms, much less one directly against the ABA or its members. Nor is there any concrete indication that one such EO is forthcoming, let alone "certainly impending." Because the ABA cannot show standing for prospective relief based on speculative future injury, this Court should dismiss this case for lack of subject-matter jurisdiction.

**B.    The ABA also fails to satisfy other requirements to establish organizational standing, associational standing, or third-party standing.**

The fact that the ABA—an organization composed of individual lawyers—is challenging a purported Law *Firm* Intimidation Policy only exacerbates the flaws in its standing arguments. As an organization, the ABA "can assert standing in one of two ways"—"[i]t can assert standing on its own behalf, as an organization, or on behalf of its members, as associational standing." *Elec. Privacy Info Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 100 (D.C. Cir. 2019). And the ABA invokes both: it alleges that the ABA itself has "been harmed directly as result of the" so-called Law Firm Intimidation Policy, Compl. ¶ 201, and it alleges that the Policy "has already caused—and will continue to cause—harm to many members of the ABA who practice at law firms," *id.* ¶ 184. But neither of these theories are availing. Moreover, to the extent that the ABA seeks to assert interests beyond its own and those of its members, such as any law firm or lawyer engaged in litigation against the government, it lacks third-party standing.

**1.** For organizational standing, the ABA must make "the same showing required of individuals: an action or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-*

*Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). On this front, the ABA alleges that it is "often involved as party in litigation" and "frequently relies on pro bono representation." *Id*. It further asserts that "[f]ollowing the implementation of the Law Firm Intimidation Policy, the ABA "has experienced difficulty finding . . . law firms to represent it in litigation adverse to the federal government." *Id*. ¶ 202. In other words, the asserted organizational injury is a purported difficulty finding legal representation.

In a continuation of a theme, the ABA's supposed injury is speculation layered on guesswork, and cannot support standing. To begin, the ABA has failed to adequately allege that any law firm *expressly* declined to represent them *because* of some "Law Firm Intimidation Policy." *See Food & Water Watch v. Vilsak*, 808 F.3d 905, 913 (D.C. Cir. 2015) (emphasizing that a court addressing a Rule 12(b)(1) motion need not "accept inferences that are unsupported by the facts set out in the complaint" (quoting *Arpaio*, 797 F.3d at 19)); *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 192 (D.D.C. 2020) ("The problem for Freedom Watch is that it has failed to make its case by advancing specific facts to support its claim to have suffered an injury-in-fact."). The ABA bases its alleged injury on the fact that a firm which was once willing to represent it has now declined to do so. Compl. ¶ 203. In the ABA's view, this can only be explained by a "Law Firm Intimidation Policy." *Id.* That is specious reasoning. There are any number of reasons a firm might decline to represent the ABA in a given matter. Maybe the firm thought less of the merits of the ABA's case than the ABA did, or maybe the relevant lawyers at the firm lacked bandwidth. Either way, an allegation that the ABA did not receive its first choice of law firm does not somehow state a claim that an imaginary policy exists, does not justify this Court inferring the existence of an imaginary policy, and certainly does not indicate that the law firm declined representation *because* of any such policy. *See Iqbal*, 556 U.S. at 678 (emphasizing

that, even under the more permissive 12(b)(6) standard, "[t]hreadbare recitals" and "mere conclusory statements" are insufficient).

But even *if* the ABA had properly alleged that firms have declined to represent it out of fear of some potential future executive order, that still would not support standing. Again, that some law firms might have chilled themselves from representing the ABA cannot establish standing in the absence of any "certainly impending" harm. *Clapper*, 568 U.S. at 416. As has already been explained, there is no such harm from the ABA's theoretical Law Firm Intimidation Policy; to the extent any law firm feels "chilled," that is traceable only to its imagination. And the ABA's theory of standing is even more attenuated—it depends on a hypothetical Presidential action leading to hypothetical agency actions, causing a law firm to decline to represent the ABA. This Court should reject this Rube Goldberg conception of standing.

**2.** The ABA similarly cannot satisfy the requirements for associational standing on behalf of its members. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024). An organization may assert associational standing by showing "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 334 (1997). The ABA fails on both the first and third *Hunt* prongs.

Start with the first—that the ABA's members must "otherwise have standing to sue in their own right." *Id.* The ABA's assertions that its members have standing are largely a rehash. According to the ABA, its members have suffered various chilling injuries, as well as costs and burdens, all out of anticipation of some future executive order. Member A, says the ABA, works

at a firm which "made changes to its case acceptance procedures" because of the "possibility of being targeted with a retaliatory executive order," Compl. ¶ 187; Member B, for his part, has "diverted time, energy, and other resources to preparing to defend [his firm]" in the event of an executive order, *id.* ¶¶ 190–91. But—again—the ABA has failed to adequately allege a Law Firm Intimidation Policy, and has accordingly not alleged a certainly impending injury. And with no such injury, the ABA's members cannot "manufacture standing" by spending or chilling themselves in anticipation of some speculative harm. *Clapper*, 568 U.S. at 402; *All. for Hippocratic Med.*, 602 U.S. at 394.

That is especially so considering that the hypothetical executive orders the ABA asks this Court to enjoin primarily target *law firms*. In its complaint, the ABA seeks an injunction against the "Security Clearance Termination Provision," the "Government Contracting Provision," the Federal Building and Employee Access Provision," and the "Federal Employment Provision"— each of which are directed at law firms. *See, e.g.*, EO 14230 § 2(b) (directing agencies to cease providing "Government goods, property, material, and services . . . provided for the benefit of Perkins Coie"); *id.* § 3(b)(i) (directing termination of contracts "for which Perkins Coie has been hired to perform any service"); *id.* § 4(a) (directing EEOC to review practices of "industry leading law firms"). But the ABA's members are *lawyers*, not *law firms*. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges," standing is "ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562. To be clear, no law firm has standing to seek the relief the ABA asks for either. But this case is yet one more bridge too far.

Perhaps recognizing that it cannot point to a single member with any likelihood of future injury, the ABA appears to suggest that, at some point, one of its members will suffer harm

because it "counts lawyers from every AmLaw 100 firm among its membership." Compl. ¶ 20. But that blanket assertion cannot change the fact that it still must "establish[] that at least one identified member had suffered or would suffer harm." *Summers*, 55 U.S. at 497–98. A "statistical probability" that "some of [the ABA's] members are threatened with concrete injury" is nowhere near enough to support standing. *Id.*

Indeed, that the ABA with its thousands of members cannot identify a single one who will suffer the "requisite harm" and must instead resort to a rejected "probabilistic standing" theory only confirms that its case has no legs to stand on. *Id.* at 499. It "is not enough to aver that unidentified members have been injured." *U.S. Chamber of Com. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011). And several district courts have held that where "organizations have not identified any members by name," they "do not have associational standing to bring a claim." *Green Oceans v. Dep't of Interior*, Case No. 1:24-cv-141-RCL, 2025 WL 973540, at *8 (D.D.C. Apr. 1, 2025); *see also Freedom Watch, Inc.*, 442 F. Supp. 3d at 193–94; *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69–70 (D.D.C. 2013); *Californians for Renewable Energy v. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012).[1] The ABA attempts to excuse this defect, explaining "[t]hese members are not named because many fear that even being identified in this lawsuit could lead to their firms being subjected to a retaliatory executive order or other

---

[1] To be sure, "[c]ourts in this district have divided over whether an association must identify an injured member by name at the motion to dismiss stage or instead a lesser degree of identification is enough." *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 153 (D.D.C. 2023). At "the very least," however, "the identity of the party suffering an injury in fact must be firmly established." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 19 (D.D.C. 2018) (quoting *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006)); *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (concluding that although "anonymity is no barrier to standing on this record[,]" administrative record included "survey responses from specific, individual Teamsters members [that] demonstrate that those members" would have standing).

punitive action." Compl. ¶ 183. But courts have declined to excuse this sort of deficiency especially where, as here, the complaint supplies only generic information, lacking sufficient substantive details about the association's members. *See Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. 2022) ("[H]ere the lack of any substantive detail about the John Does' circumstances makes it all but impossible to determine whether any of the John Does, as individuals, face imminent injury."); *Freedom Watch, Inc.*, 442 F. Supp. 3d at 193 (rejecting contention "that [organization] has standing because it is protecting its members' identities.").

That failure matters. The ABA points to a supposed Member A, Member B, Member C, and Member D as individual lawyers who will be harmed by some future executive order. Yet none of those members is alleged to have security clearances, and none is alleged to work at a firm which is at risk of an adverse finding from an EEOC investigation. The anonymous cover under which the ABA proffers these unelaborated allegations are of a piece with the rest of its complaint. Such "[t]hreadbare recitals" and "conclusory statements," without more, cannot survive a motion to dismiss, let alone support standing. *Iqbal*, 556 U.S. at 678.

The ABA cannot satisfy the third *Hunt* prong either. That prong "reflects a judicially self-imposed limit on the exercise of federal jurisdiction," and is focused on "matters of administrative convenience and efficiency." *Tanner-Brown*, 105 F.4th at 447 (internal quotation marks omitted). Associational standing is inappropriate when "the nature of [the] suit necessarily requires consideration of the individual circumstances of any aggrieved member of the organization." *Id.* (internal quotation marks omitted).

This is precisely the sort of suit which must be brought by individuals—not a monolithic organization. The ABA cannot show that the participation of individual members will be unnecessary to establish its entitlement to the relief it seeks. *See Nat'l Ass'n of Consumer*

*Advocs. v. RentGrow, Inc.*, No. 24-cv-3218 (PLF), 2025 WL 1429172, at *7 (D.D.C. May 16, 2025) (assessing the relief sought by plaintiff "to determine whether participation from plaintiff's individual members would be required" for its resolution). The ABA would like this Court to declare "any Security Clearance Termination Provision," "Government Contracting Provision," "Federal Building and Employee Access Provision," and "Federal Employment Provision" unconstitutional. Compl. ¶¶ 269–72. But the "Law Firm Orders" that the ABA castigates have all been individualized against specific law firms based on the conduct of those law firms. ABA membership is accordingly no short cut for this Court; any relief would have to be limited to ABA members with standing, *see CASA*, 145 S. Ct. at 2563, and because mere ABA membership does not establish a credible threat of enforcement this Court will inevitably have to engaged in individualized determinations. Moreover, unless this Court is prepared to announce that no Administration can ever revoke a security clearance from any law firm employee, the relief the ABA requests will necessarily depend on the specific circumstances of whatever firm is the subject of any future executive order.

Indeed, the fact that even the ABA's hypothetical executive orders would be directed to specific *individual* law firms indicates that the membership the ABA purports to represent raises concerns about potential conflicts of interest. Although Defendants acknowledge that the D.C. Circuit in *National Maritime Union v. Commander*, 824 F.2d 1228 (D.C. Cir. 1987)[2] suggested otherwise, other circuit courts have recognized that "associational standing has never been

---

[2] The D.C. Circuit in *National Maritime Union* determined that an internal conflict of interest among union members did not defeat associational standing in a government contract award dispute. 824 F.2d at 1234. Should this Court conclude that *National Maritime Union* is dispositive, Defendants hereby preserve this issue for appellate review.

granted in the presence of serious conflicts of interest either among the members of an association or between an association and its members." *Polaroid Corp. v. Disney*, 862 F.2d 987, 999 (3d Cir. 1988); *see also Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991) ("Prong three of the *Hunt* test . . . is not met when conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests."). Here, ABA members who are employed by a (potentially) targeted firm's competitors are not merely uninjured by such an executive order—they may be *benefited* by the competing firm being subject to an executive order. And this is not an instance where merely "some members" might be harmed by the ABA's requested remedy. *Contra NTEU v. Whipple*, 636 F. Supp. 2d 63, 74 (D.D.C. 2009). The ABA says that it has members in every AmLaw 100 firm. Even if "15" law firm executive orders were to issue (and, to repeat, that is entirely speculative), that would still leave the *majority* of the ABA's members potentially advantaged by such orders.

That many if not most of the ABA's members' interests diverge from the ABA's blanket position in this case highlights another flaw with the ABA's standing theory: the ABA cannot bind its members (let alone the law firms). There is no indication that the ABA's members— especially those who would *prefer* any given executive order to remain in place—will consider themselves bound by any judgment the ABA can receive here, thus defeating any supposed administrative efficiency rationale for allowing associational standing here. And even if the ABA's members did consider themselves bound, there is no reason to think that *anyone* involved in this case could bind, or represent the views of, the *law firms*. That makes the ABA's requested remedies directed to the law firms inappropriate. *See* Compl. ¶¶ 273–77 (asking the Court to enjoin a future executive order's implementation against its members' "law firm[s]").

The ABA's industry-wide standing theory, in which it purports to bind persons with different interests and to represent even non-members, brings it in tension with the recent decision in *Trump v. CASA*. There, the Supreme Court held that injunctions "asserting the power to prohibit enforcement of a law or policy against anyone . . . likely exceed the equitable authority that Congress has granted to federal courts." *CASA*, 145 S. Ct. at 2548. It directed the lower courts that had issued the preliminary injunctions at issue to "move expeditiously" to make their injunctions "[no] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id*. at 2562–63. And it specifically rejected the attempt to use broad injunctions as a substitute for properly certified class actions: "[B]y forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions circumvent Rule 23's procedural protections and allow 'courts to create de facto class actions at will.'" *Id.* at 2555. The ABA is effectively seeking such a shortcut here, asking for an asynchronous injunction applying to the entire legal community (or at least all that associate with it), without imposing the requirements of preclusion that would follow from a true class action. This sort of broad, industry-wide relief that the ABA seeks is a nonstarter, and this Court should not allow the ABA to smuggle it in by stretching associational standing beyond recognition.

**3.** That the ABA has neither organizational nor associational standing should end the matter, and this Court should dismiss the case. But it is worth noting that recent history demonstrates why the ABA cannot bring this suit. Third-party standing is disfavored, because a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of [other] parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citing *Tileston v. Ullman*, 318 U.S. 44 (1943) (per curiam)). In general, only the party afforded a given constitutional right "has the appropriate incentive to challenge (or not

challenge) governmental action" in a way that genuinely furthers the right-holder's interests, "and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). And adjudicating rights at the request of third parties could force courts to consider "questions of wide public significance" in an "abstract" setting removed from the concrete circumstances of the right-holders. *Id*. Thus, absent a "'close relationship' to the" absent parties, as well as evidence of "some hindrance to the [absent parties] asserting their own rights," a litigant generally may not assert the rights of another. *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998).

Those considerations apply with full force here. The ABA's complaint appears to assert the rights of others, including unidentified law firms and non-member lawyers. *E.g.*, Compl. ¶ 22 ("Our Constitution does not vest the Executive Branch with the power to point to individual lawyers or law firms, declare by executive fiat that their work or their internal policies are 'against the national interest' or otherwise illegal or improper, and direct (or threaten) executive action against that lawyer or law firm."). Even setting aside the ABA's complaint's Article III standing defects, the ABA fails to establish third party standing. There is simply no hindrance to the affected parties bringing their own suits in due course. Perkins Coie, Jenner & Block, WilmerHale, and Susman Godfrey have already challenged the executive orders in their own lawsuits. *See Perkins Coie LLP*, 2025 WL 1276857, at *13–15, 49–51; *Jenner & Block LLP*, 2025 WL 1482021, at *5, 25–27; *WilmerHale*, 2025 WL 1502329, at *4, 33–34; *Susman Godfrey LLP*, 2025 WL 1779830, at *4, 26–27; *see also All. for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024) ("The third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries."). Plus, the same conflict-of-interest issues that defeat the ABA's

associational standing also doom its third-party standing. *See, e.g.*, *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991).

There is no case or controversy here. But even if there were, there is no good reason for the ABA to insert itself where the affected parties have consistently shown the ability to prosecute their own cases.

## II.    THE ABA'S CLAIMS ARE UNRIPE.

The ABA's claims are also unripe. Before a federal court may hear a case, Article III requires that it not be "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. at 131 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Article III standing and ripeness "generally boil down to the same question in cases where the plaintiff challenges a law before it is enforced against them." *DNC*, 2025 WL 1573181, at *4. And when a case is "riddled with contingencies and speculation," it fails under either doctrine. *Trump v. New York*, 592 U.S. at 131.

Just so here. The ABA is not even challenging an *existing* law before it is enforced against its members. It is challenging a *hypothetical* executive order. And, again, because the President himself cannot be enjoined or subject to a declaratory judgment, *see Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), the chain is even more attenuated. Any relief the ABA asks for depends on a hypothetical executive order, implemented in downstream agency actions, against a not-yet-determined law firm, which might employ an ABA member. If guessing how "the Executive Branch might eventually implement [a] general statement of policy" was "no more than conjecture" in *Trump v. New York*, 592 U.S. at 131, plotting how the Executive Branch might someday implement a *nonexistent* executive order is pure speculative fiction. That uncertainty dooms the ABA's claims.

But it is not the only defect. "Even if there were greater certainty," plaintiffs must still show both that the issues are "fit[] . . . for judicial decision" and that "the hardship to the parties of withholding consideration" warrants judicial resolution now. *Texas v. United States*, 523 U.S. at 300–01 (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967)). "[T]he fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Atl. States Legal Found, Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). Fundamentally, however, judicial fitness turns on whether the case "depends on future events that may never come to pass, or that may not occur in the form forecasted"; if so, the cases are unripe, because "[f]ederal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing." *Id.* at 424–25 (quoting *McInnis-Miesnor v. Me. Medical Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003)).

Set against these standards, this case is not fit for judicial disposition. The D.C. Circuit has explained that "[r]ipeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treas. Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996); *see also Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) ("Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury."). Here, there is no injury that is certainly impending in this case to meet the fitness requirement. *Food & Water Watch v. United States Env't Prot. Agency*, 5 F. Supp. 3d 62, 80 (D.D.C. 2013); *see Jenner & Block*, 2025 WL 1482021, at *25 ("Whether best viewed as a shortcoming of standing, ripeness, or a 'basis in equity for an injunction,' the guesswork entailed

in enjoining all future uses of the sentiments expressed in Section 1 would exceed the Court's proper role."). Again, the President has not issued any further executive orders against law firms since early April of this year. He may never do so again. And the ABA can only challenge the agency implementation of a future EO—and named Defendants have no executive order to implement and, accordingly, have undertaken no actions adverse to the ABA or its members. *See Jenner & Block*, 2025 WL 1482021, at *25 ("Jenner lacks standing to challenge hypothetical future actions taken pursuant to Section 1; unlike actions taken pursuant to Sections 2 through 5, these are purely 'conjectural or hypothetical' because agencies have not been instructed to take them."). Indeed, the EOs mandate that the orders be implemented "consistent with applicable law." *E.g.* Jenner & Block EO, § 6(b). Given that directive, this Court has "no occasion to consider whether [a future EO] can and will be carried out consistent with the constraints of law." *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025) (Sotomayor, J., concurring).

Further, consideration of the ABA's claims would undoubtedly "benefit from a more concrete setting." *Devia*, 492 F.3d at 424. The text of any future EOs, or their targets, or their rationale, is entirely inchoate. Without a concrete executive order, it is unclear who among the ABA's membership are going to be injured, if at all. Judicial intervention at this stage would be premature because any reviewing court could benefit from further factual development—*i.e.*, if and when the President issues an EO addressing the ABA or a law firm implicating the ABA's membership. *Food & Water Watch*, 5 F. Supp. 3d at 80; *see also Trump v. New York*, 592 U.S. at 134 ("Letting the Executive Branch's decisionmaking process run its course not only brings more manageable proportions to the scope of the parties' dispute, but also ensures that we act as

judges, and do not engage in policymaking properly left to elected representatives." (cleaned up)).

Moreover, with respect to whether there is "hardship to the parties of withholding court consideration," *Devia*, 492 F.3d at 427, here, such claims would be "insubstantial." The ABA is "not required to engage in, or to refrain from, any conduct." *Id.* Nor is any hardship to the ABA "immediate and significant," because no executive order imposes any obligations on them. *Id.* At most, the specter of a future executive order is shrouded in "a cloud of uncertainty," but that "is not sufficient to make a claim ripe for review." *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 7 (D.D.C. 2014) (citing *NRDC v. U.S.E.P.A.*, 859 F.2d 156, 166 (D.C. Cir. 1988)).

The ABA, in short, is shadowboxing without a shadow. This case is quintessentially unripe, and this Court should dismiss.

## CONCLUSION

For the foregoing reasons, this Court should dismiss without prejudice the ABA's Complaint for lack of subject-matter jurisdiction.

Dated: August 8, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ *James J. Wen*
JAMES J. WEN
Trial Attorney,
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 598-7361
E-mail: james.j.wen@usdoj.gov

*Counsel for Defendants*

## CERTIFICATION OF SERVICE

I hereby certify that, on August 8, 2025, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *James J. Wen*
JAMES J. WEN