UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BAR ASSOCIATION,<br><br>    *Plaintiff,*<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, et al.,<br><br>    *Defendants.* | Civil Case No. 1:25-cv-01888-AHA |

**<u>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

I.      The ABA Alleges the Administration has a Law Firm Intimidation
Policy that Remains in Effect. ...............................................................................3

II.     The Complaint Shows How the Law Firm Intimidation Policy
Continues to Cause Injury......................................................................................6

LEGAL STANDARD.........................................................................................................8

ARGUMENT .......................................................................................................................9

I.      The ABA Alleges Concrete and Imminent Injury to Its Members.......................10

      A.     The ABA sufficiently alleges that the Policy exists and
constitutes a credible threat of adverse government action. ......................10

      B.     The ABA sufficiently alleges that the Policy has chilled
protected speech and conduct of lawyers across the country,
and continues to do so................................................................................15

      C.     The Government's attempts to counter the allegations of injury
fail. ...........................................................................................................19

II.     The ABA has Established Standing on Behalf of Itself and Its
Members Under Organizational, Associational, and Third-Party
Standing Doctrines................................................................................................23

      A.     The ABA alleges associational standing based on the injury to
specific members caused by the Law Firm Intimidation Policy...............23

            1.     Specific ABA members have standing to sue...............................23

            2.     Individual members' participation is not required........................28

      B.     The ABA alleges organizational standing based on direct harm
suffered by the ABA. ................................................................................32

      C.     The third-party standing doctrine supports the ABA's standing. ..............35

III.    The ABA's Claims Are Ripe. ...............................................................................37

CONCLUSION...................................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ...................................................................33

*Action All. of Senior Citizens of Greater Phila. v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ...................................................................34

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    41 F.4th 586 (D.C. Cir. 2022) ...............................................................26, 27

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ...............................................................36

*Am. Assoc. of Univ. Profs. v. Rubio*,
    780 F. Supp. 3d 350 (D. Mass. 2025) ................................................11, 26, 34

*Am.  for Prosperity Foundation v. Bonta*,
    594 U.S. 595 (2021) .................................................................................34

*Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*,
    642 F.3d 1137 (D.C. Cir. 2011) ..................................................................8

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
    901 F. Supp.2d 19 (D.D.C. 2012) ..............................................................26

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) .................................................................................14

*Bennett v. Spear*,
    520 U.S. 154 (1997) .................................................................................35

*Berni v. Barilla S.p.A.*,
    964 F.3d 141 (2d Cir. 2020) ......................................................................20

*Cals. for Renewable Energy v. U.S. Dep't of Energy*,
    860 F. Supp. 2d 44 (D.D.C. 2012) ..............................................................28

*Cent. & S. Motor Freight Tariff Ass'n v. United States*,
    757 F.2d 301 (D.C. Cir. 1985) ..................................................................29

*Chamber of Commerce of U.S. v. Reich*,
    57 F.3d 1099 (D.C. Cir. 1995) .............................................................37, 38

*Chi. Women in Trades v. Trump*,
    773 F. Supp. 3d 592 (N.D. Ill. 2025) ................................................................38

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................20

*Clapper v. Amnesty Intern. USA*,
    568 U.S. 398 (2013) ..............................................................................................18

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ..........................................................................37, 38

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) ..............................................................................................17

*Democratic Nat'l Committee v. Trump*,
    No. 25-00587 (AHA), 2025 WL 1573181 (D.D.C. June 3, 2025) .........................14

*Devia v. Nuclear Regulatory Comm'n*,
    492 F.3d 421 (D.C. Cir. 2007) ............................................................................39

*Doe v. Office of Personnel Mgmt.*,
    No. 25-234, 2025 WL 513268 (D.D.C. Feb. 17, 2025) ........................................21

*Equal Rts. Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ............................................................................8

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ..............................................................................................17

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
    62 F. Supp. 3d 1 (D.D.C. 2014) ..........................................................................39

*Food & Water Watch v. Evnt'l Protection Agency*,
    5 F. Supp. 3d 62 (D.D.C. 2013) ..........................................................................39

*Foundation on Economic Trends v. Lyng*,
    943 F.2d 79 (D.C. Cir. 1991) ..............................................................................28

*Freedom Watch, Inc. v. McAleenan*,
    442 F. Supp. 3d 180 (D.D.C. 2020) ................................................................27, 28

*Green v. U.S. Dep't of Justice*,
    392 F. Supp.3d 68 (D.D.C. 2019) ........................................................................13

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) ............................................................................2

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987) ........................................................................12

*Halley v. Blinken*,
    No. 24-571, 2024 WL 4853874 (D.D.C. Nov. 21, 2024) ......................................21

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................................32

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..............................................................................23, 35

*In re Al-Nashiri*,
    47 F.4th 820 (D.C. Cir. 2022) ......................................................................14

*Indigenous People of Biafra v. Blinken*,
    639 F. Supp. 3d 79 (D.D.C. 2022) ..................................................................27

*Iowa League of Cities v. Envt'l Protection Agency*,
    711 F.3d 844 (8th Cir. 2013) ........................................................................30

*Irregulators v. Fed. Commc'ns Comm'n*,
    953 F.3d 78 (D.C. Cir. 2020) ........................................................................20

*Jenner & Block LLP v. Dep't of Justice*,
    No. 25-5265 (D.C. Cir.) ..........................................................................14, 19

*Jenner & Block LLP v. U.S. Dep't of Justice*,
    784 F. Supp. 3d 76 (D.D.C. 2025) ........................................................... *passim*

*Laird v. Tatum*,
    408 U.S. 1 (1972) .................................................................................10, 20

*Lepelletier v. Fed. Deposit Ins. Corp.*,
    164 F.3d 37 (D.C. Cir. 1999) ........................................................................36

*Lewis v. Mutond*,
    62 F.4th 587 (D.C. Cir. 2023) .........................................................................2

*Louisiana Environ'l Action Network v. Environ'l Protection Agency*,
    172 F.3d 65 (D.C. Cir. 1999) ........................................................................31

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................9

*Maryland Highways Contractors Assoc., Inc. v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ......................................................................31

*McCoy v. Kollar-Kotelly*,
  No. 23-02695, 2025 WL 928611 (D.D.C. Mar. 27, 2025) ....................................21

*Media Matters for Am. v. Paxton*,
  732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd* 138 F.4th 563 (D.C. Cir. 2025)...........................10, 16

*Murthy v. Missouri*,
  603 U.S. 43 (2024)...........................................................................................20

*NAACP v. City of Phila.*,
  39 F. Supp.3d 611 (D. Pa. 2014).....................................................................11

*NAACP v. State of Alabama ex rel. Patterson*,
  357 U.S. 449 (1958).....................................................................................26, 34

*Nat'l Ass'n of Consumer Advocates v. RentGrow, Inc.*,
  No. CV 24-3218 (PLF), 2025 WL 1429172 (D.D.C. May 16, 2025)...................................29

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  767 F. Supp. 3d. 243 (D. Md. 2025) ...............................................................22

*Nat'l Lime Ass'n v. Envt'l Protection Agency*,
  233 F.3d 625 (D.C. Cir. 2000)..........................................................................31

*Nat'l Treasury Emps. Union v. Seidman*,
  786 F. Supp. 1041 (D.D.C. 1992)......................................................................29

*National Maritime Union of Am. v. Commander*,
  824 F.2d 1228 (D.C. Cir. 1987).................................................................30, 31, 32

*Navegar, Inc. v. United States*,
  103 F.3d 994 (D.C. Cir. 1997)..........................................................................38

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)........................................................................................20

*Oceans v. U. S. Dep't of the Interior*,
  No. 1:24-cv-141-RCL, 2025 WL 973540 (D.D.C. Apr. 1, 2025) ...........................27

*Oregon Council for Humanities v. United States DOGE Serv.*,
  No. 3:25-cv-829, 2025 WL 2237478, 36 (D. Or. Aug. 6, 2025) ...........................32

*Perkins Coie LLP v. U.S. Dep't of Justice*,
  783 F. Supp. 3d. 105 (D.D.C. 2025)....................................................3, 18, 19, 40

*Perkins Coie v. U.S. Dep't of Justice*,
  No. 25-5241 (D.C. Cir.) ...................................................................................14

*Pharm. Research & Manufacturers of Am. v. Dep't of Health & Human Services*,
    656 F. Supp. 3d 137 (D.D.C. 2023) ........................................................................28

*Polaroid Corp. v. Disney*,
    862 F.2d 987 (3d Cir. 1988) ....................................................................................31

*Pub. Citizen, Inc. v. Fed. Trade Comm'n*,
    869 F.2d 1541 (D.C. Cir. 1989) ..............................................................................29

*Pub. Citizen, Inc. v. Trump*,
    297 F. Supp. 3d 6 (D.D.C. 2018) ............................................................................27

*Reese Bros., Inc. v. U.S. Postal Serv.*,
    531 F. Supp. 2d 64 (D.D.C. 2008) .....................................................................36, 37

*Speech First, Inc. v. Cartwright*,
    32 F. 4th 1110 (11th Cir. 2022) ..................................................................13, 24, 36

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ..................................................................................13

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ..................................................................................13

*Speech First, Inc. v. Shrum*,
    92 F.4th 947 (10th Cir. 2024) .................................................................................26

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ....................................................................................15, 19, 38

*Susman Godfrey LLP v. Exec. Off. of the President*,
    No. 25-1107, 2025 WL 1779830 (D.D.C. June 27, 2025) .................................18, 40

*Susman Godfrey LLP v. Exec. Off. of the President*,
    No. 25-5310 (D.C. Cir.) ..........................................................................................14

*The Presbyterian Church (U.S.A.) v. United States*,
    870 F.2d 518 (9th Cir. 1989) ..................................................................................34

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ............................................................................................32

*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333 (D.D.C. Cir. 2020) ............................................................. *passim*

*Turning Point USA at Ark. State Univ. v. Rhodes*,
    973 F.3d 868 (8th Cir. 2020) ..................................................................................11

*U.S. Chamber of Commerce v. Environ. Protection Agency*,
    642 F.3d 192 (D.C. Cir. 2011) ............................................................................27

*U.S. Telecom Assoc. v. Fed. Commc'ns Comm'n*,
    825 F.3d 674 (D.C. Cir. 2016) ............................................................................13

*United Presbyterian Church in the U.S.A. v. Reagan*,
    738 F.2d 1375 (D.C. Cir. 1984) ..........................................................................20

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ..........................................................................10, 14, 19

*Western Wood Preservers Institute v. McHugh*,
    925 F. Supp. 2d 63 (D.D.C. 2013) ......................................................................27

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
    784 F. Supp. 3d 127 (D.D.C. 2025) ...........................................................18, 22, 40

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
    No. 25-5277 (D.C. Cir.) ....................................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(1) .........................................................................................8

**Regulations**

Exec. Order No. 14230, 90 Fed. Reg. 11,781 (Mar. 11, 2025) ......................................3

**Constitional Provisions**

U.S. Const. amend. I ....................................................................................... *passim*

U.S. Const. art. III ...................................................................................25, 35

**Other Authorities**

10 Moore's Federal Practice § 101.61[5][a] (3d ed. 2024) ...........................................35

## INTRODUCTION

The Government's motion proposes that, although the President had issued five nearly identical executive orders ("EOs") against law firms as of the date the ABA brought this case—stating in two of them that "[m]y Administration **is committed to**" a policy of "addressing the significant risks associated with law firms" like them—the President "**may** never" issue another similar EO again. ECF No. 22-1 ("MTD Mem.") 32 (emphasis added). While nine of the largest law firms in the country submitted to "settlements" with the Administration to avoid similar EOs—"settlements" they secured at the cost of their attorneys' First Amendment rights—the Government contends that law firms are merely "chill[ing] themselves" and that "to the extent any law firm feels 'chilled,' that is traceable only to its imagination." *Id.* at 22.

There are certainly cases where a plaintiff conjures a "policy" from rare actions and stray statements by government actors and claims he is worried it might someday be used in a certain way against him. There are other cases where a plaintiff claims to fear a new and purely hypothetical way of enforcing a law. There are yet other cases where a plaintiff relies only on past harm to show future injury. This is none of those cases.

Here, the ABA's Complaint details a campaign in which the President himself issued virtually identical EOs against five different law firms while threatening to do the same against any other law firm that did not "behave," as the President warned to a nationwide audience from the Oval Office. And the Complaint establishes that even the most sophisticated and well-resourced law firms in the country took the threat so seriously that they agreed to forgo constitutionally protected expression and to contribute more than $1 billion in pro bono work to avoid being subject to EOs themselves. These allegations are not about coincidences and anecdotes, nor are they the product of overactive imaginations. The ABA has pleaded a well-defined and consistent policy that continues to repress constitutional rights.

The Government's response—that in order for the ABA to have standing, the Complaint must disprove the possibility that the President might choose to abandon the policy he has established—has no basis in law. It also highlights the nature of the game the Administration has chosen to play with America's legal profession. It would have been easy for the Government to assure the Court that the Administration will never again issue an EO materially like the ones at issue in this case. It did not. The Government could have chosen not to appeal the decisions striking down the EOs as unconstitutional. It appealed. Plainly, it serves the Government's interests to maintain the threat of retaliation that is at the Policy's core. Yet the Government insists the Court must assume that the President and his Administration will refrain from doing again the unconstitutional things they have done before and seek the freedom to do in the future.

As explained below, the Government's standing and ripeness arguments are wrong. The ABA has alleged concrete, imminent injury to specific ABA Members and to itself, caused by a Law Firm Intimidation Policy (or "Policy") seeking to suppress challenges to the Administration from the legal profession—and threatening a cornerstone of our democracy as a result. The ABA is a proper party to bring this suit, and now is the necessary and appropriate time to bring it. The Court should deny the Government's motion.[1]

---

[1] The Court can resolve this motion in the ABA's favor on the basis of the Complaint, for all the reasons given in this brief. But if the Court finds that there is sufficient doubt about whether the ABA has plausibly alleged facts to support standing, the Court should permit the ABA to seek jurisdictional discovery into the Government's ongoing implementation of the Policy. *Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023) (cleaned up); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000).

## FACTUAL BACKGROUND

I.    **The ABA Alleges the Administration has a Law Firm Intimidation Policy that Remains in Effect.**

Since taking office this year, President Trump and his Administration have adopted and implemented the Law Firm Intimidation Policy, pursuant to which the Administration has issued numerous materially identical executive orders against certain law firms and threatened to do the same against others, in order to intimidate and coerce law firms and lawyers to refrain from challenging the President or his Administration in court or speaking publicly in support of policies or causes the President does not like. *See* Compl. ¶¶ 1-22, 64-167. "*The Policy is ongoing*." Compl. ¶ 5 (emphasis added). As one judge in this District put it, such EOs are part of a "broader campaign" of "President Trump using the power of the presidency to target individual lawyers and law firms associated with them based on personal dislike of their legal work—in other words, for retribution." *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d. 105, 164 (D.D.C. 2025).

On February 25, 2025, the White House issued a memorandum targeting the law firm Covington & Burling by (1) revoking security clearances of certain Covington attorneys explicitly on the basis that they worked with former Department of Justice Special Counsel Jack Smith, (2) directing agencies to terminate engagements with Covington, and (3) directing agencies to review government contracts with Covington for potential termination. Compl. ¶ 69 n.8.

On March 6, 2025, President Trump signed Executive Order 14230, "Addressing Risks from Perkins Coie LLP" ("Perkins Order"). Compl. ¶ 69. The Perkins Order accuses the law firm Perkins Coie of "dishonest and dangerous activity"—namely, representing "failed Presidential candidate Hillary Clinton" and working with "activist donors"—as well as "discriminat[ing] against its own attorneys and staff" through its diversity initiatives. *Id*. The EO contains four punitive provisions:

- Section 2, directing the Attorney General and agency and department heads "to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest"; and directing heads of agencies to cease providing "Government goods, property, material, and services" to Perkins Coie ("Security Clearance Termination Provision"), Compl. ¶ 70;

- Section 3, requiring "Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract" so that agency heads can perform a required "review of all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie," "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law," ("Government Contracting Provision"), Compl. ¶ 71;

- Section 4, directing the EEOC to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964," and directing the Attorney General—in coordination with the EEOC and State Attorneys General—to investigate large law firms doing business with Federal entities "for compliance with race-based and sex-based non-discrimination laws" and to "take any additional actions the Attorney General deems appropriate in light of the evidence uncovered" ("Racial Discrimination Provision"); Compl. ¶ 72;

- Section 5(a), directing agency heads to "provide guidance limiting official access from federal government buildings to employees of Perkins Coie" when such access would "be inconsistent with the interests of the United States" and to "provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States" ("Federal Building and Employee Access Provision"), Compl. ¶ 73; and

- Section 5(b), barring agencies from hiring Perkins Coie employees absent a waiver ("Federal Employment Provision"), Compl. ¶ 73.

The White House subsequently issued EOs containing materially identical versions of Sections 2 through 5(b) against four additional firms: Paul Weiss on March 14, Jenner & Block on March 25, WilmerHale on March 27, and Susman Godfrey on April 9. Compl. ¶¶ 85, 107, 115, 120. In each instance, the first Section of the Order identifies the purported bases for punitive provisions—including, among other things, "condon[ing] partisan 'lawfare,'" "abus[ing] its pro bono practice to engage in activities that undermine justice and the interests of the United States," "engag[ing] in obvious partisan representations to achieve political ends," "support[ing] efforts to

discrimination the basis of race," "further[ing] the degradation of the quality of American elections," "employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice," "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections," and "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Compl. ¶¶ 107, 115, 123.

Apart from these five EOs, the Administration threatened at least eight other law firms with EOs, and each of those firms settled with the Administration before any EO was issued, agreeing to provide hundreds of millions of dollars of so-called "pro bono" legal services at no charge to the government and to limit their own conduct in certain ways. Compl. ¶¶ 8, 160. Though no additional EOs have been issued, the Administration repeatedly stated that there would be more EOs targeting other law firms. Compl. ¶¶ 150, 161-163. The reason is simple: these threats of more EOs are coercive and designed to dissuade law firms and lawyers from representing the Administration's critics and challengers and from representing clients whose causes or positions the current Administration disfavors. Compl. ¶ 167.

As previewed in the Perkins Order, the Administration directed the EEOC to review the practices of "large, influential, or industry leading law firms." Compl. ¶ 72. On March 17, the EEOC issued letters to twenty law firms requesting information about employment practices relating to diversity, equity, and inclusion ("DEI"). Compl. ¶¶ 96-99. On March 22, the Administration issued a memorandum entitled "Preventing Abuses of the Legal System and the Federal Court," which directed the Attorney General to "review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years" for purported "misconduct" and recommend responses "including reassessment of security clearances held by

the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions." Compl. ¶¶ 105, 165. The memorandum informed all American lawyers, including all members of the ABA, that they risked sanctions if, in the Administration's eyes, they participated in unreasonable or frivolous "litigation against the Federal Government." Compl. ¶ 106.

In short, the Policy targets and threatens law firms and their lawyers with sanctions designed to cripple any law firms' businesses and injure their lawyers if they engage in expressive conduct—plainly protected by the First Amendment—disfavored by the President or the Administration. Compl. ¶¶ 65-66. The Policy uses materially identical EOs as the "modus operandi" for extracting concessions and meting out punishment for those who refuse to capitulate to the Administration's unconstitutional demands. Compl. ¶ 113. The Administration's public statements—and the EOs issued pursuant to the Policy—confirm that its targets include lawyers who represent clients in matters seeking to vindicate the rights of immigrants, women or LGBTQ+ individuals; defend election integrity; or challenge the current Administration's policies, no matter how illegal. Compl. ¶¶ 66, 69, 75, 101, 107, 111, 115, 123, 149. And the President's comments at a March 4 press conference made clear that *no* ABA member or their law firm is safe: "I just think that the law firms have to behave themselves." Compl. ¶ 149.

## II.    The Complaint Shows How the Law Firm Intimidation Policy Continues to Cause Injury.

The Policy's chilling effect on the ABA and American lawyers, including ABA members, was nearly instantaneous. As soon as the EOs started issuing, news outlets began reporting that the Administration's Policy of intimidation—just as intended—created fear throughout the legal profession. Compl. ¶¶ 169, 170, 174-179. Lawyers and their firms abruptly changed their own

speech and conduct to avoid scrutiny and retaliation from the Administration, as reflected in their decisions about whom to represent and what to say on public-facing websites. Compl. ¶¶ 178-180.

The Administration's coercion of settlements from nine AmLaw 100 law firms illustrates the enormous and reasonable fear created by the Policy. Although four of the targeted law firms challenged their EOs in court, others took a different tack. In March 2025, Paul Weiss negotiated a settlement under which Paul Weiss was relieved of the EO's sanctions in exchange for "acknowledge[ing] the wrongdoing of its former partner"—which consisted entirely of being a part of a team of prosecutors in a criminal action brought against then private citizen Donald Trump—and agreeing to "adopt[] a policy of political neutrality with respect to client selection and attorney hiring; tak[e] on a wide range of pro bono matters representing the full political spectrum; commit[] to merit-based hiring, promotion, and retention, instead of 'diversity, equity, and inclusion' policies"; and "dedicat[e] the equivalent of $40 million in pro bono legal services . . . to support causes" the Administration favors. Compl. ¶ 89 (linking to the Paul Weiss Revocation Order). Eight other law firms—none of which was named in an EO, but each of which feared one—quickly followed suit, collectively committing to provide more than $940 million in free legal services to the Government and agreeing to internal policy changes in order to be spared the sanctions promised by the Administration's Policy. Compl. ¶¶ 91, 130, 133, 135, 141, 160. The Administration extracted these concessions despite the President's candid acknowledgement that "they've done nothing wrong[,] [b]ut what the hell, they give me a lot of money considering they've done nothing wrong." Compl. ¶ 138.

The harm to ABA members is clear and ongoing. The Members identified in the Complaint have faced the prospect of losing specific clients (and thus the revenue from those representations) if their firm draws the Administration's ire, Compl. ¶ 186; have been coerced into declining

representations adverse to or disfavored by the Administration out of fear of reprisal, Compl. ¶ 188; have encountered difficulty finding co-counsel for matters adverse to the Administration, Compl. ¶ 194; and have devoted substantial time and resources responding to and preparing for enforcement of the Policy against their firms, Compl. ¶¶ 187, 191, 199-200. Other ABA members not specifically identified in the Complaint have confirmed that the Policy is chilling their speech and legal representations but were too fearful of retaliation to be included in the Complaint themselves. Compl. ¶ 183. Indeed, by directly attacking the largest firms, which have the greatest resources to resist those attacks, the Policy has had the intended effect of intimidating smaller firms that lack those resources—as well as other large firms.

The ABA itself has also suffered harm. The ABA has faced increased challenges finding representation, as law firms and lawyers previously willing to represent it in litigation adverse to the federal government have declined to do so out of fear of adverse consequences. In some instances, the ABA has been unable to secure pro bono representation in matters for which the ABA would have been able to obtain pro bono representation prior to the existence of the Law Firm Intimidation Policy. Compl. ¶¶ 201-205.

## <u>LEGAL STANDARD</u>

In evaluating a motion that challenges a plaintiff's standing under Rule 12(b)(1), the Court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). The burden on a plaintiff to allege a factual basis for standing "at the pleading stage is not onerous." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court]

presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

## ARGUMENT

The Complaint alleges facts sufficient to establish standing and ripeness at the pleading stage. As explained in Part I below, the Complaint establishes standing by alleging (1) the existence of a concrete policy and related imminent adverse government action and (2) the chilled speech and diverted resources of the ABA's Members in response to the Administration's punitive and retaliatory Law Firm Intimidation Policy. And the Government's argument that "*subjective*" chill does not constitute cognizable harm fails because the ABA has alleged much more than just individual attorneys' subjective fears. Rather, the Complaint alleges an ongoing Policy, which the Government does not disavow and which it continues to actively pursue.

In addition, as explained in Part II below, the ABA has sufficiently alleged associational standing based on concrete injury suffered by its members caused by the Policy. The ABA has also alleged organizational standing due to harms directly suffered by the ABA itself. And third-party standing principles support the ABA's standing here in light of the close relationship between the ABA and its members and the hindrance posed to ABA members' own ability to bring claims on their behalf due to the fear of Government retaliation.

Finally, Part III explains that the ABA's claims are ripe because of the allegation of ongoing self-censorship—present harm caused by an ongoing policy that requires relief *now* and that presents legal questions well-suited to resolution by the Court. The Government raised similar ripeness arguments in each of the law firm EO cases, and judges in this District repeatedly rejected them. This Court should do likewise here.

## I.    The ABA Alleges Concrete and Imminent Injury to Its Members.

"Where, as here, a plaintiff brings a claim of First Amendment retaliation, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 25 (D.D.C. 2024) (cleaned up), *aff'd* 138 F.4th 563 (D.C. Cir. 2025); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). The Government asserts that allegations of subjective chill alone will not suffice to confer standing, citing the Supreme Court's decision in *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). MTD Mem. 18-19. But the Government ignores the post-*Laird* caselaw that explains what more a plaintiff must allege. "[P]ost-*Laird* cases plainly establish that a subjective chill of First Amendment rights, *paired with a credible threat of imminent, adverse government action against the claimant, may create a cognizable injury*." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 359 (D.D.C. Cir. 2020) (emphasis added).  Here, the ABA has amply alleged both a credible threat of adverse government action through the Policy, and the ongoing chilling effect on the nation's lawyers including the ABA's members.

### A.    The ABA sufficiently alleges that the Policy exists and constitutes a credible threat of adverse government action.

The ABA's allegations show that the Law Firm Intimidation Policy is of a piece with adverse government policies or state action that courts have enjoined in the past.

The fact that the Policy is not a formal statute or regulation is no bar. Particularly where First Amendment rights are at stake, courts have been willing to enjoin state action pursuant to even informal or unwritten policies. In *Turner*, the court enjoined the Administration from taking any further actions pursuant to a demonstrated (but unwritten) policy of interfering with the

10

independence of the Voice of America. No. 20-cv-02885-BAH, ECF No. 44 at 1-2 (Nov. 20, 2020)

(enjoining defendants from "making or interfering with personnel decisions with respect to

individual editorial or journalistic employees at Voice of America" and associated institutions;

"directly communicating with editors and journalists" at those institutions; and "conducting any

and all investigations into journalistic content, individual editors or journalists, or alleged editorial

lapses or breaches of journalistic ethics at Voice of America" and those institutions). The court

found that plaintiffs had standing to seek the requested injunctive relief based on allegations of

actions taken and statements made by Administration officials that demonstrated their intent to

interfere with Voice of America's historic independence and journalistic integrity. 502 F. Supp.

3d at 348-358. Rejecting the Government's standing argument, the court analogized the plaintiff's

challenge to implicit government policy to other pre-enforcement challenges, finding that:

> [The plaintiff's] theory of injury is closely analogous to a pre-enforcement
> challenge, and so she may establish a cognizable, non-speculative injury in fact by
> demonstrating her intent to exercise editorial and journalistic discretion and
> independence of the sort defendants have made a habit of penalizing, and a
> reasonable expectation that defendants will continue to restrict and penalize acts of
> editorial and journalistic independence which they perceive to be insufficiently
> supportive of President Trump.

502 F. Supp. 3d at 359-360 (citation omitted). Other courts have not hesitated to invalidate an

unwritten policy that tramples on First Amendment rights, in both pre- and post-enforcement cases.

*See, e.g., American Assoc. of Univ. Professors v. Rubio*, 780 F. Supp. 3d 350, 383 (D. Mass. 2025)

("[A] speech code that is unwritten or vague but enforced with harsh penalties would seem more

likely to chill broad swaths of speech than one that clearly defines what is forbidden."); *NAACP v.

City of Phila.*, 39 F. Supp.3d 611, 634 (D. Pa. 2014) ("If a plaintiff can show the existence of an

unconstitutional unwritten policy, a court will invalidate the policy as unconstitutional."); *Turning

Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 876 (8th Cir. 2020) (invalidating "unwritten

Tabling Policy" restricting organizations that could set up tables at university student union).

11

Here, the Government fundamentally misconstrues the target of the ABA's complaint. Rather than targeting simply a "hypothetical EO by the President against a hypothetical law firm," MTD Mem. 10, the ABA alleges the details of a specific, existing government policy threatening and causing concrete harm:

- The Administration issued five materially identical law firm EOs, and used the explicit threat of more, to extract coercive settlements from nine firms. Compl. ¶¶ 69-95, 107-144.

- The President and his Staff Secretary confirmed that the Administration is looking to punish "about 15 different firms . . . *or more*." Compl. ¶ 76 (emphasis added).

- The President described his thinking as follows: "I just think that the law firms have to behave themselves." Compl. ¶ 149.

- The previous EOs are described as being motivated by the Administration's "commit[ment] to addressing" what the President views as "the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests." Compl. ¶¶ 108, 164.

- The Administration's press secretary explained that "President Trump's policy team is executing on his directive to hold Big Law accountable for their weaponization of justice and their lies, and this strategy has proven tremendously successful." Compl. ¶ 146.

- The Administration violated EEOC protocol by publicly threatening investigation of the country's top firms by revenue. Compl. ¶¶ 98-99.

- The Administration issued a memorandum threatening discipline and seeking sanctions against firms and lawyers who challenge the Administration in court, which observers "fear . . . could mean any challenge to the president's policies." Compl. ¶ 103.

This is far more than mere speculative fear about hypothetical future action, and it is not a "nebulous assertion of the existence of a policy." MTD Mem. 17. Compare the allegations here to those in *Haase*, where there were *no* official government pronouncements regarding the alleged policy of searching travelers returning from Nicaragua and only three examples of ostensibly similar searches. *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987). This case is like *Turner*, where the existence of a government policy was demonstrated by a combination of specific retaliatory acts and public pronouncements of the Government's position. 502 F. Supp. 3d at 360-

61 (retaliation policy shown by "extensive pattern of penalizing . . . employees whom defendants regard as insufficiently supportive of President Trump . . . . bolstered by [defendant's] blunt public statement of his intent to 'drain the swamp' as applying to VOA").

Likewise, the facts here are consistent with what courts have found to constitute an ongoing, imminent threat of the adverse government action. This requirement is not a huge hurdle: it "[r]equires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law." *U.S. Telecom Assoc. v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 739 (D.C. Cir. 2016). A conventional background expectation that the government will take adverse action exists where the plaintiff alleges past enforcement efforts by the Government and a refusal by the Government to "disavow[] enforcement if plaintiffs undertake their proposed course of conduct." *Green v. U.S. Dep't of Justice*, 392 F. Supp.3d 68, 84 (D.D.C. 2019).[2] The determination regarding potential enforcement is forgiving. As several Courts of Appeals have held, for example, a plaintiff organization has standing to challenge the mere existence of university policies allegedly proscribing certain types of speech, even where those policies lack formal enforcement mechanisms. *See Speech First, Inc. v. Cartwright*, 32 F. 4th 1110, 1123 (11th Cir. 2022) ("Neither formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights—indirect pressure may suffice."); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765-66 (6th Cir. 2019); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 332-33 (5th Cir. 2020).

While the Government here argues that there may not be additional executive orders, this is *not* a case where the Government has actually disavowed future enforcement, or future executive

---

[2] Defendants do not contest that ABA members intend to commit acts violative of the Policy, and in any event the Complaint pleads that they will. *See* Compl. ¶¶ 186, 191, 194, 198.

orders pursuant to the Policy. *Compare Am. Booksellers*, 484 U.S. at 393 ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."), *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 290 (1979) (noting that "appellees have reason to fear prosecution for violation of the provision, where the State has not disavowed any intention of invoking the criminal penalty prosecution") *with In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (finding challenge to use of statements obtained by torture nonjusticiable where "the Government has repeatedly assured us it will not bring such statements in the future"), *Democratic Nat'l Committee v. Trump*, No. 25-00587 (AHA), 2025 WL 1573181, at *4 (D.D.C. June 3, 2025) (relying on government's assurances "through briefing and oral representations of counsel that the section has not been applied to employees of the FEC and there is no plan to apply it to the FEC" to find FEC challenge to executive order nonjusticiable). Here, to the contrary, the Government recently confirmed its commitment to the Policy's enforcement by appealing from the district court permanent injunctions against it in each of the four law firm EO cases. *See Perkins Coie v. Dep't of Justice*, No. 25-5241 (D.C. Cir.); *Jenner & Block LLP v. Dep't of Justice*, No. 25-5265 (D.C. Cir.); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-5277 (D.C. Cir.); *Susman Godfrey LLP v. Exec. Off. of the President*, No. 25-5310 (D.C. Cir.). If the Administration did not intend to issue more law firm EOs and did not want lawyers to continue to be intimidated, it would not seek to overturn the injunctions of its Policy as against those four law firms. And as reported by the Wall Street Journal, President "Trump remains interested in the [law firm] orders, and deputy White House chief of staff Stephen Miller and his allies want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration." Compl. ¶ 5.

14

The ABA's members continue to have reason to fear unconstitutional retaliation if they take representations or positions that the Administration disfavors. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("We have observed that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical.") (cleaned up). The Administration's public statements are entirely consistent with ongoing enforcement. By the Government's own math—the Administration made public comments threatening at least 15 EOs total, and 13 firms have either sued or settled—there are at least two additional target law firms under consideration. *See* MTD Mem. 12-13. The ABA has alleged a credible threat of imminent adverse government action.

**B.    The ABA sufficiently alleges that the Policy has chilled protected speech and conduct of lawyers across the country, and continues to do so.**

The ABA has likewise pleaded an ongoing chill of First Amendment rights, in addition to other harms. Even under the status quo and even without a new law firm EO having been issued while the Government is actively seeking to overturn injunctions issued against it in four other ones, the ABA's members are presently suffering real injury, and real harm to their constitutional rights. The fact that the previous law firm EOs were enjoined has not ameliorated the Policy's chilling effects. Compl. ¶¶ 129-44. The Administration has not abandoned its Policy and its threat to issue more EOs pursuant to that Policy, and courts have not extended injunctive relief beyond the individual law firms that filed suit to challenge the EOs against them. The ABA is not relying on *past* harms to satisfy the imminent injury requirement, but *present* harms that continue unabated. *Cf.* MTD Mem. 14-16.

The ABA alleges numerous examples of specific, concrete ways in which its members' rights and interests are currently being adversely affected by the Law Firm Intimidation Policy:

- The organization Law Firm Partners United reported that lawyers were declining to represent clients because they feared government retaliation. Compl. ¶ 172.

- The Washington Post reported that lawyers were declining to represent Biden-era officials and pro bono organizations because of fear of retaliation. Compl. ¶ 174.

- Numerous pro bono organizations reported that firms who worked with them in the past were declining representations out of fear.  Compl. ¶¶ 175-76, 178-79. ABA Member C confirmed the same.  Compl. ¶¶ 195-96.

- Law firms have removed content from their websites that they fear would trigger adverse government scrutiny or action.  Compl. ¶¶ 170, 180.

- Partners at Am Law 100 firms, many of whom are ABA members, declined to sign amicus briefs in favor of the law firms that challenged the previous EOs.  Compl. ¶¶ 81, 171.

- ABA Member A described in the Complaint that their firm has more than one client who has expressed concern that the firm might be targeted by a future EO and more than one client who has expressed that they will be forced to find new representation if so. Compl. ¶ 186.

- ABA Member A described in the Complaint that their firm declined to take an immigration matter adverse to the Administration out of fear of reprisal. Compl. ¶ 188.

- ABA Members B and D have devoted substantial time and resources to preparing for enforcement of the Policy against them and their firms.  Compl. ¶¶ 191, 199-200.

- Other ABA members confirmed that the Policy is chilling their speech and legal representations but were too fearful of retaliation to be included in the Complaint. Compl. ¶ 183.

These allegations, which the Court must assume to be true in evaluating whether the ABA has standing, make clear that the Policy exists and that it is chilling the speech and the exercise of other constitutional rights of lawyers, including ABA members. They make clear that lawyers risk losing business because of the Policy, and resources are being expended to protect against potential retaliation from the Policy. This puts the ABA on the same footing as plaintiffs in cases where courts have found standing for pre-enforcement challenges. *See, e.g., Turner*, 502 F. Supp. 3d at 349-50 (evidence of chilling included removing videos from VOA website); *Media Matters*, 732

F. Supp. 3d at 25 (plaintiffs showed chilling effect on "news operations and journalistic mission" through changes to editorial process and other internal policies).[3]

Furthermore, the Complaint shows that ABA members who continue to participate in disfavored speech and representation face a credible threat of retaliation. ABA Members B, C, and D have in the past represented and continue to represent clients of the very type that the Administration has indicated may trigger retaliation.  Compl. ¶¶ 190-91, 193-94, 197. They each articulate a concern that they or their firms will be targeted by a similar EO pursuant to the Policy. *Id.* The Government has not disavowed any intention to refrain from and cease penalizing lawyers who take on cases the Government does not like, particularly when it comes to representing clients in immigration or other cases against the federal government. To the contrary, though it would have been very easy for the Government to state in its motion that no further EOs will be issued, it did not do so. Because it didn't and won't, the Policy continues to coerce and intimidate lawyers and law firms into censoring their speech, limiting their representations, and refraining from other disfavored conduct. This ongoing injury to ABA members confers standing. *Turner*, 502 F. Supp. 3d at 359-60.

With regard to ABA members' expenditure of resources to prepare for enforcement of the Policy against them, the "loss of even a small amount of money is ordinarily an 'injury' for standing purposes." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (citation omitted). Indeed, the Supreme Court has repeatedly found standing "based on a 'substantial risk' that [a]

---

[3] Citing *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the government argues that expending resources to guard against the effects of the Policy is insufficient to create standing. But unlike in *Alliance for Hippocratic Medicine*, ABA Members B, C, and D are not spending time and money to oppose the Policy; they are spending time and money to guard against retaliation under the Policy and because the Policy's threats are interfering with their core business and professional activities. *Compare id.* at 395 *with* Compl. ¶¶ 191, 194-96, 199-200.

harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (collecting cases).

The ABA's and its members' harm is like the harms identified by every court that has considered the law firm EOs. In each of those cases, the court found that the perception that a law firm might be out of favor with the Administration was causing concrete and particularized injury. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 146 (D.D.C. 2025) (complaint alleged that clients were considering terminating engagements, and clients were concerned about difficulties engaging with federal government); *id.* at 148-49 (observing that "the mere threat of limited access . . . may be sufficient to constitute unconstitutional retaliation"); *Jenner & Block LLP v. U.S. Dep't of Justice*, 784 F. Supp. 3d 76, 112 (D.D.C. 2025) ("The injury [Jenner fears] is also the coercion it feels now to change its speech to avoid impending consequences; the mere fact that the defendants are weighing things like 'limiting Government employees' from engaging with Jenner personnel . . . exemplifies the speech-based discrimination Jenner is experiencing."); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 147 (D.D.C. 2025) ("The Complaint alleges, for example, that the Order has a chilling effect on speech and creates significant uncertainty for the firm's clients even before agency officials issue guidance or make factual findings."); *Susman Godfrey LLP v. Exec. Off. of the President*, No. 25-1107, 2025 WL 1779830, at *9 (D.D.C. June 27, 2025) (finding standing where firm alleged that the EO "is chilling its current and prospective attorney-client relationships in the here-and-now . . . and that clients are inquiring about how the Order will affect the firm's ability to represent them"); *cf.* Compl. ¶ 186 (Member A's clients have expressed concern that the firm might be targeted and clients might need to find new representation). In the previous EO cases, the courts recognized that the retaliatory and chilling effects of the EOs were directed to and

felt by American lawyers generally, not just the individual firm named in the challenged EO. *See, e.g.*, *Jenner*, 784 F. Supp. 3d at 88 ("More subtle but perhaps more pernicious is the message the order sends to the lawyers whose unalloyed advocacy protects against governmental viewpoint becoming government-imposed orthodoxy."); *Perkins Coie*, 783 F. Supp. 3d at 120 (describing the EO's message as "lawyers must stick to the party line, or else").[4]

Thus, the ABA alleges ongoing and imminent injury to its members that satisfies the test for standing. *See, e.g.*, *Am. Booksellers*, 484 at 393; *Susan B. Anthony List*, 573 U.S. at 164, 167-68; *Turner*, 502 F. Supp. 3d at 359-60.

### C.    The Government's attempts to counter the allegations of injury fail.

The Government's principal response to the ABA's allegations is that they are motivated by purely fanciful, subjective concerns because there "may never" be further law firm EOs. MTD Mem. 32. The intentionally coy word choice speaks volumes. Certainly, the Government *could* dampen the Policy's coercive effects by stating unequivocally that the Policy "will not" now (or in the future) be enforced. But a disavowal of the Policy would defeat the Administration's purpose in implementing the Policy: an *in terrorem* effect that is widespread in its coercion of law firms and lawyers.

The Government's cases are inapposite. Perhaps most importantly, in all but three of those cases, the alleged injury did not involve the ongoing chill of expressive rights. As explained above, courts have been particularly willing to find standing for pre-enforcement challenges where such

---

[4] The *Jenner* Court declined to grant Jenner's request to "enjoin federal officials from using or considering in any way or for any purpose the statements laid out in Section 1" of the Jenner EO. 784 F. Supp. 3d at 117-18 (cleaned up). That request is unlike the ABA's request here. The ABA is asking this Court to enjoin specific conduct—for example, revoking security clearances or denying lawyers access to federal buildings. Jenner's request was aimed at an open-ended universe of any government conduct in any way related to the Administration's animus toward the firm, separate and apart from the specific actions the court enjoined.

a chill has been demonstrated. *See supra*, at 11, 13-14, 16. And in the cases involving alleged chilling of expressive rights, the plaintiffs failed to demonstrate standing because they could not tie the alleged expressive chill to an imminent, adverse government action. Specifically, in *Murthy v. Missouri*, 603 U.S. 43 (2024), which was decided on a full, post-discovery record, the plaintiffs sought to enjoin alleged federal-government influence in social-media platforms' content-moderation decisions. The Court found that the plaintiffs lacked standing because they failed to show any evidence that the federal defendants were likely to have a future effect on the platforms' moderation decisions. *Id.* at 68-74. In the other two cases, the plaintiffs challenged federal government surveillance policies but did not show any likelihood that there was an adverse government action connected to those policies that was poised to be taken against them. *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378-79 (D.C. Cir. 1984). Those cases are not this case, where the Complaint alleges through the previous EOs and public statements by the Administration that additional retaliatory actions will likely be taken against attorneys who support cases and causes the Administration disfavors and the Government has not disavowed the possibility of such future action.

In several of the government's other cases—unlike here—the plaintiffs showed only past harm and did not provide evidence of ongoing effects that were harming them. *See O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974) (plaintiffs offered no evidence that they were likely to be arrested and subject to discriminatory policies in future); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (being subject to illegal chokehold in past insufficient for future injunctive relief where plaintiff did not allege likelihood that he would be again subject to illegal chokehold); *Irregulators v. Fed. Commc'ns Comm'n*, 953 F.3d 78, 82-85 (D.C. Cir. 2020) (no evidence supported plaintiffs' theories of alleged harm); *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147-49 (2d

Cir. 2020) (addressing standing to seek forward-looking relief of plaintiffs who had suffered only past harm); *McCoy v. Kollar-Kotelly*, No. 23-02695, 2025 WL 928611, at *2 (D.D.C. Mar. 27, 2025) (plaintiff seeking injunction against courtroom policy did not allege intent to return to courtroom). Finally, in the remaining cases cited by the Government, the plaintiffs' prediction of potential future injury was simply too speculative. *See Halley v. Blinken*, No. 24-571, 2024 WL 4853874, at *3 (D.D.C. Nov. 21, 2024) (request to enjoin future appropriation of funds to organization that plaintiffs speculated might be used to fund terrorist activities was too attenuated from any harm to plaintiffs, who were direct or indirect victims of past terrorist attacks); *Doe v. Office of Personnel Mgmt.*, No. 25-234, 2025 WL 513268, at *5-6 (D.D.C. Feb. 17, 2025) (allegations that email addresses were stored on unsecured system and vulnerable to hacking, based on "a decade-old failure to protect sensitive data" did not establish any imminent injury). None of these cases involved the type of allegations of ongoing, expressive injury that are alleged in the ABA's Complaint.

Perplexingly, the Government asserts that "the ABA cannot even allege an action that this Court can enjoin." MTD Mem. 12. To the contrary, the Complaint is very specific about what the ABA is asking this Court to enjoin: retaliatory conduct materially similar to that which has already been enjoined with respect to four individual law firms. Compl ¶¶ 269-78. There is no question that this Court has the authority to enjoin federal agencies from engaging in unconstitutional retaliation, just as four other courts in this District already have done. The ABA's request for relief is directly analogous to the order issued in *Turner*, where the court enjoined federal actors from taking future action pursuant to an implicit policy of retaliation against Voice of America that was demonstrated by a constellation of previous examples of retaliation. *Turner*, No. 20-cv-02885-BAH (D.D.C.), ECF No. 44 (Nov. 20, 2020); *see Turner*, 502 F. Supp. 3d at 348-53 (D.D.C. 2020).

The Government next misunderstands the ABA's request to enjoin retaliatory disciplinary proceedings. *See* MTD Mem. 15-16. The ABA is not asking the Court to enjoin Defendants from initiating or referring *any* disciplinary proceeding against any ABA lawyer for *any* reason. That is a straw man. Rather, the ABA is asking the Court to enjoin Defendants from taking disciplinary action against a lawyer or firm on the basis of the lawyer's law firm or organizational affiliation, or on the basis of the identity of the lawyer's clients or the clients' claims for relief. This request is plainly tied to the Policy. As explained above and in the Complaint, the Policy goes far beyond the law firm EOs and extends to a variety of retaliatory measures threatened by the Administration, including retaliatory disciplinary proceedings and sanctions requests based on nothing more than disfavored law firms, clients, or litigation positions. *See supra*, at 12.

The very point of the Policy is to insulate the Administration's actions from legal challenge and judicial review by threatening—explicitly or implicitly—retaliation against any lawyer or firm who takes a representation or a position that the Administration does not like. *See Jenner*, 784 F. Supp. 3d at 88 ("This order, like the others, seeks to chill legal representation the administration doesn't like, thereby insulating the Executive Branch from the judicial check fundamental to the separation of powers."). The policy "is akin to a sword of Damocles hanging over" all ABA members, waiting to fall if they step out of line. *Wilmer*, 784 F. Supp. 3d at 147. "[W]here a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d. 243, 266 (D. Md. 2025) (cleaned up). So too here. If lawyers and law firms are forced to wait until there is another law firm EO—a possibility the Government will not rule out—and litigate the constitutionality of

every EO on an individual basis, then the Policy's chilling effects will persist and lawyers will be unable to practice without the reasonable fear of retaliation by this Administration.

## II.     The ABA Establishes Standing on Behalf of Itself and Its Members Under Organizational, Associational, and Third-Party Standing Doctrines.

The ABA's Complaint establishes the ABA's associational standing based on the injuries to its members, and organizational standing based on the direct injury suffered by the ABA itself. Nothing in the Government's brief undercuts either. And while the Government argues that the general principles of third-party standing weigh against granting the ABA standing here, precisely the opposite is true: This case presents a quintessential example of why courts have granted plaintiffs the right to enforce third parties' First Amendment rights when those third parties face obstacles to doing so themselves. The ABA is an appropriate party to bring this case.

### A.     The ABA alleges associational standing based on the injury to specific members caused by the Law Firm Intimidation Policy.

As the Government acknowledges, an organization has standing to bring suit on behalf of its members when: (a) at least one of its members would otherwise have standing to sue in their own right; (b) the interests the organization seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires that individual members participate in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Government does not contest the second element; and it offers no persuasive argument regarding the first or the third.

#### 1.     More than one ABA member has standing to sue.

With respect to the first prong, as explained above, the ABA's Complaint alleges facts sufficient to show that at least one of its members would have standing to sue in his or her own right. The ABA demonstrated that it alleges injury in fact suffered by specific members and caused

23

by the Law Firm Intimidation Policy and does not repeat those points here. *See supra*, at 15-18 (discussing harm to Members A-D); Compl. ¶¶ 185-200.

The Government's additional arguments regarding individual member standing do not change the analysis.

*First*, the Government argues that the EO provisions the ABA seeks to enjoin target "*law firms*" rather than "*lawyers*," and that this somehow means that the *lawyers* directly and foreseeably harmed by those EOs government action lack standing to sue for their injuries. MTD Mem. 23. As a threshold matter, claiming that the at-issue provisions are solely directed at law firms mischaracterizes the challenged conduct. The Administration has made clear that a motivating factor behind its retaliatory EOs is the disfavored conduct of individual lawyers. *See, e.g.*, Compl. ¶ 107 (quoting the Jenner Order's reference to the "unethical Andrew Weismann" and his "pursuit of nonexistent crimes, bribery of foreign nationals, and overt demand that the Federal Government pursue a political agenda against [President Trump]" as justification for the Order); ¶115 (quoting WilmerHale Order's reference to work performed by Robert Mueller, Aaron Zebley, and James Quarles as justification for the Order). Furthermore, the "Security Clearance Termination Provision" does not suspend a law firm's security clearance; it suspends clearances "held by individuals" at a given firm—*i.e.*, held by individual *lawyers*. Compl. ¶ 67(i). Likewise, the "Federal Building and Employee Access Provision" limits *lawyers*' access to federal government buildings and restricts government employees from engaging with *lawyers*. Compl. ¶ 67(iii). The Federal Employment provision restricts the hiring of *lawyers*. Compl. ¶ 67(iv). And the Government Contracting Provision threatens to interfere with client relationships held by *lawyers*. Compl. ¶ 67(ii). In short, the retaliatory law firm EOs seek to penalize firms by taking

24

aim *at their lawyers*. And any injury from the Policy on a law firm also inflicts injury on every equity partner or shareholder of that firm, many of whom are ABA members.

The Government's argument fundamentally misunderstands the Article III injury alleged by the ABA. Contrary to the Government's brief, the ABA does not rely on some possible "future injury" to its members; rather, it relies on present, ongoing harm that many of its members are suffering right now because of their reasonable fear. That reasonable fear is the exact purpose of the Law Firm Intimidation Policy, and it continues to chill and constrain the speech and conduct of ABA members. Individual lawyers are objectively chilled by retaliatory EOs that threaten to bar them from federal buildings; restrict them from interacting with federal officials; restrict their ability to seek federal employment; suspend their security credentials; and jeopardize their relationships with any clients that also contract with the federal government. As one court in this District put it, these EOs "cast[] a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government." *Jenner*, 784 F. Supp. 3d at 115. In short, the alleged harm caused by the Policy is harm suffered by *lawyers*, including ABA Members A – D.

*Second*, the Government argues that the ABA cannot rely on the "statistical probability" of harm to some of its members. MTD Mem. 24 (quoting *Summers*, 55 U.S. at 497–98). The ABA does not do so. Instead, it identifies four specific Members and alleges concrete injury suffered by each. Compl. ¶¶ 185-200.

*Third*, the Government suggests that the ABA has failed to sufficiently identify harmed members because it has not identified them by name. MTD Mem. 24. This is incorrect. The D.C. Circuit has made clear that associational standing does not require identifying an injured member by name, so long as a plaintiff points to specific members that suffered a concrete harm. In

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration*, 41 F.4th 586 (D.C. Cir. 2022), the D.C. Circuit held that "anonymity is no barrier to standing" where a plaintiff has proffered allegations establishing injury to specific members—in that instance, anonymous survey responses from the plaintiff's members. *Id*. at 594. This holding conforms to decades of precedent. As the Tenth Circuit has explained in addressing precisely this issue, "[l]ongstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims," and nothing in the Supreme Court's jurisprudence suggests that associational standing requires deviating from that rule. *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024); *accord Am. Ass'n of Univ. Professors*, 780 F. Supp. 3d at 377 (the experiences of anonymous members described in the complaint sufficed to support associational standing); *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp.2d 19, 31 (D.D.C. 2012) (holding that "the plaintiff need not identify an affected member by name" at the pleading stage and collecting cases holding the same).

Requiring the ABA to identify injured members by name would be particularly inappropriate here given the facts alleged by the ABA: The harm suffered by the ABA's members flows from their objectively reasonable fear of retaliation by the Administration, pursuant to the Law Firm Intimidation Policy, for litigation activities that situate the members as adverse to the Administration or its perceived interests. Requiring those same members to publicly identify themselves in order to seek relief would unreasonably burden their First Amendment rights. *Cf. NAACP*, 357 U.S. at 462. Indeed, some of the members contacted by counsel for the ABA declined to offer statements for the Complaint, even anonymously, because of their concern regarding retaliation. Compl. ¶ 183; *see Am. Ass'n of Univ. Professors*, 780 F. Supp. 3d at 378 (finding associational standing in case where, in addition to specifically identified anonymous members,

some members "who were interviewed by counsel 'were too fearful even to have their experiences described anonymously'"). To be sure, the desire for anonymity does not obviate the ABA's obligation to identify specific harmed members, *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 193 (D.D.C. 2020); but the ABA has done so. This case is a far cry from the scenario in *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79 (D.D.C. 2022), where the plaintiff provided "no specifics about the John Does on whose behalf it claims to be bringing this action, except to say that each is an anonymous member who 'reasonably fears' injury at the hands of the Nigerian government." *Id*. at 85; *see* Compl. ¶¶ 185-200 (listing specific facts about Members A-D and their injuries). And the facts of this case involving fear of retaliation by the Government underscore why standing does not require the use of names.

None of the district court cases cited by Defendants supports treating specific Members' desire for anonymity as a bar to associational standing at the pleading stage, in contravention of D.C. Circuit law. *Advocates for Highway & Auto Safety*, 41 F.4th at 594. In *Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018), the plaintiff "made no effort" to "identify a specific member who has suffered, or who [was] likely to suffer, an injury in fact due to the Executive Order's effect"—rather, the complaint there discussed potential harm to the plaintiff's members generally. *Id.* at 18. The same was true in *Western Wood Preservers Institute v. McHugh*, 925 F. Supp. 2d 63, 69-70 (D.D.C. 2013). The ABA, by contrast, has specifically identified four injured Members.  Compl. ¶¶ 185-200. The court in *Oceans v. U. S. Dep't of the Interior*, No. 1:24-cv-141-RCL, 2025 WL 973540 (D.D.C. Apr. 1, 2025), cited no authority for its apparent requirement that an organizational plaintiff identify injured "members by name." *Id*. at *8. Rather, it cited to *U.S. Chamber of Commerce v. Environmental Protection Agency*, 642 F.3d 192, 199–200 (D.C. Cir. 2011), which required only that a plaintiff "specifically identify members" injured—which

the ABA has done—and *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991), which does not address this issue at all.

In *Freedom Watch*, the plaintiff did not merely fail to identify any member by name. Rather, it "sa[id] *nothing* about its members' identities, [*or*] the nature of their interests, *or* how they have suffered an 'actual,' 'concrete and particularized' harm." 442 F. Supp. 3d at 194. The plaintiff there seemed to think that a desire to protect its members' anonymity excused it from pleading any specific member injury at all, *id.*—which is not the position taken by the ABA. In *Californians for Renewable Energy v. U.S. Department of Energy*, 860 F. Supp. 2d 44 (D.D.C. 2012), the court focused on injury to the one named member of the plaintiff organization because he was the only member identified in *any* manner. *Id.* at 48-49; *see* Complaint, *Cal. for Renewable Energy v. U.S. Dep't of Energy*, No. 1:11-cv-02128, at ECF 1 (Nov. 28, 2011). And in *Pharmacy Research & Manufacturers of America v. Department of Health & Human Services*, 656 F. Supp. 3d 137, 153 (D.D.C. 2023), the court did not reach the question of whether members must be identified by name.

The ABA has pleaded specific facts showing that Members A, B, C, and D have suffered injury in fact caused by the Law Firm Intimidation Policy, thereby satisfying the first required element of associational standing.

## 2. Individual members' participation is not required

Turning to the third consideration for associational standing, the Government has not pointed to any reason why participation in this litigation by individual ABA members would be required. The ABA seeks a declaration that the challenged provisions embodying the Law Firm Intimidation Policy are unconstitutional and injunctive relief barring their enforcement against any ABA member based on law firm affiliation or client representations.  Compl. ¶¶ 269-278. As Defendant's own cited case explains, "[t]he member-participation inquiry turns on whether the

organization's requested relief can be awarded without 'individualized proof' from its members."

*Nat'l Ass'n of Consumer Advocates v. RentGrow, Inc*., No. CV 24-3218 (PLF), 2025 WL 1429172,

at *7 (D.D.C. May 16, 2025) (cleaned up). Courts have repeatedly held that claims for declaratory

and injunctive relief, as the ABA asserts here, do not require individual member participation. *See,*

*e.g.*, *Nat'l Treasury Emps. Union*, 636 F. Supp. 2d at 75 ("NTEU seeks declaratory and injunctive

relief, which does not require individual participation."); *Nat'l Treasury Emps. Union v. Seidman*,

786 F. Supp. 1041, 1045 (D.D.C. 1992) ("[P]laintiffs limit their requests to injunctive and

declaratory relief, so no individual participation is required as would be the case if the Court

needed to measure specific individual damages."). The nature of the ABA's claims further

underscores that they do not require "individualized proof": once the ABA demonstrates—as it

has—that specific identified members have suffered concrete injury, the Court need only consider

whether the Law Firm Intimidation Policy violates the First Amendment by creating an objective

fear of enforcement. As the Government itself has emphasized, MTD Mem. 18, the subjective

fears of individual ABA members are not at issue.

  The Government nevertheless tries to manufacture individual issues by arguing that "mere

ABA membership does not establish a credible threat of enforcement," MTD Mem. 26, but this

misunderstands the inquiry. Associational standing does not require establishing harm to every

member of an organization; *one* injured member is enough. *Cent. & S. Motor Freight Tariff Ass'n*

*v. United States*, 757 F.2d 301, 312 (D.C. Cir. 1985) ("[A]ccording to the Supreme Court, an

association has standing if 'its members, *or any one of them,* are suffering immediate or threatened

injury as a result of the challenged action.'") (citation omitted, emphasis by the court); *Pub. Citizen*

*v. Fed. Trade Comm'n*, 869 F.2d 1541, 1550 (D.C. Cir. 1989) (organizational standing considers

individual injured members and does not turn on "the injuries suffered by a population 'as a

whole'"); *Iowa League of Cities v. Envt'l Protection Agency*, 711 F.3d 844, 869 (8th Cir. 2013) (a plaintiff "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing") (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). And the Government's assertion that granting the ABA's requested relief would mean "that no Administration can ever revoke a security clearance from any law firm employee" mischaracterizes the relief the ABA seeks. MTD Mem. 26. The ABA seeks a declaration that the specific provisions repeated in all of the law firm EOs—including the Security Clearance Provision—are unconstitutional, and an injunction barring their enforcement against its members based on law firm affiliation or client representations.  Compl. ¶¶ 269-278. The ABA does not seek to enjoin all possible Executive action regarding an individual lawyer's security clearance.

The Government also bizarrely argues that some ABA Members *may benefit* from future retaliatory EOs, because those Orders will hurt their competitors, styling this cynical view of legal professionals as a "conflict of interest." MTD Mem. 27. The Government again misunderstands the alleged injury, which is injury occurring right now from objective fears, not hypothetical future harm to a lawyer or law firm from a future EO. The Government's argument that "the *majority* of the ABA's members [are] potentially advantaged" by future retaliatory EOs ignores the present harm caused by the objectively reasonable fear that *any* given law firm or lawyer could be subject to such an EO. MTD Mem. 27. Absent certainty as to which firms will or will not be next, the harm sweeps far broader than the lawyers who may at some future date be subjected to enforcement.

Furthermore, as the Government acknowledges, even a true conflict of interest between members (which this case does not present) would not prevent associational standing under the law of this Circuit. In *National Maritime Union of America v. Commander*, 824 F.2d 1228 (D.C.

Cir. 1987), the D.C. Circuit rejected an argument similar to that advanced by the Government here—that plaintiffs lacked associational standing "because the employees they represent have conflicting interests in the outcome of this litigation," holding that "the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members." *Id*. at 1232, 1234. The D.C. Circuit reaffirmed this position in *Louisiana Environmental Action Network v. Environmental Protection Agency*, 172 F.3d 65 (D.C. Cir. 1999), holding that absent a showing of some "internal procedural violation"—which the Government has not (and could not) claim occurred here—"conflict of interest within an organization does not deprive the organization of representative standing." *Id*. at 68; *see also Whipple*, 636 F. Supp. 2d at 74 ("[C]onflicts of interest among members do not necessarily deprive the organization of associational standing even if the remedies sought may harm some members."); *Nat'l Lime Ass'n v. Envt'l Protection Agency*, 233 F.3d 625, 637 (D.C. Cir. 2000) (stating that the plaintiff is "entitled to be an advocate for a subgroup of cement manufacturers whose interests diverge from those of the run of cement producers").[5]

The Government also seems to argue that the third element of associational standing is not met because ABA members are not "bound by any judgment the ABA can receive here." MTD

---

[5] The Government's out-of-circuit cases do not bind this Court, nor do they change the analysis. In *Maryland Highways Contractors Association, Inc. v. Maryland*, 933 F.2d 1246 (4th Cir. 1991), the alleged harm flowed from a regulation expressly benefitting minority businesses; and the Fourth Circuit expressed concern about the organization's internal procedures that led to the litigation—namely, that there was no minority business owner on the group's board, the board did not tell members about the decision to litigate until after filing suit, and "[t]his secrecy raise[d] suspicion regarding the motives of the Association." *Id.* at 1253. *Polaroid Corp. v. Disney*, 862 F.2d 987 (3d Cir. 1988), is even further afield, as it rejected an associational standing analysis in considering whether a target corporation had standing to sue on behalf of its shareholders and cited no authority for its dicta regarding associational conflicts of interest. *Id.* at 999. It has also, in the decades since its issuance, never been cited by any court in this District.

Mem. 27. No one would be "bound" by the ABA's request for declaratory and injunctive relief other than Defendants. To the extent the Government means that ABA members would not themselves be bound by *res judicata* principles, that is true of association members in any case involving associational standing. Indeed, the fact that individual members are still free to represent their own interests, potentially taking positions divergent from their organization, is one of the reasons this Circuit does not treat intra-organizational conflicts of interest as preclusive of associational standing. *See National Maritime Union*, 824 F.2d at 1234 (explaining that concern regarding conflicting member interests is lessened because dissenting individual members are not bound by the organization's litigating position and may still advocate for their own interests).

The Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), holding that universal injunctions likely exceed the powers of the district courts, does not apply here. The ABA does not seek "to prohibit enforcement of a law or policy against *anyone*"; it seeks to prohibit enforcement only against its own members and their law firms. *Id.* at 2548;  Compl. ¶¶ 206-278. CASA did not purport to upend decades of caselaw establishing organizations' ability to bring suit on behalf of injured members. *See, e.g.*, *Oregon Council for Humanities v. United States DOGE Serv.*, No. 3:25-cv-829, 2025 WL 2237478, at *35-36 (D. Or. Aug. 6, 2025) (discussing *CASA* and holding that "[w]ithin the principles of direct and associational standing, the Court properly may order injunctive relief for the Federation's members").

### B.    The ABA alleges organizational standing based on direct harm suffered by the ABA.

An organization has standing in its own right when, like an individual with standing, it has "alleged . . . a personal stake in the outcome of the controversy," because the challenged actions have caused "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*,

455 U.S. 363, 379 (1982) (cleaned up). When assessing organizational standing, the D.C. Circuit "has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (collecting cases). The ABA's allegations satisfy this standard.

The ABA alleges that its "founding commitment" is "to advance the rule of law across the American nation," with a mission "[t]o serve equally our members, our profession and the public by defending liberty and delivering justice as the national representative of the legal profession." Compl. ¶¶ 1, 20. The ABA further alleges that one of the routine ways it advances its mission is through litigation, on which it partners with law firms serving as pro bono counsel. *Id*. ¶201. This includes "litigation against the federal government; litigation related to social and political issues disfavored by the current Administration; and amicus briefs related to issues affecting the mission and policy of the ABA." *Id*. The ABA alleges specific facts demonstrating that the Law Firm Intimidation Policy has impaired the ABA's ability to further its organizational purpose. In particular,

- A law firm that previously expressed interest in partnering on litigation challenging certain of the President's policies affecting immigrants declined to do so following the implementation of the Law Firm Intimidation Policy, Compl. ¶ 203;

- A long-time law firm partner of the ABA is no longer willing to represent the ABA in any litigation against or potentially adverse to the Administration and its policies, despite that partner's prior willingness to do so, Compl. ¶ 204; and

- No law firm was willing to serve as counsel for the ABA in litigation challenging on First Amendment grounds the federal government's termination of certain grants to the ABA, despite many firms' prior willingness to represent the ABA in similar matters, Compl. ¶ 205.

In short, the ABA's litigation activity—which it has historically used to advance its core goals—has been impaired as a consequence of the Law Firm Intimidation Policy. This impediment to the

ABA's activities constitutes organizational injury in fact. *See, e.g.*, *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 & n.7 (D.C. Cir. 1986) (finding organizational standing where party had "concrete programmatic organizational interests at stake").

The Supreme Court long ago made clear that an organization can assert chilled association as cognizable injury. In *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449 (1958), the Supreme Court recognized that compelled disclosure of the NAACP's membership lists might "induce members to withdraw from the Association and dissuade others from joining it." *Id.* at 463. The Court held that such deterrent effects constitute constitutional injury—including when the harm flows through private actors' responses to government action. *Id.* at 464. And the Supreme Court has more recently reaffirmed this principle: in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), the Court found that the plaintiff charitable organization alleged cognizable injury caused by state donor disclosure requirements that would deter association with plaintiff. The Court emphasized that when it comes to the freedom of association, the protections of the First Amendment "are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals." *Id.* at 618. Rather, "[t]he risk of a chilling effect on association is enough": "First Amendment freedoms need breathing space to survive." *Id.*; *see also The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) (INS's alleged surveillance conduct constituted a "distinct and palpable" injury where it chilled individual congregants' participation in the plaintiff church and thus interfered with the church's ability to carry out its mission); *Am. Ass'n of Univ. Professors*, 780 F. Supp. 3d at 380 (plaintiff had organizational standing where it plausibly alleged that "Public Officials' actions directly affect and interfere with its core activities," by deterring individuals "from participating in core organization activities") (cleaned up).

The Government tries to avoid this body of caselaw by arguing the ABA has failed to plausibly allege that the Law Firm Intimidation Policy chilled firms' willingness to partner with the ABA—but a review of the Complaint belies this characterization. To begin, the ABA has alleged specific facts supporting the chilling effect of the Policy with respect to firms' support of the ABA—namely, the timing of firms' decisions not to partner with the ABA; specific firms' prior willingness to do so; conversations with lawyers at the relevant firms; and the lack of any other explanation for the refusal to continue those partnerships.  Compl. ¶¶ 203-205. At the pleading stage, these allegations are sufficient to support a plausible allegation regarding the chilled firms' motivations. *Bennett v. Spear*, 520 U.S. 154, 168 (1997) ("[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." (cleaned up)); *cf*. Moore's Federal Practice § 101.61[5][a] (3d ed. 2024) ("Within the First Amendment context, courts properly apply an expanded notion of standing to determine who may institute the asserted claim for relief."). In addition, as explained above, the ABA has alleged a policy that creates an objective fear of participating in exactly the sort of activities central to the ABA's mission that the ABA alleges have been chilled—confirming that the ABA has plausibly alleged injury caused by the Policy. *Supra*, at 10-19. Simply put, the facts alleged in the complaint sufficiently plead the ABA's injury, all that is required at this stage of the litigation.

### C.    The third-party standing doctrine supports the ABA's standing here.

The ABA has already explained that it satisfies the requirements for associational standing, which constitutes a well-established exception to the general rule that a party must assert only its own rights. *See Hunt*, 432 U.S. at 345. Nevertheless, the Government's separate arguments with respect to third-party standing—which "is available to plaintiffs who, in addition to their own Article III standing, can successfully demonstrate a 'close relationship' with the third parties

whose rights they assert and some 'hindrance' to the third parties pursuing their own rights," *Turner*, 502 F. Supp. 3d at 361—are meritless.

*First*, the Government argues that the ABA lacks a close relationship with the third parties whose First Amendment rights it asserts because it purportedly asserts rights of non-members. MTD Mem. 29. This misreads the Complaint, which seeks relief only for ABA members and their firms (along with the ABA itself). Compl. ¶¶ 206-278. The Government does not contend the ABA lacks a close relationship with its own members, nor could it. A "close relationship" exists where there is "an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests," which is precisely the case between the ABA and its injured members. *Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 44 (D.C. Cir. 1999). As set forth in the Complaint, the ABA has been stymied in its attempts to take on the same sort of litigation adverse to the Administration or its interests that its own members would like to take on but for their reasonable fear of retaliation.

*Second*, to satisfy the hindrance requirement, a plaintiff need only show that "there is some impediment to the real party in interest's ability to assert his own legal rights." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010) (citing *Singleton v. Wulff*, 428 U.S. 106, 118 (1976)). This is not a stringent standard; and it may be even further "relax[ed]" when a plaintiff asserts "First Amendment claims." *Reese Bros., Inc. v. U.S. Postal Serv.*, 531 F. Supp. 2d 64, 69 (D.D.C. 2008) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) and *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). Here, the Government claims that no impediment exists to members asserting their own rights, pointing to the lawsuits filed by four law firms that have been targeted by retaliatory Executive Orders (apparently forgetting the nine other firms that settled rather than litigate). MTD Mem. 29. The Government once again misunderstands or ignores the

harm asserted in this case—the chilling effects, right now, of the Law Firm Intimidation Policy. ABA members whose law firms have not yet been targeted by an EO face a significant barrier to enforcing their First Amendment rights: The very nature of their injury (that is, the chill on their First Amendment right to take positions adverse to the Administration) means that they are unlikely to take on a position adverse to the Administration by challenging the Policy. *See Turner*, 502 F. Supp. 3d at 362 (hindrance requirement satisfied where third party journalists believed that, were they to sue under their own names, they would face retaliation); *Reese Bros.*, 531 F. Supp. 2d at 70 (granting third-party standing on the basis of "merely a danger of chilled speech"). The law firms that have brought suit, by contrast, have *already* been targeted. Their injury is not a reasonable fear of future enforcement, but rather a challenge to present enforcement.

* * *

The ABA satisfies the requirements for organizational and associational standing by pleading harm to its members and to itself; and the facts of this case underscore why courts have carved out exceptions to the general rule against third-party standing. Challenging a policy of the Administration that is designed to prevent lawyers *from taking positions adverse to the Administration* is precisely the sort of action for which third-party standing doctrines exist.

## III.    The ABA's Claims Are Ripe.

Courts conducting a ripeness analysis "consider both the fitness of the issues for judicial decision and the hardship to the parties of withholding review." *Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (cleaned up). "Much like standing, ripeness requirements are also relaxed in First Amendment cases." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013).

Courts are particularly likely to find a plaintiff's claims ripe where the plaintiff is suffering an ongoing chilling effect to First Amendment rights or similar self-censorship, even in the pre-

enforcement context. *See, e.g.*, *Navegar, Inc. v. United States*, 103 F.3d 994, 998-99 (D.C. Cir. 1997) (observing that "[f]ederal courts most frequently find preenforcement challenges justiciable when the challenged statutes allegedly 'chill' conduct protected by the First Amendment"); *Cooksey*, 721 F.3d at 240 ("In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill." (citation omitted)); *Chi. Women in Trades v. Trump*, 773 F. Supp. 3d 592, 603 (N.D. Ill. 2025) (noting that "a plaintiff may bring a pre-enforcement action when First Amendment rights are at stake"). Being forced to choose between freely exercising constitutional rights and risking government censure makes a plaintiff's challenge to government policy sufficiently justiciable. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 167-68; *Chi. Women in Trades*, 773 F. Supp. 3d at 603.

Here, as explained above (and contrary to the Government's unsubstantiated assumptions, MTD Mem. 32), the ABA's members are already experiencing the type of chill and self-censorship that was sufficient to show ripeness in similar cases. *See supra*, at 15-19. The issues presented by the ABA's claims are "[p]urely legal questions," *Reich*, 57 F.3d at 1100, as evidenced by the fact that the courts in each of the previous law firm EO cases resolved the merits of the firms' claims without any discovery, and with no requests for discovery by the Government. The allegations in the Complaint show that the ABA's members are facing hardship from the Policy even without additional EOs, because they are faced "with the difficult choice between" taking positions adverse to the Administration or keeping their heads down and not risking becoming a target of the Government's displeasure. *Id.* at 1101. The threats to the legal profession, including the ABA's members, are unprecedented and substantial—as recognized by each of the courts that has considered a law firm EO and by a multitude of well-respected commentators. This readily

distinguishes this case from those on which the Government relies. *See Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007) (noting that "[n]either petitioner [nor respondent] suggests that it would suffer any hardship were we to hold its petition in abeyance" and intervenors' licenses were unaffected while petition was being held); *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 6-7 (D.D.C. 2014) (no live controversy where it was undisputed that government would engage in further administrative review before beginning any relevant construction).

The ABA is not challenging purely hypothetical government action that might take an unknown form. *Cf.* MTD Mem. 31-32. The ABA is challenging a specific, articulated government policy of retaliation against disfavored lawyers, which has already taken shape through five nearly identical EOs and various other acts and statements by Government officials. The ABA is seeking to enjoin specific, articulated government action that would be taken pursuant to that policy. As already noted, the Government has not disavowed issuing additional EOs against additional law firms along the same lines as those previously issued under the Policy.  The Government's request for "further factual development—*i.e.*, if and when the President issues an EO addressing the ABA or a law firm implicating the ABA's membership," MTD Mem. 32—is unnecessary because there is no set of facts under which an Executive Order materially similar to the five already issued would be constitutional. *See Jenner*, 784 F. Supp. 3d at 112 ("The Court can imagine no exclusion of Jenner employees from federal buildings, no bar of Jenner employees from interacting with federal employees, and no federal hiring ban on Jenner employees that would pass constitutional muster."); *cf. Food & Water Watch v. Evnt'l Protection Agency*, 5 F. Supp. 3d 62, 80-81 (D.D.C. 2013) (plaintiffs' challenge to authorization of pollution trading and offset program was not ripe

where there were many uncertainties about how program would be implemented and what permits would be issued).

Likewise, the courts in the previous law firm EO cases easily rejected the Government's ripeness arguments there, even for those provisions of the EOs that simply directed agencies to develop guidance on how to implement the Policy. *See Jenner*, 784 F. Supp. 3d at 111-12; *Perkins Coie*, 783 F. Supp. 3d at 148-49 ("[P]laintiff persuasively argues that the mere threat of limited access, whatever the exact details of the final guidance may be, constitutes unconstitutional retaliation to suppress viewpoints with which the current presidential administration disagrees."); *Wilmer*, 784 F. Supp. 3d at 147 (finding ripeness in part because Wilmer's "Complaint alleges, for example, that the Order has a chilling effect on speech and creates significant uncertainty for the firm's clients even before agency officials issue guidance or make factual findings"); *Susman*, 2025 WL 1779830, at *11. While the firms in each of those cases had been singled out, the harms that they suffered were no different in kind from the harms that the ABA's members allege here, which are rooted in a reasonable fear that their legal practice will be materially and adversely affected by taking on disfavored clients or by challenging the Administration or its policies.

At bottom, the Government wants to continue to reap the unjust and unconstitutional rewards of its Policy—coercing lawyers and law firms into not taking positions and representations the Administration disfavors—while insulating the blatantly unconstitutional Policy from judicial review. The Court should reject this attempt to perpetuate against the ABA and its members "an unprecedented attack on [our country's] foundational principles," *Perkins Coie*, 783 F. Supp. 3d at 120.

## **CONCLUSION**

For these reasons, the Court should deny the Government's motion.

Dated:  September 24, 2025

/s/ Stephen Shackelford, Jr.
Stephen Shackelford, Jr. (D.C. Bar #NY0443)
Beatrice Franklin (*pro hac vice pending*)
Jillian Hewitt (*Admitted pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Tel.: 212-336-8330
sshackelford@susmangodfrey.com
bfranklin@susmangodfrey.com
jhewitt@susmangodfrey.com


Neal Manne (D.C. Bar #357012)
Barry Barnett*
Harry Susman*
Justin A. Nelson (D.C. Bar#490347)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713-651-9366
nmanne@susmangodfrey.com
bbarnett@susmangodfrey.com
hsusman@susmangodfrey.com
jnelson@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel.: 310-789-3100
dbrook@susmangodfrey.com

Jordan Connors*
Steve Seigel (D.C. Bar#D00473)
Katherine Peaslee (*Admitted pro hac vice*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, Washington 98101
Tel: 206-516-3880
jconnors@susmangodfrey.com
sseigel@susmangodfrey.com
kpeaslee@susmangodfrey.com

*pro hac vice* forthcoming

*Attorneys for Plaintiff American Bar Association*

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically filed the foregoing opposition to Defendants' motion to dismiss with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered participants.

*/s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.