**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **AMERICAN BAR ASSOCIATION,** | ) | |
| _Plaintiff_, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01888 |
| | ) | |
| **EXECUTIVE OFFICE** | ) | |
| **OF THE PRESIDENT,** | ) | |
| _et al._, | ) | |
| _Defendants_. | ) | |
| _____ | ) | |

**BRIEF OF**
**FORMER PRESDENTS OF THE DISTRICT OF COLUMBIA BAR, OTHER**
**FORMER OFFICERS, GOVERNORS AND SENIOR STAFF OF THE DISTRICT OF**
**COLUMBIA BAR,**
**PAST AND PRESENT LEADERS OF VOLUNTARY BAR ASSOCIATIONS,**
**AND**
**VOLUNTARY BAR ASSOCIATIONS IN THE DISTRICT OF COLUMBIA**
**AS _AMICI CURIAE_**
**IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

Andrea Ferster
Law Offices of Andrea C Ferster
(DC Bar #384648)
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

Philip Allen Lacovara
(DC Bar #194472)
4352 West Gulf Drive
Sanibel, FL 33957-5106
Phone: 239-472-2992
Email: placovara@gmail.com

Counsel for _amici curiae_

## TABLE OF CONTENTS                                              Page

INTEREST OF *AMICI CURIAE* ……………………………………………………………..1

SUMMARY OF ARGUMENT………………………………………………………….3

CONTEXT FOR ABA'S COMPLAINT…………………………………………………5

ARGUMENT…………………………………………………………………………..8

I.    THE CLAIM FOR RELIEF IS RIPE FOR ADJUDICATION AND
      THE ABA HAS STANDING TO BRING THIS CASE………………………………8

   A. THE PRESIDENT'S ATTEMPT TO BLACKBALL LAWYERS
      AND LAW FIRMS BECAUSE OF PERSONAL DISAGREEMENTS
      IS DETERRING LAWYERS FROM PROVIDING PROFESSIONAL
      LEGAL SERVICES, INCLUDING PRO BONO SERVICES………………………...8

   B. THE ABA AND ITS MEMBERS HAVE BEEN INJURED AS A
      RESULT OF CONTINUED, THREATENED ATTACKS ON THE
      LEGAL PROFESSION…………………………………………………………..17

II.   THE ADVERSARY SYSTEM IS AN ESSENTIAL ELEMENT OF
      THE RULE OF LAW IN THE AMERICAN CONSTITUTIONAL
      SYSTEM……………………………………………………………………..19

III.  THE RIGHT TO SELECT ONE'S OWN CHOSEN COUNSEL IS AN
      ESSENTIAL ELEMENT OF THE RIGHT TO REPRESENTATION ……………...23

IV.   BLACKBALLING OR PUNISHING A LAWYER OR LAW FIRM
      BECAUSE OF VIGOROUS (AND LAWFUL) REPRESENTATION
      OF A CLIENT CONFLICTS WITH BASIC PRINCIPLES OF THE
      RULE OF LAW……………………………………………………………….26

CONCLUSION………………………………………………………………..28

## INTEREST OF *AMICI CURIAE*

The *Amici Curiae* are leaders of the legal profession in the Nation's Capital who have served as presidents or officers of The District of Columbia Bar and various voluntary bar associations, and various local bar associations in their institutional capacities.

We tender this brief in support of Plaintiff's opposition to the motion to dismiss [ECF Document 27] in order to put in context the enormous damage being done to the legal system by the actions that the President has directed against an array of lawyers and law firms and, indeed, the entire legal profession.

The Defendants have moved to dismiss the Complaint, contending, in part, that the relief sought by Plaintiff American Bar Association ("ABA") is not "ripe" and that the ABA lacks standing [ECF Document 22]. The Defendants' theory is that the President's coercion of various law firms is not continuing and may not be resumed, that any equitable relief would be "premature" and that the ABA has incurred no injury.

That theory is fundamentally flawed. As the Complaint alleges, the President's campaign against lawyers and law firms who have undertaken to represent clients or causes with which he personally disagrees *continues* to have substantial, deleterious, and unjustifiable effects. Indeed, as we explain, the palpable fear of becoming the targets of another round of presidential retaliation is distorting the vital system for providing pro bono legal services and is inducing firms to refrain from undertaking pro bono clients and causes that are likely to arouse the President's ire.

Assuming that the Court denies the motion to dismiss, *Amici Curiae* will also support the ABA's request for final relief from the President's unconstitutional campaign to undermine the American legal system as it exists under the Constitution. The Court can deal with some of these

ongoing consequences through appropriately tailored declaratory and injunctive relief. This brief, however, only addresses the motion to dismiss the case at the threshold.

The *Amici Curiae* consist of three categories of leadership of the legal profession in the District of Columbia.

1.    The first category includes former Presidents of The District of Columbia Bar, which is the "mandatory" or "unified" bar that was formed in 1972 as an official arm of the District of Columbia Court of Appeals. The DC Bar is responsible for licensing lawyers and regulating the practice of law in Washington. The DC Bar is the second largest unified bar in the United States, with over 120,000 members. As these statistics suggest, while headquartered in our Nation's Capital, the DC Bar's members span the world, practicing in all 50 states and more than 80 countries. These *amici* were elected at various points over the past fifty years by the tens of thousands of lawyers authorized to practice law in the Nation's Capital wherever they principally practice.

Other *amici* in this category served in senior executive positions with the DC Bar over a period of thirty-five years or as former Officers and Governors of the DC Bar.

As such, the DC Bar *amici* reflect the interests of the legal profession throughout the United States in protecting the Rule of Law against abridgment by any government official, including the President.

2.    In addition, the District of Columbia is the venue for private organizations of lawyers called "voluntary bar associations," which focus on specialized professional development and advocacy but do not regulate the practice of law or discipline lawyers. The second category of *amici* who join in this brief are former presidents of a number of those voluntary bar associations, including the Women's Bar Association of the District of Columbia, the Bar

Association of the District of Columbia, the National Bar Association, the Washington Bar Association, and the Trial Lawyers Association of Metropolitan Washington, DC.

3.      Finally, following their own procedures for determining when to take public positions on important matters of interest to the legal community and the larger society, the third category of *amici* consists of the following voluntary bar associations that have decided to appear as *amici* in their institutional capacities: Bar Association of the District of Columbia, Hispanic Bar Association of the District of Columbia, Metropolitan Washington Employment Lawyers Association, National Bar Association, Trial Lawyers Association of Metropolitan Washington, DC, and Women's Bar Association of the District of Columbia,

The full list of *Amici Curiae* and their affiliations is attached as an Appendix.

## SUMMARY OF ARGUMENT

The President's conduct being challenged in this litigation involves not merely a small number of attacks on lawyers or law firms but a systematic and systemic assault on the vital underpinnings of the American legal process itself.  In addition to the Plaintiff American Bar Association, leaders of the bar elsewhere,  including dozens of state and local bar associations, have condemned these attacks on the Rule of Law.  This conduct is patently unlawful and has had direct and immediate consequences to the ability of lawyers and law firms to discharge their ethical responsibilities to provide *pro bono* service to assist the legal profession in fulfilling its duty to make legal counsel available.

The *Amici* tender this brief to explain the following points: The President's retaliation against lawyers and law firms is unconstitutionally distorting the system of pro bono representation that is vital to the functioning of the system of justice administered by Article III courts.  The President's campaign against firms that have undertaken pro bono clients or causes that he opposes

is substantially deterring many other lawyers and firms from undertaking such representations. The *Amici* have personally observed the destructive consequences that the President's campaign is having on the availability of legal services for clients and causes that the President dislikes. In particular, risk-averse lawyers are shying away from undertaking pro bono representation of clients or causes – or providing financial support to such clients or causes – that the President and his Administration oppose, lest they suffer retaliation from the President and his subordinates, as other lawyers and firms have. As explained in detail in the ABA's opposition to the motion to dismiss, this *in terrorem* effect has direct and immediate consequences that adversely affect the constitutional rights (and ethical obligations) of lawyers and law firms.

This assault is of special concern, though, to the vitality of the Rule of Law in the seat of government, where we have served as leaders of the bar.

It would be hard to imagine any action that poses a graver danger to the Rule of Law than allowing a President summarily to blackball – or threaten to blackball – lawyers and law firms, preventing them from representing clients who otherwise would choose to engage them, because the lawyers have had the temerity to represent causes or clients whom the President disapproves. The Constitution does not allow any government official, including the President, simply to declare that no client may choose to retain a presidentially disfavored lawyer to represent the client in dealing with the government.

Accordingly, the President's actions, including those taken or potentially to be taken by his subordinates to implement his unconstitutional pique, are "ripe" for equitable relief, and the ABA has standing to address these ongoing and unrelenting unconstitutional attacks on the legal profession, the administration of justice, and the rule of law.

## CONTEXT FOR ABA'S COMPLAINT

The President of the United States has chosen to retaliate against lawyers and law firms that – as he boldly admits – engaged in representing clients or causes with which he disagrees, especially cases in which he himself had a personal interest. The President is using purported power to govern by "Executive Order" or "Presidential Memorandum" in order to weaponize the force of the national government to retaliate against perceived political opponents. The President's relentless campaign of weaponizing the Oval Office against his perceived personal enemies is brutally sweeping.

For example, the President has issued "Executive Orders" purporting to punish several major law firms, some of which have responded by challenging the constitutionality of such Orders. These targets of formal Executive Orders include Covington & Burling, Perkins Coie, Paul Weiss Rifkind Wharton & Garrison, Jenner & Block, WilmerHale, and Susman Godfrey. As discussed below, Paul Weiss and many other firms (i) have "settled" with the President in order to escape being punished for their lawful professional work or (ii) have abandoned or rejected lawful client relationships, especially in pro bono matters, in order to avoid presidential retribution.

This use of purported presidential power to punish lawyers and law firms for perceived personal grievances is part of an astonishingly blatant pattern of misuse of the office of the Chief Executive to settle personal scores.

For example, the President issued an Executive Order targeting the Susman Godfrey firm, because (among the President's other personal grievances), the firm successfully represented clients who sued the President's favored network, FOX, and one of his campaign advisors,

Rudolph Giuliani, for falsely claiming that the clients had helped "steal" the 2020 presidential election from candidate Trump.

In addition, in sanctioning the WilmerHale firm, the President acted because the firm had taken in as a partner former FBI Director Robert Mueller, whom the Attorney General had appointed as Independent Counsel to investigate Russian influence in connection with Mr. Trump's 2016 presidential campaign.  See *Wilmer Cutler Pickering Hale and Dorr LLP* v. *Executive Office of the President* (D.D.C. 1:25-cv-917 (RJL).

The President imposed an interdict on Jenner & Block simply because one of its *former* partners, Andrew Weissmann, had earned a place as a *bete noir* on the long list of the President's perceived personal enemies.  See *Jenner & Block LLP* v. *United States Department of Justice* (D.D.C. 1-25-cv-916 (JDB).

After the Perkins Coie firm filed the first legal challenge to the President's unconstitutional actions, the President upped the stakes by promulgating still another Executive Order targeting an additional firm, Elias Law Group, and seeking "to cow the legal profession" by weaponizing both the Justice Department and the Department of Homeland Security.  The President directed them to seek out and punish firms that have brought suits against the government over the past eight years or that may do so in the future, if Trump Administration officials consider those suits "vexatious."

In another case, the President stripped lawyer Marc Zaid of his security clearance, not because he is a security risk, but because he represented clients, including whistleblowers, in matters adverse to the President's personal interests.  See *Zaid v. Executive Office of the President* (D.D.C. Case No. 1:25-cv-01365-AHA).  This inference is evident from the group of targets of presidential wrath included in the Presidential Memorandum banning Zaid from continuing to hold a security clearance for the purpose of representing clients dealing with the government on national

security matters. Without any individualized explanation, the President's fiat stripping and banning such clearances simply declares:

> "Having determined that it is no longer in the national interest for the following individuals to access classified information: Antony Blinken, Jacob Sullivan, Lisa Monaco, **Mark Zaid**, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of Joseph R. Biden Jr.'s family. Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access to classified information. I also direct all executive department and agency heads to revoke unescorted access to secure United States Government facilities from these individuals."

Each of the persons listed, including Zaid, either served as counsel in litigation or criminal investigations adverse to Donald Trump, in his personal capacity, or was affiliated with his personal political adversaries.

There is no doubt that, in all of the limited recitals of pretexts for the President's grievances, the law firms or their individual partners were acting as counsel representing clients in connection with legal proceedings. Indeed, the President's principal grievance appears to be, on the face of his stream of Executive Orders, that lawyers in these firms represented candidates for public office who were running against Mr. Trump in his personal capacity or were involved in official investigations into his own possibly criminal conduct.

Not surprisingly, four members of this Court already have ruled in favor of each of the four large law firms that challenged presidential retaliation, finding that the President's campaign violates a whole checklist of constitutional guarantees, See *Perkins Coie LLP* v. *U.S. Dep't of Justice*, __ F. Supp. 3d ___, Case No. 25-cv-716, 2025 WL 1276857, at *1-2 (D.D.C. May 2, 2025); *Jenner & Block LLP* v. *U.S. Dep't of Justice*, ___ F. Supp. 3d ___, Case No. 25-cv-916, 2025 WL 1482021, at *8 (D.D.C. May 23, 2025); *Wilmer Cutler Pickering Hale and Dorr LLP* v. *Exec. Office of the President*, ___ F. Supp. 3d ___, Case No. 25-cv-917, 2025 WL 1502329, at *1

(D.D.C. May 27, 2025); *Susman Godfrey LLP* v. *Executive Office of the President*, ___ F. Supp. 3d ___ (Case No. 25-cv-1107-LLA (D.D.C. June 27, 25).  Each of these jurists has entered orders enjoining enforcement of these executive orders against the lawyers and law firms so targeted.

However, despite these uniform rulings and accumulated loses, the Trump administration has continued its unconstitutional attacks and has appealed each of these decisions.  As a result, lawyers and law firms remain vulnerable to these unconstitutional and retaliatory attacks.  Fearing similar actions, some  law firms that the President dislikes are being forced to negotiate for "protection" from his threatened retaliation.  As discussed below, some already have succumbed to the threats.  Of consequence for the present motion, President Trump's past actions are having a continuing effect distorting pro bono representation.  It is imperative that the ABA's lawsuit be permitted to proceed in order to remedy these ongoing harms to constitutionally protected advocacy, the administration of justice, and the rule of law.

## ARGUMENT

I.    **THE CLAIM FOR RELIEF IS RIPE FOR ADJUDICATION AND THE ABA HAS STANDING TO BRING THIS CASE**

A. **THE PRESIDENT'S ATTEMPT TO BLACKBALL LAWYERS AND LAW FIRMS BECAUSE OF PERSONAL DISAGREEMENTS IS DETERRING LAWYERS FROM PROVIDING PROFESSIONAL LEGAL SERVICES, INCLUDING PRO BONO SERVICES**

One of the hallmarks of the legal profession is the understanding that lawyers have an ethical obligation (i) to undertake pro bono representation of persons and organizations who cannot afford such representation or (ii) to provide financial support to legal services organizations.  This principle is stated in Rule 6.1 ("Pro Bono Public Service") of the DC Bar Rules of Professional Conduct:

> "A lawyer should participate in serving those persons, or groups of persons, who are unable to pay all or a portion of reasonable attorney's fees or who are otherwise unable to obtain

counsel.  A lawyer may discharge this responsibility by providing professional services at no fee, or at a substantially reduced fee, to persons and groups who are unable to afford or obtain counsel, or by active participation in the work of organizations that provide legal services to them. When personal representation is not feasible, a lawyer may discharge this responsibility by providing financial support for organizations that provide legal representation to those unable to obtain counsel."

As explained in the Comment to the Rule:

"The rule incorporates the legal profession's historical commitment to the principle that all persons in our society should be able to obtain necessary legal services. The rule also recognizes that the rights and responsibilities of individuals and groups in the United States are increasingly defined in legal terms and that, as a consequence, legal assistance in coping with the web of statutes, rules, and regulations is imperative for persons of modest and limited means, as well as for the relatively well-to-do."

The President has made it explicit in the various Executive Orders punishing law firms that he does not like that he is holding against them what he regards as their "harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes."

The President is seeking to discourage this pro bono work both by directly imposing sanctions on lawyers and law firms and by limiting their ability to be retained by paying clients. By banning disfavored firms from representing clients in dealing with the federal government, the President's Executive Orders threaten to erode the availability of pro bono services. Lawyers and firms depend on the revenue from paying clients to enable them to represent pro bono clients and to contribute to the support of a broad range of human rights organizations.

A consequence of the Executive Orders, therefore, is not just to punish lawyers for pro bono work that the Chief Executive finds objectionable, but also to degrade their financial capacity to take on the routine pro bono work of representing indigent clients, a service on which our courts depend to contribute to the efficient administration of justice.

~ 9 ~

In the District of Columbia, as throughout the rest of the country, the availability of pro bono legal service has been essential to the effective participation of many non-profit organizations in the advocacy process, including advocacy before Article III courts and Congress. This pro bono service extends to organizations that pursue programs and objectives that may be at odds with the policies and preferences of a particular national Administration.

According to the latest data from the Pro Bono Institute, law firms with at least fifty lawyers throughout the country devoted more than 5,000,000 hours of professional time to pro bono work in 2023. One of the major categories of such professional commitment is "racial justice initiatives" in the following areas:

> Criminal Justice
> Economic Empowerment
> Education
> Healthcare
> Housing
> Police Reform
> Voting Rights

In the District of Columbia alone, major firms devoted nearly 914,000 hours to comparable pro bono services.

As is evident, many of these professional commitments involve challenging government programs and policies or pressing governments at all levels for reform.

President Trump has been disturbingly candid in highlighting that a central motive for his retaliation against various law firms is his disagreement with such causes they pursued on behalf of their pro bono clients. This hostility also has been channeled into attacks on the Plaintiff itself because of its support for the Rule of Law and for pro bono services in the traditional sense. Thus, Judge Cooper of this Court ruled in May that the Trump Administration had unconstitutionally sought to punish the Plaintiff because of "the ABA's history of 'tak[ing] positions on contentious

legal, policy, and social issues' that 'frequently have not aligned with the positions advanced by [DOJ]' and its 'litigat[ion] in support of activist causes.'"

The President's campaign distorts the vital system of pro bono representation and support in two ways.

First, the President's attempt to punish law firms for undertaking representation of causes and clients involved in a variety of civil rights and civil liberties issues, including DEI initiatives and migrant protection, has deterred many firms from undertaking or continuing to represent such causes.  In addition, firms that traditionally have been major contributors of financial support for civil rights and civil liberties organizations have pulled back their support dramatically.

The *Amici* who submit this brief are personally aware of these consequences flowing from the President's campaign.  Firms perceive that they risk presidential wrath if they publicly are identified either as counsel representing such organizations or as providing them with financial support.  The firms perceive that any action that places them in the President's gunsights either will induce clients to avoid trusting their affairs to firms laboring under such an Administration cloud or will undercut their ability to represent their clients effectively in dealing with federal agencies answerable to the President.  This type of constraint damages the firm's financial interests, as even one of the nominally successful firms that challenged the President in court appears to have experienced.

Moreover, published reports confirm that, perhaps intentionally, the President's notorious campaign against law firms has scared off many firms from offering pro bono services that they traditionally had considered appropriate and important.  For example, NPR recently reported:

> "NPR spoke with attorneys at a half dozen organizations that regularly team up with Big Law firms providing pro bono assistance to challenge government actions or policies. All of them say they have deep concerns about law firms pulling back from pro bono work. Some say it's already happening."

~ 11 ~

The head of one civil rights project explained:

> "I have been turned down on some recent requests where people have expressed concern about political ramifications about being involved in immigrant rights work in this time, about being involved in civil rights, voting rights cases, in challenges against the administration."

Similarly, CNN reported:

> "'I know from talking to organizations, they are having a hell of a time finding firms to partner with,' one senior partner at a large law firm told CNN. 'Firms are really gun shy to take on cases that may upset the administration.'"

In an extensively researched piece, *Pro Publica* summarized in August 2025:

> "Some of the country's largest law firms have declined to represent clients challenging the Trump administration, more than a dozen attorneys and nonprofit leaders told ProPublica, while others have sought to avoid any clients that Trump might perceive as his enemies. * * * Big Law firms are also refusing to take on legal work involving environmental protections, LGBTQ+ rights and police accountability or to represent elected Democrats and federal workers purged in Trump's war on the 'deep state.' Advocacy groups say this is beginning to hamper their efforts to challenge the Trump administration.
>
> ***
>
> "There are cases that aren't being brought at a time when civil rights abuses are maybe at the highest they've been in modern times * * *."

These reports are consistent with what *Amici* have personally observed and experienced.

Second, the choice to curry the President's favor rather than to risk his retaliation has induced a number of firms to "do deals" with the President. These deals typically include an explicit distortion of the traditional notion of pro bono service.

In this context, we take note of the "capitulation" by a series of law firms that the President has targeted for "retribution." First was the Paul Weiss firm. That firm's response illustrates the unwarranted distortion of the legal process that the President's unlawful intervention creates, especially about the provision of pro bono services. As the *Washington Post* summarized:

"The firm will provide $40 million in pro bono legal services *to support Trump's agenda* after the president threatened to rescind some government contracts with the firm and its clients."
[Emphasis added].

The firm also was forced to revamp its historic commitment to minority recruitment, because of the President's personal opposition to "DEI" programs.

The President has decided to undermine the legal profession's support for pro bono work in the traditional sense. For example, the "deal" that Paul Weiss accepted, with a loaded gun to its head, involves a massive redirection of the firm's pro bono activities, so that at least $40 million in professional services will be redirected away from clients and organizations that the firm otherwise would be assisting and instead provided to those clients and causes that are compatible with the President's personal "agenda."

In a March 23 memorandum to his colleagues at Paul Weiss, the chairman of the firm explained that the President's decree had presented the firm with an "existential crisis," because the President's "executive order could easily have destroyed our firm." Accordingly, the chairman explained, "in the face of an unprecedented threat," the firm "settled" with the Administration and "agreed to commit substantial pro bono resources" to what were euphemistically described as "areas of shared interest."

In the wake of the Paul Weiss "settlement," a second major firm, Skadden Arps, was forced to fork over to the President's favored causes an even greater volume of purported pro bono work in the face of the mere *threat* of being added to his law-firm hit list. Under that euphemistically characterized "settlement" the firm decided "to provide the equivalent of $100 million in free legal work to causes supported by the administration."

The next firm to succumb was Willkie Farr & Gallagher. On April 1, the President announced that the firm not only is abandoning its DEI policies but also "will provide the equivalent of $100 million in pro bono legal services for causes the administration supports."

The next firm to pay for protection was Milbank, which came within the President's crosshairs because it chose to hire former Obama Administration Acting Solicitor General Neal Katyal, who had been critical of Mr. Trump's conduct in and out of office. Milbank apparently was willing to pay the new going rate for protection from the President's wrath, $100 million in supposed pro bono services directed to the President's preferred causes.

Other major, national firms that subsequently made deals for as much as $125 million in "pro bono" services for the President's pet causes include Latham & Watkins; Cadwalader, Wickersham & Taft; A & O Shearman; Kirkland & Ellis; and Simpson Thacher & Bartlett.

Perversely, the President has coerced once-proud law firms to agree to divert almost a billion dollars in free legal services away from representing the poor and oppressed to such things as implementing his tariff programs and broadening coal mining. Some White House officials "believe that some of the pro bono legal work could even be used toward representing Mr. Trump or his allies if they became ensnared in investigations." Thus, a legal commentator has noted, "the president has spent the last several weeks reminding Paul, Weiss and the others that their escape from sanctions came with a price: They work for him now."

This was not just bluster. The *New York Times* reported in mid-August that two of the firms "that reached deals with President Trump this year to avoid punitive executive orders," Kirkland & Ellis and Skadden Arps, actually were impressed into providing the President's view of "pro bono" service. The Secretary of Commerce later confirmed that "some of America's top law firms

and legal minds" are working "to cement the truly historic trade deals" that emerged from President Trump's unilateral imposition of massive tariffs paid by American importers.

This kind of government-coerced diversion of major law firms from traditional pro bono representations is having a perverse impact. As one professor of legal ethics explained in an article in *The New York Times*, the law firms that the President has targeted had regularly topped the national lists of major providers of volunteered pro bono hours:

> "These firms now top a different list: law firms targeted by the Trump administration's executive orders. This is no accident. These orders use the pretense of punishing Mr. Trump's perceived enemies to pursue the far more comprehensive goal of controlling pro bono work, the lifeblood of legal aid and public-interest law organizations, which depend on pro bono support to promote access to justice and defend the values of liberal democracy. This targeting replaces the ideal of pro bono publico, literally 'for the public good,' with pro bono Trump."

As a consequence of the President's campaign of threats to injure law firms that undertake to represent pro bono causes that the President dislikes, some *Amici* have observed that many firms have become reluctant to undertake pro bono matters that might get them cross-wise with the President. It is telling that a number of these organizations have asked not to be named lest they encounter even more difficulty obtaining counsel from firms reluctant to incur retaliation from the Trump administration

Two civil rights organizations have shared their experiences in identifying pro bono assistance in the months following the issuance of executive orders targeting law firms by the Trump administration. One civil rights organization has stated:

> "The Trump Administration's executive orders targeting law firms represent an existential threat to the critical tradition of American law firms providing pro bono representation. In no area of our justice system has this chilling effect had a greater adverse impact than pro bono civil rights advocacy. Since the height of the Civil Rights movement, law firms have eagerly stepped up to serve as pro bono co-counsel alongside civil rights litigating organizations. Now, however, they are not as willing to commit—especially in cases challenging executive overreach.

Some firms have pointed to major litigation victories we have achieved together in recent years, telling us they dare not engage in such advocacy now. Even firms that convey a willingness to consider such representation find themselves unable to offer a timely response to pro bono requests, reflecting what some law firm partners and pro bono coordinators describe as new clearance and approval requirements that have nothing to do with the law and everything to do with fear of political and extralegal reprisal by the chief executive. The lack of willingness to litigate, and the delayed and hesitant decision-making, have equated to many law firms being sidelined while our organization is engaged in the most important legal battles of our time. Without law firms being willing to represent clients or causes unpopular with the administration, both our civil rights and the rule of law are in grave danger."

Another civil rights organization has shared this observation:

"In the wake of the Administration's recent attacks on the private bar, it has become significantly more difficult to find co-counsel willing to represent plaintiffs in cases against the government. [We] significantly [rely] on them to assist us in the litigation of complex cases. Law firm reluctance to participate in these types of cases makes it that much more difficult for individuals with legitimate claims to challenge government overreach."

Legal aid organizations, who provide essential civil legal services to our poorest residents, have also been harmed. One legal aid organization has shared its experiences with us:

"The administration's executive orders targeting law firms has, in my estimation, dulled the desire of several large law firms to take on pro bono immigration matters for fear that they would incur the White House's ire. In the past, these matters have routinely been mainstays in these law firms' pro bono docket. These matters often involve the sort of claims that are at the heart of a democracy that abides by the rule of law. Though they present themselves in various forms, these matters, at their core, embody claims of substantive and procedural due process; access to justice; and governmental conduct that is arbitrary and capricious.

Since the administration began resorting to these executive orders, several law firms that my nonprofit routinely engages in its immigration work have asked to take on fewer pro bono cases than normal. Moreover, in some instances, firms have asked for cases representing clients—young children, as opposed to adults, for example—which the firm ostensibly feels it can more readily explain publicly as to why they opted to represent a particular client. The more law firms that step back from their traditional pro bono commitments, the more legal-service providers must look inward to represent marginalized clients. These executive orders not only erode law firms' willingness to represent the underserved, they also effectively deny competent counsel—and, arguably, justice—to those most in need. "

Finally, we reference an article in The Hill Newspaper about the efforts of Democracy Forward, an organization that is actively litigating cases challenging a variety of actions from the current administration. The organization's executive director, Skye Perryman, provided the following statement:

> "'Democracy Forward's focus has long been at the district court level, investigating and building out cases, because traditionally, that's where there has been a gap in the 'pro-democracy legal landscape,' Perryman said.
>
> Once cases reached the appellate level, from appeals courts to the Supreme Court, they'd often attract pro bono representation from bigger law firms seeking to help shape the law or boost the appellate experience on their teams.
>
> That's changed since Trump took back the White House, with his targeting of law firms themselves. Though four firms have fought back in court, and all won at the trial level, other firms struck deals with Trump to avoid punishments.
>
> A new gap has emerged now that the nation's most elite law firms — many of them — are not taking on the level of pro bono work that they used to take on, and that's in that appellate space," Perryman said.
>
> There are simply not that many appellate practitioners who are at law firms that are willing to cross the administration in this time,' she added."

Respect for the Rule of Law, however, must mean that members of the legal profession are free to exercise their own personal and professional judgment in determining which pro bono clients to represent and which causes to pursue. No government official, especially a President, may legitimately commandeer those professional services and impress lawyers into the service of his own personal "agenda." See, *e.g.*, 18 U.S.C. §§ 872, 1951(b)(2).

## B.  THE ABA AND ITS MEMBERS HAVE BEEN INJURED AS A RESULT OF CONTINUED, THREATENED ATTACKS ON THE LEGAL PROFESSION

The ongoing threat posed by this administration to the legal profession is a national problem that must be addressed with nationwide relief in order to protect the constitutional role of the entire legal profession, as represented by the members of the Plaintiff ABA.

The ABA is suing to vindicate the opportunity of the *legal profession*, as exemplified by its members, to be free to represent clients or causes without being blackballed or intimidated because the President dislikes the clients or causes or has a grudge against lawyers in the firm. These concerns are not fanciful or of merely historical interest. The President's actions and threats continue to radiate throughout the legal community and are having real and unwarranted effects not only on the availability of legal services, especially pro bono services as this concept is generally understood, but on the lawyers or firms who are threatened with financial penalties for making an independent professional judgment.

The President's campaign is having an *in terrorem* effect that has forced even powerful law firms to yield their autonomy rather than to confront the President in court. Concern about presidential retaliation is inducing lawyers throughout the nation to refrain from undertaking to represent particular clients or causes, especially those that traditionally fall within the ambit of pro bono service. Fear of threatened reprisal is also choking off financial support for pro bono programs advancing civil rights and civil liberties that the President opposes. As discussed below, the adverse impacts on our adversarial system represent a continuing harm to the independence of lawyers and their ability to discharge their ethical obligations to their clients.

The ABA's lawsuit would put a halt to these unconstitutional actions, and afford immediate, nationwide relief barring all officers of the federal government (i) from imposing any restrictions, penalties, or disabilities upon any lawyer or law firm because the lawyer or firm has lawfully represented or is lawfully representing any client or cause, or has provided or is providing financial support for any lawful entity or cause, or (ii) from threatening to do so. The ABA, as the nation's largest voluntary association of legal professionals, should be accorded standing to vindicate the rights of its members and the clients they choose to represent by bringing this action.

## II.    THE ADVERSARY SYSTEM IS AN ESSENTIAL ELEMENT OF THE RULE OF LAW IN THE AMERICAN CONSTITUTIONAL SYSTEM

The foregoing unrelenting, systemic, and retaliatory attacks on lawyers and law firms have resulted in immediate and ongoing harm to our adversary system.  The adversary system is a basic element of the Rule of Law on which our constitutional structure rests.  Any constraints on that system, therefore, could only be justified by the clearest constitutional authorization and only in the most extreme factual context.  Neither requirement is satisfied in the current setting.

What Judge Howell observed at the beginning of her opinion granting a permanent injunction against the Executive Order in the *Perkins Coie* case [Case 1:25-cv-00716-BAH; Document 185; filed 05/02/25], summarizes the core constitutional principle:

> "The importance of independent lawyers to ensuring the American judicial system's fair and impartial administration of justice has been recognized in this country since its founding era." [Op. at 1]

In understanding the constitutional system that the President is flouting, we can begin with the Separation of Powers, a crucial part of the constitutional structure.  Under Article III, the federal courts have jurisdiction to adjudicate "cases or controversies."  As the Supreme Court has emphasized, the essence of a "case or controversy" that federal courts are to adjudicate is the presence of adverse parties genuinely contesting issues of law and fact.  See, *e.g.*, *TransUnion* v. *Ramirez*, 594 U.S ___ (2021).

As long ago as *Marbury* v *Madison*, 5 U.S. (1 Cranch) 137 (1803), the Supreme Court declared: "It is emphatically the duty of the Judicial Department to say what the law is."  Under the "case or controversy" principle, the federal courts can function and perform their constitutional function to determine what the law is only when adverse parties appear before them in a genuine dispute.

An essential corollary of the *adversary system of justice* in this country is the right of parties *to be represented by counsel* in those proceedings.  In criminal cases, the Sixth Amendment makes this right to counsel explicit.  Over time, the Supreme Court has stressed the vital importance of legal representation in order to enable the justice system to function fairly and reliably.  This principle even requires the government to pay for counsel to be appointed to represent defendants whom the government itself is prosecuting.  See, *e.g.*, *Gideon* v. *Wainwright,* 372 U.S. 335 (1963).

This constitutional principle is codified in Rule 44 of the Federal Rules of Criminal Procedure ensuring the right to appointed counsel at every stage of criminal proceedings, if a defendant cannot afford to hire counsel.

Implicit in this Rule, of course, is the constitutional guarantee that those defendants who are *financially able to hire counsel* of their choice are at least equally entitled to be represented throughout the proceedings by their chosen counsel.

Although the Constitution does not expressly guarantee a similar right to have counsel *appointed* to provide *free* representation in all civil proceedings, see, *e.g.*, *Turner* v. *Rogers*, 564 U.S. 431 (2011), the adversary system that is the predicate for constitutional "case or controversy" jurisdiction under Article III presupposes a civil litigant's right to hire counsel to represent the client in the case.

For example, cases such as *Mine Workers* v. *Illinois State Bar Assn.*, 389 U. S. 217 (1967), and *Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar*, 377 U. S. 1 (1964), long ago established for individuals and organizations a right to ensure "meaningful access to courts" for themselves or their members by retaining or recommending counsel.  As the Court explained in *Railroad Trainmen*:

> "A State could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented

in lawsuits authorized by Congress to effectuate a basic public interest. Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries, cf. *Gideon* v. *Wainwright*. . . ."

As the Court explained there, this right to be able to retain counsel of one's own choosing rests on the interplay of several constitutional principles, including the First Amendment rights of free speech, petition, and association, and the Due Process clause.

This right is especially important in adversary proceedings in court.  Compare *Walters* v. *Radiation Survivors*, 473 U.S. 305, 333-334 (1985); *Caplin & Drysdale* v. *United States*, 491 U.S. 617, 626 (1989) (referring to "the individual's right to spend his own money to obtain the advice and assistance of . . . counsel.").

Not surprisingly, therefore, the Federal Rules of Civil Procedure assume that a party has a right to be represented in civil litigation, if the party so chooses and is able to hire counsel of the party's choosing.  Thus, for example, Rule 11 establishes the core predicate for the proper functioning of federal courts in the adjudication of civil "cases or controversies," specifying: "Every pleading, written motion, and other paper *must be signed by at least one attorney of record* in the attorney's name—or by a party personally *if* the party is unrepresented." [Emphasis added].

These principles apply to the adversary system for litigation in federal courts under Article III.  But the Constitution also presupposes a similar process for adversary presentation in other forums, especially where the government is involved.  Thus, the First Amendment enshrines the right of every person in the United States to "petition for redress of grievances," a right that extends to lobbying Congress or appearing before government agencies.  *Eastern R.R. Presidents Conf. v. Noerr Motor Freight,* 365 U.S. 127, 137 (1961); *United States* v. *Harriss*, 347 U.S. 612, 617 (1954) (upholding lobbying disclosure statute, because Congress legitimately "wants only to know who is being hired, who is putting up the money, and how much) cf. "). *NAACP* v. *Button*, 371 U.S.

415, 429 (1963) (holding that NAACP-initiated litigation was protected by the First Amendment as "a form of political expression").

The right to petition assumes that the government may be reluctant to extend the protection or benefit being sought, and thus a convincing case must be made to a skeptical or sometimes hostile official.  In practice, this often means that the petitioner must be able to speak through the medium of a qualified lawyer familiar with often arcane principles and procedures.

Congress recognized this real-world imperative when it included in the Administrative Procedure Act a guarantee that anyone required to appear before a federal agency "is entitled to be accompanied, represented, and advised by counsel."  5 U.S.C. § 555(b).

The role of an independent bar free from government hamstringing – or retaliation – is a constitutional imperative.  The Supreme Court has been quite clear that the government may not put its official thumb on the scales of justice by, for example, prohibiting lawyers, including federally funded lawyers providing pro bono services, from pursuing claims or making arguments that the government disapproves.  The courts cannot perform their constitutional function if lawyers face political restrictions on arguments and theories that the government "finds unacceptable but which by their nature are within the province of the courts to consider." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546 (2001).

In *LSC*, the Court explained that government restrictions on "advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys." (531 U.S at 544-545).  Such government constraints conflict with the principle of *Marbury* v *Madison* that it is the province of the courts to say what the law is:

> "Interpretation of the law and the Constitution is the primary mission of the judiciary when it acts within the sphere of its authority to resolve a case or controversy. *Marbury* v. Madison, 1 Cranch 137, 177 (1803) ("It is emphatically the province and the

duty of the judicial department to say what the law is").  An informed, independent judiciary presumes an informed, *independent* bar."
[531 U.S. at 545 (emphasis added)]

When clients hire their own counsel, as in all the instances to which President Trump's Executive Orders react, the government has even less room under the Constitution to threaten, punish, or anathematize lawyers who represent disfavored clients, advance disfavored goals of those clients, or advance disfavored arguments in favor of those clients and goals.

Accordingly, any action by anyone, including especially the head of the Executive Branch, that undermines the proper functioning of the adversary system is fundamentally anti-constitutional.

Yet, among the blunderbuss penalties summarily imposed on several law firms and threatened against many more, without any evidentiary support, much less even the pretense of a hearing, the presidential decrees purport to (i) require federal agencies to refuse to deal with disfavored firms, (ii) strip firms of necessary security clearances, (iii) exclude lawyers from disfavored firms from access to federal buildings, or (iv) prohibit award of public contracts to any client represented by the firms the President does not like.

Indeed, this kind of *diktat* is a particularly ironic misuse of alleged presidential power.  One of the President's core constitutional obligations is, under Article II, Section 3, to "take Care that the  Laws be faithfully executed."  Any intervention by a President that demonstrably obstructs the functioning of the legal process is nothing short of a betrayal of this solemn constitutional duty.

## III.    THE RIGHT TO SELECT ONE'S OWN CHOSEN COUNSEL IS AN ESSENTIAL ELEMENT OF THE RIGHT TO REPRESENTATION

The right to representation would be hollow indeed if someone else, such as the opposing party, including the government itself, could forbid a party in court or in dealings with the government to select counsel in whom the client has confidence.  A lawyer acts as a fiduciary for

the client and undertakes special obligations to advance the client's interests. The legal system rests on the principle that (except in extraordinary circumstances) the client gets to select the lawyer who will be trusted to serve most faithfully and effectively in this role of trust and confidence.

Thus, for example, the Rules of Professional Conduct for members of the District of Columbia Bar make clear that the selection and retention of counsel are the prerogative of the client, and the client decides when to hire counsel, what objectives to assign the lawyer to pursue, and when to terminate the representation. See, *e.g.*, Rules 1.2, 1.16, 2.1. 3.1. Thus, Rule 1.2 states:

> **"Rule 1.2: Scope of Representation**
> "(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d), and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation."

Of course, none of the scenarios in which the President has chosen to blackball or threaten law firms have anything to do with the power of the *courts* to supervise the conduct of lawyers appearing before them or with the authority of bar authorities to assure professional competence and integrity. In the District of Columbia, as in most States, that kind of supervision over the professional conduct of lawyers comes within the ambit of the judiciary, not the Executive, especially a self-interested Chief Executive.

Federal courts have ample authority under Rule 11 of the Federal Rules of Civil Procedure to deal with "vexatious" lawsuits. Moreover, if ethical violations are properly alleged, the District of Columbia Bar has a comprehensive and well-regarded system for adjudicating and sanctioning such violations through the filing of a disciplinary complaint, ultimately resolved by the District of Columbia Court of Appeals.

Against the backdrop, this Court would search in vain for any legitimate basis for *presidential* intervention in these affairs.

Rather, in his present campaign, the President has manifested personal pique because of the clients whom the firms represented or the causes, including "diversity, equity and inclusion" policies, that they chose to pursue on behalf of their clients or their own professional autonomy. Although the presidential decrees purport to invoke generic powers "as President of the United States" and unspecified "laws of the United States," the President does not articulate any specific Article II power or any particular federal statute that supposedly confers on the President any authority to determine the qualifications of lawyers otherwise licensed to practice law or to superintend the choice of counsel by otherwise competent clients.

The President's stated grounds for issuing these decrees appear to reflect his unilateral hostility toward lawyers who undertook to represent his political opponents. For more than 400 years, however, it has been a bedrock principle of the Anglo-American legal system that, as Chief Justice Sir Edward Coke put it in 1610 (*Dr. Bonham's Case*), "no man should be judge in his own cause." See, *e.g.*, *Caperton* v. *A. T. Massey Coal Co.*, 556 U.S. 868 (2009). That principle bars the exercise of what otherwise might be some implicit presidential power in order to settle personal grudges with opposing counsel.

Moreover, the Constitution bars "bills of attainder." As the Supreme Court explained in *United States* v. *Brown*, 381 U.S. 437 (1965), bills of attainder are *non-judicial* declarations directly imposing "pains and penalties," including deprivations of rights, that "named the parties to whom they were to apply" or "simply described them." The prohibition of bills of attainder is "an implementation of the separation of powers," since it confines each branch within its authorized functions, and was "looked to as a bulwark against tyranny." 381 U.S. at 442-444.

*Brown* makes clear why this principle also must apply to Executive Branch actions that impinge on the judicial function, even though (for reasons the Court explained) the Framers only considered it necessary to add it to the explicit limits on *legislative* powers:

> "Thus the Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited *as politically independent judges and juries* to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."
> [381 U.S. at 445 (emphasis added)].

If any of the targets of the President's summary banishment were guilty of any misconduct and were properly subject to some sanctions, the constitutional Separation of Powers would entrust such a determination to the *judicial* function under Article III (see, *e.g.*, D.D.C. Local Rules LCrR 57.27(d) [governing complaints of misconduct filed in this Court.]), not to some undiscovered, inherent power of a President under Article II simply to decree guilt. See also *United States* v. *Lovett*, 328 U.S. 303 (1946).

As former judge J. Michael Luttig aptly opined, President Trump's persistent and deliberate attacks on the institutions of the law manifest that "the president wants to assume the role of judge." On the face of the various Orders, moreover, the President has made clear that he has hardly been acting as an "impartial tribunal."

## IV.    BLACKBALLING OR PUNISHING A LAWYER OR LAW FIRM BECAUSE OF VIGOROUS (AND LAWFUL) REPRESENTATION OF A CLIENT CONFLICTS WITH BASIC PRINCIPLES OF THE RULE OF LAW

It is essential to the functioning of the legal system under our constitutional order that lawyers must be able to represent clients who may be unpopular or even reviled in the eyes of others. As this Court is well aware, that is, indeed, the proudest and most honorable characteristic of the legal profession.

This principle distinguishing the client's identity and interests from the lawyer's own personal views is enshrined in the DC Rules of Professional Conduct.  Rule 1.2 declares:

> "(b)   A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities."

The American Bar Association Model Rules of Professional Conduct codify this same principle as reflecting the prevailing American tradition.

This vital feature of the legal profession has played a long and courageous part in American history.  For example, lawyer James Hamilton risked retaliatory disbarment for daring to represent publisher John Peter Zenger in his 1735 criminal trial for seditious libel for publishing (truthful) articles criticizing the colonial governor of New York for wrongfully sacking the colony's chief justice.  Similarly heroic and professional was the willingness of colonial patriot (and later President) John Adams to represent the British soldiers ("Redcoats") charged with the murder of American protestors in the infamous 1770 Boston Massacre.

And so on down through our subsequent constitutional history.

The challenge is that someone or some group is inevitably going to be demonized by someone else or some other group –

- Catholics, Jews, evangelical Protestants, Muslims, Hare Krishna, or Scientologists, etc.
- Fundamentalists or evolutionists
- Alleged rapists, murderers, pederasts, or white-collar fraudsters
- Black Panthers or KKK
- Pacificists and draft resisters or alleged terrorist detainees
- Anarchists, communists, socialists, or libertarians
- Conservatives or Liberals; Republicans or Democrats
- Impeached office holders (such as President Trump) or members of Congress evaluating impeachment

The point is that *each* has the right to effective and diligent representation by counsel, regardless of any hostility to the particular client or the client's conduct or affiliation.  As renowned

Washington lawyer Edward Bennett Williams noted many years ago, of the major civil liberties cases that reached the Supreme Court over the years, most of the defendants "have been accused of murder, rape, arson, narcotics offenses, bootlegging and membership in the Communist Party."

History has properly lauded lawyers for zealously seeking to protect the rights of their clients in the face of public opprobrium.

The Court can easily imagine where our country would be today, if lawyers who undertook to represent those unpopular clients had been browbeaten or threatened into withdrawing from the cases – or had been too fearful of recrimination and retaliation even to have undertaken the cases. Is this the kind of neutered legal system that any court would tolerate in response to the whim of any President wishing to deconstruct the Rule of Law some 238 years into our constitutional history?

## CONCLUSION

The Defendants' Motion to Dismiss should be denied.

Dated: October 2, 2025                    Respectfully submitted.

_____
Andrea C. Ferster*
Law Offices of Andrea C Ferster
(DC Bar #384648)
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

*Of Counsel*
Philip Allen Lacovara
(DC Bar #194472)
4552 West Gulf Drive
Sanibel, FL 33957-5106
Phone: 239-472-2992

~ 28 ~

Email: placovara@gmail.com

---

*Pursuant to Local Civil Rule 7(o)(5), counsel for Amici certifies that no counsel for a party authored this brief in whole or in part, and no person other than Amici, their members, or their counsel made a monetary contribution to the brief's preparation or submission.