**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN BAR ASSOCIATION,<br><br>                    *Plaintiff*,<br><br>         v.<br><br>EXECUTIVE OFFICE<br>OF THE PRESIDENT, *et al.*,<br><br>                    *Defendants*. | Case No. 1:25-cv-01888-AHA |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 4

     I.      THE ABA LACKS ARTICLE III STANDING .................................................... 4

           A.      The ABA Lacks Standing to Seek Prospective Relief ............................ 4

           B.      The ABA Also Fails to Satisfy Other Requirements to Establish
                   Organizational Standing, Associational Standing, Or Third-Party
                   Standing. ............................................................................................... 13

     II.     THE ABA'S CLAIMS ARE UNRIPE. ............................................................. 16

CONCLUSION ................................................................................................................... 17

CERTIFICATE OF SERVICE

## INTRODUCTION

The American Bar Association ("ABA") agrees that a plaintiff cannot "conjure a 'policy' from rare actions and stray statements by government actors and claim he is worried it might someday be used in a certain way against him." ECF No. 27 at 1. It also agrees that plaintiffs generally lack standing when he "claims to fear a new and purely hypothetical way of enforcing a law," or when he "relies only on past harm to show future injury." *Id.* The ABA spends the rest of its brief attempting to show that its lawsuit "is none of those cases" that clearly warrant dismissal under 12(b)(1). *Id.*

The ABA is right; its lawsuit is even worse. Rather than a "purely hypothetical way of enforcing a law" (which would be insufficient for standing), the ABA complains of not only a "purely hypothetical" *law*—a possible future Executive Order ("EO") pursuant to a so-called "Law Firm Intimidation Policy"—but also a purely hypothetical enforcement of this hypothetical policy to a hypothetical law firm that might (hypothetically) harm one of its lawyer members. Rather than rely on one's own past harm to show one's own risk of future injury (also insufficient for standing by itself), the ABA at best alleges past harm *to someone else*—that is, particular law firms that are not even similarly situated to the ABA. And rather than plausibly alleging fears that a future EO (with uncertain terms) might someday be used (in an uncertain way) against the ABA (again insufficient for standing), the ABA alleges that a future EO might someday be used against some undetermined law firm, which might employ some of the ABA's members, which might then ultimately affect the ABA.

All those mights, maybes, and hypothetical possibilities are not the stuff of Article III, and the ABA's briefing does not remedy any of its clear jurisdictional deficiencies. The ABA concedes that there is no current EO to challenge, and tries to abstract outward to an alleged, unwritten,

unpublished "policy" of "intimidat[ing] and coerc[ing] law firms and lawyers to refrain from challenging the President or his Administration in court or speaking publicly in support of policies or causes the President does not like." ECF No. 27 at 3. But the ABA's admission that there is no concrete EO to challenge is impossible to square with the ABA's very concrete requests for relief—namely, declarations that "any" Security Clearance Termination Provision, Government Contracting Provision, Federal Building and Employee Access Provision, and Federal Employment Provision is unlawful. Compl. ¶¶ 269–72. And though the ABA tries to plausibly allege some overarching policy, its best efforts amount to pointing to various comments made by the President, his Staff Secretary, and his Press Secretary, and blaming Defendants for not "assur[ing] the Court that the Administration will never again issue an EO materially like the ones at issue in this case." ECF No. 27 at 2, 12. These attempts to cure the implausibility of this suit only exacerbate it. There is no basis for the ABA to haul the Executive into court, get an advisory opinion, and obtain legally binding declarations whenever it hears a remark from the President that it does not like.

Beyond creative framing, the ABA has done nothing to plausibly allege that it has standing or that its claims are ripe. The ABA implausibly alleges that the purported "policy" has chilled speech and legal representations adverse to the President in violation of the First Amendment. But the ABA have asserted no facts that such a "policy" exists, separate from their present fears about future, hypothetical government action. Again, such a challenge runs headlong into well-established case law that holds that speculation about potential future harm is insufficient for standing. Nor can the ABA manufacture standing by choosing to harm itself by refraining from legal representations based on speculative fears of future injury.

And even under the ABA's preferred framing, its theory of injury fails on its own terms. As a natural consequence of challenging a purported nebulous, unwritten, unofficial policy, the ABA fails to show that any of the desired conduct that it or its members wish to undertake is proscribed by the so-called Law Firm Intimidation Policy. And because the ABA cannot show precisely what the alleged policy proscribes that would trigger enforcement, it relies on pure guesswork in asserting that there is a credible threat of enforcement. Moreover, the ABA's assertion that a credible threat of enforcement exists is further belied by the fact that it has not been the subject of a previous EO, it has identified no threats of enforcement directed at it or its members, and there has been no EOs since early April.

And though the Court need not even reach it, the ABA's argument that its claims are ripe for adjudication based on its First Amendment pre-enforcement theory similarly falters. The ABA's pre-enforcement claim rests on hypotheticals that are too remote, speculative, and abstract for judicial review. Ultimately, this case turns on whether the President will issue another EO, this time directed against the ABA. But this has not happened and may well never happen. Until it does, the ABA's Complaint is premature and amounts to a request for an advisory opinion on a theoretical policy of unknown scope, unknown terms, and unknown effect.

Article III is more than a requirement for creative pleading. The ABA has, at best, alleged a theoretical Law Firm Intimidation Policy, which might lead to an EO, which (after implementation by various agencies) might then affect a particular firm, which might then affect particular lawyers at that firm, who might be members of the ABA. No amount of lawyering can

create standing out of that very long speculative chain of possibilities. This Court should dismiss the ABA's Complaint.[1]

## ARGUMENT

### I.    THE ABA LACKS ARTICLE III STANDING.

#### A.    The ABA Lacks Standing to Seek Prospective Relief.

As Defendants explained, ECF No. 22-1 at 11–20, the ABA has failed to plead a plausible basis for its Article III standing. Its theory of injury rests on a speculative chain of contingencies about the potential issuance of a future EO that might direct certain actions against an as-yet-unknown law firm that depends on the agency implementation of such order, which might or might not impact it or any of its members. At bottom, the ABA is trying to bootstrap its claims to the previous EOs that the President issued many months ago. But those EOs never applied to the ABA—and, even if they did, the ABA must allege much more than "past exposure to illegal conduct" to establish standing for the injunctive and declaratory relief sought here. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

Fundamentally, the ABA cannot show a sufficiently imminent future injury to justify the prospective relief it seeks. That is because the risk that the President will issue a new EO directing

---

[1] In a footnote, the ABA requests, in the alternative, jurisdictional discovery "if the Court finds that there is sufficient doubt about whether the ABA has plausibly alleged facts to support standing . . ." ECF No. 27 at 2 n.1. That request, however, is improper for several reasons, including the fact that there is no separate motion that describes the relief sought and the justifications for that relief, there is no "detailed showing of what discovery [the ABA] wishes to conduct," *Colo. Wild Horse & Burro Coal., Inc. v. Kempthorne*, 527 F. Supp. 2d 3, 7 (D.D.C. 2007), and the ABA did not confer with the undersigned counsel about this request, LCvR 7(m). In any event, "a request for jurisdictional discovery cannot be based on mere conjecture or speculation, and a plaintiff may not use jurisdictional discovery to conduct a fishing expedition in the hopes of discovering some basis of jurisdiction." *Trump v. Comm. on Ways & Means, United States House of Representatives*, 415 F. Supp. 3d 98, 112 (D.D.C. 2019) (cleaned up).

certain actions against some law firm—something that the President has not done since early April—is entirely speculative. The ABA, therefore, falls far short of demonstrating that any "threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). Similarly, the ABA's allegations of current burdens borne out of fear that the President will issue another EO—as part of an ongoing, purported "Law Firm Intimidation Policy"—fare no better because it cannot "manufacture standing" by expending resources or chilling itself in anticipation of some speculative harm. *Clapper*, 568 U.S. at 402; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). Plainly, "[n]othing supports the requested injunctive relief except [the ABA]'s generalized interest in deterrence, which is insufficient for purposes of Article III." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108–09 (1998).

The ABA attempts to maneuver around these obstacles, but none of its dodges passes muster. *First*, the ABA asserts that it is not "targeting simply a 'hypothetical EO by the President against a hypothetical law firm,'" ECF No. 27 at 12, but the broader "Law Firm Intimidation Policy." But the ABA's attempt to claim that the purported "Law Firm Intimidation Policy" is something different than a future EO is plainly belied by the specific declaratory and injunctive relief the ABA seeks. Referring to the sections contained in each of the previous EOs, the ABA seeks relief against future applications of the "Security Clearance Provision," the "Government Contracting Provision," the "Federal Building and Employee Access Provision," and the "Federal Employment Provision." *See* Compl. ¶¶ 269–76.

That simply will not do. A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Town of Chester v. Laroe Estates, Inc.*, 581 U.S.

433, 439 (2017), and the only reason the ABA can give for why it would have standing to ask for specific injunctions against specific EO language is that (in the past) the President used those provisions against someone else. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," much less *someone else's* past exposure to conduct. *Lyons*, 461 U.S. at 103 (cleaned up); *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 35 (D.D.C. 2021) ("[A]llegations of a subjective chilling effect resulting from the defendants' past actions are insufficient to confer standing." (citing *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972))), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). The ABA is not "realistically threatened by a repetition of [its] experience" when it has *no* experience being named in a law firm executive order. *Haase v. Sessions*, 835 F.2d 902, 910–11 (D.C. Cir. 1987) (quoting *Lyons*, 461 U.S. at 109). And ensuing events have put a fine point on the ABA's speculative fear. The President has neither issued an EO nor announced a settlement agreement since April—now over eight months ago. *Cf. Trump v. New York*, 592 U.S. 125, 131 (2020) ("A foundational principle of Article III is that 'an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'").

*Second*, the ABA still fails to "demonstrate [the] existence" of a Law Firm Intimidation Policy. *Rowe v. PChange Protective Servs., LLC*, No. CV 22-3098 (JEB), 2023 WL 2598683, at *3 (D.D.C. Mar. 22, 2023) (citing *Haase*, 835 F.2d at 911) (alterations in *Rowe*). Contrary to the ABA's briefing, the problem is not merely that the Law Firm Intimidation Policy is "unwritten." ECF No. 27 at 11. It is that the ABA has not plausibly alleged that there even *is* a Law Firm Intimidation Policy that would support standing. Any plaintiff could circumvent the rule that past harm cannot establish future injury if all that was needed was a blanket allegation that the past harm is part of an undefined "policy." What the ABA coins as the Law Firm Intimidation Policy

is nothing more than a convenient label to lump together the previous EOs and any future ones so they can challenge them all in a single stroke. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a pleading that offers labels and conclusions . . . will not do") (cleaned up); *cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–94 (1990) (observing that no such "land withdrawal review program" existed, "[i]nstead, it was simply shorthand for the 'continuing (and thus constantly changing) operations of the [the agency]' in administering public lands . . ."). That flies in the face of the "case-by-case approach" that "remains the normal" and "traditional . . . mode of operation of the courts." *Lujan*, 497 U.S. at 894.

Again, all the relief that the ABA seeks is tied directly to the EOs. The one exception is the ABA's request to "[e]njoin Defendants from initiating attorney conduct and disciplinary proceedings, or making a referral for disciplinary action, of any ABA member . . . ." Compl. ¶ 277. As Defendants explained, that requested relief is disconnected from any alleged injury. ECF No. 22-1 at 15–16. The ABA now attempts to clarify that it "is not asking the Court to enjoin Defendants from initiating or referring *any* disciplinary proceedings against any ABA lawyer for *any* reason." ECF No. 27 at 22. "Rather, the ABA is asking the Court to enjoin Defendants from taking disciplinary action against a lawyer or firm on the basis of the lawyer's law firm or organizational affiliation . . ." *Id*. But that vague explanation still does not elaborate how that requested "remedy [is] tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Perhaps this request is directed at the President's March 22 Memorandum, "Preventing Abuses of the Legal System and the Federal Court," *see* Compl. ¶¶ 100–06, which, in relevant part, directs "the Attorney General to take all appropriate action to refer for disciplinary action any attorney whose conduct in Federal court or before any component of the Federal Government

appears to violate professional conduct rules . . . ."[2] But lumping this March 22 Memorandum with the previous EOs and settlements still does not articulate a Law Firm Intimidation Policy. After all, as Defendants previously explained, the EOs do not call for any disciplinary proceedings. ECF No. 22-1 at 15. Moreover, the March 22 Memorandum fails as a basis for injunctive relief because the ABA alleges no concrete actions Defendants have undertaken pursuant to that memo, much less any injury. *See DNC v. Trump*, No. 25-cv-00587 (AHA), 2025 WL 1573181, at *6 (D.D.C. June 3, 2025) ("And although the committees emphasize section seven's compulsory nature in that it requires executive employees to comply with the President and Attorney General's legal opinions, the section does not require the President or the Attorney General to issue any opinions in the first place."). Nor does the ABA suggest that its members intend to violate professional conduct rules. As such, this request is, at most, tied to another "future injury that 'rests on [a] highly speculative fear,' [which] does not satisfy the requirement that threatened injury must be certainly impending." *Ali v. Al-Nahyan*, No. 23-cv-576 (RDM), 2025 WL 3250945 at *15 (D.D.C Oct. 31, 2025) (quoting *Clapper*, 568 U.S. at 410) (alteration in *Ali*)).

*Third*, even assuming there is any ongoing injury as result of the purported Law Firm Intimidation Policy, the ABA's attempt to analogize its theory of standing to "other pre-enforcement challenges" is unavailing. ECF No. 27 at 11. Specifically, the ABA argues that such cases "establish that a subjective chill of First Amendment rights, paired with a credible threat of imminent, adverse government action against the claimant, may create a cognizable injury." *Id.* at 10 (quoting *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 359 (D.D.C. 2020)

---

[2] The White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/

(emphasis removed)). By the ABA's telling, establishing standing in such a pre-enforcement context "is not a huge hurdle," *id*. at 13, because "standing to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law," *ANSWER v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) (cleaned up). Accordingly, the ABA asserts that its allegations "make clear that the Policy exists and that it is chilling the speech and the exercise of other constitutional rights of lawyers, including ABA members." ECF No. 27 at 16.

The ABA's theory of pre-enforcement injury tries to run before it can crawl. A pre-enforcement challenge presupposes that there *is* a law that the plaintiff can challenge and that the government will enforce. It makes no sense for the ABA to speak of "background expectation[s] that the government will enforce the law" when there is no law to enforce. ECF No. 27 at 13 (quoting *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016)). Likewise, even if "imminent threats commonly suffice" for pre-enforcement challenge standing, here there is not even an imminent *law*, let alone an imminent threat to enforce it. *ANSWER*, 589 F.3d at 435. To attempt to analyze this lawsuit under a pre-enforcement challenge framework is to turn Article III upside down.

Regardless, the ABA's theory fails. When plaintiffs assert standing based on a purported chill of their constitutional rights, they must establish (1) that their conduct has been "proscribed" by the law they wish to challenge and (2) that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159, 164. The ABA satisfies neither requirement.

To begin, the ABA cannot identify the "desired conduct" it would like to engage in "that might trigger an enforcement action in the first place." *Matthew A. Goldstein, PLLC v. U.S. Dep't*

*of State*, 851 F.3d 1, 4 (D.C. Cir. 2017). Understandably so—because the ABA cannot articulate what its purported Law Firm Intimidation Policy specifically proscribes, it cannot say what activities would result in enforcement either. Instead, it offers only the vague description of "any lawyer or firm who takes a representation or position that the Administration does not like." *E.g.* ECF No. 27 at 22. Plaintiffs asserting standing to bring a pre-enforcement challenge must show that their desired conduct would violate the law they seek to challenge. *See Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 103 (D.D.C. 2016) ("Backpage.com stumbles at the outset in its attempt to demonstrate Article III standing because the course of conduct it alleges an intent to continue performing is not 'proscribed by [the] statute' they wish to challenge."); *cf. Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009) (holding that a "sincere fear" that a statute might be applied to plaintiffs' conduct does not satisfy standing when plaintiffs' conduct is not actually targeted by that statute). By failing to do so (because it cannot do so), the ABA's pre-enforcement theory fails at the start.

What is more, the ABA fails the other requirement that it shows a credible threat of enforcement of the challenged policy. *See Matthew A. Goldstein, PLLC*, 851 F.3d at 6. After all, the threat of prosecution cannot be imaginary, chimerical, or wholly speculative. *See Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Here, the policy *itself* is speculative, let alone the enforcement of the policy.

Even if the Court were to run through the usual factors—"past enforcement or official threats made against the plaintiff; a failure to disavow future enforcement; and the frequency of enforcement against similarly situated persons," *Ali v. Hogan*, 496 F. Supp. 3d at 917, 927 (D. Md. 2020)—the answer is the same. The ABA does not and cannot claim any past enforcement against or official threats directed at itself. Indeed, even in *Turner*, the case the ABA relies on, that court

10

emphasized that a plaintiff must make a showing that includes "a credible threat of *imminent*, adverse government action against *the claimant* . . . ." 502 F. Supp. 3d at 359 (emphases added). Nor has there been frequent enforcement against similarly situated persons. At most, the ABA can point to the previous EOs against various law firms. But the ABA is not a law firm, nor does it count any law firms in its membership.

The ABA insists that there is a "conventional background expectation that the government will take adverse action exists" because the Government "appeal[ed] from the district court permanent injunctions against it in each of the four law firm EO cases." ECF No. 27 at 13, 14. Wrong again. At most, the fact that Defendants have preserved their right to appeal in those cases means that the Government intends to enforce those particular four executive orders. This Court has already recognized that those cases are fact-bound when it refused to enjoin "all uses of Section 1 [of the Executive Order]" against Jenner & Block "in the abstract." *See Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 117–18 (D.D.C. 2025). Defendants' litigation strategy in those ongoing cases have little bearing on whether, someday, an executive order might be implemented against law firms with lawyers who might be ABA members.

Thus, the ABA can show no "conventional background expectation" that the government will enforce the purported Law Firm Intimidation Policy—that is assuming it exists at all as something other than a vague fear that the President may issue another EO. And "[w]here there is no expectation of enforcement, there is unlikely to be a 'credible threat' of prosecution." *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014). Under these circumstances, the ABA's pre-enforcement framing does little to water down its burden to show that its "threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158.

*Fourth*, without a credible threat of enforcement, the ABA's chilling injuries are insufficient to establish standing. The ABA provides a bulleted list of "examples of specific, concrete ways in which its members' rights and interests are currently being affected by the Law Firm Intimidation Policy . . . ." ECF No. 27 at 15. But many of these bullet points do not allege member-specific harms; instead, they present generalized grievances of the legal community insufficient to establish standing. For example, the ABA asserts that "[t]he organization Law Firm Partners United reported that lawyers were declining to represent clients because they feared government retaliation." *Id.*; *see also id.* at 16 (showing various allegations that "lawyers" were declining engagements). Again, this suggests that the ABA continues to rely on a theory of "probabilistic standing," which is insufficient for Article III. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

The allegations concerning the ABA's actual membership fare no better. As Defendants emphasized, ECF No. 22-1 at 18–20, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 13–14. All the ABA contends "is that [its] members have engaged in self-censorship because they have a conjectural fear that they may be targeted by the Government for their speech[,]" which is insufficient. *Coal. for Humane Immigrant Rts. v. U.S. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 95 (D.D.C. 2025). And the ABA's invocation of "expenditure of resources to prepare for enforcement of the Policy against them," ECF No. 27 at 17, is nothing more than an at attempt to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

**B.** **The ABA Also Fails to Satisfy Other Requirements to Establish Organizational Standing, Associational Standing, Or Third-Party Standing.**

In addition to the standing defects discussed above, the ABA fails to meet the requirements of organizational standing, associational standing, and third-party standing.

*First*, the ABA's allegation of direct harm hinges substantially on the allegation that a law firm that was once willing to represent it has now declined to do so because of the purported Law Firm Intimidation Policy. ECF No. 22-1 at 21. The ABA insists that it has "alleged specific facts supporting the chilling effect of the Policy with respect to firms' support of the ABA—namely, the timing of the firms' decisions not to partner with the ABA; specific firms' prior willingness to do so; conversations with lawyers at the relevant firm; and the lack of any other explanation for the refusal to continue those partnerships." ECF No. 21 at 35. According to the ABA, that is all that is needed at the pleading stage "to support a plausible allegation regarding the chilled firms' motivations." *Id*. But, as Defendants previously noted and as the ABA does not dispute, there could be any number of reasons a firm might decline to represent the ABA. ECF No. 22-1 at 21. And that is still removed from what the ABA actually needs to allege—that the firms declined to represent the ABA because of a non-conjectural fear of a hypothetical executive order. The ABA may have plausibly alleged that it has not received the representation it would have liked. But it has not produced a plausible allegation that some unwritten, undefined "law firm intimidation policy" has forced firms to give the "nation's largest voluntary association of legal professionals" a cold shoulder. Compl. ¶ 23; *see also Air Excursions LLC v. Yellen*, 66 F.4th 272, 278 (D.C. Cir. 2023) (because the "plausibility standard requires more than a sheer possibility that the plaintiff has standing to sue," a complaint that "pleads facts that are merely consistent with the plaintiff's theory of standing" is insufficient).

*Second*, the ABA similarly cannot satisfy the requirements for associational standing on behalf of its members. The ABA principally asserts that at least one of its members would have standing in their own right. ECF No. 27 at 23–28. The ABA argues that "the retaliatory law firm EOs seek to penalize firms by taking aim at their lawyers. And any injury from the Policy on a law firm also inflicts injury on every equity partner or shareholder of that firm, many of whom are ABA members." *Id.* at 24–25. As already mentioned, this theory fails for the simple reason that no one—including the ABA's members—can identify a non-speculative imminent injury stemming from a so-called Law Firm Intimidation Policy. But even on the specific requests for relief, the ABA's argument falters. The ABA seeks to enjoin the future application of a "Security Clearance Termination Provision," ECF No. 22-1 at 23, yet the ABA does not bother to allege Member A, Member B, Member C, or Member D holds any active security clearance. *Id.* at 24. A plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester*, 581 U.S. at 439. The ABA has identified no one who can seek the relief it requests.

As for the third prong concerning individual participation, the potential for internal conflicts raises questions as to the propriety of associational standing. The ABA, however, brushes this issue away. On the one hand, "the mere fact of conflicting interest among members of an association does not itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members." *Nat'l Maritime Union of America v. Commander*, 824 F.2d 1228, 1233–34 (D.C. Cir. 1987). But the court in *Kickapoo Tribe of Oklahoma v. Lujan* explained how internal conflicts in cases like this one should preclude third-party standing, "analogiz[ing] cases which have held that when the members of an association hold divergent views on an issue, or have conflicting interests, individual participation

14

in a lawsuit is necessary . . . ." 728 F. Supp. 791, 796 n.8 (D.D.C. 1990). An organization as broad as the ABA's purported mission and membership necessarily creates internal conflicts that render this theory of standing inappropriate, especially in cases such as this one where there is no concrete, particularized harm or ripe policy to challenge.

The ABA also mischaracterizes Defendants' arguments and gives short shrift to the Supreme Court's decision in *Trump v. CASA, Inc*., 606 U.S. 831 (2025). Although the ABA acknowledges that its members would "not be bound by *res judicata* principles" as is "true in of association members in any case involving associational standing[,]" ECF No. 27 at 32, it overlooks the Supreme Court's concern with "forging a shortcut to relief that benefits parties and nonparties alike," which "circumvent Rule 23's procedural protections and allow courts to created de facto class actions at will." *CASA*, 606 U.S. at 849 (cleaned up). More fundamentally, the point the ABA is missing is any prospective relief is properly limited to members that the ABA has specifically identified for purposes of standing, *see Earth Island Inst*., 555 U.S. at 497–500, and that any injunction must be no broader than necessary to provide relief to those identified members. *CASA*, 606 U.S. at 861. The main problem with the broad, association-wide relief that the ABA seeks is that it "creates the possibility of asymmetrical preclusion," enabling the members of organizational plaintiffs to enjoy the benefits of a favorable judgment while escaping the burdens of an adverse one." *All. For Hippocratic Med*., 602 U.S. at 402 (Thomas, J., concurring). That is particularly true given that the ABA has invented a "Law Firm Intimidation Policy" to bootstrap entire law firms as an end-run around Rule 23, *CASA*, and standing requirements.

*Finally*, the ABA nakedly embraces third-party standing, seeking to insert itself into any controversy in connection with the purported Law Firm Intimidation Policy, even if it concerns unidentified law firms and non-member lawyers. *See* ECF No. 27 at 35–37. But this just further

shows that this case is "only an undifferentiated, generalized grievance about the conduct of government" (on behalf of the wider legal community) that courts "refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

## II.    THE ABA'S CLAIMS ARE UNRIPE.

As this Court previously observed, Article III standing and ripeness "generally boil down to the same question in cases where the plaintiff challenges a law before it is enforced against them." *DNC*, 2025 WL 1573181, at *4. And, as the D.C. Circuit has made clear, "[t]he ripeness doctrine, even in its prudential aspect, is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines." *In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011) (cleaned up). A claim is premature and therefore unripe for judicial review if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. at 131.

Here, the ABA urges that the case is ripe, at least under its preferred framing that it is making a pre-enforcement challenge to the purported Law Firm Intimidation Policy and is "suffering an ongoing chilling effect to its First Amendment rights or similar self-censorship . . . ." ECF No. 27 at 37. But again, as discussed, that framing does not withstand scrutiny, and this Court should reject it. Ultimately, the ABA seeks to enjoin the future implementation of a hypothetical EO based on the chilling effect of the President's previous EOs directing actions against certain law firms, when the President has not issued any such EO in over eight months. Thus, "[t]here can be little doubt here that the pre-enforcement issues raised in this case are not fit for adjudication," *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023), because the ABA's Complaint is "riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. at 131. "Absent a concrete factual context, determination of the scope and constitutionality

of a purported government policy in advance of its immediate adverse effect . . . involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Saline Parents*, 88 F.4th at 307 (cleaned up).

The ABA, however, argues that the case is ripe, pointing out that "the courts in the previous law firm EO cases easily rejected the Government's ripeness arguments there . . . ." ECF No. 27 at 40. But those cases at least involved actual EOs directing specific actions against real—as opposed to hypothetical—law firms, whereas, here, the ABA is seeking prospective relief based on subjective chill borne from a theoretical policy. Ripeness applies in full force here, and until there is a Presidential action that will crystalize into concrete harms affecting the ABA or its identified members, there is no "concrete, ripe dispute." *DNC*, 2025 WL 1573181, at *3.

## CONCLUSION

For the foregoing reasons, this Court should dismiss without prejudice the ABA's Complaint for lack of subject-matter jurisdiction.

Dated: December 19, 2025        Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ *James J. Wen*
JAMES J. WEN
Trial Attorney,
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 598-7361
E-mail: james.j.wen@usdoj.gov
*Counsel for Defendants*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, on December 19, 2025, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *James J. Wen*</u>
JAMES J. WEN