UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN BAR ASSOCIATION,        )
                                 )
          Plaintiff,             )
                                 )
       vs.                       )  CASE NO. 1:25-cv-01888-AHA
                                 )
EXECUTIVE OFFICE OF THE          )
PRESIDENT, et al.,               )
                                 )
          Defendants.            )
_____    )

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
Wednesday - March 4, 2026
2:30 p.m. - 3:42 p.m.
Washington, DC

**FOR THE PLAINTIFF:**
    Susman Godfrey, LLP
    BY:  STEPHEN SHACKELFORD, JR. and JILLIAN S. HEWITT
    One Manhattan West
    395 9th Avenue, 50th Floor
    New York, New York 10001

**FOR THE DEFENDANTS:**
    United States Department of Justice
    BY:  ABHISHEK KAMBLI and JAMES WEN
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

_____

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

(Call to Order of the Court at 2:30 p.m.)

DEPUTY CLERK:  This is Civil Action 25-18888, *American Bar Association versus the Executive Office of the President, et al.*

May I have counsel approach the lectern and state your appearance for the record, beginning with plaintiff's counsel.

MR. SHACKELFORD:  Stephen Shackelford of Susman Godfrey here for the American Bar Association.  I do want to note for the Court that we have here today from the ABA, the president, the past president, the chair of the house of delegates, the executive director, the general counsel and others, Your Honor.

THE COURT:  Good afternoon to all of you.

MR. KAMBLI:  Good afternoon, Your Honor.  Abhishek Kambli and James Wen for the defendants.

THE COURT:  Good afternoon to both of you as well.

I say this any time one of the parties is in the room, but you're welcome to sit in on these proceedings any time. These cases after all are not about attorneys, they are about the people who are actually litigating the case and behind the scenes.  I say that to agency counsel and clients on the government side as well.  I think it's always a good thing when clients, parties are present.

We are here today on the defendants' motion to dismiss for lack of jurisdiction.  I plan to have oral argument on

that.  I'm not going to set time limits, but I'll naturally keep the argument moving and will ask you both plenty of questions.  I'll also give you the opportunity to present a little bit before I ask questions.

I will hear from defendants first since it's their motion, then I'll hear from the plaintiffs, and then give opportunity for a brief rebuttal as well.

Go ahead.

MR. KAMBLI:  Thank you, Your Honor.

So courts are not roving commissions to oversee the legality of every hypothetical executive branch action into the future.  Federal courts are ultimately those of limited jurisdiction that can cover live cases and controversies.

Here, the ABA is asking to join hypothetical executive orders based on past executive orders, and asking for future injunctive relief based on that, and the Court should not entertain it.

I'll be spending pretty much all my time discussing the impending injury/ripeness, since it's really hard to discuss associational/organizational standing unless those are fleshed out.  There are a lot of arguments in our motion, so I'll kind of break it down into four categories.

The first is talking about the concreteness/particularized nature of the complaints.

Two, the temporal aspect of imminent injury.

Three, whether the harms that they state that they have endured are manufactured.

And four, ripeness.  And then I'll touch a little bit on associational/organizational third-party standing to the extent that the Court has questions.

But whether it's viewed as a standing issue regarding requiring that the injury be concrete, particularized or imminent, or of ripeness, that it's not dependent on future contingent events that may not occur, anticipated, or may not occur at all, the ABA's complaint falls short of pleading the jurisdictional requirements, and the Court should dismiss the case.

So I'll start by talking about the fact that the harm must be concrete and particularized.  One thing to note up front, the ABA's reference to this being a law firm intimidation policy, that's a label that they explicitly use, but as *Iqbal* and *Twombley* say, merely attaching labels and conclusions aren't enough.

THE COURT:  I do want to get to that, and it's a fair place for you to start, but can I take you back for one second.

The complaint alleges a series of claims.  There is First Amendment retaliation claims, retaliation for speaking.  There is a viewpoint discrimination element to it.  You don't challenge whether they state a claim.

MR. KAMBLI:  Yes, Your Honor.  We're filing under

12(b)(1), not 12(b)(6).

THE COURT:  Right.  It may seem like an obvious question, but I think it's a helpful thing to kind of situate the argument, right, because I'm not saying at all that you're conceding you won't win on those claims later, but in terms of conceptualizing the argument you're making, you're saying even if these executive orders were targeting people based on expression, based on ideological viewpoint, that the case has to be dismissed.

MR. KAMBLI:  Yes, Your Honor, because there has to be something that exists that --

THE COURT:  Of course.  I'm not contesting that standing doctrine exists.  It's just a helpful way to think about the arguments I think you're about to make.

So why don't you tell me a little bit about concreteness as it relates to this particular complaint.

MR. KAMBLI:  Yes, Your Honor.  So what the ABA's effectively alleging is past actions are going to have future consequences, and the past actions that they reference are the executive orders that were issued in the spring of 2025.

So in order to have a so-called law firm intimidation policy -- because what they are ultimately asking for is a permanent injunction against things --

THE COURT:  I get what they are asking for, but help me with the standard.  I mean, I think you kind of accept in

your briefing that at least kind of the way to look at this is have they plausibly alleged a policy. I mean, that's the point, past actions equal future actions. Well, one way you get there is to say, well, they have got a policy of doing this, and they were, at least at the time of the complaint, were imminently going to do it because they had a policy of doing it.

So do you agree with me that the question is have they plausibly alleged a policy?

MR. KAMBLI: Yes, Your Honor. The problem is that each of those law firm executive orders was a concrete action that was geared towards a particular law firm. It's a limited pattern that ended in April of 2025 up until now in the sense of there hasn't been anything further since then. So to have this policy be something that --

THE COURT: Let me -- that's actually really helpful, because, you know, this complaint was filed in June, if I understand it.

MR. KAMBLI: Yes, Your Honor.

THE COURT: And there were four -- if the question is is there a plausibly alleged policy, this isn't like a case that comes in and says, "We're going to put a label on something." You said the label is not enough. "We're going to put a label on something, but we have got no facts behind it." We're at the pleading stage -- and I have some questions for

you about that too.  We're at the pleading stage.

And they have got a lot more than just a label, right? I mean, from March to June, so we're talking about a three-month-ish period --

MR. KAMBLI:  I believe it was March and April, but, yes, Your Honor.  The vast majority of the actions occurred during that two-month timeframe.

THE COURT:  Yeah.  Well, I think that's worse for you. The complaint was filed June.

MR. KAMBLI:  Yes, Your Honor.

THE COURT:  Do you agree that standing is assessed at the time of the complaint?

MR. KAMBLI:  So, Your Honor, not only is it assessed at the time of the complaint, but the plaintiff must maintain it as the case goes on.

THE COURT:  Well, they must maintain a showing of standing.

MR. KAMBLI:  Yes, Your Honor.

THE COURT:  It is still assessed at the time of the complaint.

MR. KAMBLI:  So, Your Honor, because they have to demonstrate that the injury is impending, so if nine months has passed by since the beginning of the complaint, that goes towards whether the injury is impending or not.

THE COURT:  What case are you relying on for that

proposition?

MR. KAMBLI:  Your Honor, *Murthy v. Missouri* talks about how it's not enough that you demonstrate -- you have to maintain standing as the case progresses as well, not just --

THE COURT:  I get that you have to maintain standing as the case progresses, but I think what that's getting at is that you start with -- the showing progresses, right?  You start with it at the pleading standard, have they plausibly alleged a policy, which I think you have already kind of accepted is the standard right now, and then as you have facts, you have to show that you have facts to support standing, but you're still asking whether they had standing when they filed the complaint.

MR. KAMBLI:  So, Your Honor, I would have to push back on that, because the temporal aspect of whether there is an impending injury, the Court --

THE COURT:  Okay.  Could I push back on it in the way of quoting a Supreme Court case to you and you can tell me how you'd deal with it?

MR. KAMBLI:  Yes, Your Honor.

THE COURT:  *Davis v. Federal Election Commission* said, "While the proof required to establish standing increases as the suit proceeds," see *Lujan,* "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  So

tell me how you square that.

MR. KAMBLI:  So the requisite injury, it still has to be impending, so I think the Court can look at what's happened since the complaint was filed.

THE COURT:  For standing?

MR. KAMBLI:  Yes, Your Honor, because they are alleging --

THE COURT:  Well, let me read you the next sentence then of the case I was just reading from which is saying specifically that that applies even for a case where, quote, "The injury required for standing," it says in this case, "The injury required for standing need not be actualized," so it was dealing with an impending injury case and it still said that. You're telling me that's the distinction of *Davis*?

MR. KAMBLI:  So, Your Honor, yeah.  Our view is even if you look at the time of complaint, that's still two months after --

THE COURT:  But that's not what you were saying a moment ago.  It's helpful for me to narrow this.  I think standing is viewed at the time the complaint is filed.

MR. KAMBLI:  Yes, Your Honor, but --

THE COURT:  If you want to start arguing that you voluntarily ceased, then you're in mootness land and there is a totally different burden for a reason, right?  The reason being if you changed conduct after a lawsuit, it's a higher standing.

MR. KAMBLI: Right. So, Your Honor, whether we talk about a couple months after the lawsuit was filed or now, we still don't believe that the injuries --

THE COURT: It's kind of important, right, because let me tell you during that -- again, I think it's better for you, frankly. I thought I was throwing you a bone that it's a three-month period, not a one-month period. And now I think you're picking up on that.

But during that three-month period, you had, I think it was, five law firm executive orders that all had -- I take your point that the section one focused on the law firm specifically, but that's not the section that the plaintiffs are pointing to and focused on. They are pointing to the kind of particular sanctions.

Each of those five law firm orders, I think, you used the word that they are materially identical in your briefing. So there is five orders explicitly on those things. Again, we're in the land of plausibly alleging a policy. And then there is another, I think in your brief at least, publicly nine firms that were negotiating during that three-month period.

And then we have a statement saying -- from the White House saying, "The President's policy team" -- let me start again. A statement from the White House saying that the President's, quote, "policy team is executing on his directive to hold big law accountable for their weaponization of justice

and their lies, and this strategy has proven tremendously successful," so a specific reference to policy, directive, strategy.

I'm saying this to say we're at the plausibly alleged land. And then we have a report from the *Wall Street Journal* saying that the President remains interested in the orders and the Deputy White House Chief of Staff wants to keep the threats of more executive orders on the table. This is just, I think, a couple of weeks before the complaint is filed.

So if we're in the land of plausibly alleging a policy, tell me why that doesn't -- and the reason I ask you this question and the reason why I think it's relevant to the question I was just asking is I read your complaint describing the allegations, and I thought, okay, well, that seems like building towards plausibly alleging a policy until one line when you said, "And since the complaint has filed, there have been no more executive orders," and I think you have just accepted that that's not relevant to standing.

I have to judge standing as of the time of the complaint, so the one thing you said in your briefing that seemed to help you is actually not relevant to the inquiry. So help me figure that out.

MR. KAMBLI: So, Your Honor, even still, like, that also ties back to the issue of ripeness, because what they are challenging -- obviously, for the discrete law firm executive

orders, there was a plaintiff with standing that either sued or decided to settle, so then, at that point, what you have is a limited series of actions.

They still have to demonstrate that there is not just a reasonable likelihood, but an impending likelihood that there is going to be future executive orders, even if you're looking at the time of the complaint, which was in June, which was a couple months after --

THE COURT:  Why haven't they plausibly alleged an impending likelihood if they can point to five explicit, nine -- at least you could infer that those sanctions were in the background of negotiations, plus express statements from both the White House directly and others who are reporting on the White House.  Why doesn't that -- again, we're just at the pleading standard.

I take your point.  You may well have an argument that, when we get to the facts here, Your Honor, it's going to show that there was no policy whatsoever and this was all just ad hoc.  That's a different argument, different stage.

Why is that not enough?  I mean, I take standing, ripeness very seriously.  In fact, one of the decisions you're citing routinely through your brief was one of my decisions where the DNC tried to bring a suit before any action had been taken, right.

But here, you have a complaint in a very brief period

where there was lots of actions taken consistent with the policy that's alleged, and so there is a lot of factual -- we're in *Iqbal/Twombly* land.  I mean, where does this not meet *Iqbal* and *Twombly*?

MR. KAMBLI:  So, Your Honor, that also leads me to the next point that I was going to get into, which is ripeness.  I think that that's also where it requires what exactly a future executive order would look like in terms of fitness.

THE COURT:  Can you help me understand that, because your brief starts by saying, whether it's ripeness or standing, and I think you started your argument that way.  How does it help you to pivot to ripeness?  I mean, at the end of the day, it's case in controversy.  We're talking about is there a concrete enough injury, so why does it help you to pivot to ripeness?

MR. KAMBLI:  Yes, Your Honor.  Impending injury and ripeness can be interrelated.  Ripeness has its own requirements.  So it has to not be dependent on contingent future events that may not occur as anticipated or indeed may not occur at all, and that's also where some of the timing is important, because, for instance, it still requires something that's going to happen that's substantially similar to the executive orders because what they are asking for is a permanent injunction of substantially similar actions as taken to those --

THE COURT:  Maybe this will help.  This is going to be a hypothetical, so I'm acknowledging at the outset it's a hypothetical.

Let's say the President signs on day one the Perkins Coie order, and assume with me, which I think, again, we acknowledged at the beginning you kind of have to be willing to accept this that it's viewpoint discrimination, it's targeting law firms based on their speech or their political statements. Whatever hypothetical you want of something that's blatantly unconstitutional.

And on day one, they issue the Perkins Coie executive order with the same sanctions that the executive order actually had.  And I want you to stop me when you think it is sufficiently impending that it would become ripe.  Okay. You're using ripeness now, so I'll use the word ripe, standing, whichever one you want to use.

So day two, he issues the Jenner & Block order, same sanctions, everything.

Day three, issues the WilmerHale order, same sanctions.  Are we ripe yet --

MR. KAMBLI:  So, Your Honor --

THE COURT:  -- for a suit on day four?

MR. KAMBLI:  -- ripeness in terms of a law firm intimidation policy as they allege, it would have to be dependent on there being more than a limited fact pattern, as

to -- for instance, they quote in their complaint that there were approximately 15 --

THE COURT:  So I'll keep going.  You tell me when.

Day four, they issue an executive order, Susman Godfrey, same four sanctions in it.

Day five, there is an executive order issued against Paul, Weiss, same four sanctions in it.

Stop me.  I want to know what your position is on when this becomes ripe.

Day six, Skadden gets its executive order, same four sanctions.  Can they sue on day seven at that point?

MR. KAMBLI:  So, Your Honor, when a couple months pass, so like the Susman Godfrey executive order was, for instance, I believe on April 9th, and that was the last, I believe, of the executive orders, and then they filed in June, there was a two-month gap where there were no further executive orders.

THE COURT:  I think you're acknowledging it's a spectrum.

MR. KAMBLI:  Yes, Your Honor.

THE COURT:  And so if it was those six I gave you in a row in a day, maybe day seven, there would have been, but because it was four explicit ones over the course of a month, and then there was a little bit after, and I guess nine of them happened with those sanctions, at least you could infer, I

think, in the background, instead of being explicit, that's a different side of the spectrum?

MR. KAMBLI:  Yes, Your Honor, because you still have to demonstrate that this policy exists to begin with, and it doesn't have to be written, obviously, but it still has to be something that combines together that creates this policy that they are talking about.

THE COURT:  And when you add to it that the White House issued a statement calling it something the policy team was working on and directives and strategy --

MR. KAMBLI:  Your Honor, the facts that they hang on are ultimately the law firm executive orders themselves.

THE COURT:  I think that's in the complaint.  I have to judge the complaint as a whole.

MR. KAMBLI:  Yes, Your Honor, but a lot of those statements were made at the time that these executive orders came out, but even if you look at that gap between when the Susman Godfrey executive order was issued and the filing of the complaint, that's still about a two-month gap.

So they, one, demonstrated a limited pattern, which demonstrates the likelihood that there is an impending injury to its members, and two --

THE COURT:  But I think that's why I'm trying to -- if we're rewinding back to mid June of 2025, and so you had all of of that happen, you had all of the reports on the settlements

with the firms, that I think are relevant to plausibly alleging this too, and then you get this June 1 statement in the *Wall Street Journal* saying specifically that the President is -- I can read it again, but the President and the Deputy Chief of Staff are still interested in this and still pursuing this.

You say it's a spectrum, but you have got those four explicit ones. You have got nine that are settling off with those sanctions behind the scenes. And then you have also got a statement directly from the White House and a statement just before the suit in this case saying that this is going to keep happening, so where does it fall short?

MR. KAMBLI: Your Honor, like pursuing it could mean a lot of things. Pursuing it could mean continue pursuing the litigation that unfolded with the existing law firm executive orders. It doesn't necessarily mean that there is going to be more in the future. That's --

THE COURT: I think that's helpful, but I think that's where you run into the challenge of the stage we're at right now. I agree that plaintiff hasn't won this case by putting together allegations in the complaint, but the standard isn't what you just said, that it necessarily means something.

It's drawing all inferences in the favor of the plaintiff, have they plausibly alleged a policy.

MR. KAMBLI: So, Your Honor, we still believe that that's a limited pattern, because they can only use past injury

as prologue towards the future, so even if you're looking at the June to April period, you have to still believe that there is going to be, even at that time, future executive orders that are substantially similar to what was there.

THE COURT:  So there you are moving into the associational standing?

And there is just not even a plausible enough allegation to that.  And it's especially true when you look at the impending injury, because they are not the ones -- especially given that the ABA and their members are not the direct targets of those law firm executive orders, it was law firms generally, and --

THE COURT:  So there you are moving into the associational standing?

MR. KAMBLI:  It is related, because in order to have a concrete thing to analyze, we would need another executive order that the ABA can then demonstrate whether its members have standing to challenge.  For instance, if it's a law firm executive order --

THE COURT:  I think that their argument is based on all of the allegations in the complaint, but as it relates to the law firm executive orders, you know, I saw your argument in your brief that those are focused on law firms.

The challenge I had with it is that, one, you then cite to section one of the law firm executive orders, which happens to be the section that the plaintiffs aren't focused on here, so it seemed a little convenient, and then you

selectively quoted from the other parts, because the actual executive orders do target attorneys, not law firms.

MR. KAMBLI:  So, Your Honor, it would still -- like, if you look at the titles of the executive orders, it is ultimately geared towards law firms too, but the other issue is until we have a future executive order, because they are not alleging, based on my understanding of the complaint, that they have particularized harms, like, for instance, security clearances tied to -- like, they aren't alleging, for instance, that a member is at risk of losing their security clearance or at risk of an EEOC investigation.

So when you have a limited pattern based on past executive orders that they are not alleging were directly applicable to its members, then --

THE COURT:  But why wasn't it directly applicable? So, for example, section two doesn't say -- let's just use Perkins Coie, even though it happened several other times.  It doesn't say Perkins Coie loses security clearance, right?  It says that they shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie.

Section five -- these are the things that you didn't quote in your brief, that you left out -- says -- and I was kind of surprised when I read your brief, and then I went and read it, because I thought there might be something to it, but

it says, when it's talking about government buildings, it says, "They should be limiting official access to federal government buildings to employees of Perkins Coie."  So it is focused on people and attorneys.

MR. KAMBLI:  Employees of the law firm.

THE COURT:  So is the argument that -- what is your argument?  I mean, presumably that is attorneys.  ABA is an association made up of attorneys.

MR. KAMBLI:  Yes, Your Honor.  That's part of the associational standing, but the problem is that the way that the ABA has alleged their complaint, they are not saying that their members that they cite have faced any direct harms as far as being employees of the law firms that were at issue in the past, but they are worried about them in the future.

But there are things that they are asking for relief from, such as relief from the security clearance provision, they haven't alleged, for instance, that anyone has a security clearance that they are at risk of losing.  They haven't alleged that someone is at risk --

THE COURT:  Isn't that just bound up in the policy thing or the definition of what the policy is?  As I understand it -- I'm not going to put words in the plaintiff's mouth, but when I read the complaint, it's there is a policy of targeting people who have law practices by doing these things, by imposing these sanctions based on viewpoint discrimination and

based on retaliation for speech, and we have members of people who have law practices, and so by virtue of having a policy of doing that with all of these firms, presumably ABA members and these giant firms too who are affected, they are not suing on behalf of -- they are not suing based on the past damage.  They are suing based on the existence of a policy that is targeting people who have law practices.

MR. KAMBLI:  Correct, Your Honor, but until we have a concrete executive order -- for instance, let's just say there is a hypothetical executive order that is aimed, I don't know, at security clearances.  Then, they would have to demonstrate that their member is -- they have to demonstrate a member that is potentially at risk of losing a security clearance.

THE COURT:  Is your argument that no one in the ABA is a person with a law practice who has a security clearance?

MR. KAMBLI:  No, that's not -- I'm just saying that they haven't -- because we don't have a policy to weigh it against, we have -- it's impossible to weigh whether -- how associational or organizational standing exists when you're talking about shadowboxing against a hypothetical executive order that may come out in the future, because that is ultimately what they are asking for an injunction of, an injunction against any future executive order.

THE COURT:  I guess my point is isn't some of this reduced to the question of whether they plausibly alleged a

policy of doing these things against people who have law practices?

MR. KAMBLI:  And they have to allege that this will continue in the future, which, even at the time of their complaint, it had been two months since there was an executive order, so April 9th.

THE COURT:  I know your argument on that point, but I think it reduces to the same argument, doesn't it, about whether they have plausibly alleged a policy from which you could then infer that it's going to happen again?

MR. KAMBLI:  Yes, but, Your Honor, it still has to be -- so it --

THE COURT:  You keep saying we don't have a concrete policy, but I think you have kind of accepted that there is a world in which you can sue based on something that is impending.

MR. KAMBLI:  Yes, if you have standing and the case is ripe for judicial review, and it meets all the other standing. But the problem is that the law firm executive orders themselves were not geared towards the ABA, and it was not geared towards any of their members.

And they, obviously, did not sue on that one, and they can't, because it's already, obviously, been enjoined, so the only way that they can demonstrate for the relief that they are asking, which is a permanent injunction against basically

sections -- anything like sections two through five of all of those other law firms, and unless there is an impending -- and it's not just a reasonable likelihood or a non-paranoid fear that it would happen, it has to be certainly impending.

THE COURT:  Yeah, you think it has to look like the hypothetical I gave you where it was like day one, day two, day three, day four, day five.  At some point there, then the ABA can say --

MR. KAMBLI:  Yes, Your Honor, and they rely, for instance, a lot on *Turner*, but there were constant events that were happening to the individual claimant in the *Voice of America*.

THE COURT:  So can I ask you a question, I suppose at risk of complicating things, but when you had mentioned in your briefing -- I think now you have kind of acknowledged that standing is assessed at the time of the complaint, which I think is correct under the law.

When you had brought up the point of, well, nothing has happened since, the question that occurred to me is what are you asking me for?  Are you asking me for what I think your motion to dismiss indicated, which was a decision on the pleadings, under which it's decided under the pleading standard, or are you saying we should go into jurisdictional discovery and decide this at an evidentiary hearing?

MR. KAMBLI:  No, Your Honor, we believe that it should

be dismissed without prejudice, and then if there is some concrete action that they can point to afterwards, then they can refile their complaint.

THE COURT:  Okay.  All right.  But you're asking for it to be decided on the pleadings?  You're not asking for an evidentiary hearing?  You're not asking for discovery?

MR. KAMBLI:  No, Your Honor.  To the extent that the Court is inclined to do anything with jurisdictional discovery, obviously, it's only been addressed in two footnotes, so we would request the opportunity to further brief that issue.

THE COURT:  Let me put it this way to maybe bring it to the forefront.  There are circumstances in which a party, a defendant, typically, can ask for jurisdictional discovery and to have the 12(b)(1) question decided based on facts.  You cited a fact, which is what happens after the complaint for which is not in the complaint, it's not alleged, I don't know if it's even relevant, but you were citing things that aren't in the complaint, such as that there hasn't been an executive order since.

And I'm cautious about that, because, if we're going to go into facts after the complaint, then I think I need to have both parties have the opportunity to discuss facts.

And so sometimes a party will come and say, look, I get that they might be able to plausibly allege this policy, but if you really look at the facts here and we just do some

more circumscribed jurisdictional discovery, you will see there actually is no jurisdiction here.  And the reason a party does that is because, if we get past this stage, you may not have a great argument for cabining discovery just to jurisdiction, right.  We might just be in full-fledged discovery land and relevance land.  And so -- but I hear you telling me you don't want jurisdictional discovery.

MR. KAMBLI:  No, Your Honor.  We believe that jurisdictional discovery is not a crutch if it's otherwise speculative and doesn't meet the Article III standing requirements.  Even if you look at the April to June timeframe, there was no executive order that was released between Susman in that period too.  So even taking in --

THE COURT:  What was the timing of the other nine negotiations?  Were those done by April as well?

MR. KAMBLI:  I don't remember offhand, Your Honor, but --

THE COURT:  Were they still ongoing in May?

MR. KAMBLI:  I would have to look back to verify that, but I believe it was done in April.

THE COURT:  Okay.

MR. KAMBLI:  Or by April.

THE COURT:  Right.  Clearly, I understand you're not looking for jurisdictional discovery, but if you knew there was something there in May or June saying, hey, look, I get that we

were doing these sorts of things, but there is no policy of this, and, even if there was, we're stopping it as of May or June, that would be pretty persuasive for you in the future for saying that there was no standing at the time of the suit, but I don't hear you asking for that.

MR. KAMBLI:  No, we're not asking for that.  Your Honor, the one analogy that I would draw that I think might be helpful in this case, let's just say you had a series of regulations, for instance, that were -- or statutes that were released, what they are asking for is a belief that, let's just call these EO statutes doing exactly the same thing, they would -- they are alleging that there is going to be a statute in the future that's going to be substantially similar to that one, and I don't think that even taking the complaint on its own terms that they have met the hurdles to do that.

THE COURT:  Why does it help to change it to statute?  Here, it's is four EOs.  There is the other nine being negotiated.

MR. KAMBLI:  Because it also goes into the ripeness to the extent --

THE COURT:  Is the idea that it sounds better as a statute because it's harder to pass a statute than to sign an EO?  I don't understand.  Why does it help?

MR. KAMBLI:  Just because something has happened in the past doesn't necessarily make it prologue for future injury

that is certainly impending, so that is the issue here, because, one, even if you take the time period between the Susman Godfrey executive order and their complaint, there wasn't any, and, to the extent that any could be issued in the future, it would have to also be substantially similar to the ones that came before to fit under their theory of the law firm intimidation policy.

So it's not only that something that happens in the future, but that that something be substantially similar to what has come before.

THE COURT:  Can I ask you a question just to make sure I'm clear on this?  I understand you have your point that the four executive orders that were issued and not rescinded were enjoined and are presently enjoined as unconstitutional.

Assume that, let's just use Perkins Coie again because it was the first one, that EO is issued against Perkins Coie. I know, obviously, Perkins Coie challenged it in court and succeeded, but assume that before they had or that they didn't one of the individuals at the firm whose security clearance was taken away sued, maybe because they want -- because their security clearance was taken away or because they couldn't access federal buildings anymore.  Do you dispute that that attorney would have standing?

MR. KAMBLI:  No, but they are also challenging a concrete executive order.

THE COURT:  Understood.  Understood it's not responsive to your full thing, but you agree that that person would have standing in that instance?

MR. KAMBLI:  Yes.

THE COURT:  All right.  And then any other submissions you want to make?  I am interested in whether any of the recent back-and-forth regarding the law firm appeals is relevant to the matter before me right now.

MR. KAMBLI:  No, Your Honor.  At this point, with that, the appeals are still standing, so we're basically at the same stage where we were when briefing ended on that.

THE COURT:  The government's position is that it's not relevant?

MR. KAMBLI:  Not relevant right now.

THE COURT:  Any other submissions you want to make before I hear from the plaintiffs?

MR. KAMBLI:  No, Your Honor, provided we get time to come back later.

THE COURT:  You'll have some time, yeah.

Mr. Shackelford, go ahead.

MR. SHACKELFORD:  Your Honor, I was remiss not to introduce my partner at counsel table, Jillian Hewitt, who is also here today.

THE COURT:  Good afternoon, Ms. Hewitt.

MR. SHACKELFORD:  Your Honor, I took notes during your

discussion with counsel for the government, and I'm going to jump around some.  But I do want to start with a question you asked.  I think I heard the same answer from the government that I would give, which is I think this does reduce to whether we have plausibly pled a policy.

There are a number of cases we cite about policies. As Your Honor pointed out, a policy doesn't have to be written, although this one was written down repeatedly.  You don't have to have the government say it is our policy to impose these sorts of restrictions if they have done it consistently.

And I think throughout our complaint for the ABA, we have numerous allegations that certainly plausibly, and I think far more than plausibly, explain what the policy is that we are challenging.

To be clear, another thing that counsel for the government said was, "Well, we stopped issuing EOs in mid April."  The policy is not just to issue EOs.  The policy is to threaten to issue EOs against other law firms that represent causes or clients that the government doesn't like.  That is precisely how the government explained the executive orders that it did issue, and that's in our pleadings.  And that is the exact threat that we are suing to get lifted from ABA members.

So a one-and-a-half-month pause between the issuance of an EO -- and we agree with Your Honor that you assess

standing at the time of the complaint, and the nine-month period might have to do with a later mootness challenge that I'd be happy to talk about if Your Honor would like.

But in addition to the specific allegations Your Honor pointed out, like the June 1st statement or the June 1st story, the policy worked and the policy was kept in place.  And even in the last 48 hours, if Your Honor were to look at them, they proved that the administration is continuing to double-down on the policy because it's working.

So if this comes down to, as we think it should, whether at the pleading stage we have plausibly pled a government policy to threaten and enact these sorts of EOs in order to prevent as many law firm, ABA members included, lawyers from taking up causes and clients that the administration doesn't like, we have far surpassed that in the pleadings, Your Honor.

THE COURT:  So sticking with whether you have plausibly alleged a policy.  You have got the law firm executive orders, five of which I think were written and have the same sanctions in them, and I think everybody agrees they were materially identical in their sanctions.

When it comes to the settlements, I'll call them or the negotiations, what do we -- what allegations do you have there?  Let me say it this way.  Is the idea that by virtue of the fact that those EOs have been issued and that those

settlements happened that it's a reasonable inference that those same sanctions were being threatened, or is there something more you would point me to?

MR. SHACKELFORD:  So obviously, with Paul, Weiss, they did receive one of the EOs and they did then settle, and they effectively created the framework for settlements to either get out of or avoid EOs, so I think that by itself shows that the settlements, all the settlements are directly related to avoiding the threat of the EOs.

When Paul, Weiss got out of the EO by the settlement, they gave up certain parts of their speech quite overtly.  They gave up the right to represent certain kinds of client.  They said they would work to choose pro bono clients in a different way that would please the government.

THE COURT:  I get that they gave up certain things.  I guess my question is what's the tie-in from the settlements to the kind of specific sanctions that you allege are the policy here, the policy of being in EOs or otherwise threatened?

MR. SHACKELFORD:  Right.  So I think there are statements by some of the law firms that settled that I believe we quote in the complaint.  For instance, we talk about Skadden Arps' settlement at paragraphs 130 and 131 where Skadden specifically said that they entered into this preemptive settlement, and, according to a firm-wide email sent by Skadden's executive partner, this is paragraph 131, Skadden

believed it would be the target of a forthcoming executive order and thus proactively engaged with the administration.

So that's just one example of a law firm saying for itself we're doing these settlements to avoid the threat of the EOs. So we plead that, and I think it's pretty obvious.

But to be clear, if you look at the Paul, Weiss settlement, the Paul, Weiss settlement itself had nothing to do with the stated claims about national security. The Paul, Weiss settlement simply avoided their EO. They got the EO taken away, and they agreed to do certain work -- they agreed to change the way that they practice law in certain ways, and they agreed to make certain changes to the way that they employed people as well, which is one of the impermissible, as all four courts found, one of the impermissible motivations behind the retaliation.

THE COURT: Yeah, but you're not just seeking -- I mean, I think it would be fair to say you can't come in here and just say -- there might be some areas where your client is too broad on this point -- we want to enjoin any executive order against a law firm, right?

MR. SHACKELFORD: Of course we're not saying that.

THE COURT: That's not what you're asking for.

MR. SHACKELFORD: Right.

THE COURT: So I think you have to do more than just say they were afraid of an EO. I'm trying to understand how

you connect those, which you rely on, to the actual four sanctions that you highlight in your relief section.

MR. SHACKELFORD:  I don't think Skadden was saying, "We're afraid of a random EO."  By that point, the pattern was quite well set of what the EOs would have in it.  And certainly, at the pleading stage, we're entitled to the presumption that --

THE COURT:  So I guess the answer to my question then is you have the four EOs, they all looked the same.

MR. SHACKELFORD:  The five EOs.

THE COURT:  The five EOs, four that were challenged. The five EOs, they all look the same, and then the inference that they are threatening the same things in these conversations that are getting the law firms to settle, is that the idea?

MR. SHACKELFORD:  Right, and the law firms admitting that that's exactly what they were trying to avoid through the settlements.

THE COURT:  Okay.  Help me with that question of the specific relief.  In your prayer for relief section, you do not just say I want to enjoin anything between the administration and the law firms.  You highlight those specific sanctions, presumably because that's what you have facts and allegations related to.

What's my role at this stage or what's your

understanding of my role at this stage as it relates to focusing on the relief section and standing?  Do I have to parse through the relief and say which of these you have standing to do?  Help me think about that.

MR. SHACKELFORD:  We do have to prove standing of at least one plaintiff -- there is only one plaintiff, but whether on organizational standing or member-based standing.  We do have to prove that we have at least one theory to go forward for each form of relief, but the relief we're seeking is declaratory injunctive.

And the relief we're seeking I think you do have to parse if we have standing for each individual piece of relief, but I think we have proven that, Your Honor, both through the ABA's own experiences and through the experience of the members that we list, members A through D.

THE COURT:  I'm trying to understand how that works given that the relief that can ultimately be afforded at the end of the case can be narrower or different than what is actually listed there.  How I do account for that?

MR. SHACKELFORD:  I don't think at the standing stage, Your Honor.  If the government was arguing that we don't have any standing to seek any of the relief at all, that might be a standing question, but I think the Court can postpone specific questions about the final relief, both based on whether we prove our case about the existence of that part of the policy

or --

THE COURT:  One of the reasons I ask is that your complaint does ask to enjoin the defendants from initiating attorney conduct and disciplinary proceedings or making a referral for disciplinary action of any ABA member or ABA member's law firm based on the individual's law firm or organizational affiliation.

Where is the policy there or the -- where is that coming from?

MR. SHACKELFORD:  It's the memo that went out -- I believe it's the March 22nd memo, which is at paragraphs 102 to 106 of our complaint where the -- let me get to that for you.

It was a White House memorandum entitled "Preventing Abuses of the Legal System in the Federal Court."

THE COURT:  I'm familiar with the memo, but you don't ask me to enjoin -- the memo hasn't been, at least you don't allege the memo has been rescinded, has it, or challenged in court?

MR. SHACKELFORD:  Not to my knowledge has it been rescinded.

THE COURT:  Or invalidated by a court, to your knowledge?

MR. SHACKELFORD:  I'm not aware of that.

THE COURT:  And you're not asking me to enjoin the memo.

MR. SHACKELFORD:  What the memo was asking was for complaints to be filed based solely on disagreement, as I read the memo.

THE COURT:  I think that's where I get -- if the point is whether you have plausibly alleged the policy, I see the argument as it relates to, okay, for these four sanctions that keep appearing in these law firm executive orders, we have got these settlements, we've got these statements about a law firm strategy.  You have got facts and something to decide whether that's a plausible allegation of a policy.

Then you get to the law firm disciplinary one, and you cite to me a memo, under which I don't think you point me to any action that's been undertaken in that memo.  It starts to look a lot more like -- it frankly starts to look a lot more like the DNC case that I decided not that long ago on similar grounds that you have got this memo, but no action taken under it.

And it starts to look a lot more like the cases where the Supreme Court has said -- and the DC Circuit have said you have got to wait until there is some action taken.

MR. SHACKELFORD:  Well, there were other facts that I think worked against the plaintiff in the DNC case, Your Honor.

THE COURT:  Well, tell me about this case.

MR. SHACKELFORD:  In this case, it's a memo that quite clearly instructs the attorney general to recommend to the

President various steps if the attorney general determines without any real explanation that an attorney or law firm in litigation against the federal government, their conduct requires some sort of response.  It goes into some detail talking about filing frivolous litigation or engaging in fraudulent practices.  Obviously, no attorney is going to defend frivolous litigation or fraudulent practices.

THE COURT:  So why do you have a problem with it?

MR. SHACKELFORD:  But in the context of the broader law firm intimidation policy, Your Honor, including the sorts of statements that the President made both in signing statements and fact sheets and so forth about the law firms that he specifically hit with EOs, he made it clear that what he means by that is anyone who went up against me and did litigation that I don't like.  And that was actually one part of the executive orders one or two of the courts --

THE COURT:  I think you got my point.  Maybe you do or you don't.  My point is for one of these you seem to have -- you're arguing we have plausibly alleged a policy and you can see that they have carried it out in these ways.

MR. SHACKELFORD:  Agreed.

THE COURT:  And it seems to me for the other you're saying we think there is a policy, but you can't point to that they have carried it out in a way that I think you're afraid of.

MR. SHACKELFORD:  It's a policy that -- I don't have facts to allege, Your Honor, but I don't think that that is a reason to dismiss on standing grounds.  I think that would be a debate that we could have as we try to formulate that there is a reason for a remedy, or that the policy --

THE COURT:  Yeah, and that's why my question started as at what level do I have to parse those aspects of the relief at this stage, if there is standing for some relief.

MR. SHACKELFORD:  I think, Your Honor, if the Court were to, as we encourage the Court, if the Court were to let the case go forward on the lion's share of the executive order policy, we would certainly seek discovery.

THE COURT:  My question is mostly like just doctrinal case, if you have a case that helps me figure that out, how much to parse it.

MR. SHACKELFORD:  There are cases that look at it as a whole.  I think the *Voice of America* case, for instance, looks at it sort of as a whole.  I think the *AAUP* case in the District of Massachusetts looked at it as a whole.  You could look it as a whole right now.  We allege a comprehensive policy, and we put enough in there right now to allege the policy.

And we certainly have standing, the ABA does, as an organization and on behalf of members to pursue the policy as a whole.  If Your Honor rules that way, we should then get

discovery, because we will ask for discovery to prove the existence of a policy sufficient to get a permanent injunction. And at that point, part of the discovery should be into whether this particular memo is being acted upon or threatened --

THE COURT:  Your argument is we've plausibly alleged the existence of these policies, and if we get into discovery and it doesn't exist, we lose, and, if we get into discovery and it's half of the policy that we thought it was and that we plausibly alleged then our relief will be limited accordingly?

MR. SHACKELFORD:  Yes, Your Honor, I think that's the way I would look at it.

THE COURT:  Help me understand -- and I actually will ask the government the same question on rebuttal, because I didn't ask it before.  Can you help me understand the way to reconcile the usual imminence requirement for standing based on future injury with your argument that there is a chill.

This is a back-and-forth the government gets into. Anything you guys can offer me, it's a confusing area of law, and I know you highlight the fact that it's a First Amendment context, but I'm interested in how much that actually matters if you have got this impending injury, because the court has recognized standing outside of the First Amendment context based on impending conduct that allows for standing.  So how do you think about those?

MR. SHACKELFORD:  So, Your Honor, I'd first point the

Court to the *Susan B. Anthony List* case, which talks about imminence, including a substantial risk that the harm will occur.  So if the Court were to look at this as what risk is there of the -- if the Court were to look at it as the ABA members and the ABA and lawyers that the ABA wishes to work with who are now not working with the ABA, is there a substantial risk that they could be affected by this policy if they were to engage in conduct that the -- or speech that the administration doesn't like, I think we have certainly proven there is substantial risk as of the time we filed, given the pattern that the administration went through.

But the pre-enforcement cases, those cases, as they say, they don't require you to actually go through and do something that is going to get you in trouble with the law whether the law is constitutional or not.  They allow, particularly in the First Amendment context, they allow for the injury to be a chill, and that's actually -- that's connected to the retaliation cases as well, Your Honor.

Retaliation -- the threat of retaliation is also actionable just as much as retaliation, which is why you're allowed to bring a First Amendment case without having to actually break the law.  You can say that there was --

THE COURT:  So what role does the chill play in your standing argument?

MR. SHACKELFORD:  It is both, our argument is both a

substantive wrong, and if you can show that the chill is sufficient to deter a person of ordinary firmness, and that's I think sufficient to show that you are not acting -- it's not speculative, the chill is not based on a speculative fear, it's based on enough of a fear that the Court has held that it's actionable.

THE COURT: So is the idea that like a sufficiently concretely imminent enforcement or sanction that's coming can be enough on its own in some circumstances for standing, but if you have some objective basis to be chilled and you have reorganized your conduct, that's a plus and better, and maybe you need slightly less on the impending? How do you think about it? Which is needed and which is sufficient?

MR. SHACKELFORD: I think, Your Honor, I really -- this is a pre-enforcement action. If we have proven that there is a policy, at the time that we filed there is a policy, and I think we have certainly alleged sufficiently for that to be plausible, well beyond plausibility, then the ABA is acting on behalf of itself and its members in a pre-enforcement context.

And there, the Court, both through the *Susan B. Anthony List* case and the DC Circuit in the *U.S. Telecom Association* case, I think that's the right standard to apply. You have standing if you can show that you want to challenge a law burdening expressive rights, and there is a credible statement that you intend to commit violative acts, meaning,

for instance, Member A said that Member A would have taken on the same sort of work that Member A had done in the past --

THE COURT:  That part is interesting, because in this case, the violative acts, at least as alleged in the complaint, have already happened.  It's not like, as I understand it, at least, the law firm executive orders were after this administration started, something happened that violated the conduct and then they retaliated.

The idea was we're going to look historically at your conduct and determine whether there is something that satisfies this kind of viewpoint discrimination, again accepting the complaint as true.  In other words, there is almost no violative act that has to happen because every person -- not every, but there would be many lawyers out there who have a law practice and who are associating with someone who might have done something that the administration finds objectionable or satisfies whatever the threshold is for its viewpoint discrimination.

So the violative act piece is kind of -- I get that in a case where it's a pre-enforcement conduct where you're saying this is some sort of law that we shouldn't have to go violate in order to have them enforce it against us, but here, the conduct already happened.

MR. SHACKELFORD:  Some of the conduct happened, Your Honor, but I'm glad you asked that question, because, as we

plead and I think that facts support this, the purpose of the policy was not just to punish five law firms, one of which, by the way, as soon as it behaved as the President would say, it lost executive order against it and it was able to move forward. The purpose of it was to set an example, and we plead this throughout. We plead that the purpose was to chill ongoing work by top lawyers to work against the administration or the President's priorities.

So the potential violative act would be engaging in protected First Amendment activity, such as bringing a new lawsuit or representing a client against the administration in an area that the President cares about. So while you're correct that there were past alleged violative acts, and, again, none of these violative acts were illegal, they just displeased the administration or the President, that is only a piece of it.

It is much more important that what the President did with these executive orders and with the settlements was set an example. And you can see this in the rulings by the four judges in the executive order cases. It was intended to set an example, and a number of them say lawyers were watching to see and lawyers were chilled from taking on clients, and we pled this, because that was seen as a violative act by the administration.

And we pled places where the administration, including

the President, say this.  The President says, "Law firms just need to behave," and in context it's clear what he meant, which is don't take on the kind of cases that are going to make me angry.

THE COURT:  Part of my question is why.  It seems like a bigger bite to chew to go down the path of that type of chill, and there are limitations on when you can be chilled.

I think *Laidlaw* maybe supports what you're arguing and the theory you're arguing.  But why isn't the argument we were all -- attorneys were similarly situated to these law firms, like they were going after one, two, three, four, all the way to thirteen, fifteen and any one could have been sixteen, seventeen, eighteen, because what they were doing was just looking at if you were associated with someone who has done something that's objectionable.

I would think you would take this as an easier path, which is that we were all just sitting ducks unless there was a settlement.

MR. SHACKELFORD:  But the harm is -- the real harm is that lawyers, ABA members and their law firms are chilled from future action.  That's what the case is about.  And they are not chilled -- again, we pled this.  Law firms are chilled from hiring certain people for exactly that reason, because of what the President did to certain law firms that hired people he had railed against.

Law firms are chilled from taking on certain types of cases because the President set an example as to law firms that had taken on those same types of cases. That's what the case is focused on.

THE COURT: Let me ask you this question related to that, or not related, but a question I want to ask you anyway.

Why does -- and maybe it's the same answer, maybe it is related. Why does this suit need to be brought by the ABA instead of targeted firms? I mean, the firms that were targeted who wanted to challenge it have succeeded. Others made the decision not to, but it's not like the nine who were listed who publicly struck settlements or these negotiations are the most vulnerable in society. They are some of the most powerful institutions who decided to do that.

So why does the ABA have to bring this? Why not just let the firms make their own decisions here?

MR. SHACKELFORD: Your Honor, ABA is bringing it on behalf of its members who are lawyers, many of whom are at firms that are unwilling to let these lawyers to take on the kind of work they had traditionally done without any problem because of this particular chill and this policy.

We plead this, and Paul, Weiss said it, Paul, Weiss said this was an existential crisis. Paul, Weiss believed they could not survive as a law firm unless they got right with the President, and that included clearly not taking on future work

that was, as we pled, that was contrary to the President's top priorities.

So while some firms are able to withstand the possibility of being hit by an executive order, some firms can scramble within days and find counsel, which, by the way, is not easy to do.  There are not many firms that will even take on these cases, but to find firms that are willing to take it on.

Other firms, if they were hit by an executive order that would immediately close off their access to federal buildings, told federal employees they were not able to speak to the law firm anymore, strip the law firm's security clearances, threaten to fire from federal contracts the law firm's clients, some law firms would collapse within a matter of days.  We pled this, so certainly at the pleading stage that's what the Court has to consider, but that's just the facts of what the ABA has seen, including what the ABA has heard from some of its members, as we pled.

The ABA doesn't have to do anything.  The ABA is bringing this because the ABA believes deeply in ending the enforcement of this policy on behalf of its members and itself. The ABA has been directly affected by an inability to use law firms that they had used for decades who are reasonably concerned about crossing the administration.

But to answer Your Honor's question, the reason why

many law firms haven't been able to do this is because of the enormous consequences of being hit by an executive order that this threatens.

THE COURT: All right. Any other submissions you want to make before I give the government the opportunity to rebut?

MR. SHACKELFORD: Your Honor, I think I pointed to this already, but the disavow point is important, that the government has made very clear that it is not disavowing the policy. It can argue the policy no longer exists, but that's not a question of standing, and we think the events of the last 48 hours belie that argument.

THE COURT: Why would it matter if they disavowed the policy at this point for the purposes of this motion?

MR. SHACKELFORD: I agree it should not matter, Your Honor. It matters what the world was like at the time we filed, which I think Your Honor --

THE COURT: So if discovery shows that there was an internal disavowment of the policy before June, that would be relevant? I guess you would still argue it wasn't public so it chilled us in various ways and we still had a concrete injury maybe, but it would be relevant to standing?

MR. SHACKELFORD: I don't know that that would be -- perhaps it might be relevant in a loose sense to standing, Your Honor, but for exactly the reason you say, I don't think it would affect the standing.

THE COURT: I'm not asking you to concede anything at the moment. I'm just trying to understand the efficacy of the argument.

Hold on. Let's say that there is a disavowment post-complaint, whether it's something that's in discovery or something that's made in the future, that would presumably fall in the land of, what, of mootness?

MR. SHACKELFORD: Yes, Your Honor.

THE COURT: Then you would be in voluntary cessation land, because it's post-litigation conduct?

MR. SHACKELFORD: Yes, Your Honor.

THE COURT: Okay. Anything else?

MR. SHACKELFORD: Let me just check my notes from earlier.

(Pause)

MR. SHACKELFORD: I want to cite the *Johnson versus District of Columbia* case, which states there is a conventional background expectation of enforcement absent a disavow and many other facts that could contravene that background expectation. Again, the key question is have we proven a policy. If there is, I think we --

THE COURT: Have you plausibly alleged a policy?

MR. SHACKELFORD: Thank you. Have we plausibly alleged a policy. If so, then the background expectation is that the government was going to continue to enforce it, which

we don't even need the background expectation given what the government and the administration kept saying about what they were doing.

The only last thing I will say, Your Honor, there is a lot of case law that we have cited about the relaxed standard for both standing and ripeness in the First Amendment context because of the need to protect First Amendment and protect from chilling First Amendment speech.  The ABA believes, we believe, that that particular approach is even more important when you're talking about the right to petition and the right to have an attorney to take you to the courthouse.

All four of the judges who decided the EO cases focused on the unique place, the unique role attorneys play in the constitutional system, so I think chilling a huge swath of attorneys from taking on cases against the administration or that might displease the administration is as dangerous or more dangerous than chilling political speech under our constitutional system.

So we think that the background role that standing and ripeness requirements are relaxed in cases of First Amendment chilling is even more important in a case like this.  I don't think we need that thumb on the scale, but it is there.  That's it, Your Honor.

THE COURT:  All right.  Appreciate your submissions.

I think you each got almost exactly a half hour.  Why

don't you go ahead and take a few minutes.

MR. KAMBLI:  Yes, Your Honor, just a few things to clarify some of the dates that you were asking me about earlier.  So April 9 was the Susman Godfrey order.  I believe April 11 was the last settlement.  And June 16 was when the complaint was filed.  But even that two-month-plus period is relevant, because we also have to pay attention to what was happening during that time.

By mid April, the Susman Godfrey was the fourth one that was enjoined in some way by a court through TRO.  You would have to believe that in the two months after when four executive orders were enjoined that there is still an immediate threat of repeated conduct that was imminent.

THE COURT:  Can you give me those dates again?  I'll have them in the record, but so I can process it at the moment.

MR. KAMBLI:  April 9 was the Susman Godfrey executive order.

THE COURT:  Which was the last of the explicit executive orders?

MR. KAMBLI:  Yes, and it was enjoined I believe a few days later, if not right away.

THE COURT:  What was the date of the last settlement?

MR. KAMBLI:  I believe April 11, there was five settlements announced on that day.

THE COURT:  Is that the last settlement that is

referenced in the complaint or the last settlement that occurred?

MR. KAMBLI:  Both, Your Honor, that's my understanding.  And so when you look at two months after that, you still have to demonstrate --

THE COURT:  There were no more settlements after the Susman Godfrey decision?

MR. KAMBLI:  That's my understanding, yes, Your Honor, that April 11, I believe, is the last date, but I'll double-check that and just make sure.

But that's why we would point the Court's attention to *Haase versus Sessions*.  You must not only demonstrate the existence of a policy, but that it's likely to be subjected to that policy.  When you're in a world where the four concrete actions were enjoined and there is a two-month period where nothing happened, that also cuts against the idea that there is a real and immediate threat of future injury, because if there is not, then we're in *Lyons* territory where you're trying to rely on past conduct, but don't have enough to demonstrate a future action.

And the other thing, Your Honor, that's telling with the plaintiff's arguments is that --

THE COURT:  Can I ask you -- that's helpful because I think it's getting to the right question of whether there was standing at the time that the complaint was filed.  How do I

process -- there is the -- I mentioned them before, but I didn't get your specific response to them.

These are just allegations, but there is the statement from the White House that the President's, quote, "policy team is executing on his directive to hold big law accountable for their weaponization of justice and their lies, and the strategy has proven tremendously successful."  That's the reference to policy team, directive and strategy, in the kind of plausibly alleged land, plus the law firm EOs.  How do I understand that?

MR. KAMBLI:  Your Honor, there is a domestic policy council for the President that puts out executive orders, so I don't know if that necessarily moves the needle or not in terms of whether there is a policy in the sense of something that can be tangible that's really -- that's just the name of the -- policy council is who executive orders go through generally.  So I don't know if that really moves the needle one way or the other in terms of whether there is a policy for Article III purposes.

THE COURT:  What does it mean that the strategy has been tremendously successful?

MR. KAMBLI:  Your Honor, I'm not aware of kind of the context of what exactly that's talking about, but we can at least look at what they are alleging are the issues, which I think, when you combine the three buckets, there is the explicit executive orders of which there were five of, and

Susman Godfrey was the last one on April 9.  There is the settlements, but I'm not sure like if the relief really tailors the settlements.

THE COURT:  Maybe you can help me.  What does it mean by the weaponization of justice and their lies?  This is not -- I'm not intending to like -- it's not a gotcha question, but these are actual allegations in the complaint, and they tie to -- "lies" sounds like a view of speech.  "Weaponization of justice" sounds like petitioning the court.  So these tie to the chilling that is being argued.  And so how do I understand that in a way that it doesn't tie to those things?

MR. KAMBLI:  Your Honor, we believe that it's plaintiff's burden to tie that knot together and demonstrate to you how that tailors into a concrete policy.

THE COURT:  But you don't have an argument for me for how it doesn't tie to those things, like an interpretation of the language?

MR. KAMBLI:  We're just saying that when you look at what existed at the time of the complaint that was filed, you had some settlements, you had the executive order, and then you had the March 22nd memorandum.  They are trying to lump all that together and call it some type of policy.

THE COURT:  How about -- I mean, you stopped it at kind of mid April, but how about the June 1st report, quote, "Trump remains interested in the orders and Deputy White House

Chief of Staff Stephen Miller and his allies want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing the critics of the administration."

Again, I'm just trying to understand.  I'm giving you the opportunity to tell me how to understand that.  I know you're not conceding that that is true, but it is an allegation in the complaint, it was publicly reported.

I'm focused on a few things here.  First, "the orders," right.  We're in June now.  "More executive orders in June."  And then "dissuading the best lawyers from representing critics of the administration."  "Dissuading the best lawyers from representing" sounds like the concern about petitioning the court, First Amendment.  And also "critics of the administration" sounds like expression, viewpoint discrimination.

Help me understand why that doesn't add on to the allegations that plaintiff has to plausibly allege policies.

MR. KAMBLI:  Your Honor, at best, that media article is a characterization of what has happened and what the article believes will happen in the future.  But what we can point to at the pleading stage and what they are primarily basing their relief on is the combination of the orders, the settlement and the March 22nd memorandum on attorney referrals, because those are the concrete things that the Court has to look at.  And

those concrete things that there was --

THE COURT:  So the idea is just ignore it, assume it's not true?

MR. KAMBLI:  No, Your Honor.  We can just look at what is the tangible thing that they are challenging and what they believe is going to be the repeated injury from that.

THE COURT:  The tangible thing is the policy that they say is reflected in the orders that are mentioned in the quote.

MR. KAMBLI:  Your Honor, even at that time, you had policies -- or excuse me, executive orders that were enjoined, settlements that didn't happen again after mid April, and then you had a March 22nd memorandum that they didn't even challenge.  And they are claiming that two months later when the tangible things were enjoined, and they didn't even challenge the one thing that wasn't, that there is going to be a certainly impending and immediate threat, and that's not enough, Your Honor, and that's our position on that.

THE COURT:  The statement that in June they remain interested in doing those things --

MR. KAMBLI:  It's not relevant when you consider what the tangible things were that were out there.  For instance, the executive orders, you saw there were a number that came out between March and April, but then nothing after that.

THE COURT:  I think that's what I was responding to.  Maybe I'm confused here.  I was responding to you saying, okay,

essentially cut it off at mid April, these were enjoined, they have got nothing, and my point to you is there is this statement in June, just before the complaint, that they remain interested in those very things, and I'm trying to get your response to that, but I'm not really getting it.

MR. KAMBLI:  So, Your Honor, the context of that I'm not quite sure what exactly it's referring to.  It could mean, for instance, continuing to litigate the injunctions against the existing ones through appeal or other options.  It could mean a lot of things, so I don't think that that necessarily is indicative of future executive orders.  As you have seen, between now and then, there weren't any that came out.

THE COURT:  You don't think that's saying that they want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics is indicative of a policy of wanting to do that?

MR. KAMBLI:  No, Your Honor.  We don't believe that that's the case, especially when you have what's actually happened between April and that, so when you're talking --

THE COURT:  Maybe you can help me with a question I told you -- I gave you a preview I would ask you, how you think about the relationship between the cases dealing with impending injury and chill.  Obviously, there is a strong relation between those two, but what's your position on the cases and

what they say about what is required, what's not required, and how those two things relate?

MR. KAMBLI:  Your Honor, our position is that if there is not an impending injury based on a concrete and particularized policy, then you can't manufacture harm to make up for those.  For instance, if you have a subjective chill based on something that's not an immediate threat, then you're effectively self-censoring based on something that's not immediately going to be there.  And obviously, *Clapper* says you can't manufacture harm.

And it's the same way with expenses incurred to, I guess, block against whatever they anticipate is coming.  It all turns on whether there is impending injury.  And just the fact that they might have subjected themselves to some harm --

THE COURT:  The idea being if it's just a subjective fear, it's not enough.  This is the kind of *Laidlaw* distinction drawn when *Lyons* is invoked.  They say, well, in *Lyons* we said a subjective fear was not enough, but in this case, this unlawful conduct was continuing to occur when the injunction happened, so it wasn't -- I think they credited -- I don't think they used in that instance chilling, but they said it actually was relevant that the plaintiffs there would have changed their behavior based on the impending -- in other words, the change in behavior, the reorganization can be relevant if it's objectively reasonable, is that the idea?

MR. KAMBLI: Your Honor, it goes toward whether there is impending injury. If there is not, then you can't make up for it by self-censoring or incurring costs for something that -- even if you objectively believe that it will happen, so basically like when you're talking about impending injury, it's not enough to have a reasonable belief that it's going to happen, it's not enough to have an unparanoid fear, it has to be --

THE COURT: Imminent. Can the --

MR. KAMBLI: That's where the two-month timeline plays into this when you're talking about what the state of the world was at the time of the complaint.

THE COURT: Can imminent injury be enough on its own?

MR. KAMBLI: Yes, Your Honor. If there is an imminent injury, then we obviously have to satisfy the other elements of standing, but the point that we're making with -- in some ways maybe the briefs were talking past each other a little bit on the First Amendment subjective chill, but our position is the fact that they had a subjective chill doesn't change the calculus, because the Court ultimately has to decide whether there is an impending injury, and, if not, then whatever they incurred as a result isn't particularly relevant.

THE COURT: Okay. That's helpful. Any other submissions you want to make in response to the plaintiff?

MR. KAMBLI: No, Your Honor. The big thing is they

are not just challenging -- the relief is tailored towards, I guess, sections two through five of the concrete executive orders, but they are tying things like settlements and the March 22nd memorandum in there without actually suing on the March 22nd memorandum. So that's why when we're calling it a policy, it's really difficult to nail down what exactly they are referencing.

So, for instance, if they are saying they don't want anything substantially similar to the other EOs, then really the March 22nd memorandum and the settlements are not terribly relevant because obviously the Court can't enjoin law firms from reaching some kind of agreements with the administration for a wide variety of things.

THE COURT: So you would say, even in that instance where there is the section four through seven or whatever of the law firm EOs, you got to look and see, okay, that relief they are seeking regarding attorney discipline, that still has to go?

MR. KAMBLI: Your Honor, you still have to -- what's interesting is they could have challenged that March 22nd memorandum, but are not challenging it directly, but then kind of layering it into this policy, which makes it more difficult to bend down and see precisely what it is that they are talking about and what exactly --

THE COURT: Do you have a case that would help me to

figure out that you have got to kind of parse through the relief at that level?

MR. KAMBLI:  So just the case that -- just the general line of cases that say you have to demonstrate standing for each type of relief that you're seeking.  So that's -- by standing, we also mean, obviously, demonstrating impending injury.

THE COURT:  That's helpful.  I appreciate your submissions.

I'm going to take the parties' arguments under advisement, and I'll issue a written opinion on the question and on the motion.

I appreciate everything.  We can go ahead and adjourn.

(Proceedings concluded at 3:42 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 9th day of March, 2026.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
                              FEDERAL OFFICIAL COURT REPORTER

## /

**/s** [1] - 60:22

## 1

**1** [1] - 17:2
**10001** [1] - 1:16
**102** [1] - 35:11
**106** [1] - 35:12
**11** [3] - 50:5, 50:23, 51:9
**12(b)(1** [2] - 5:1, 24:14
**12(b)(6)** [1] - 5:1
**130** [1] - 31:22
**131** [2] - 31:22, 31:25
**15** [1] - 15:2
**16** [1] - 50:5
**1:25-cv-01888-AHA** [1] - 1:5
**1st** [3] - 30:5, 53:24

## 2

**20001** [1] - 1:24
**2025** [3] - 5:20, 6:13, 16:24
**2026** [2] - 1:11, 60:20
**20530** [1] - 1:20
**22nd** [8] - 35:11, 53:21, 54:24, 55:12, 59:4, 59:5, 59:10, 59:20
**25-18888** [1] - 2:2
**2:30** [2] - 1:11, 2:1

## 3

**333** [1] - 1:24
**395** [1] - 1:16
**3:42** [2] - 1:11, 60:14

## 4

**4** [1] - 1:11
**48** [2] - 30:7, 47:11

## 5

**50th** [1] - 1:16

## 9

**9** [3] - 50:4, 50:16, 53:1
**950** [1] - 1:19
**9th** [4] - 1:16, 15:14, 22:6, 60:20

## A

**AAUP** [1] - 38:18
**ABA** [32] - 2:9, 3:14, 18:8, 18:15, 20:7, 20:11, 21:3, 21:14, 22:20, 23:7, 29:11, 29:22, 30:13, 35:5, 38:23, 40:4, 40:5, 40:6, 41:18, 44:20, 45:8, 45:15, 45:17, 46:17, 46:19, 46:20, 46:22, 49:8
**ABA's** [4] - 4:10, 4:15, 5:17, 34:14
**ABHISHEK** [1] - 1:19
**Abhishek** [1] - 2:14
**able** [5] - 24:24, 43:4, 46:3, 46:11, 47:1
**above-entitled** [1] - 60:18
**absent** [1] - 48:18
**Abuses** [1] - 35:14
**accept** [2] - 5:25, 14:7
**accepted** [3] - 8:10, 11:18, 22:14
**accepting** [1] - 42:11
**access** [3] - 20:2, 27:22, 46:10
**according** [1] - 31:24
**accordingly** [1] - 39:9
**account** [1] - 34:19
**accountable** [2] - 10:25, 52:5
**accurate** [1] - 60:17
**acknowledged** [2] - 14:6, 23:15
**acknowledging** [2] - 14:2, 15:18
**act** [4] - 42:13, 42:19, 43:9, 43:23
**acted** [1] - 39:4
**acting** [2] - 41:3, 41:18
**Action** [1] - 2:2
**action** [11] - 3:11, 6:11, 12:23, 24:2, 35:5, 36:13, 36:16, 36:20, 41:15, 44:21, 51:20
**actionable** [2] - 40:20, 41:6
**actions** [9] - 5:18, 5:19, 6:3, 7:6, 12:3, 13:1, 13:24, 51:15
**active** [1] - 19:20
**activity** [1] - 43:10
**acts** [4] - 41:25, 42:4, 43:13, 43:14
**actual** [3] - 19:1, 33:1, 53:7
**actualized** [1] - 9:12
**ad** [1] - 12:19
**add** [2] - 16:8, 54:17
**addition** [1] - 30:4
**addressed** [1] - 24:9
**adjourn** [1] - 60:13
**administration** [21] - 30:8, 30:15, 32:2, 33:21, 40:9, 40:11, 42:7, 42:16, 43:7, 43:11, 43:15, 43:24, 43:25, 46:24, 49:2, 49:15, 49:16, 54:4, 54:12, 54:15, 59:12
**admitting** [1] - 33:16
**advisement** [1] - 60:11
**affect** [1] - 47:25
**affected** [3] - 21:4, 40:7, 46:22
**affiliation** [1] - 35:7
**afforded** [1] - 34:17
**afraid** [3] - 32:25, 33:4, 37:24
**afternoon** [4] - 2:13, 2:14, 2:16, 28:24
**afterwards** [1] - 24:2
**agency** [1] - 2:21
**ago** [2] - 9:19, 36:15
**agree** [6] - 6:8, 7:11, 17:19, 28:2, 29:25, 47:14
**agreed** [4] - 32:10, 32:12, 37:21
**agreements** [1] - 59:12
**agrees** [1] - 30:20
**ahead** [4] - 3:8, 28:20, 50:1, 60:13
**aimed** [1] - 21:10
**al** [2] - 1:6, 2:4
**ALI** [1] - 1:10
**allegation** [3] - 18:6, 36:10, 54:7
**allegations** [10] - 11:14, 17:20, 18:19, 29:12, 30:4, 30:23, 33:23, 52:3, 53:7, 54:18
**allege** [9] - 14:24, 22:3, 24:24, 31:17, 35:17, 38:2, 38:20, 38:21, 54:18
**alleged** [25] - 6:2, 6:9, 6:21, 8:9, 11:4, 12:9, 13:2, 17:23, 20:11, 20:17, 20:19, 21:25, 22:9, 24:16, 30:18, 36:5, 37:19, 39:5, 39:9, 41:17, 42:4, 43:13, 48:22, 48:24, 52:9
**alleges** [1] - 4:21
**alleging** [11] - 5:18, 9:7, 10:18, 11:10, 11:15, 17:1, 19:7, 19:9, 19:13, 26:12, 52:23
**allies** [1] - 54:1
**allow** [2] - 40:15, 40:16
**allowed** [1] - 40:21
**allows** [1] - 39:23
**almost** [2] - 42:12, 49:25
**Amendment** [12] - 4:22, 39:19, 39:22, 40:16, 40:21, 43:10, 49:6, 49:7, 49:8, 49:20, 54:14, 58:18
**America** [2] - 23:12, 38:17
**American** [2] - 2:2, 2:8
**AMERICAN** [1] - 1:3
**AMIR** [1] - 1:10
**analogy** [1] - 26:7
**analyze** [1] - 18:14
**angry** [1] - 44:4
**announced** [1] - 50:24
**answer** [4] - 29:3, 33:8, 45:7, 46:25
**Anthony** [2] - 40:1, 41:21
**anticipate** [1] - 57:12
**anticipated** [2] - 4:9, 13:19
**anyway** [1] - 45:6
**appeal** [1] - 56:9
**appeals** [2] - 28:7, 28:10
**appearance** [1] - 2:6
**appearing** [1] - 36:7
**applicable** [3] - 19:14, 19:15, 19:20
**applies** [1] - 9:10
**apply** [1] - 41:22
**appreciate** [3] - 49:24, 60:8, 60:13
**approach** [2] - 2:5, 49:9
**April** [22] - 6:13, 7:5, 15:14, 18:2, 22:6, 25:11, 25:15, 25:20, 25:22, 29:17, 50:4, 50:5, 50:9, 50:16, 50:23, 51:9, 53:1, 53:24, 55:11, 55:23, 56:1, 56:20
**area** [2] - 39:18, 43:12
**areas** [1] - 32:18
**argue** [2] - 47:9, 47:19
**argued** [1] - 53:10
**arguing** [5] - 9:22, 34:21, 37:19, 44:8, 44:9
**argument** [24] - 2:25, 3:2, 5:4, 5:6, 12:16, 12:19, 13:11, 18:18, 18:20, 20:6, 20:7, 21:14, 22:7, 22:8, 25:4, 36:6, 39:5, 39:16, 40:24, 40:25, 44:9, 47:11, 48:3, 53:15
**arguments** [4] - 3:21, 5:14, 51:22, 60:10
**Arps'** [1] - 31:22
**Article** [2] - 25:10, 52:17
**article** [2] - 54:19, 54:20
**aspect** [2] - 3:25, 8:15
**aspects** [1] - 38:7
**assess** [1] - 29:25
**assessed** [4] - 7:11, 7:13, 7:19, 23:16
**associated** [1] - 44:14
**associating** [1] - 42:15
**association** [1] - 20:8
**Association** [3] - 2:3, 2:8, 41:22
**ASSOCIATION** [1] - 1:3
**associational** [3] - 18:12, 20:10, 21:19
**associational/ organizational** [2] - 3:20, 4:4
**assume** [4] - 14:5, 27:15, 27:18, 55:2
**attaching** [1] - 4:17
**attention** [2] - 50:7, 51:11
**attorney** [9] - 27:23, 35:4, 36:25, 37:1, 37:2, 37:6, 49:11, 54:24, 59:17
**attorneys** [8] - 2:19,

19:2, 20:4, 20:7, 20:8, 44:10, 49:13, 49:15
**Avenue** [3] - 1:16, 1:19, 1:24
**avoid** [3] - 31:7, 32:4, 33:17
**avoided** [1] - 32:9
**avoiding** [1] - 31:9
**aware** [2] - 35:23, 52:21

## B

**back-and-forth** [2] - 28:7, 39:17
**background** [7] - 12:12, 16:1, 48:18, 48:19, 48:24, 49:1, 49:19
**BAR** [1] - 1:3
**Bar** [2] - 2:3, 2:8
**based** [26] - 3:15, 3:16, 5:7, 5:8, 14:8, 18:18, 19:7, 19:12, 20:25, 21:1, 21:5, 21:6, 22:15, 24:14, 34:7, 34:24, 35:6, 36:2, 39:15, 39:23, 41:4, 41:5, 57:4, 57:7, 57:8, 57:23
**basing** [1] - 54:22
**basis** [1] - 41:10
**become** [1] - 14:14
**becomes** [1] - 15:9
**BEFORE** [1] - 1:10
**begin** [1] - 16:4
**beginning** [3] - 2:6, 7:23, 14:6
**behalf** [5] - 21:5, 38:24, 41:19, 45:18, 46:21
**behave** [1] - 44:2
**behaved** [1] - 43:3
**behavior** [2] - 57:23, 57:24
**behind** [4] - 2:20, 6:24, 17:8, 32:15
**belie** [1] - 47:11
**belief** [2] - 26:10, 58:6
**believes** [3] - 46:20, 49:8, 54:21
**bend** [1] - 59:23
**best** [5] - 54:3, 54:11, 54:12, 54:19, 56:15
**better** [3] - 10:5, 26:21, 41:11
**between** [10] - 16:17, 25:12, 27:2, 29:24,

33:21, 55:23, 56:12, 56:20, 56:23, 56:25
**beyond** [1] - 41:18
**big** [3] - 10:25, 52:5, 58:25
**bigger** [1] - 44:6
**bit** [5] - 3:4, 4:3, 5:15, 15:24, 58:17
**bite** [1] - 44:6
**blatantly** [1] - 14:9
**block** [1] - 57:12
**Block** [1] - 14:17
**bone** [1] - 10:6
**bono** [1] - 31:13
**bound** [1] - 20:20
**branch** [1] - 3:11
**break** [2] - 3:22, 40:22
**brief** [9] - 3:7, 10:19, 12:22, 12:25, 13:10, 18:21, 19:23, 19:24, 24:10
**briefing** [5] - 6:1, 10:16, 11:20, 23:15, 28:11
**briefs** [1] - 58:17
**bring** [4] - 12:23, 24:11, 40:21, 45:15
**bringing** [3] - 43:10, 45:17, 46:20
**broad** [1] - 32:19
**broader** [1] - 37:9
**brought** [2] - 23:18, 45:8
**buckets** [1] - 52:24
**building** [1] - 11:15
**buildings** [4] - 20:1, 20:3, 27:22, 46:11
**burden** [2] - 9:24, 53:13
**burdening** [1] - 41:24
**BY** [2] - 1:15, 1:19

## C

**cabining** [1] - 25:4
**calculus** [1] - 58:20
**cares** [1] - 43:12
**carried** [2] - 37:20, 37:24
**case** [44] - 2:20, 4:12, 5:8, 6:21, 7:15, 7:25, 8:4, 8:6, 8:18, 9:9, 9:10, 9:11, 9:13, 13:13, 17:10, 17:19, 22:17, 26:8, 34:18, 34:25, 36:15, 36:22, 36:23, 36:24, 38:11, 38:14, 38:17, 38:18,

40:1, 40:21, 41:21, 41:22, 42:4, 42:20, 44:21, 45:3, 48:17, 49:5, 49:21, 56:19, 57:18, 59:25, 60:3
**CASE** [1] - 1:5
**cases** [19] - 2:19, 3:13, 29:6, 36:18, 38:16, 40:12, 40:18, 43:20, 44:3, 45:2, 45:3, 46:7, 49:12, 49:15, 49:20, 56:23, 56:25, 60:4
**categories** [1] - 3:22
**causes** [2] - 29:19, 30:14
**cautious** [1] - 24:20
**ceased** [1] - 9:23
**censoring** [2] - 57:8, 58:3
**certain** [9] - 31:11, 31:12, 31:15, 32:10, 32:11, 32:12, 44:23, 44:24, 45:1
**certainly** [10] - 23:4, 27:1, 29:12, 33:6, 38:12, 38:23, 40:9, 41:17, 46:15, 55:16
**CERTIFICATE** [1] - 60:15
**Certified** [1] - 1:23
**certify** [1] - 60:17
**cessation** [1] - 48:9
**chair** [1] - 2:10
**challenge** [9] - 4:24, 17:18, 18:16, 18:22, 30:2, 41:23, 45:10, 55:13, 55:15
**challenged** [4] - 27:17, 33:11, 35:17, 59:20
**challenging** [6] - 11:25, 27:24, 29:14, 55:5, 59:1, 59:21
**change** [4] - 26:16, 32:11, 57:24, 58:19
**changed** [2] - 9:25, 57:23
**changes** [1] - 32:12
**characterization** [1] - 54:20
**check** [2] - 48:13, 51:10
**chew** [1] - 44:6
**Chief** [3] - 11:7, 17:4, 54:1
**chill** [12] - 39:16, 40:17, 40:23, 41:1, 41:4, 43:6, 44:7, 45:21, 56:24, 57:6,

58:18, 58:19
**chilled** [8] - 41:10, 43:22, 44:7, 44:20, 44:22, 45:1, 47:20
**chilling** [6] - 49:8, 49:14, 49:17, 49:21, 53:10, 57:21
**choose** [1] - 31:13
**Circuit** [2] - 36:19, 41:21
**circumscribed** [1] - 25:1
**circumstances** [2] - 24:12, 41:9
**cite** [5] - 18:23, 20:12, 29:6, 36:12, 48:16
**cited** [2] - 24:15, 49:5
**citing** [2] - 12:22, 24:17
**Civil** [1] - 2:2
**claim** [1] - 4:24
**claimant** [1] - 23:11
**claiming** [1] - 55:13
**claims** [4] - 4:21, 4:22, 5:5, 32:8
**Clapper** [1] - 57:9
**clarify** [1] - 50:3
**clear** [6] - 27:12, 29:15, 32:6, 37:13, 44:2, 47:8
**clearance** [8] - 19:10, 19:18, 20:16, 20:18, 21:13, 21:15, 27:19, 27:21
**clearances** [4] - 19:9, 19:20, 21:11, 46:13
**clearly** [3] - 25:23, 36:25, 45:25
**CLERK** [1] - 2:2
**client** [3] - 31:12, 32:18, 43:11
**clients** [7] - 2:21, 2:23, 29:19, 30:14, 31:13, 43:22, 46:14
**close** [1] - 46:10
**Coie** [9] - 14:5, 14:11, 19:17, 19:18, 19:21, 20:3, 27:15, 27:16, 27:17
**collapse** [1] - 46:14
**Columbia** [2] - 48:17, 60:17
**COLUMBIA** [1] - 1:1
**combination** [1] - 54:23
**combine** [1] - 52:24
**combines** [1] - 16:6

**coming** [3] - 35:9, 41:8, 57:12
**Commission** [1] - 8:21
**commissions** [1] - 3:10
**commit** [1] - 41:25
**complaint** [54] - 4:10, 4:21, 5:16, 6:5, 6:17, 7:9, 7:12, 7:14, 7:20, 7:23, 8:13, 9:4, 9:16, 9:20, 11:9, 11:13, 11:16, 11:20, 12:7, 12:25, 15:1, 16:13, 16:14, 16:19, 17:20, 18:19, 19:7, 20:11, 20:23, 22:5, 23:16, 24:3, 24:15, 24:16, 24:18, 24:21, 26:14, 27:3, 29:11, 30:1, 31:21, 35:3, 35:12, 42:4, 42:12, 48:5, 50:6, 51:1, 51:25, 53:7, 53:19, 54:8, 56:3, 58:12
**complaints** [2] - 3:24, 36:2
**complicating** [1] - 23:14
**comprehensive** [1] - 38:20
**concede** [1] - 48:1
**conceding** [2] - 5:5, 54:7
**conceptualizing** [1] - 5:6
**concern** [1] - 54:13
**concerned** [1] - 46:24
**concluded** [1] - 60:14
**conclusions** [1] - 4:18
**concrete** [16] - 4:7, 4:14, 6:11, 13:14, 18:14, 21:9, 22:13, 24:2, 27:25, 47:20, 51:14, 53:14, 54:25, 55:1, 57:4, 59:2
**concretely** [1] - 41:8
**concreteness** [1] - 5:16
**concreteness/ particularized** [1] - 3:24
**conduct** [15] - 9:25, 35:4, 37:3, 39:23, 40:8, 41:11, 42:8, 42:10, 42:20, 42:23, 42:24, 48:10, 50:13,

51:19, 57:19
**Conference** [1] - 60:19
**conformance** [1] - 60:18
**confused** [1] - 55:25
**confusing** [1] - 39:18
**connect** [1] - 33:1
**connected** [1] - 40:17
**consequences** [2] - 5:19, 47:2
**consider** [2] - 46:16, 55:20
**consistent** [2] - 13:1, 19:19
**consistently** [1] - 29:10
**constant** [1] - 23:10
**Constitution** [1] - 1:24
**constitutional** [3] - 40:15, 49:14, 49:18
**contesting** [1] - 5:12
**context** [9] - 37:9, 39:20, 39:22, 40:16, 41:19, 44:2, 49:6, 52:22, 56:6
**contingent** [2] - 4:9, 13:18
**continue** [3] - 17:13, 22:4, 48:25
**continuing** [3] - 30:8, 56:8, 57:19
**contracts** [1] - 46:13
**contrary** [1] - 46:1
**contravene** [1] - 48:19
**controversies** [1] - 3:13
**controversy** [1] - 13:13
**convenient** [1] - 18:25
**conventional** [1] - 48:17
**conversations** [1] - 33:14
**correct** [3] - 21:8, 23:17, 43:13
**costs** [1] - 58:3
**council** [2] - 52:11, 52:15
**counsel** [8] - 2:5, 2:6, 2:11, 2:21, 28:22, 29:1, 29:15, 46:5
**couple** [4] - 10:2, 11:9, 12:8, 15:12
**course** [3] - 5:12, 15:23, 32:21

**Court** [27] - 1:23, 2:1, 2:9, 3:16, 4:5, 4:11, 8:16, 8:18, 9:3, 24:8, 34:23, 35:14, 36:19, 38:9, 38:10, 40:1, 40:3, 40:4, 41:5, 41:20, 46:16, 54:25, 58:20, 59:11, 60:16, 60:16
**COURT** [118] - 1:1, 2:13, 2:16, 4:19, 5:2, 5:12, 5:24, 6:16, 6:20, 7:8, 7:11, 7:16, 7:19, 7:25, 8:5, 8:17, 8:21, 9:5, 9:8, 9:18, 9:22, 10:4, 12:9, 13:9, 14:1, 14:22, 15:3, 15:18, 15:21, 16:8, 16:13, 16:23, 17:17, 18:11, 18:18, 19:15, 20:6, 20:20, 21:14, 21:24, 22:7, 22:13, 23:5, 23:13, 24:4, 24:11, 25:14, 25:18, 25:21, 25:23, 26:16, 26:21, 27:11, 28:1, 28:5, 28:12, 28:15, 28:19, 28:24, 30:17, 31:15, 32:16, 32:22, 32:24, 33:8, 33:11, 33:19, 34:16, 35:2, 35:15, 35:21, 35:24, 36:4, 36:23, 37:8, 37:17, 37:22, 38:6, 38:13, 39:5, 39:12, 40:23, 41:7, 42:3, 44:5, 45:5, 47:4, 47:12, 47:17, 48:1, 48:9, 48:12, 48:22, 49:24, 50:14, 50:18, 50:22, 50:25, 51:6, 51:23, 52:19, 53:4, 53:15, 53:23, 55:2, 55:7, 55:18, 55:24, 56:13, 56:21, 57:15, 58:9, 58:13, 58:23, 59:14, 59:25, 60:8, 60:23
**court** [7] - 27:17, 35:18, 35:21, 39:21, 50:10, 53:9, 54:14
**Court's** [1] - 51:11
**courthouse** [1] - 49:11
**courts** [4] - 3:10, 3:12, 32:14, 37:16
**cover** [1] - 3:13
**created** [1] - 31:6
**creates** [1] - 16:6
**credible** [1] - 41:24
**credited** [1] - 57:20

**crisis** [1] - 45:23
**critics** [4] - 54:4, 54:12, 54:14, 56:16
**crossing** [1] - 46:24
**CRR** [1] - 60:22
**crutch** [1] - 25:9
**cut** [1] - 56:1
**cuts** [1] - 51:16

## D

**damage** [1] - 21:5
**dangerous** [2] - 49:16, 49:17
**date** [2] - 50:22, 51:9
**Dated** [1] - 60:20
**dates** [2] - 50:3, 50:14
**Davis** [2] - 8:21, 9:14
**days** [3] - 46:5, 46:15, 50:21
**DC** [5] - 1:12, 1:20, 1:24, 36:19, 41:21
**deal** [1] - 8:19
**dealing** [2] - 9:13, 56:23
**debate** [1] - 38:4
**decades** [1] - 46:23
**decide** [3] - 23:24, 36:9, 58:20
**decided** [7] - 12:2, 23:22, 24:5, 24:14, 36:15, 45:14, 49:12
**decision** [3] - 23:21, 45:11, 51:7
**decisions** [3] - 12:21, 12:22, 45:16
**declaratory** [1] - 34:10
**deeply** [1] - 46:20
**defend** [1] - 37:7
**defendant** [1] - 24:13
**Defendants** [1] - 1:7
**defendants** [3] - 2:15, 3:5, 35:3
**DEFENDANTS** [1] - 1:18
**defendants'** [1] - 2:24
**definition** [1] - 20:21
**delegates** [1] - 2:11
**demonstrate** [13] - 7:22, 8:3, 12:4, 16:4, 18:15, 21:11, 21:12, 22:24, 51:5, 51:12, 51:19, 53:13, 60:4
**demonstrated** [1] - 16:20
**demonstrates** [1] - 16:21

**demonstrating** [1] - 60:6
**Department** [1] - 1:18
**dependent** [3] - 4:8, 13:18, 14:25
**Deputy** [3] - 11:7, 17:4, 53:25
**DEPUTY** [1] - 2:2
**describing** [1] - 11:13
**detail** [1] - 37:4
**deter** [1] - 41:2
**determine** [1] - 42:10
**determines** [1] - 37:1
**different** [6] - 9:24, 12:19, 16:2, 31:13, 34:18
**difficult** [2] - 59:6, 59:22
**Diplomate** [1] - 1:22
**direct** [2] - 18:9, 20:12
**directive** [4] - 10:24, 11:2, 52:5, 52:8
**directives** [1] - 16:10
**directly** [7] - 12:13, 17:9, 19:13, 19:15, 31:8, 46:22, 59:21
**director** [1] - 2:11
**disagreement** [1] - 36:2
**disavow** [2] - 47:7, 48:18
**disavowed** [1] - 47:12
**disavowing** [1] - 47:8
**disavowment** [2] - 47:18, 48:4
**disciplinary** [3] - 35:4, 35:5, 36:11
**discipline** [1] - 59:17
**discovery** [18] - 23:24, 24:6, 24:8, 24:13, 25:1, 25:4, 25:5, 25:7, 25:9, 25:24, 38:12, 39:1, 39:3, 39:6, 39:7, 47:17, 48:5
**discrete** [1] - 11:25
**discrimination** [6] - 4:23, 14:7, 20:25, 42:11, 42:18, 54:16
**discuss** [2] - 3:20, 24:22
**discussing** [1] - 3:18
**discussion** [1] - 29:1
**dismiss** [4] - 2:24, 4:11, 23:21, 38:3

**dismissed** [2] - 5:9, 24:1
**displease** [1] - 49:16
**displeased** [1] - 43:15
**dispute** [1] - 27:22
**dissuades** [2] - 54:3, 56:15
**dissuading** [2] - 54:11, 54:12
**distinction** [2] - 9:14, 57:16
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 38:19, 48:17, 60:16
**DNC** [3] - 12:23, 36:15, 36:22
**doctrinal** [1] - 38:13
**doctrine** [1] - 5:13
**domestic** [1] - 52:10
**done** [7] - 25:15, 25:20, 29:10, 42:2, 42:16, 44:15, 45:20
**double** [2] - 30:8, 51:10
**double-check** [1] - 51:10
**double-down** [1] - 30:8
**down** [7] - 3:22, 29:8, 30:8, 30:10, 44:6, 59:6, 59:23
**draw** [1] - 26:7
**drawing** [1] - 17:22
**drawn** [1] - 57:17
**ducks** [1] - 44:17
**during** [6] - 7:7, 10:5, 10:9, 10:20, 28:25, 50:8

## E

**easier** [1] - 44:16
**easy** [1] - 46:6
**EEOC** [1] - 19:11
**effectively** [3] - 5:18, 31:6, 57:8
**efficacy** [1] - 48:2
**eighteen** [1] - 44:13
**either** [2] - 12:1, 31:6
**Election** [1] - 8:21
**element** [1] - 4:23
**elements** [1] - 58:15
**email** [1] - 31:24
**employed** [1] - 32:13
**employees** [4] - 20:3, 20:5, 20:13, 46:11
**enact** [1] - 30:12

**encourage** [1] - 38:10
**end** [2] - 13:12, 34:18
**ended** [2] - 6:13, 28:11
**ending** [1] - 46:20
**endured** [1] - 4:2
**enforce** [2] - 42:22, 48:25
**enforcement** [7] - 40:12, 41:8, 41:15, 41:19, 42:20, 46:21, 48:18
**engage** [1] - 40:8
**engaged** [1] - 32:2
**engaging** [2] - 37:5, 43:9
**enjoin** [6] - 32:19, 33:21, 35:3, 35:16, 35:24, 59:11
**enjoined** [10] - 22:23, 27:14, 50:10, 50:12, 50:20, 51:15, 55:10, 55:14, 56:1
**enormous** [1] - 47:2
**entered** [1] - 31:23
**entertain** [1] - 3:17
**entitled** [3] - 33:6, 35:13, 60:18
**EO** [10] - 26:11, 26:23, 27:16, 29:25, 31:10, 32:9, 32:25, 33:4, 49:12
**EOs** [20] - 26:17, 29:16, 29:17, 29:18, 30:12, 30:25, 31:5, 31:7, 31:9, 31:18, 32:5, 33:5, 33:9, 33:10, 33:11, 33:12, 37:13, 52:9, 59:9, 59:16
**equal** [1] - 6:3
**especially** [3] - 18:6, 18:8, 56:19
**essentially** [1] - 56:1
**establish** [1] - 8:22
**et** [2] - 1:6, 2:4
**events** [4] - 4:9, 13:19, 23:10, 47:10
**evidentiary** [2] - 23:24, 24:6
**exact** [1] - 29:22
**exactly** [10] - 13:7, 26:11, 33:17, 44:23, 47:24, 49:25, 52:22, 56:7, 59:6, 59:24
**example** [6] - 19:16, 32:3, 43:5, 43:19, 43:21, 45:2

**excuse** [1] - 55:10
**executing** [2] - 10:24, 52:5
**Executive** [1] - 2:3
**EXECUTIVE** [1] - 1:6
**executive** [76] - 2:11, 3:11, 3:14, 3:15, 5:7, 5:20, 6:11, 10:10, 11:8, 11:17, 11:25, 12:6, 13:8, 13:23, 14:11, 14:12, 15:4, 15:6, 15:10, 15:13, 15:15, 15:16, 16:12, 16:16, 16:18, 17:14, 18:3, 18:9, 18:14, 18:17, 18:20, 18:23, 19:2, 19:4, 19:6, 19:13, 21:9, 21:10, 21:20, 21:23, 22:5, 22:19, 24:18, 25:12, 27:3, 27:13, 27:25, 29:20, 30:19, 31:25, 32:1, 32:19, 36:7, 37:16, 38:11, 42:6, 43:4, 43:18, 43:20, 46:4, 46:9, 47:2, 50:12, 50:16, 50:19, 52:11, 52:15, 52:25, 53:20, 54:2, 54:10, 55:10, 55:22, 56:11, 56:14, 59:2
**exist** [1] - 39:7
**existed** [1] - 53:19
**existence** [5] - 21:6, 34:25, 39:2, 39:6, 51:13
**existential** [1] - 45:23
**existing** [2] - 17:14, 56:9
**exists** [5] - 5:11, 5:13, 16:4, 21:19, 47:9
**expectation** [4] - 48:18, 48:19, 48:24, 49:1
**expenses** [1] - 57:11
**experience** [1] - 34:14
**experiences** [1] - 34:14
**explain** [1] - 29:13
**explained** [1] - 29:20
**explanation** [1] - 37:2
**explicit** [6] - 12:10, 15:23, 16:1, 17:7, 50:18, 52:25
**explicitly** [2] - 4:16, 10:17

**express** [1] - 12:12
**expression** [2] - 5:8, 54:15
**expressive** [1] - 41:24
**extent** [4] - 4:5, 24:7, 26:20, 27:4

## F

**faced** [1] - 20:12
**fact** [9] - 4:13, 12:21, 14:25, 24:15, 30:25, 37:12, 39:19, 57:14, 58:19
**facts** [16] - 6:24, 8:10, 8:11, 12:17, 16:11, 24:14, 24:21, 24:22, 24:25, 33:23, 36:9, 36:21, 38:2, 43:1, 46:17, 48:19
**factual** [1] - 13:2
**fair** [2] - 4:19, 32:17
**fall** [2] - 17:11, 48:6
**falls** [1] - 4:10
**familiar** [1] - 35:15
**far** [3] - 20:12, 29:13, 30:15
**favor** [1] - 17:22
**fear** [6] - 23:3, 41:4, 41:5, 57:16, 57:18, 58:7
**Federal** [2] - 35:14, 60:16
**FEDERAL** [1] - 60:23
**federal** [9] - 1:23, 3:12, 8:21, 20:2, 27:22, 37:3, 46:10, 46:11, 46:13
**few** [4] - 50:1, 50:2, 50:20, 54:9
**fifteen** [1] - 44:12
**figure** [3] - 11:22, 38:14, 60:1
**filed** [17] - 6:17, 7:9, 8:12, 8:25, 9:4, 9:20, 10:2, 11:9, 11:16, 15:15, 36:2, 40:10, 41:16, 47:16, 50:6, 51:25, 53:19
**filing** [3] - 4:25, 16:18, 37:5
**final** [1] - 34:24
**fire** [1] - 46:13
**firm** [37] - 4:15, 5:21, 6:11, 6:12, 10:10, 10:11, 10:15, 11:25, 14:23, 16:12, 17:14, 18:9, 18:16, 18:20, 18:23, 20:5, 22:19,

27:6, 27:19, 28:7, 30:13, 30:18, 31:24, 32:3, 32:20, 35:6, 36:7, 36:8, 36:11, 37:2, 37:10, 42:6, 45:24, 46:12, 52:9, 59:16
**firm's** [2] - 46:12, 46:14
**firm-wide** [1] - 31:24
**firmness** [1] - 41:2
**firms** [38] - 10:20, 14:8, 17:1, 18:10, 18:21, 19:2, 19:5, 20:13, 21:3, 21:4, 23:2, 29:18, 31:20, 33:14, 33:16, 33:22, 37:12, 43:2, 44:1, 44:11, 44:20, 44:22, 44:24, 45:1, 45:2, 45:9, 45:16, 45:19, 46:3, 46:4, 46:6, 46:7, 46:9, 46:14, 46:23, 47:1, 59:11
**first** [4] - 3:5, 3:23, 27:16, 39:25
**First** [13] - 4:22, 39:19, 39:22, 40:16, 40:21, 43:10, 49:6, 49:7, 49:8, 49:20, 54:9, 54:14, 58:18
**fit** [1] - 27:6
**fitness** [1] - 13:8
**five** [16] - 10:10, 10:15, 10:17, 12:10, 15:6, 19:22, 23:1, 23:7, 30:19, 33:10, 33:11, 33:12, 43:2, 50:23, 52:25, 59:2
**fledged** [1] - 25:5
**fleshed** [1] - 3:21
**Floor** [1] - 1:16
**focused** [9] - 8:24, 10:11, 10:13, 18:21, 18:24, 20:3, 45:4, 49:13, 54:9
**focusing** [1] - 34:2
**footnotes** [1] - 24:9
**FOR** [3] - 1:1, 1:14, 1:18
**forefront** [1] - 24:12
**foregoing** [1] - 60:17
**form** [1] - 34:9
**format** [1] - 60:18
**formulate** [1] - 38:4
**forth** [3] - 28:7, 37:12, 39:17
**forthcoming** [1] - 32:1
**forward** [3] - 34:8,

38:11, 43:5
**four** [24] - 3:22, 4:3, 6:20, 14:22, 15:4, 15:5, 15:7, 15:10, 15:23, 17:6, 23:7, 26:17, 27:13, 32:14, 33:1, 33:9, 33:11, 36:6, 43:19, 44:11, 49:12, 50:11, 51:14, 59:15
**fourth** [1] - 50:9
**framework** [1] - 31:6
**frankly** [2] - 10:6, 36:14
**fraudulent** [2] - 37:6, 37:7
**frivolous** [2] - 37:5, 37:7
**front** [1] - 4:15
**full** [2] - 25:5, 28:2
**full-fledged** [1] - 25:5
**future** [29] - 3:12, 3:15, 4:8, 5:18, 6:3, 12:6, 13:7, 13:19, 17:16, 18:1, 18:3, 19:6, 20:14, 21:21, 21:23, 22:4, 26:3, 26:13, 26:25, 27:5, 27:9, 39:16, 44:21, 45:25, 48:6, 51:17, 51:20, 54:21, 56:11

## G

**gap** [3] - 15:16, 16:17, 16:19
**geared** [4] - 6:12, 19:5, 22:20, 22:21
**general** [4] - 2:11, 36:25, 37:1, 60:3
**generally** [2] - 18:10, 52:15
**giant** [1] - 21:4
**given** [4] - 18:8, 34:17, 40:10, 49:1
**glad** [1] - 42:25
**Godfrey** [11] - 1:14, 2:8, 15:5, 15:13, 16:18, 27:3, 50:4, 50:9, 50:16, 51:7, 53:1
**gotcha** [1] - 53:6
**government** [19] - 2:22, 20:1, 20:2, 29:1, 29:3, 29:9, 29:16, 29:19, 29:20, 30:12, 31:14, 34:21, 37:3, 39:13, 39:17, 47:5, 47:8, 48:25, 49:2

**government's** [1] - 28:12
**great** [1] - 25:4
**grounds** [2] - 36:16, 38:3
**guess** [7] - 15:24, 21:24, 31:16, 33:8, 47:19, 57:12, 59:2
**guys** [1] - 39:18

## H

**Haase** [1] - 51:12
**half** [3] - 29:24, 39:8, 49:25
**hang** [1] - 16:11
**happy** [1] - 30:3
**hard** [1] - 3:19
**harder** [1] - 26:22
**harm** [7] - 4:13, 40:2, 44:19, 57:5, 57:10, 57:14
**harms** [3] - 4:1, 19:8, 20:12
**hear** [5] - 3:5, 3:6, 25:6, 26:5, 28:16
**heard** [2] - 29:3, 46:18
**hearing** [2] - 23:24, 24:6
**HEARING** [1] - 1:10
**held** [2] - 19:20, 41:5
**help** [17] - 5:24, 11:21, 11:22, 13:9, 13:12, 13:14, 14:1, 26:16, 26:23, 33:19, 34:4, 39:12, 39:14, 53:4, 54:17, 56:21, 59:25
**helpful** [9] - 5:3, 5:13, 6:16, 9:19, 17:17, 26:8, 51:23, 58:23, 60:8
**helps** [1] - 38:14
**hereby** [1] - 60:17
**Hewitt** [2] - 28:22, 28:24
**HEWITT** [1] - 1:15
**higher** [1] - 9:25
**highlight** [3] - 33:2, 33:22, 39:19
**hired** [1] - 44:24
**hiring** [1] - 44:23
**historically** [1] - 42:9
**hit** [4] - 37:13, 46:4, 46:9, 47:2
**hoc** [1] - 12:19
**hold** [3] - 10:25, 48:4, 52:5
**Honor** [91] - 2:12,

2:14, 3:9, 4:25, 5:10, 5:17, 6:10, 6:19, 7:6, 7:10, 7:13, 7:18, 7:21, 8:2, 8:14, 8:20, 9:6, 9:15, 9:21, 10:1, 11:23, 12:17, 13:5, 13:16, 14:21, 15:12, 15:20, 16:3, 16:11, 16:15, 17:12, 17:24, 19:3, 20:9, 21:8, 22:11, 23:9, 23:25, 24:7, 25:8, 25:16, 26:7, 28:9, 28:17, 28:21, 28:25, 29:7, 29:25, 30:3, 30:4, 30:7, 30:16, 34:13, 34:21, 36:22, 37:10, 38:2, 38:9, 38:25, 39:10, 39:25, 40:18, 41:14, 42:25, 45:17, 47:6, 47:15, 47:16, 47:24, 48:8, 48:11, 49:4, 49:23, 50:2, 51:3, 51:8, 51:21, 52:10, 52:21, 53:12, 54:19, 55:4, 55:9, 55:17, 56:6, 56:18, 57:3, 58:1, 58:14, 58:25, 59:19
**Honor's** [1] - 46:25
**HONORABLE** [1] - 1:10
**hour** [1] - 49:25
**hours** [2] - 30:7, 47:11
**house** [1] - 2:10
**House** [10] - 10:22, 10:23, 11:7, 12:13, 12:14, 16:9, 17:9, 35:13, 52:4, 53:25
**huge** [1] - 49:14
**hurdles** [1] - 26:15
**hypothetical** [8] - 3:11, 3:14, 14:2, 14:3, 14:9, 21:10, 21:20, 23:6

## I

**idea** [9] - 26:21, 30:24, 33:15, 41:7, 42:9, 51:16, 55:2, 57:15, 57:25
**identical** [2] - 10:16, 30:21
**ideological** [1] - 5:8
**ignore** [1] - 55:2
**III** [2] - 25:10, 52:17
**illegal** [1] - 43:14
**immediate** [4] -

50:12, 51:17, 55:16, 57:7
**immediately** [3] - 19:19, 46:10, 57:9
**imminence** [2] - 39:15, 40:2
**imminent** [7] - 3:25, 4:8, 41:8, 50:13, 58:9, 58:13, 58:14
**imminently** [1] - 6:6
**impending** [28] - 3:19, 7:22, 7:24, 8:16, 9:3, 9:13, 12:5, 12:10, 13:16, 14:14, 16:21, 18:7, 22:16, 23:2, 23:4, 27:1, 39:21, 39:23, 41:12, 55:16, 56:23, 57:4, 57:13, 57:23, 58:2, 58:5, 58:21, 60:6
**impermissible** [2] - 32:13, 32:14
**important** [6] - 10:4, 13:21, 43:17, 47:7, 49:9, 49:21
**impose** [1] - 29:9
**imposing** [1] - 20:25
**impossible** [1] - 21:18
**inability** [1] - 46:22
**inclined** [1] - 24:8
**included** [2] - 30:13, 45:25
**including** [4] - 37:10, 40:2, 43:25, 46:17
**increases** [1] - 8:22
**incurred** [2] - 57:11, 58:22
**incurring** [1] - 58:3
**indeed** [1] - 13:19
**indicated** [1] - 23:21
**indicative** [2] - 56:11, 56:16
**individual** [2] - 23:11, 34:12
**individual's** [1] - 35:6
**individuals** [2] - 19:21, 27:19
**infer** [3] - 12:11, 15:25, 22:10
**inference** [2] - 31:1, 33:12
**inferences** [1] - 17:22
**initiating** [1] - 35:3
**injunction** [7] - 5:23, 13:24, 21:22, 21:23, 22:25, 39:2, 57:19
**injunctions** [1] - 56:8

**injunctive** [2] - 3:16, 34:10
**injuries** [1] - 10:3
**injury** [30] - 3:25, 4:7, 7:22, 7:24, 8:16, 9:2, 9:11, 9:12, 9:13, 13:14, 13:16, 16:21, 17:25, 18:7, 26:25, 39:16, 39:21, 40:17, 47:20, 51:17, 55:6, 56:24, 57:4, 57:13, 58:2, 58:5, 58:13, 58:15, 58:21, 60:7
**injury/ripeness** [1] - 3:19
**inquiry** [2] - 8:23, 11:21
**instance** [20] - 13:21, 15:1, 15:14, 18:16, 19:8, 19:9, 20:17, 21:9, 23:10, 26:9, 28:3, 31:21, 38:17, 42:1, 55:21, 56:8, 57:6, 57:21, 59:8, 59:14
**instead** [2] - 16:1, 45:9
**institutions** [1] - 45:14
**instructs** [1] - 36:25
**intend** [1] - 41:25
**intended** [1] - 43:20
**intending** [1] - 53:6
**interested** [7] - 11:6, 17:5, 28:6, 39:20, 53:25, 55:19, 56:4
**interesting** [2] - 42:3, 59:20
**internal** [1] - 47:18
**interpretation** [1] - 53:16
**interrelated** [1] - 13:17
**intimidation** [5] - 4:16, 5:21, 14:24, 27:7, 37:10
**introduce** [1] - 28:22
**invalidated** [1] - 35:21
**investigation** [1] - 19:11
**invoked** [1] - 57:17
**invoking** [1] - 8:24
**Iqbal** [2] - 4:17, 13:4
**Iqbal/Twombly** [1] - 13:3
**ish** [1] - 7:4
**issuance** [1] - 29:24
**issue** [12] - 4:6, 11:24, 14:11, 15:4,

19:5, 20:13, 24:10, 27:1, 29:17, 29:18, 29:21, 60:11
**issued** [8] - 5:20, 15:6, 16:9, 16:18, 27:4, 27:13, 27:16, 30:25
**issues** [3] - 14:17, 14:19, 52:23
**issuing** [1] - 29:16
**itself** [5] - 31:7, 32:4, 32:7, 41:19, 46:21

## J

**James** [1] - 2:15
**JAMES** [1] - 1:19
**Jenner** [1] - 14:17
**JILLIAN** [1] - 1:15
**Jillian** [1] - 28:22
**Johnson** [1] - 48:16
**join** [1] - 3:14
**Journal** [2] - 11:5, 17:3
**JR** [1] - 1:15
**judge** [2] - 11:19, 16:14
**JUDGE** [1] - 1:10
**judges** [2] - 43:20, 49:12
**judicial** [1] - 22:18
**Judicial** [1] - 60:19
**jump** [1] - 29:2
**June** [20] - 6:17, 7:3, 7:9, 12:7, 15:15, 16:24, 17:2, 18:2, 25:11, 25:25, 26:3, 30:5, 47:18, 50:5, 53:24, 54:10, 54:11, 55:18, 56:3
**jurisdiction** [5] - 2:25, 3:13, 8:24, 25:2, 25:4
**jurisdictional** [8] - 4:11, 23:23, 24:8, 24:13, 25:1, 25:7, 25:9, 25:24
**Justice** [1] - 1:18
**justice** [4] - 10:25, 52:6, 53:5, 53:9

## K

**Kambli** [1] - 2:15
**KAMBLI** [80] - 1:19, 2:14, 3:9, 4:25, 5:10, 5:17, 6:10, 6:19, 7:5, 7:10, 7:13, 7:18, 7:21, 8:2, 8:14, 8:20, 9:2, 9:6, 9:15, 9:21, 10:1,

11:23, 13:5, 13:16, 14:21, 14:23, 15:12, 15:20, 16:3, 16:11, 16:15, 17:12, 17:24, 18:13, 19:3, 20:5, 20:9, 21:8, 21:16, 22:3, 22:11, 22:17, 23:9, 23:25, 24:7, 25:8, 25:16, 25:19, 25:22, 26:6, 26:19, 26:24, 27:24, 28:4, 28:9, 28:14, 28:17, 50:2, 50:16, 50:20, 50:23, 51:3, 51:8, 52:10, 52:21, 53:12, 53:18, 54:19, 55:4, 55:9, 55:20, 56:6, 56:18, 57:3, 58:1, 58:10, 58:14, 58:25, 59:19, 60:3

**keep** [8] - 3:2, 11:7, 15:3, 17:10, 22:13, 36:7, 54:1, 56:14
**kept** [2] - 30:6, 49:2
**key** [1] - 48:20
**kind** [23] - 3:22, 5:3, 5:25, 6:1, 8:9, 10:4, 10:13, 14:6, 19:24, 22:14, 23:15, 31:17, 42:11, 42:19, 44:3, 45:20, 52:8, 52:21, 53:24, 57:16, 59:12, 59:21, 60:1
**kinds** [1] - 31:12
**knot** [1] - 53:13
**knowledge** [2] - 35:19, 35:22

## L

**label** [5] - 4:16, 6:22, 6:23, 6:24, 7:2
**labels** [1] - 4:17
**lack** [1] - 2:25
**Laidlaw** [2] - 44:8, 57:16
**land** [10] - 9:23, 10:18, 11:5, 11:10, 13:3, 25:5, 25:6, 48:7, 48:10, 52:9
**language** [1] - 53:17
**last** [11] - 15:14, 30:7, 47:10, 49:4, 50:5, 50:18, 50:22, 50:25, 51:1, 51:9, 53:1
**law** [79] - 4:15, 5:21, 6:11, 6:12, 10:10, 10:11, 10:15, 10:25, 11:25, 14:8, 14:23,

16:12, 17:14, 18:9, 18:16, 18:20, 18:21, 18:23, 19:2, 19:5, 19:20, 20:5, 20:13, 20:24, 21:2, 21:7, 21:15, 22:1, 22:19, 23:2, 23:17, 27:6, 28:7, 29:18, 30:13, 30:18, 31:20, 32:3, 32:11, 32:20, 33:14, 33:16, 33:22, 35:6, 36:7, 36:8, 36:11, 37:2, 37:10, 37:12, 39:18, 40:14, 40:15, 40:22, 41:24, 42:6, 42:14, 42:21, 43:2, 44:10, 44:20, 44:22, 44:24, 45:1, 45:2, 45:24, 46:12, 46:13, 46:14, 46:22, 47:1, 49:5, 52:5, 52:9, 59:11, 59:16
**Law** [1] - 44:1
**lawsuit** [3] - 9:25, 10:2, 43:11
**lawyers** [13] - 30:14, 40:5, 42:14, 43:7, 43:21, 43:22, 44:20, 45:18, 45:19, 54:3, 54:11, 54:12, 56:15
**layering** [1] - 59:22
**leads** [1] - 13:5
**least** [11] - 6:1, 6:5, 10:19, 12:11, 15:25, 34:6, 34:8, 35:16, 42:4, 42:6, 52:23
**lectern** [1] - 2:5
**left** [1] - 19:23
**Legal** [1] - 35:14
**legality** [1] - 3:11
**less** [1] - 41:12
**level** [2] - 38:7, 60:2
**lies** [4] - 11:1, 52:6, 53:5, 53:8
**lifted** [1] - 29:22
**likelihood** [5] - 12:5, 12:10, 16:21, 23:3
**likely** [1] - 51:13
**limitations** [1] - 44:7
**limited** [8] - 3:12, 6:12, 12:3, 14:25, 16:20, 17:25, 19:12, 39:9
**limiting** [1] - 20:2
**limits** [1] - 3:1
**line** [2] - 11:15, 60:4
**lion's** [1] - 38:11
**list** [1] - 34:15
**List** [2] - 40:1, 41:21
**listed** [2] - 34:19,

45:12
**litigate** [1] - 56:8
**litigating** [1] - 2:20
**litigation** [6] - 17:14, 37:3, 37:5, 37:7, 37:15, 48:10
**live** [1] - 3:13
**LLP** [1] - 1:14
**look** [31] - 6:1, 9:3, 9:16, 13:8, 16:17, 18:6, 19:4, 23:5, 24:23, 24:25, 25:11, 25:19, 25:25, 30:7, 32:6, 33:12, 36:14, 36:18, 38:16, 38:20, 39:11, 40:3, 40:4, 42:9, 51:4, 52:23, 53:18, 54:25, 55:4, 59:16
**looked** [2] - 33:9, 38:19
**looking** [4] - 12:6, 18:1, 25:24, 44:14
**looks** [1] - 38:17
**loose** [1] - 47:23
**lose** [1] - 39:7
**loses** [1] - 19:18
**losing** [3] - 19:10, 20:18, 21:13
**lost** [1] - 43:4
**Lujan** [1] - 8:23
**lump** [1] - 53:21
**Lyons** [3] - 51:18, 57:17

## M

**maintain** [4] - 7:14, 7:16, 8:4, 8:5
**majority** [1] - 7:6
**Manhattan** [1] - 1:15
**manufacture** [2] - 57:5, 57:10
**manufactured** [1] - 4:2
**March** [13] - 1:11, 7:3, 7:5, 35:11, 53:21, 54:24, 55:12, 55:23, 59:4, 59:5, 59:10, 59:20, 60:20
**Massachusetts** [1] - 38:19
**materially** [2] - 10:16, 30:21
**matter** [5] - 28:8, 46:14, 47:12, 47:14, 60:18
**matters** [2] - 39:20, 47:15
**mean** [18] - 5:25, 6:2,

7:3, 12:20, 13:3, 13:12, 17:12, 17:13, 17:15, 20:7, 32:17, 45:9, 52:19, 53:4, 53:23, 56:7, 56:10, 60:6
**meaning** [1] - 41:25
**means** [2] - 17:21, 37:14
**meant** [1] - 44:2
**media** [1] - 54:19
**meet** [2] - 13:3, 25:10
**meets** [1] - 22:18
**member** [5] - 19:10, 21:12, 34:7, 35:5
**Member** [3] - 42:1, 42:2
**member's** [1] - 35:6
**member-based** [1] - 34:7
**members** [19] - 16:22, 18:8, 18:15, 19:14, 20:12, 21:1, 21:3, 22:21, 29:23, 30:13, 34:14, 34:15, 38:24, 40:5, 41:19, 44:20, 45:18, 46:18, 46:21
**memo** [13] - 35:10, 35:11, 35:15, 35:16, 35:17, 35:25, 36:1, 36:3, 36:12, 36:13, 36:16, 36:24, 39:4
**memorandum** [8] - 35:13, 53:21, 54:24, 55:12, 59:4, 59:5, 59:10, 59:21
**mentioned** [3] - 23:14, 52:1, 55:8
**merely** [1] - 4:17
**met** [1] - 26:15
**mid** [6] - 16:24, 29:16, 50:9, 53:24, 55:11, 56:1
**might** [11] - 19:25, 24:24, 25:5, 26:7, 30:2, 32:18, 34:22, 42:15, 47:23, 49:16, 57:14
**Miller** [1] - 54:1
**minutes** [1] - 50:1
**Missouri** [1] - 8:2
**moment** [3] - 9:19, 48:2, 50:15
**month** [14] - 7:4, 7:7, 10:7, 10:9, 10:20, 15:16, 15:23, 16:19, 29:24, 30:1, 50:6, 51:15, 58:10

**months** [9] - 7:22, 9:16, 10:2, 12:8, 15:12, 22:5, 50:11, 51:4, 55:13
**mootness** [3] - 9:23, 30:2, 48:7
**most** [2] - 45:13
**mostly** [1] - 38:13
**motion** [6] - 2:24, 3:6, 3:21, 23:21, 47:13, 60:12
**MOTION** [1] - 1:10
**motivations** [1] - 32:14
**mouth** [1] - 20:22
**move** [1] - 43:4
**moves** [2] - 52:12, 52:16
**moving** [2] - 3:2, 18:11
**MR** [117] - 2:7, 2:14, 3:9, 4:25, 5:10, 5:17, 6:10, 6:19, 7:5, 7:10, 7:13, 7:18, 7:21, 8:2, 8:14, 8:20, 9:2, 9:6, 9:15, 9:21, 10:1, 11:23, 13:5, 13:16, 14:21, 14:23, 15:12, 15:20, 16:3, 16:11, 16:15, 17:12, 17:24, 18:13, 19:3, 20:5, 20:9, 21:8, 21:16, 22:3, 22:11, 22:17, 23:9, 23:25, 24:7, 25:8, 25:16, 25:19, 25:22, 26:6, 26:19, 26:24, 27:24, 28:4, 28:9, 28:14, 28:17, 28:21, 28:25, 31:4, 31:19, 32:21, 32:23, 33:3, 33:10, 33:16, 34:5, 34:20, 35:10, 35:19, 35:23, 36:1, 36:21, 36:24, 37:9, 37:21, 38:1, 38:9, 38:16, 39:10, 39:25, 40:25, 41:14, 42:24, 44:19, 45:17, 47:6, 47:14, 47:22, 48:8, 48:11, 48:13, 48:16, 48:23, 50:2, 50:16, 50:20, 50:23, 51:3, 51:8, 52:10, 52:21, 53:12, 53:18, 54:19, 55:4, 55:9, 55:20, 56:6, 56:18, 57:3, 58:1, 58:10, 58:14, 58:25, 59:19, 60:3
**Murthy** [1] - 8:2
**must** [4] - 4:14, 7:14,

7:16, 51:12

## N

nail [1] - 59:6
name [1] - 52:14
narrow [1] - 9:19
narrower [1] - 34:18
national [1] - 32:8
naturally [1] - 3:1
nature [1] - 3:24
necessarily [5] - 17:15, 17:21, 26:25, 52:12, 56:10
need [9] - 9:12, 18:14, 24:21, 41:12, 44:2, 45:8, 49:1, 49:7, 49:22
needed [1] - 41:13
needle [2] - 52:12, 52:16
negotiated [1] - 26:18
negotiating [1] - 10:20
negotiations [4] - 12:12, 25:15, 30:23, 45:12
New [2] - 1:16
new [1] - 43:10
next [2] - 9:8, 13:6
nine [9] - 7:22, 10:19, 12:10, 15:24, 17:7, 25:14, 26:17, 30:1, 45:11
nine-month [1] - 30:1
NO [1] - 1:5
non [1] - 23:3
non-paranoid [1] - 23:3
none [1] - 43:14
note [2] - 2:9, 4:14
notes [2] - 28:25, 48:13
nothing [5] - 23:18, 32:7, 51:16, 55:23, 56:2
number [3] - 29:6, 43:21, 55:22
numerous [1] - 29:12
NW [2] - 1:19, 1:24

## O

objectionable [2] - 42:16, 44:15
objective [1] - 41:10
objectively [2] -

57:25, 58:4
obvious [2] - 5:2, 32:5
obviously [13] - 11:25, 16:5, 22:22, 22:23, 24:9, 27:17, 31:4, 37:6, 56:24, 57:9, 58:15, 59:11, 60:6
occur [6] - 4:9, 4:10, 13:19, 13:20, 40:3, 57:19
occurred [3] - 7:6, 23:19, 51:2
OF [3] - 1:1, 1:6, 1:10
offer [1] - 39:18
offhand [1] - 25:16
OFFICE [1] - 1:6
Office [1] - 2:3
OFFICIAL [1] - 60:23
Official [2] - 1:23, 60:16
official [1] - 20:2
one [44] - 2:17, 4:20, 6:3, 10:7, 10:11, 11:15, 11:20, 12:21, 12:22, 14:4, 14:11, 14:16, 16:20, 18:22, 18:23, 21:14, 22:22, 23:6, 26:7, 26:14, 27:2, 27:16, 27:19, 29:8, 29:24, 31:5, 32:3, 32:13, 32:14, 34:6, 34:8, 35:2, 36:11, 37:15, 37:16, 37:18, 43:2, 44:11, 44:12, 50:9, 52:16, 53:1, 55:15
One [2] - 1:15, 4:14
one-and-a-half-month [1] - 29:24
one-month [1] - 10:7
ones [5] - 15:23, 17:7, 18:7, 27:6, 56:9
ongoing [2] - 25:18, 43:7
opinion [1] - 60:11
opportunity [6] - 3:3, 3:7, 24:10, 24:22, 47:5, 54:6
options [1] - 56:9
oral [1] - 2:25
order [38] - 5:21, 13:8, 14:5, 14:12, 14:17, 14:19, 15:4, 15:6, 15:10, 15:13, 16:18, 18:13, 18:15, 18:17, 19:6, 21:9, 21:10, 21:21, 21:23, 22:6, 24:19, 25:12,

27:3, 27:25, 30:13, 32:2, 32:20, 38:11, 42:22, 43:4, 43:20, 46:4, 46:9, 47:2, 50:4, 50:17, 53:20
Order [1] - 2:1
orders [50] - 3:15, 5:7, 5:20, 6:11, 10:10, 10:15, 10:17, 11:6, 11:8, 11:17, 12:1, 12:6, 13:23, 15:15, 15:17, 16:12, 16:16, 17:15, 18:3, 18:9, 18:20, 18:23, 19:2, 19:4, 19:13, 22:19, 27:13, 29:20, 30:19, 36:7, 37:16, 42:6, 43:18, 50:12, 50:19, 52:11, 52:15, 52:25, 53:25, 54:2, 54:10, 54:23, 55:8, 55:10, 55:22, 56:11, 56:14, 59:3
ordinary [1] - 41:2
organization [1] - 38:24
organizational [3] - 21:19, 34:7, 35:7
original [1] - 60:17
otherwise [2] - 25:9, 31:18
outcome [1] - 8:25
outset [1] - 14:2
outside [1] - 39:22
oversee [1] - 3:10
overtly [1] - 31:11
own [6] - 13:17, 26:15, 34:14, 41:9, 45:16, 58:13

## P

p.m [4] - 1:11, 2:1, 60:14
page [1] - 60:18
paragraph [1] - 31:25
paragraphs [2] - 31:22, 35:11
paranoid [1] - 23:3
parse [5] - 34:3, 34:12, 38:7, 38:15, 60:1
part [5] - 20:9, 34:25, 37:15, 39:3, 42:3
Part [1] - 44:5
particular [6] - 5:16, 6:12, 10:14, 39:4, 45:21, 49:9
particularized [4] -

4:7, 4:14, 19:8, 57:5
particularly [2] - 40:16, 58:22
parties [3] - 2:17, 2:23, 24:22
parties' [1] - 60:10
partner [2] - 28:22, 31:25
parts [2] - 19:1, 31:11
party [5] - 4:4, 8:24, 24:12, 24:23, 25:2
pass [2] - 15:13, 26:22
passed [1] - 7:23
past [15] - 2:10, 3:15, 5:18, 5:19, 6:3, 17:25, 19:12, 20:14, 21:5, 25:3, 26:25, 42:2, 43:13, 51:19, 58:17
path [2] - 44:6, 44:16
pattern [7] - 6:13, 14:25, 16:20, 17:25, 19:12, 33:4, 40:11
Paul [9] - 15:7, 31:4, 31:10, 32:6, 32:7, 32:8, 45:22, 45:23
pause [1] - 29:24
Pause [1] - 48:15
pay [1] - 50:7
Pennsylvania [1] - 1:19
people [10] - 2:20, 5:7, 20:4, 20:24, 21:1, 21:7, 22:1, 32:13, 44:23, 44:24
perhaps [1] - 47:23
period [12] - 7:4, 10:7, 10:9, 10:20, 12:25, 18:2, 25:13, 27:2, 30:2, 50:6, 51:15
Perkins [9] - 14:4, 14:11, 19:17, 19:18, 19:21, 20:3, 27:15, 27:16, 27:17
permanent [4] - 5:23, 13:24, 22:25, 39:2
person [4] - 21:15, 28:2, 41:2, 42:13
persuasive [1] - 26:3
petition [1] - 49:10
petitioning [2] - 53:9, 54:13
picking [1] - 10:8
piece [3] - 34:12, 42:19, 43:16
pivot [2] - 13:12, 13:14

place [3] - 4:20, 30:6, 49:13
places [1] - 43:25
plaintiff [9] - 7:14, 12:1, 17:19, 17:23, 34:6, 36:22, 54:18, 58:24
Plaintiff [1] - 1:4
PLAINTIFF [1] - 1:14
plaintiff's [4] - 2:6, 20:22, 51:22, 53:13
plaintiffs [5] - 3:6, 10:12, 18:24, 28:16, 57:22
plan [1] - 2:25
plausibility [1] - 41:18
plausible [3] - 18:5, 36:10, 41:18
plausibly [27] - 6:2, 6:9, 6:21, 8:8, 10:18, 11:4, 11:10, 11:15, 12:9, 17:1, 17:23, 21:25, 22:9, 24:24, 29:5, 29:12, 29:13, 30:11, 30:18, 36:5, 37:19, 39:5, 39:9, 48:22, 48:23, 52:8, 54:18
play [2] - 40:23, 49:13
plays [1] - 58:10
plead [5] - 32:5, 43:1, 43:5, 43:6, 45:22
pleading [10] - 4:10, 6:25, 7:1, 8:8, 12:15, 23:22, 30:11, 33:6, 46:15, 54:22
pleadings [4] - 23:22, 24:5, 29:21, 30:16
pled [8] - 29:5, 30:11, 43:22, 43:25, 44:22, 46:1, 46:15, 46:18
plenty [1] - 3:2
plus [4] - 12:12, 41:11, 50:6, 52:9
point [30] - 6:3, 10:11, 12:2, 12:10, 12:16, 13:6, 15:11, 21:24, 22:7, 23:7, 23:18, 24:2, 27:12, 28:9, 31:3, 32:19, 33:4, 36:4, 36:12, 37:17, 37:18, 37:23, 39:3, 39:25, 47:7, 47:13, 51:11, 54:21, 56:2, 58:16

**pointed** [3] - 29:7, 30:5, 47:6
**pointing** [2] - 10:13
**policies** [4] - 29:6, 39:6, 54:18, 55:10
**policy** [90] - 4:16, 5:22, 6:2, 6:4, 6:6, 6:9, 6:15, 6:21, 8:9, 10:18, 10:22, 10:24, 11:2, 11:11, 11:15, 12:18, 13:2, 14:24, 16:4, 16:6, 16:9, 17:23, 20:20, 20:21, 20:23, 21:2, 21:6, 21:17, 22:1, 22:9, 22:14, 24:24, 26:1, 27:7, 29:5, 29:7, 29:9, 29:13, 29:17, 30:6, 30:9, 30:12, 30:18, 31:17, 31:18, 34:25, 35:8, 36:5, 36:10, 37:10, 37:19, 37:23, 38:1, 38:5, 38:12, 38:21, 38:22, 38:24, 39:2, 39:8, 40:7, 41:16, 43:2, 45:21, 46:21, 47:9, 47:13, 47:18, 48:20, 48:22, 48:24, 51:13, 51:14, 52:4, 52:8, 52:10, 52:13, 52:15, 52:17, 53:14, 53:22, 55:7, 56:16, 57:5, 59:6, 59:22
**political** [2] - 14:8, 49:17
**position** [6] - 15:8, 28:12, 55:17, 56:25, 57:3, 58:18
**possibility** [1] - 46:4
**post** [2] - 48:5, 48:10
**post-complaint** [1] - 48:5
**post-litigation** [1] - 48:10
**postpone** [1] - 34:23
**potential** [1] - 43:9
**potentially** [1] - 21:13
**powerful** [1] - 45:14
**practice** [3] - 21:15, 32:11, 42:15
**practices** [6] - 20:24, 21:2, 21:7, 22:2, 37:6, 37:7
**prayer** [1] - 33:20
**pre** [4] - 40:12, 41:15, 41:19, 42:20
**pre-enforcement** [4] - 40:12, 41:15, 41:19,

42:20
**precisely** [2] - 29:20, 59:23
**preemptive** [1] - 31:23
**prejudice** [1] - 24:1
**present** [2] - 2:23, 3:3
**presently** [1] - 27:14
**President** [17] - 2:3, 11:6, 14:4, 17:3, 17:4, 37:1, 37:11, 43:3, 43:12, 43:15, 43:17, 44:1, 44:24, 45:2, 45:25, 52:11
**PRESIDENT** [1] - 1:6
**president** [2] - 2:10
**President's** [5] - 10:22, 10:24, 43:8, 46:1, 52:4
**presumably** [4] - 20:7, 21:3, 33:23, 48:6
**presumption** [1] - 33:7
**pretty** [3] - 3:18, 26:3, 32:5
**prevent** [1] - 30:13
**Preventing** [1] - 35:13
**preview** [1] - 56:22
**primarily** [1] - 54:22
**priorities** [2] - 43:8, 46:2
**pro** [1] - 31:13
**proactively** [1] - 32:2
**problem** [5] - 6:10, 20:10, 22:19, 37:8, 45:20
**Proceedings** [1] - 60:14
**proceedings** [2] - 2:18, 35:4
**proceeds** [1] - 8:23
**process** [2] - 50:15, 52:1
**Produced** [1] - 1:25
**progresses** [3] - 8:4, 8:6, 8:7
**prologue** [2] - 18:1, 26:25
**proof** [1] - 8:22
**proposition** [1] - 8:1
**protect** [2] - 49:7
**protected** [1] - 43:10
**prove** [4] - 34:5, 34:8, 34:25, 39:1
**proved** [1] - 30:8
**proven** [6] - 11:1, 34:13, 40:9, 41:15,

48:20, 52:7
**provided** [1] - 28:17
**provision** [1] - 20:16
**public** [1] - 47:19
**publicly** [3] - 10:19, 45:12, 54:8
**punish** [1] - 43:2
**purpose** [3] - 43:1, 43:5, 43:6
**purposes** [2] - 47:13, 52:18
**pursue** [1] - 38:24
**pursuing** [4] - 17:5, 17:12, 17:13
**push** [2] - 8:14, 8:17
**put** [5] - 6:22, 6:24, 20:22, 24:11, 38:21
**puts** [1] - 52:11
**putting** [1] - 17:19

## Q

**questions** [5] - 3:3, 3:4, 4:5, 6:25, 34:24
**quite** [4] - 31:11, 33:5, 36:24, 56:7
**quote** [8] - 9:10, 10:24, 15:1, 19:23, 31:21, 52:4, 53:24, 55:8
**quoted** [1] - 19:1
**quoting** [1] - 8:18

## R

**railed** [1] - 44:25
**random** [1] - 33:4
**RDR** [1] - 60:22
**RDR-CRR** [1] - 60:22
**reaching** [1] - 59:12
**read** [7] - 9:8, 11:13, 17:4, 19:24, 19:25, 20:23, 36:2
**reading** [1] - 9:9
**real** [3] - 37:2, 44:19, 51:17
**really** [10] - 3:19, 6:16, 24:25, 41:14, 52:14, 52:16, 53:2, 56:5, 59:6, 59:9
**Realtime** [1] - 1:23
**reason** [10] - 9:24, 11:11, 11:12, 25:2, 38:3, 38:5, 44:23, 46:25, 47:24
**reasonable** [5] - 12:5, 23:3, 31:1, 57:25, 58:6
**reasonably** [1] - 46:23

**reasons** [1] - 35:2
**rebut** [1] - 47:5
**rebuttal** [2] - 3:7, 39:13
**receive** [1] - 31:5
**recent** [1] - 28:6
**recognized** [1] - 39:22
**recommend** [1] - 36:25
**reconcile** [1] - 39:15
**Record** [1] - 1:25
**record** [3] - 2:6, 50:15, 60:18
**reduce** [1] - 29:4
**reduced** [1] - 21:25
**reduces** [1] - 22:8
**Reeves** [2] - 60:16, 60:22
**REEVES** [2] - 1:22, 60:22
**reference** [4] - 4:15, 5:19, 11:2, 52:7
**referenced** [1] - 51:1
**referencing** [1] - 59:7
**referral** [1] - 35:5
**referrals** [1] - 54:24
**referring** [1] - 56:7
**refile** [1] - 24:3
**reflected** [1] - 55:8
**regarding** [3] - 4:6, 28:7, 59:17
**Registered** [1] - 1:22
**regulations** [2] - 26:9, 60:18
**relate** [1] - 57:2
**related** [6] - 18:13, 31:8, 33:24, 45:5, 45:6, 45:8
**relates** [4] - 5:16, 18:19, 34:1, 36:6
**relation** [1] - 56:24
**relationship** [1] - 56:23
**relaxed** [2] - 49:5, 49:20
**released** [2] - 25:12, 26:10
**relevance** [1] - 25:6
**relevant** [17] - 11:12, 11:18, 11:21, 17:1, 24:17, 28:7, 28:13, 28:14, 47:19, 47:21, 47:23, 50:7, 55:20, 57:22, 57:25, 58:22, 59:11
**relief** [25] - 3:16, 20:15, 20:16, 22:24, 33:2, 33:20, 34:2,

34:3, 34:9, 34:11, 34:12, 34:17, 34:22, 34:24, 38:7, 38:8, 39:9, 53:2, 54:23, 59:1, 59:16, 60:2, 60:5
**rely** [3] - 23:9, 33:1, 51:19
**relying** [1] - 7:25
**remain** [2] - 55:18, 56:3
**remains** [3] - 8:23, 11:6, 53:25
**remedy** [1] - 38:5
**remember** [1] - 25:16
**remiss** [1] - 28:21
**reorganization** [1] - 57:24
**reorganized** [1] - 41:11
**repeated** [2] - 50:13, 55:6
**repeatedly** [1] - 29:8
**report** [2] - 11:5, 53:24
**reported** [1] - 54:8
**REPORTER** [1] - 60:23
**Reporter** [4] - 1:22, 1:23, 1:23, 60:16
**reporting** [1] - 12:13
**reports** [1] - 16:25
**represent** [2] - 29:18, 31:12
**representing** [5] - 43:11, 54:3, 54:11, 54:13, 56:16
**request** [1] - 24:10
**require** [1] - 40:13
**required** [5] - 8:22, 9:11, 9:12, 57:1
**requirement** [1] - 39:15
**requirements** [4] - 4:11, 13:18, 25:11, 49:20
**requires** [3] - 13:7, 13:21, 37:4
**requiring** [1] - 4:7
**requisite** [2] - 8:25, 9:2
**rescinded** [3] - 27:13, 35:17, 35:20
**responding** [2] - 55:24, 55:25
**response** [4] - 37:4, 52:2, 56:5, 58:24
**responsive** [1] - 28:2
**restrictions** [1] - 29:10

**result** [1] - 58:22
**retaliated** [1] - 42:8
**retaliation** [8] - 4:22, 21:1, 32:15, 40:18, 40:19, 40:20
**review** [1] - 22:18
**rewinding** [1] - 16:24
**rights** [1] - 41:24
**ripe** [5] - 14:14, 14:15, 14:20, 15:9, 22:18
**ripeness** [15] - 4:3, 4:8, 11:24, 12:21, 13:6, 13:10, 13:12, 13:15, 13:17, 14:15, 14:23, 26:19, 49:6, 49:20
**risk** [10] - 19:10, 19:11, 20:18, 20:19, 21:13, 23:14, 40:2, 40:3, 40:7, 40:10
**role** [5] - 33:25, 34:1, 40:23, 49:13, 49:19
**room** [1] - 2:17
**routinely** [1] - 12:22
**roving** [1] - 3:10
**row** [1] - 15:22
**rules** [1] - 38:25
**rulings** [1] - 43:19
**run** [1] - 17:18

**S**

**sanction** [1] - 41:8
**sanctions** [18] - 10:14, 12:11, 14:12, 14:18, 14:20, 15:5, 15:7, 15:11, 15:25, 17:8, 20:25, 30:20, 30:21, 31:2, 31:17, 33:2, 33:22, 36:6
**satisfies** [2] - 42:10, 42:17
**satisfy** [1] - 58:15
**saw** [2] - 18:20, 55:22
**scale** [1] - 49:22
**scenes** [2] - 2:21, 17:8
**scramble** [1] - 46:5
**second** [1] - 4:20
**section** [10] - 10:11, 10:12, 18:23, 18:24, 19:16, 19:22, 33:2, 33:20, 34:2, 59:15
**sections** [3] - 23:1, 59:2
**security** [13] - 19:8, 19:10, 19:18, 19:20, 20:16, 20:17, 21:11,

21:13, 21:15, 27:19, 27:21, 32:8, 46:12
**see** [8] - 8:23, 25:1, 36:5, 37:20, 43:19, 43:21, 59:16, 59:23
**seek** [2] - 34:22, 38:12
**seeking** [5] - 32:16, 34:9, 34:11, 59:17, 60:5
**seem** [2] - 5:2, 37:18
**selectively** [1] - 19:1
**self** [2] - 57:8, 58:3
**self-censoring** [2] - 57:8, 58:3
**sense** [3] - 6:13, 47:23, 52:13
**sent** [1] - 31:24
**sentence** [1] - 9:8
**series** [3] - 4:21, 12:3, 26:8
**seriously** [1] - 12:21
**Sessions** [1] - 51:12
**set** [6] - 3:1, 33:5, 43:5, 43:18, 43:20, 45:2
**settle** [3] - 12:2, 31:5, 33:14
**settled** [1] - 31:20
**settlement** [12] - 31:10, 31:22, 31:24, 32:7, 32:9, 44:18, 50:5, 50:22, 50:25, 51:1, 54:23
**settlements** [20] - 16:25, 30:22, 31:1, 31:6, 31:8, 31:16, 32:4, 33:18, 36:8, 43:18, 45:12, 50:24, 51:6, 53:2, 53:3, 53:20, 55:11, 59:3, 59:10
**settling** [1] - 17:7
**seven** [3] - 15:11, 15:22, 59:15
**seventeen** [1] - 44:13
**several** [1] - 19:17
**Shackelford** [2] - 2:7, 28:20
**SHACKELFORD** [39] - 1:15, 2:7, 28:21, 28:25, 31:4, 31:19, 32:21, 32:23, 33:3, 33:10, 33:16, 34:5, 34:20, 35:10, 35:19, 35:23, 36:1, 36:21, 36:24, 37:9, 37:21, 38:1, 38:9, 38:16, 39:10, 39:25, 40:25,

41:14, 42:24, 44:19, 45:17, 47:6, 47:14, 47:22, 48:8, 48:11, 48:13, 48:16, 48:23
**shadowboxing** [1] - 21:20
**shall** [1] - 19:19
**share** [1] - 38:11
**sheets** [1] - 37:12
**short** [2] - 4:10, 17:11
**show** [5] - 8:11, 12:18, 41:1, 41:3, 41:23
**showing** [2] - 7:16, 8:7
**shows** [2] - 31:7, 47:17
**side** [2] - 2:22, 16:2
**sign** [1] - 26:22
**signing** [1] - 37:11
**signs** [1] - 14:4
**similar** [8] - 13:22, 13:24, 18:4, 26:13, 27:5, 27:9, 36:15, 59:9
**similarly** [1] - 44:10
**simply** [1] - 32:9
**sit** [1] - 2:18
**sitting** [1] - 44:17
**situate** [1] - 5:3
**situated** [1] - 44:10
**six** [2] - 15:10, 15:21
**sixteen** [1] - 44:13
**Skadden** [5] - 15:10, 31:21, 31:22, 31:25, 33:3
**Skadden's** [1] - 31:25
**slightly** [1] - 41:12
**so-called** [1] - 5:21
**society** [1] - 45:13
**solely** [1] - 36:2
**someone** [3] - 20:19, 42:15, 44:14
**sometimes** [1] - 24:23
**Sonja** [2] - 60:16, 60:22
**SONJA** [2] - 1:22, 60:22
**soon** [1] - 43:3
**sort** [4] - 37:4, 38:18, 42:2, 42:21
**sorts** [4] - 26:1, 29:10, 30:12, 37:10
**sounds** [5] - 26:21, 53:8, 53:9, 54:13, 54:15
**speaking** [1] - 4:22

**specific** [7] - 11:2, 30:4, 31:17, 33:20, 33:22, 34:23, 52:2
**specifically** [5] - 9:10, 10:12, 17:3, 31:23, 37:13
**spectrum** [3] - 15:19, 16:2, 17:6
**speculative** [3] - 25:10, 41:4
**speech** [7] - 14:8, 21:1, 31:11, 40:8, 49:8, 49:17, 53:8
**spending** [1] - 3:18
**spring** [1] - 5:20
**square** [1] - 9:1
**Staff** [3] - 11:7, 17:5, 54:1
**stage** [14] - 6:25, 7:1, 12:19, 17:18, 25:3, 28:11, 30:11, 33:6, 33:25, 34:1, 34:20, 38:8, 46:15, 54:22
**stake** [1] - 8:25
**standard** [8] - 5:25, 8:8, 8:10, 12:15, 17:20, 23:23, 41:22, 49:5
**standing** [64] - 3:20, 4:4, 4:6, 5:13, 7:11, 7:17, 8:4, 8:5, 8:11, 8:12, 8:22, 8:23, 9:5, 9:11, 9:12, 9:20, 9:25, 11:18, 11:19, 12:1, 12:20, 13:10, 14:15, 18:12, 18:16, 20:10, 21:19, 22:17, 22:18, 23:16, 25:10, 26:4, 27:23, 28:3, 28:10, 30:1, 34:2, 34:4, 34:5, 34:7, 34:12, 34:20, 34:22, 34:23, 38:3, 38:8, 38:23, 39:15, 39:22, 39:23, 40:24, 41:9, 41:23, 47:10, 47:21, 47:23, 47:25, 49:6, 49:19, 51:25, 58:16, 60:4, 60:6
**start** [7] - 4:13, 4:20, 8:7, 8:8, 9:22, 10:22, 29:2
**started** [3] - 13:11, 38:6, 42:7
**starts** [4] - 13:10, 36:13, 36:14, 36:18
**state** [4] - 2:5, 4:1, 4:24, 58:11
**statement** [11] - 10:21, 10:23, 16:9, 17:2, 17:9, 30:5,

41:25, 52:3, 55:18, 56:3
**statements** [7] - 12:12, 14:8, 16:16, 31:20, 36:8, 37:11, 37:12
**states** [1] - 48:17
**STATES** [1] - 1:1
**States** [3] - 1:18, 60:16, 60:19
**statute** [4] - 26:12, 26:16, 26:22
**statutes** [2] - 26:9, 26:11
**stenographic** [1] - 60:17
**Stenographic** [1] - 1:25
**STEPHEN** [1] - 1:15
**Stephen** [2] - 2:7, 54:1
**steps** [2] - 19:19, 37:1
**sticking** [1] - 30:17
**still** [26] - 7:19, 8:12, 9:2, 9:13, 9:16, 10:3, 11:23, 12:4, 13:21, 16:3, 16:5, 16:19, 17:5, 17:24, 18:2, 19:3, 22:11, 25:18, 28:10, 47:19, 47:20, 50:12, 51:5, 59:17, 59:19
**stop** [2] - 14:13, 15:8
**stopped** [2] - 29:16, 53:23
**stopping** [1] - 26:2
**story** [1] - 30:5
**strategy** [7] - 11:1, 11:3, 16:10, 36:9, 52:6, 52:8, 52:19
**Street** [2] - 11:5, 17:3
**strip** [1] - 46:12
**strong** [1] - 56:24
**struck** [1] - 45:12
**subjected** [2] - 51:13, 57:14
**subjective** [5] - 57:6, 57:15, 57:18, 58:18, 58:19
**submissions** [6] - 28:5, 28:15, 47:4, 49:24, 58:24, 60:9
**substantial** [3] - 40:2, 40:7, 40:10
**substantially** [7] - 13:22, 13:24, 18:4, 26:13, 27:5, 27:9, 59:9
**substantive** [1] -

41:1
**succeeded** [2] - 27:18, 45:10
**successful** [3] - 11:2, 52:7, 52:20
**sue** [3] - 15:11, 22:15, 22:22
**sued** [2] - 12:1, 27:20
**sufficient** [4] - 39:2, 41:2, 41:3, 41:13
**sufficiently** [3] - 14:14, 41:7, 41:17
**suing** [5] - 21:4, 21:5, 21:6, 29:22, 59:4
**suit** [7] - 8:23, 8:25, 12:23, 14:22, 17:10, 26:4, 45:8
**support** [2] - 8:11, 43:1
**supports** [1] - 44:8
**suppose** [1] - 23:13
**Supreme** [2] - 8:18, 36:19
**surpassed** [1] - 30:15
**surprised** [1] - 19:24
**survive** [1] - 45:24
**Susan** [2] - 40:1, 41:20
**Susman** [12] - 1:14, 2:7, 15:4, 15:13, 16:18, 25:12, 27:3, 50:4, 50:9, 50:16, 51:7, 53:1
**suspend** [1] - 19:20
**swath** [1] - 49:14
**System** [1] - 35:14
**system** [2] - 49:14, 49:18

## T

**table** [4] - 11:8, 28:22, 54:2, 56:14
**tailored** [1] - 59:1
**tailors** [2] - 53:2, 53:14
**talks** [2] - 8:2, 40:1
**tangible** [5] - 52:14, 55:5, 55:7, 55:14, 55:21
**target** [2] - 19:2, 32:1
**targeted** [2] - 45:9, 45:10
**targeting** [4] - 5:7, 14:7, 20:23, 21:6
**targets** [1] - 18:9
**team** [5] - 10:22,

10:24, 16:9, 52:4, 52:8
**Telecom** [1] - 41:21
**temporal** [2] - 3:25, 8:15
**terms** [6] - 5:5, 13:8, 14:23, 26:15, 52:12, 52:17
**terribly** [1] - 59:10
**territory** [1] - 51:18
**THE** [120] - 1:1, 1:6, 1:10, 1:14, 1:18, 2:13, 2:16, 4:19, 5:2, 5:12, 5:24, 6:16, 6:20, 7:8, 7:11, 7:16, 7:19, 8:5, 8:17, 8:21, 9:5, 9:8, 9:18, 9:22, 10:4, 12:9, 13:9, 14:1, 14:22, 15:3, 15:18, 15:21, 16:8, 16:13, 16:23, 17:17, 18:11, 18:18, 19:15, 20:6, 20:20, 21:14, 21:24, 22:7, 22:13, 23:5, 23:13, 24:4, 24:11, 25:14, 25:18, 25:21, 25:23, 26:16, 26:21, 27:11, 28:1, 28:5, 28:12, 28:15, 28:19, 28:24, 30:17, 31:15, 32:16, 32:22, 32:24, 33:8, 33:11, 33:19, 34:16, 35:2, 35:15, 35:21, 35:24, 36:4, 36:23, 37:8, 37:17, 37:22, 38:6, 38:13, 39:5, 39:12, 40:23, 41:7, 42:3, 44:5, 45:5, 47:4, 47:12, 47:17, 48:1, 48:9, 48:12, 48:22, 49:24, 50:14, 50:18, 50:22, 50:25, 51:6, 51:23, 52:19, 53:4, 53:15, 53:23, 55:2, 55:7, 55:18, 55:24, 56:13, 56:21, 57:15, 58:9, 58:13, 58:23, 59:14, 59:25, 60:8
**themselves** [3] - 16:12, 22:20, 57:14
**theory** [3] - 27:6, 34:8, 44:9
**third** [1] - 4:4
**third-party** [1] - 4:4
**thirteen** [1] - 44:12
**threat** [8] - 29:22, 31:9, 32:4, 40:19, 50:13, 51:17, 55:16, 57:7
**threaten** [3] - 29:18,

30:12, 46:13
**threatened** [3] - 31:2, 31:18, 39:4
**threatening** [1] - 33:13
**threatens** [1] - 47:3
**threats** [3] - 11:7, 54:2, 56:14
**three** [9] - 4:1, 7:4, 10:7, 10:9, 10:20, 14:19, 23:7, 44:11, 52:24
**three-month** [3] - 10:7, 10:9, 10:20
**three-month-ish** [1] - 7:4
**threshold** [1] - 42:17
**throughout** [2] - 29:11, 43:6
**throwing** [1] - 10:6
**thumb** [1] - 49:22
**tie** [6] - 31:16, 53:7, 53:9, 53:11, 53:13, 53:16
**tie-in** [1] - 31:16
**tied** [1] - 19:9
**ties** [1] - 11:24
**timeframe** [2] - 7:7, 25:11
**timeline** [1] - 58:10
**timing** [2] - 13:20, 25:14
**titles** [1] - 19:4
**today** [3] - 2:9, 2:24, 28:23
**together** [4] - 16:6, 17:20, 53:13, 53:22
**took** [1] - 28:25
**top** [2] - 43:7, 46:1
**totally** [1] - 9:24
**touch** [1] - 4:3
**toward** [1] - 58:1
**towards** [8] - 6:12, 7:24, 11:15, 18:1, 19:5, 22:20, 22:21, 59:1
**traditionally** [1] - 45:20
**TRANSCRIPT** [1] - 1:10
**transcript** [3] - 60:17, 60:17, 60:18
**Transcript** [1] - 1:25
**tremendously** [3] - 11:1, 52:7, 52:20
**tried** [1] - 12:23
**TRO** [1] - 50:10
**trouble** [1] - 40:14
**true** [5] - 18:6, 42:12, 54:7, 55:3, 60:17

**Trump** [1] - 53:25
**try** [1] - 38:4
**trying** [9] - 16:23, 32:25, 33:17, 34:16, 48:2, 51:18, 53:21, 54:5, 56:4
**Turner** [1] - 23:10
**turns** [1] - 57:13
**two** [23] - 3:25, 7:7, 9:16, 14:17, 15:16, 16:19, 16:22, 19:16, 22:5, 23:1, 23:6, 24:9, 37:16, 44:11, 50:6, 50:11, 51:4, 51:15, 55:13, 56:25, 57:2, 58:10, 59:2
**two-month** [5] - 7:7, 15:16, 16:19, 51:15, 58:10
**two-month-plus** [1] - 50:6
**Twombley** [1] - 4:17
**Twombly** [1] - 13:4
**tying** [1] - 59:3
**type** [3] - 44:6, 53:22, 60:5
**types** [2] - 45:1, 45:3
**typically** [1] - 24:13

## U

**U.S** [1] - 41:21
**ultimately** [7] - 3:12, 5:22, 16:12, 19:5, 21:22, 34:17, 58:20
**unconstitutional** [2] - 14:10, 27:14
**under** [9] - 4:25, 23:17, 23:22, 27:6, 36:12, 36:16, 49:17, 60:10
**Understood** [2] - 28:1
**undertaken** [1] - 36:13
**unfolded** [1] - 17:14
**unique** [2] - 49:13
**UNITED** [1] - 1:1
**United** [3] - 1:18, 60:16, 60:19
**unlawful** [1] - 57:19
**unless** [4] - 3:20, 23:2, 44:17, 45:24
**unparanoid** [1] - 58:7
**unwilling** [1] - 45:19
**up** [13] - 4:14, 6:13, 10:8, 20:8, 20:20, 23:18, 30:14, 31:11, 31:12, 31:15, 37:14,

57:6, 58:2
**usual** [1] - 39:15

## V

**variety** [1] - 59:13
**various** [2] - 37:1, 47:20
**vast** [1] - 7:6
**verify** [1] - 25:19
**versus** [3] - 2:3, 48:16, 51:12
**view** [2] - 9:15, 53:8
**viewed** [2] - 4:6, 9:20
**viewpoint** [7] - 4:23, 5:8, 14:7, 20:25, 42:11, 42:17, 54:15
**violate** [1] - 42:21
**violated** [1] - 42:7
**violative** [8] - 41:25, 42:4, 42:13, 42:19, 43:9, 43:13, 43:14, 43:23
**virtue** [2] - 21:2, 30:24
**Voice** [2] - 23:11, 38:17
**voluntarily** [1] - 9:23
**voluntary** [1] - 48:9
**vs** [1] - 1:5
**vulnerable** [1] - 45:13

## W

**wait** [1] - 36:20
**Wall** [2] - 11:5, 17:2
**wants** [1] - 11:7
**Washington** [3] - 1:12, 1:20, 1:24
**watching** [1] - 43:21
**ways** [4] - 32:11, 37:20, 47:20, 58:16
**weaponization** [4] - 10:25, 52:6, 53:5, 53:8
**Wednesday** [1] - 1:11
**weeks** [1] - 11:9
**weigh** [2] - 21:17, 21:18
**Weiss** [9] - 15:7, 31:4, 31:10, 32:6, 32:7, 32:9, 45:22, 45:23
**welcome** [1] - 2:18
**WEN** [1] - 1:19
**Wen** [1] - 2:15
**West** [1] - 1:15
**whatsoever** [1] -

12:18
 **whichever** [1] -
14:16
 **White** [10] - 10:21,
10:23, 11:7, 12:13,
12:14, 16:8, 17:9,
35:13, 52:4, 53:25
 **whole** [6] - 16:14,
38:17, 38:18, 38:19,
38:20, 38:25
 **wide** [2] - 31:24,
59:13
 **willing** [2] - 14:6,
46:7
 **WilmerHale** [1] -
14:19
 **win** [1] - 5:5
 **wishes** [1] - 40:5
 **withstand** [1] - 46:3
 **won** [1] - 17:19
 **word** [2] - 10:16,
14:15
 **words** [3] - 20:22,
42:12, 57:24
 **works** [1] - 34:16
 **world** [4] - 22:15,
47:15, 51:14, 58:12
 **worried** [1] - 20:14
 **worse** [1] - 7:8
 **written** [5] - 16:5,
29:7, 29:8, 30:19,
60:11

## Y

 **York** [2] - 1:16