**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN BAR ASSOCIATION, *Plaintiff,* v. EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, *Defendants.* | Civil Action No. 25-01888 (AHA) |

**Memorandum Opinion and Order**

The American Bar Association ("ABA") sues federal agencies and officials, alleging they adopted an unlawful, coordinated policy of sanctioning law firms and their lawyers for engaging in speech the government does not like. The government does not dispute that the ABA states valid claims of unlawful retaliation for protected speech and association, discrimination based on viewpoint, and interference with the right to petition the government, in violation of the First Amendment. The government instead argues that even if it was repeatedly violating the Constitution in these ways in the lead up to the complaint, the ABA has not plausibly alleged a policy that posed a realistic threat to the ABA or its members, and therefore the ABA has no injury and no ripe controversy under Article III of the Constitution. The court disagrees, concluding that the ABA's complaint—which alleges the coordinated and repeat imposition of specific sanctions against lawyers and law firms around the country through the issuance and implementation of a series of executive orders, several specific settlements with law firms under threat of such sanctions, and numerous statements by senior government officials describing the coordinated strategy—easily surpasses what Article III requires at this stage.

## I.    Background[1]

The ABA's 85-page complaint details a 14-week period leading up to this suit in which the government launched and executed a coordinated campaign to intimidate and punish law firms and their lawyers based on speech the administration disapproved of. Officials targeted firms and their lawyers based on their advocacy on particular issues like diversity in the workplace; political and social affiliations, including donations to causes the administration disfavors; representation of certain clients, like immigrants, in matters adverse to the government; work on cases involving certain issues, like election integrity and women's and LGBTQ+ individuals' rights; and work on matters challenging the administration's policies. ECF No. 1 ¶ 66.

The complaint alleges the administration carried out this effort by developing a specific array of sanctions "designed to cripple targeted firms' businesses." *Id.* ¶ 65. It supports that allegation by pointing to a series of executive orders issued in quick succession imposing virtually identical sanctions on law firms and their lawyers, numerous instances in which law firms made concessions to the administration to avoid such sanctions, and explicit statements from government officials recognizing the administration's commitment to pursuing the sanctions.

The complaint describes five executive orders issued against law firms and their attorneys with virtually identical sanctions:

1. On March 6, 2025, the President issued Executive Order 14230, targeting the law firm Perkins Coie. *Id.* ¶ 69. The order imposed four sanctions on Perkins Coie, directing government officials to: (1) "suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the

---

[1]    As required when considering a motion to dismiss for lack of subject matter jurisdiction, the court accepts the complaint's well-pled allegations as true and draws all reasonable inferences in the ABA's favor. *Tanner-Brown v. Haaland*, 105 F.4th 437, 443 (D.C. Cir. 2024).

national interest," and "cease providing 'Government goods, property, material, and services' to Perkins Coie"; (2) require "Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract," review "all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie," and "take appropriate steps to terminate any contract" with Perkins Coie; (3) "'provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie' when such access would 'be inconsistent with the interests of the United States,'" and "provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States"; and (4) not hire Perkins Coie employees absent a waiver. *Id.* ¶¶ 70–73 (quoting Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025)).

2. On March 14, 2025, the President issued Executive Order 14237, targeting the law firm Paul Weiss. *Id.* ¶ 85. The Paul Weiss executive order imposed the same four sanctions as the order before it, directing government officials to: (1) suspend security clearances for Paul Weiss employees; (2) terminate government contracts with Paul Weiss and review all contracts with entities that do business with Paul Weiss; (3) limit Paul Weiss employees' access to federal government buildings, and restrict government employees from engaging with Paul Weiss employees; and (4) refrain from hiring Paul Weiss employees for jobs in the federal government. *See id.*; Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025).

3. On March 25, 2025, the President issued Executive Order 14246, targeting the law firm Jenner & Block. ECF No. 1 ¶ 107. This order imposed the same four sanctions as the two orders before it, directing government officials to: (1) suspend security clearances for Jenner & Block employees; (2) terminate government contracts with Jenner & Block and review all contracts with entities that do business with Jenner & Block; (3) limit Jenner & Block employees' access to federal government buildings, and restrict government employees from engaging with Jenner & Block employees; and (4) refrain from hiring Jenner & Block employees for jobs in the federal government. *See id.* ¶ 109; Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 28, 2025).

4. On March 27, 2025, the President issued Executive Order 14250, targeting law firm Wilmer Cutler Pickering Hale and Dorr ("WilmerHale"). ECF No. 1 ¶ 115. This order imposed the same four sanctions as the three orders before it, directing government officials to: (1) suspend security clearances for WilmerHale employees; (2) terminate government contracts with WilmerHale and review all contracts with entities that do business with WilmerHale; (3) limit WilmerHale employees' access to federal government buildings, and restrict government employees from engaging with WilmerHale employees; and (4) refrain from hiring WilmerHale employees for jobs in the federal government. *See id.* ¶ 117; Exec. Order No. 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025).

5. On April 9, 2025, the President issued Executive Order 14263, targeting law firm Susman Godfrey. ECF No. 1 ¶ 120. This order imposed the same four sanctions as the four orders before it, directing government officials to: (1) suspend security clearances for Susman Godfrey employees; (2) terminate government contracts with Susman

Godfrey and review all contracts with entities that do business with Susman Godfrey; (3) limit Susman Godfrey employees' access to federal government buildings, and restrict government employees from engaging with Susman Godfrey employees; and (4) refrain from hiring Susman Godfrey employees for jobs in the federal government. *See id.* ¶ 124; Exec. Order No. 14263, 90 Fed. Reg. 15615 (Apr. 15, 2025).

The complaint also describes language in these executive orders tying them to a broader effort to target law firms. *See* ECF No. 1 ¶ 164. It alleges two orders "open with a commitment by the Administration 'to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests.'" *Id.* (quoting Jenner & Block and WilmerHale executive orders). Another opens by referring to "'[l]awyers and law firms that engage in activities' deemed by the Administration to be detrimental to American interests." *Id.* (quoting Susman Godfrey executive order).

The complaint also alleges the executive orders were rolled out alongside White House fact sheets, which tied the accompanying executive orders to those being issued against other firms. *See id.* ¶¶ 74, 110, 118, 125. The fact sheet issued in coordination with one executive order emphasized the administration "has also taken action to hold other major law firms accountable." *Id.* ¶ 110 (quoting *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-jenner-block). Another fact sheet emphasized the accompanying executive order is part of a broader strategy of "addressing rogue law firms." *Id.* ¶ 118 (quoting *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale/).

In addition to the executive orders, the complaint alleges that the administration's coordinated effort to intimidate and punish law firms and their attorneys included threatening the sanctions against several firms that yielded to the administration. These firms made changes to how they select clients and hire attorneys, ended their commitments to diversity and inclusion, and donated millions of dollars in free representation to causes that the administration prefers. *See id.* ¶¶ 88–95, 129–144. The complaint describes nine firms that yielded to the government in this way:

1. Paul Weiss

2. Skadden, Arps, Slate, Meagher & Flom

3. Willkie Farr & Gallagher

4. Milbank

5. Kirkland & Ellis

6. Allen Overy Shearman Sterling US

7. Simpson Thacher & Bartlett

8. Latham & Watkins

9. Cadwalader, Wickersham & Taft

*See id.*

In addition to alleging that these firms made concessions in the wake of and, in some instances, simultaneous to the imposition of sanctions against other firms, the complaint alleges facts directly tying the settlements to the sanctions. The first law firm to yield to the government in this way, Paul Weiss, was initially subject to the sanctions, as described above. As to the others, the complaint alleges they yielded out of fear because the administration threatened sanctions. For example, Skadden's executive partner explained the firm yielded because he "believed it would be the target of a forthcoming executive order," and the President described the Skadden agreement

6

as "essentially a settlement." *Id.* ¶¶ 130–31. Willkie Farr's executive committee explained that the firm yielded after it "learned that the President intended to issue an Executive Order targeting Willkie similar to the orders issued against multiple firms in the past weeks." *Id.* ¶ 134. Milbank's chair stated that the firm yielded—after the firm was contacted by the Administration about cutting a deal—because of the "Administration's expressed concerns about big law firms" and "entry of Executive Orders against particular firms." *Id.* ¶ 136.

The complaint also details statements from senior executive officials in the period leading up to the complaint that tie the orders and settlements to a broader commitment to sanctioning firms. When announcing the first executive order, the President turned to the White House staff secretary and said: "And you're looking at about 15 different firms." *Id.* ¶¶ 76, 161. The staff secretary responded: "That or more, sir, yes." *Id.* The day he issued the second executive order, the President gave a speech "denouncing 'crooked law firms that aided'" in certain cases he viewed as "partisan." *Id.* ¶ 86. In late March, the President referred to "the law firms that we're going after" and stated that "the law firms all want to make deals." *Id.* ¶ 148. A few days later at a press conference, the President stated: "I just think that the law firms have to behave themselves." *Id.* ¶ 149. In April, amid the executive orders and law firm settlements, the White House press secretary stated that "President Trump's policy team is executing on his directive to hold Big Law accountable for their weaponization of justice and their lies, and the strategy has proven tremendously successful." *Id.* ¶ 146. The President spoke at a White House press event on April 8 about how "lots of law firms have been signing up with Trump" and giving him "a lot of money." *Id.* ¶ 138. The day after, while the President was signing the fifth executive order, the staff secretary referred to it as part of the administration's "action against a number of law firms that have in one way or another been involved in the weaponization of government or lawfare," *id.*

7

¶ 121, and White House deputy chief of staff Stephen Miller "commented that the deals entered by the President were getting close to 'six or seven hundred million now'" and would be "close to a billion, soon," *id.* ¶ 139. That same day, the White House press secretary stated that "Big Law continues to bend the knee to President Trump because they know they were wrong." *Id.* ¶ 140. In an interview in late April, in response to a question about using "threats and lawsuits" and "other forms of coercion," the President stated: "[w]ell, I've gotta be doing something right, because I've had a lot of law firms give me a lot of money." *Id.* ¶ 152.[2]

In June, the Wall Street Journal reported that the administration "remains interested in the orders, and deputy White House chief of staff Stephen Miller and his allies want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration." *Id.* ¶ 167.

The ABA filed this suit two weeks later. The ABA is the largest volunteer association of attorneys and other legal professionals, with hundreds of thousands of members employed by law firms of all sizes, including all the largest law firms in the country. *Id.* ¶ 61. According to the complaint, the ABA "has numerous members" who "are no longer willing to take on representations that would require suing the federal government" out of an "[u]nderstanding that certain kinds of expressions and representations pose a serious risk of making a firm the next

---

[2]    The complaint also alleges the administration's commitment to its coordinated effort against lawyers and law firms by pointing to letters the Equal Employment Opportunity Commission sent to twenty law firms "requesting information about their employment practices related to diversity, equity and inclusion" and "assert[ing] concerns that some firms' employment practices, including those that are part of firms' DEI efforts, may violate Title VII of the Civil Rights Act of 1964." *Id.* ¶ 96. The administration also issued a memorandum directed to the Attorney General and Secretary of Homeland Security about "unscrupulous behavior by attorneys and law firms" in immigration cases and when "litigating against the Federal Government" or "pursuing baseless partisan attacks"; this memorandum "direct[s] the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States." *Id.* ¶¶ 101–03.

target." *Id.* ¶¶ 182–83. The complaint also describes specific, anonymous members who have engaged and plan to engage again in the types of representations disfavored by the administration that have resulted in sanctions, *id.* ¶¶ 185–200, and members who informed the ABA that they "were too fearful of retaliation even to have their experiences described anonymously," *id.* ¶ 183.

The complaint asserts the government's coordinated effort against lawyers and law firms violates the First Amendment in various ways, including by retaliating for protected speech and association, discriminating based on viewpoint, and infringing the right to petition the government. *Id.* ¶¶ 206–43. It seeks declaratory and injunctive relief that forbids the government from continuing its alleged policy of imposing these sanctions. *Id.* ¶¶ 269–76.

The government moves to dismiss the complaint. ECF No. 22. The government does not dispute that the complaint states valid claims; it argues the court lacks jurisdiction because the complaint does not plausibly allege an adequate injury and ripe dispute. *See* ECF No. 22-1.

## II.    Discussion

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. This limitation is "fundamental to the judiciary's proper role in our system of government." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). Relevant here, the Constitution's case-or-controversy limitation means that a plaintiff must satisfy the "two related doctrines" of (1) standing, including "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical," and (2) ripeness, requiring a case that is "not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (cleaned up). These doctrines help ensure federal courts review executive actions only "when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law.'" *Murthy*, 603 U.S. at 56 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)).

Both standing and ripeness focus "on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see also Ctr. for Sci. in Pub. Int. v. Food & Drug Admin.*, No. 03-cv-1962, 2004 WL 2218658, at *3 (D.D.C. Sept. 17, 2004) ("When a court reviews claims for ripeness or standing to pursue a claim, such review is conducted based on the facts that existed at the time the complaint was filed."). While the plaintiffs' burden of proof increases as a case progresses, at the pleading stage the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (stating that each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation"). Accordingly, at the motion to dismiss stage the critical question is whether the plaintiff has plausibly alleged standing and ripeness. *See Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1063 (D.C. Cir. 2019) (recognizing that at the pleading stage, "a plaintiff is required only to state plausibly that each standing element exists"); *Giron v. Zeytuna, Inc.*, 597 F. Supp. 3d 29, 55 n.15 (D.D.C. 2022).

Here, the government argues the ABA has not pled the requisite injury or threat of injury to seek prospective relief against the government's alleged policy of sanctioning and threatening to sanction law firms and lawyers for their speech, viewpoints, and government petitioning. ECF No. 22-1 at 11–20. In light of that argument, as well as the court's independent obligation to ensure it has jurisdiction, the court considers that question.

As the government correctly points out, in cases like this where a party is seeking prospective relief against government sanction, "standing and ripeness boil down to the same question." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007); *see* ECF No. 22-1 at 30. To plead an Article III case or controversy, the ABA must plausibly allege that injury is "certainly impending" or that there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013).

As the parties agree, here, this inquiry boils down to whether the ABA has plausibly alleged a government policy of sanctioning and threatening to sanction law firms based on protected activity, by which the ABA or its members are "realistically threatened." *Haase v. Sessions*, 835 F.2d 902, 910–11 (D.C. Cir. 1987) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184, 190 (2000) (recognizing the critical inquiry as whether the plaintiff can "credibly allege that he faced a realistic threat arising from" a policy); *see also* ECF No. 42 at 29 (plaintiff stating the key question is "whether we have plausibly pled a policy"); ECF No. 42 at 6 (government agreeing that the question before the court boils down to whether the plaintiffs "plausibly alleged a policy"). The ABA cannot merely make "a nebulous assertion of the existence of a 'policy,'" but rather must allege a policy posing a "real and immediate" threat that its members are "likely to be subjected to." *Haase*, 835 F.2d at 911.

Here, the complaint goes far beyond making a nebulous assertion of a policy; it sets forth thorough and specific allegations of a real and immediate threat of sanctions on ABA members for engaging in First Amendment activity disfavored by the administration. The complaint details a

14-week period in which the government issued five executive orders imposing the same four sanctions against five law firms, along with sections that described disfavored expression by lawyers at the firms, and induced settlements with at least nine major law firms, under threat of having sanctions levied against them. *See* ECF No. 1 ¶¶ 68–144.

The complaint alleges the executive orders were drafted and carried out in a way that reasonably implies a broader policy. As the government acknowledges, the orders each contained four "operative sections" imposing the relevant sanctions that were "materially identical across the EOs." ECF No. 22-1 at 5–6. And several of the orders directly tied the sanctions to a broader coordinated effort, including a commitment "to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct" deemed "detrimental to critical American interests" and a focus on "'[l]awyers and law firms that engage in activities' deemed by the Administration to be detrimental to American interests." ECF No. 1 ¶ 164 (quoting Jenner & Block, WilmerHale, and Susman Godfrey executive orders). The complaint also alleges a consistent implementation across the orders, with each of the orders being rolled out alongside a "fact sheet" that again tied each order to a broader plan. *See id.* ¶¶ 74–75, 110, 118, 125.

In addition to the coordination and consistency across the executive orders, the complaint describes coordinated, behind-the-scenes outreach by the administration to numerous law firms, at least sometimes with the explicit threat of sanctions unless the firms offered certain concessions to the government. According to the complaint, at least nine firms capitulated: Paul Weiss, Skadden, Willkie Farr, Milbank, Kirkland & Ellis, Allen Overy Shearman Sterling, Simpson Thacher, Latham & Watkins, and Cadwalader. *See id.* ¶¶ 88–95, 129–44. The complaint alleges a direct tie between these settlements and the array of sanctions imposed through executive orders. In addition to alleging that these firms settled in the immediate wake of the executive orders, the

complaint details how the first firm to settle—Paul Weiss—was initially the subject of one of the executive orders. *See id.* ¶¶ 88–95. According to the complaint, only after Paul Weiss adopted "client selection and attorney hiring" policies to the administration's satisfaction; agreed to end "diversity, equity, and inclusion" practices; and committed millions of dollars in pro bono services to "causes favored by the President" did it reach a settlement to "relieve the sanctions against the firm." *Id.* ¶ 91. The complaint also alleges that the firms that settled did so under threat by the administration to issue orders imposing the same sanctions against them. *See, e.g.*, *id.* ¶ 134 (alleging Willkie "learned that the President intended to issue an Executive Order targeting Willkie similar to the orders issued against multiple firms" over the preceding weeks and that Willkie cut a deal to "avoid[] potentially grave consequences"); *id.* ¶ 131 (alleging Skadden believed it "would be the target of a forthcoming executive order"); *id.* ¶ 136 (alleging Milbank "was contacted by the Administration about a potential 'Skadden-type' agreement," which Milbank agreed to because of "[t]he Administration's expressed concerns about big law firms, and in some cases its entry of Executive Orders against particular firms").

The complaint also details numerous statements by senior White House officials during the 14-week period leading up to the suit, in which they characterized the executive orders and pressured settlements as part of a broader policy to sanction law firms who said things or worked on matters the administration does not like. When the President was announcing the first executive order, the White House staff secretary confirmed the administration was looking to sanction fifteen "or more" additional firms. *Id.* ¶¶ 76, 161. The President described another executive order as part of an approach toward "crooked law firms that aided" in certain cases he viewed as "partisan," *id.* ¶ 86, and the staff secretary described yet another executive order as part of the administration's "action against a number of law firms that have in one way or another been involved in the

weaponization of government or lawfare," *id.* ¶ 121; *see also id.* ¶ 122 (alleging the President described the executive orders as sanctioning "the ones we thought were inappropriate"). And the complaint alleges many similar statements tying the alleged settlements to the broader effort to intimidate and punish lawyers, including the President citing the law firms that have been "signing up with Trump" even though "they've done nothing wrong." *Id.* ¶ 138. The White House's deputy chief of staff tallied the total concessions from firms at "six or seven hundred million" and promised "we're going to be close to a billion, soon." *Id.* ¶ 139. The White House press secretary described the settlements as showing that "Big Law continues to bend the knee to President Trump." *Id.* ¶ 140. Speaking about the orders and settlements, the press secretary also stated: "President Trump's policy team is executing on his directive to hold Big Law accountable for their weaponization of justice and their lies, and the strategy has proven tremendously successful." *Id.* ¶ 146.

The complaint alleges the administration's commitment to the policy of sanctioning firms persisted even after several courts found the sanctions unlawful, including issuing four of the executive orders and pursuing all the reported settlements after a court had already enjoined the first executive order. *See* ECF No. 1 ¶ 79; *Perkins Coie LLP v. U.S. Dep't of Just.*, 770 F. Supp. 3d 190, 191 (D.D.C. 2025). The complaint also alleges that just two weeks before the complaint was filed in this case, the Wall Street Journal reported that the administration "remains interested in the orders, and deputy White House chief of staff Stephen Miller and his allies want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration." ECF No. 1 ¶ 167.

Given these thorough and specific allegations, the complaint plausibly alleges a policy that poses a "real and immediate" threat that ABA members are "likely to be subjected to." *Haase*, 835

14

F.2d at 911. The ABA's allegations show a "pattern of conduct" that supports "a strong inference that defendants would not hesitate to move against [the ABA and its members] should [they] violate defendants' restrictions on First Amendment expression." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 360–61 (D.D.C. 2020) (finding a threat of enforcement against the plaintiff credible when there was an "extensive pattern of penalizing" others for similar conduct); *see Driehaus*, 573 U.S. at 164 (finding threat credible because "there is a history of past enforcement here"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding threat of prosecution for handbilling was not "chimerical" in part because the petitioner's "handbilling companion" had in fact been prosecuted).

The ABA alleges its membership includes attorneys at firms of all sizes, including at each of the hundred largest firms in the country. ECF No. 1 ¶ 61. According to the ABA's allegations, its membership thus spans not only the firms that already were targeted by executive orders and settled with the administration, but also firms under direct threat of the administration's affirmance that it "remains interested in the orders" and would "keep the threats of more executive orders on the table" to "dissuade[] the best lawyers from representing critics of the administration." *Id.* ¶ 167; *see also id.* ¶ 96 n.26 (listing firms, several of which had not yet been targeted by an executive order but had received outreach from the administration). The complaint also describes specific members who have engaged and plan to continue to engage in the type of expression or representation that has caused firms to be targeted. *See id.* ¶¶ 189–91 (describing a member who is a partner at a firm with individuals holding security clearances and that represents clients who have contracts with the federal government, who has "[r]epresented clients in litigation against the federal government" and "in litigation related to issues disfavored by the current Administration" and will "continue such expressive conduct"); *id.* ¶¶ 192–94 (describing another member who is a

partner at a firm that represents clients who have contracts with the federal government, who, in addition to representing disfavored clients and taking on cases "related to social and political issues disfavored by the current Administration," has filed "briefs taking positions adverse to high-profile Trump Administration policies" and will "continue to engage in such expressive conduct notwithstanding the possibility of being targeted with a retaliatory executive order").

In addition to plausibly alleging a realistic threat of sanctions to establish its standing, the ABA plausibly alleges ongoing First Amendment harm from chill caused by the policy. As the D.C. Circuit has recognized, "[f]ederal courts most frequently find preenforcement challenges justiciable when the challenged statutes allegedly 'chill' conduct protected by the First Amendment." *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997); *see Chamber of Com. of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 603 (D.C. Cir. 1995) ("A party has standing to challenge, pre-enforcement, even the constitutionality of a *statute* if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecution."). And it is well established that plaintiffs need not act in the face of a legitimate threat from the government to have a concrete injury. *See MedImmune*, 549 U.S. at 128–29 (recognizing that a plaintiff's "own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction").

The complaint details at length the chilling effect the alleged policy has had on firms and lawyers, with specific allegations that firms have declined to take on matters, including those that challenge administration policies and that involve representation of the ABA itself. ECF No. 1 ¶¶ 14–15; *see also id.* ¶¶ 169–81 (detailing specific instances in which firms have declined representations or changed language on their websites to avoid punishment); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 115 (D.D.C. 2025) (recognizing that the executive orders

sanctioning law firms "cast[] a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government"). The complaint also describes an ABA member who is an equity partner at a large law firm that has "established a committee to address the potential impact of an executive order should the Firm be targeted," and "has made changes to its case acceptance procedures" because of "the credible possibility of being targeted with a retaliatory executive order." ECF No. 1 ¶ 187. The complaint describes how the committee (of which the ABA member is a part) has rejected matters that are "adverse to the federal government" or "present issues that are considered potentially disfavored by the Administration." *Id.* at 187–88. The complaint specifically describes a particular matter the member intended to work on but could not because it was rejected for being "adverse to the Administration's immigration-related policies." *Id.* ¶ 188.

The government's various responses are not persuasive. First, it casts the ABA's allegations of a policy as "mere 'labels and conclusions,' which are insufficient to survive a motion to dismiss." ECF No. 22-1 at 16 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But that is not a serious account of the complaint, which alleges with specificity a consistent and highly coordinated series of executive actions along with copious statements that support the existence of a specific policy and commitment to carrying it out at the time the complaint was filed.

Second, in its briefing the government acknowledges the complaint alleges a coordinated series of "materially identical" sanctions across executive orders, as well as nine settlements, but repeatedly asserts that the administration has not issued any further executive orders since the complaint was filed. *See* ECF No. 22-1 at 1, 3, 9, 13; ECF No. 39 at 5, 16. In doing so, the government does not advance any authority that would allow the court to go beyond the complaint and accept its unsupported assertion. *See Am. Nat'l Ins. Co.*, 642 F.3d at 1139 (noting that, at the

pleading stage, the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged'" (quoting *Thomas*, 394 F.3d at 972)). But even if the court could rely on the government's assertion about events outside of and after the filing of the complaint, it would not bear on the standing or ripeness inquiries, which are focused "on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis*, 554 U.S. at 734. The critical question is thus whether the coordinated actions and statements alleged in the weeks immediately leading up to the complaint gave rise to a realistic threat to ABA members at that time—not whether actions have in fact been taken since the case was filed.

Third, upon acknowledging the relevant timing for the court's inquiry at oral argument, the government argued that the court can infer that any alleged policy of sanctions had been abandoned by the time of the complaint. ECF No. 42 at 9. The government argued that even if the series of executive orders, settlements, and official statements plausibly allege a policy, the last executive order and settlement described in the complaint occurred in April 2025, and any immediate threat that existed would have been gone "a couple months after" when the ABA filed its complaint in June 2025. *Id.* at 12, 50–51. This is especially so, the government argued, because by then courts had enjoined the executive orders. *Id.* at 55. But this argument too conflicts with the court's obligation to credit the complaint's well-pled allegations. The complaint specifically alleges the government continued to issue executive orders and threaten sanctions despite court orders— indeed, as noted above, four of the executive orders and all nine settlements occurred *after* a court had already enjoined one of the executive orders as unlawful. *See* ECF No. 1 ¶ 79; *Perkins Coie LLP*, 770 F. Supp. 3d at 191. The complaint alleges the administration continued to pursue its policy into June 2025, pointing to reporting just two weeks before the complaint was filed that the

18

administration "remains interested in the orders" and that senior White House officials "want to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration." ECF No. 1 ¶ 167; *see Driehaus*, 573 U.S. at 165 (noting that "respondents have not disavowed enforcement if petitioners make similar statements in the future" as supporting credibility of threat); *Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68, 84 (D.D.C. 2019) (same).[3]

Fourth, the government argues that the ABA cannot sue on behalf of its members because it cannot show that its members "would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see* ECF No. 22-1 at 22–24. Here, the government largely reiterates its argument that the ABA has not plausibly alleged a policy that would create a realistic threat to its members, *see* ECF No. 22-1 at 23, which is unpersuasive for the reasons already stated. The government also asserts that, even accepting that the ABA plausibly alleged such a policy, the ABA does not have standing because its members "are *lawyers*, not *law firms*," and the executive orders "primarily target *law firms*." *Id.* That argument is unsound. As an initial matter, it is not clear why an injury to a lawyer through their partnership in a law firm would not count as a constitutional injury, and the government cites no

---

[3]    To the extent the government disavowed the practice of sanctioning firms by the time this case was filed, it will have the opportunity to develop those facts and argue the ABA lacked standing to sue. And to the extent the government disavowed the practice after the ABA filed suit, it will have the opportunity to develop those facts and argue the absence of a case or controversy under the doctrine of mootness based on its voluntary cessation. *See Laidlaw*, 528 U.S. at 189 ("[T]he standard . . . for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968))).

At oral argument, given the government's resort to facts outside the complaint suggesting cessation of the policy, the court raised the possibility of engaging in limited jurisdictional discovery. However, the government disclaimed any interest in jurisdictional discovery. *See* ECF No. 42 at 24–25.

authority for that proposition. And in any event, the executive orders do, by their terms, directly target lawyers. The executive orders suspend "security clearances held by individuals" at the target firms. ECF No. 1 ¶ 67. They "limit law firm employees' access to federal government buildings, and restrict government employees acting in their official capacity from engaging with law firm employees." *Id.* And they direct agencies to "refrain from hiring employees of the [targeted] law firm to jobs in the federal government." *Id.* Though it is true that each executive order detailed in the complaint has targeted law firms, it has done so by leveling at least some sanctions against those firms' lawyers rather than the firm itself.[4]

The government's final argument is that the ABA does not adequately identify members "who will suffer the 'requisite harm.'" ECF No. 22-1 at 24 (quoting *Summers*, 555 U.S. at 499). But, as described, the complaint details specific members who have engaged in the very type of expression and representations that have been targeted by the orders and who plan to continue to do so. ECF No. 1 ¶¶ 189–94; *see Driehaus*, 573 U.S. at 159 ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" (citation and quotation marks omitted)).

---

[4]    It is undisputed that "the interests [the ABA] seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at 343. And, at least at this stage, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* As articulated in the complaint, the ABA seeks declaratory and injunctive relief that does not require "individualized proof" and its case is "properly resolved in a group context." *Id.* at 344; *see also, e.g.*, *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 75 (D.D.C. 2009) ("NTEU seeks declaratory and injunctive relief, which does not require individual participation." (collecting cases)).

20

The court accordingly concludes the ABA has plausibly alleged a substantial risk of injury to its members at the time of the complaint sufficient to establish standing and ripeness.[5]

### III.    Conclusion

For these reasons, the court denies the defendants' motion to dismiss, ECF No. 22.

———————————————

AMIR H. ALI
United States District Judge

Date:    March 31, 2026

---

[5]    To be sure, although the ABA has plausibly alleged standing at this stage, its burden to show standing will continue as the litigation proceeds, and the government will have the opportunity to show the ABA does not meet the burden applicable at future stages. While the ABA's complaint alleges a coordinated and consistent policy of imposing or threatening a set of sanctions against firms, the government observes that, even on the ABA's own terms, some things mentioned in the complaint's prayer for relief may be outside the scope of any policy that is plausibly alleged. *See, e.g.*, ECF No. 1 ¶ 277 (asking the court to "[e]njoin Defendants from initiating attorney conduct and disciplinary proceedings, or making a referral for disciplinary action, of any ABA member or ABA member's law firm"). The government does not cite authority requiring the court to parse through each item in a complaint's prayer for relief, but its point is well taken; the court's conclusion that the ABA has plausibly alleged standing to seek prospective relief by no means guarantees the ABA will ultimately satisfy its burden for all or part of the relief sought in the complaint.