**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BAR ASSOCIATION, | Civil Case No. 1:25-cv-01888-AHA |
| *Plaintiff,* | |
| v. | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | |
| *Defendants.* | |

**MOTION TO COMPEL GOVERNMENT RESPONSE TO ABA'S REQUESTS FOR**
<u>**PRODUCTION NOS. 1-16**</u>

**TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND................................................................................1

II.   LEGAL STANDARDS CONCERNING INVOCATION OF THE
      PRESIDENTIAL COMMUNICATIONS PRIVILEGE .....................................3

      A.    *Cheney* directs district courts to narrow "overly broad" discovery
            requests before forcing invocation of the presidential communications
            privilege..................................................................................................3

      B.    There is no support for the Government's rule that for *any* discovery
            directed to the White House, the plaintiff must make a preliminary
            showing that the evidence is unavailable with due diligence elsewhere. ...............5

III.  ARGUMENT ...................................................................................................10

      A.    There is no overbreadth concern in forcing the Government to respond
            to narrow requests seeking non-privileged information (RFP Nos. 1–7,
            15). ......................................................................................................11

      B.    The Requests for internal White House communications (RFP Nos. 9–
            13, 16) are narrowly tailored and central to the ABA's claims...........................15

      C.    The ABA is willing to obtain responsive documents from other
            Defendants (RFP Nos. 8 and 14)—provided the Government actually
            intends to produce them. ...........................................................................18

IV.   CONCLUSION ...............................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Bar Ass'n v. Exec. Off. of the President*,
No. 25-cv-01888 (AHA), 2026 WL 890410 (D.D.C. Mar. 31, 2026) .......................................1

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*,
No. 25-cv-339 (JDB), 2025 WL 1129202 (D.D.C. Mar. 19, 2025)......................................11

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) .........................................................................................*passim*

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*,
532 F.3d 860 (D.C. Cir. 2008) ...............................................................................17

*Dellums v. Powell*,
561 F.2d 242 (D.C. Cir. 1977) .................................................................................9

*Food & Water Watch v. Trump*,
357 F. Supp. 3d 1 (D.D.C. 2018) ..............................................................................5

*Judicial Watch, Inc. v. Department of Justice*,
365 F.3d 1108 (D.C. Cir. 2004) ..........................................................................*passim*

*Karnoski v. Trump*,
328 F. Supp. 3d 1156 (W.D. Wash. 2018), *mandamus granted, order vacated,*
926 F.3d 1180 (9th Cir. 2019) ..........................................................................*passim*

*Missouri v. Biden*,
2022 WL 4086539 (W.D. La. Sept. 6, 2022).............................................................15

*Perkins Coie LLP v. Dep't of Justice*,
783 F. Supp.3d 105 (D.D.C. 2025) ..........................................................................10

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997)...........................................................................*passim*

*In re Subpoena of Ctr. for Mil. Readiness*,
No. 18-mc-51013, 2018 WL 6722247 (E.D. Mich. Nov. 6, 2018), *report and
recommendation adopted sub nom. In re Ctr. for Mil. Readiness*, 2019 WL
4733602 (E.D. Mich. Sept. 28, 2019) .......................................................................13

*United States v. Nixon*,
418 U.S. 683 (1974) ........................................................................................*passim*

*United States v. Poindexter* ("*Poindexter I*"),
    727 F. Supp. 1501 (D.D.C. 1989) ...................................................................................8

*United States v. Poindexter* ("*Poindexter II*"),
    732 F. Supp. 142 (D.D.C. 1990) .....................................................................................9

This Motion to Compel asks the Court to resolve a single question for each of Plaintiff's sixteen Requests for Production (Nos. 1-16) (the "Requests") directed to the Executive Office of the President: is each request sufficiently narrow to compel the government defendants to choose whether to invoke the presidential communications privilege over the requested information. For every one of Plaintiff's sixteen RFPs—each of which goes to evidence of the policy of law firm intimidation that is at the core of this case—the answer is yes.

## I.     FACTUAL BACKGROUND

On June 16, 2025, plaintiff American Bar Association ("ABA") sued federal officials and agencies, alleging they adopted an unlawful, coordinated policy of intimidating law firms and their lawyers for engaging in speech the government does not like. ECF No. 1 ("Compl.") ¶¶4-22. The ABA alleges that the government effectuated a policy of law firm intimidation (the "Policy") designed to coerce lawyers and law firms to abandon clients, causes, and policy positions the President does not like. *Id*. ¶4. The ABA alleges the government effectuated this Policy by issuing and threatening to issue punitive executive orders against law firms ("Law Firm Orders"), which could be avoided through settlements (the "Agreements") requiring each law firm to make changes to their hiring practices, alter pro bono client selection practices, change "diversity, equity, and inclusion" practices, and commit tens or even hundreds of millions of dollars in pro bono resources to causes the Administration favored. *Id.* ¶¶4, 8, 88-95, 130, 136, 149, 151.

On March 31, 2026, the Court denied the Government's motion to dismiss for lack of subject matter jurisdiction. *Am. Bar Ass'n v. Exec. Off. of the President*, No. 25-cv-01888 (AHA), 2026 WL 890410, at *10 (D.D.C. Mar. 31, 2026).

On May 12, 2026, the parties submitted a Joint Discovery and Case Management Report in which the parties jointly proposed a procedure "for promptly adjudicating a claim by the

1

Executive that it should not be compelled to invoke the presidential communications privilege in the face of 'overly broad discovery requests.'" ECF No. 55 at 7 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 390 (2004)). In the Court's June 4, 2026, Scheduling Order, it adopted the following procedure for resolution of overbreadth disputes pursuant to *Cheney*:

> 1. If Defendants object to any discovery request served on the Executive Office of the President on the grounds of overbreadth (as set forth in *Cheney*, 542 U.S. 367)—while seeking to retain the right to assert the executive privilege to withhold documents or information sought by such request—Defendants shall promptly raise any overbreadth objection to Plaintiff in writing within 14 days of being served with the request. Upon receipt of the overbreadth objection, the parties shall have an additional 14 days to attempt resolution of Defendants' overbreadth objection(s) through conferral, e.g., as through modification or narrowing of the request(s).

> 2. If the parties are unable to resolve the overbreadth dispute, the parties will request a telephone conference with the court pursuant to section 4(B) of the court's standing order and will not file any discovery-related motion without obtaining the court's leave pursuant to section 4(c) of the court's standing order. parties shall have an additional 14 days to attempt resolution of Defendants' overbreadth objection(s) through conferral, *e.g.*, as through modification or narrowing of the request(s).

> 3. Should the court authorize and the parties proceed with motions to compel and/or motion for a protective order regarding the overbreadth issue, no filing shall exceed 10 pages and responses/replies are due within five business days of the previous filing, unless an extension to the page limit and/or deadline is granted by court order.

ECF No. 57, at 2–3.

On May 13, 2026, the ABA served its first discovery requests. *See* Ex. 1. As relevant here, the requests included Requests for Production ("RFP") Nos. 1–16, which seek: (1) documents and communications exchanged with third parties about the Law Firm orders and Agreements (RFP Nos. 1–7, 15); (2) internal documents and communications about the orders and Agreements, including the facts and criteria underlying the orders (RFP Nos. 9–13, 16); and (3) communications exchanged with other federal agency Defendants about the Law Firm orders. (RFP Nos. 8, 14).

On June 12, 2026, the Government served its objections and responses to the ABA's RFP

2

Nos. 1–16. *See* Ex. 2. It clamed as to each RFP that it was overbroad in violation of *Cheney* and that, for certain RFPs (*e.g.*, RFP 8), the information that the ABA sought was available from third parties or other agency Defendants. *Id.* at 12–27.[1] The parties requested a teleconference with the Court, which was held on June 24, 2026. The Court directed the parties to file briefs on the *Cheney* over-breadth issue, directing that "The parties shall address with specificity how *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) applies to each individual document request, and include any proposals for how the requests may be narrowed." Minute Order, June 25, 2026.

On July 2, 2026, the Government filed a notice that it has moved in the United States District Court for the Southern District of New York to quash a third-party subpoena *duces tecum* and *ad testificandum* served by the ABA on Boris Epshteyn. *See* ECF No. 60, 60-1.

## II.    LEGAL STANDARDS CONCERNING INVOCATION OF THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE

Two principles concerning invocation of the presidential communications privilege bear on this dispute. *First*, the Supreme Court in *Cheney* directed district courts that are asked to enforce "overly broad" discovery requests to exercise their discretion to narrow such requests before forcing the Executive to invoke the presidential communications privilege. *See infra* § II.A. *Second*, the Government's reading of *Cheney*—that it requires for *any* discovery directed to the White House that the requesting party must make a preliminary showing that the evidence is unavailable elsewhere—is wrong. *See infra* § II.B.

### A.    *Cheney* directs district courts to narrow "overly broad" discovery requests before forcing invocation of the presidential communications privilege.

In the case of "requests for information [from the White House] for use in a civil suit," the White House need not formally invoke the presidential communications privilege in the face of "a

---

[1] A summary table of the ABA's Requests and the Government's responses, which was submitted to the Court in advance of the pre-motion conference, is included as **Appendix A** to this brief.

party's overly broad discovery requests." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 383, 389 (2004). The reason is that "[e]xecutive privilege is an extraordinary assertion of power not to be lightly invoked." *Id.* at 389 (cleaned up). Once invoked, "coequal branches of the Government are set on a collision course," as "[t]he Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Id.* Forcing such confrontations "should be avoided wherever possible." *Id.* at 389–90.

In furtherance of such constitutional avoidance, the Supreme Court in *Cheney* granted the White House mandamus relief seeking to avoid the invocation of the presidential communications privilege in the face of "***overly broad***" or "***unnecessarily broad***" discovery requests. *Id.* at 389, 390 (emphases added). Although the Court did not define these terms with precision, it offered guidance on what constituted "overly broad" requests there: interrogatories and requests for production that "ask for everything under the sky." *Id.* at 387. The Court illustrated that breadth by quoting the plaintiff's six requests for production, each of which took the form of: "[a]ll documents identifying or referring to [a subject of discovery]"; "[a]ll documents establishing or referring to [a subject of discovery]"; or "[a]ll documents concerning any communication relating to [a subject of discovery]." *Id.* at 387. Plaintiffs' interrogatories were "similarly unbounded in scope." *Id.* at 388. The Supreme Court then contrasted these "unbounded" requests with "narrowly tailored subpoena orders" at issue in *United States v. Nixon*, which "precisely identified" and "specific[ally] . . . enumerated" the materials sought. *Id.* at 387 (citing *United States v. Nixon*, 418 U.S. 683, 688 (1974) (ordering production of "tapes, memoranda, papers, transcripts or other writings relating to certain precisely identified meetings between the President and others")).

Should a plaintiff move to compel a response to "overly broad" requests, *Cheney* directs district courts to "explore other avenues, short of forcing the Executive to invoke [the] privilege,

4

when they are asked to enforce against the Executive Branch unnecessarily broad [requests for discovery]." *Id.* at 390. "[O]ne example" of a court's discretion in this regard is to "narrow, on its own, the scope of [a request] to allow the Executive 'to consider whether to invoke executive privilege with respect to . . . a possibly smaller number of documents . . . .'" *Id*. Another is for the Government to "ask[] the District Court to narrow [a request] in some way." *Id.* at 388. A third is for the Court to work with the parties to reach an agreed-upon scope of the requests—as by holding a hearing and proposing revisions to requests to be "edited and agreed to by the parties." *Food & Water Watch v. Trump*, 357 F. Supp. 3d 1, 7 (D.D.C. 2018).

At bottom, *Cheney*'s holding is limited. A district court should not compel invocation of the presidential communications privilege in the face of an "overly broad" discovery request. 542 U.S. at 389–90. Instead, district courts must use their discretion to help narrow any such overbroad request before requiring the Executive to choose to either "respond[] to the [requests]" or invoke "the presidential communications privilege" as a basis for refusing. *Food & Water Watch*, 357 F. Supp. 3d at 7. Then—***and only if the Executive invokes the privilege***—should the parties proceed to address whether the privilege may be "overcome." *See In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997) (holding that "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere").

> **B.** **There is no support for the Government's rule that for *any* discovery directed to the White House, the plaintiff must make a preliminary showing that the evidence is unavailable with due diligence elsewhere.**

During the parties' conferrals, the Government stated that *Cheney*: (1) applies to any request, even if it does plausibly seek privileged information, and (2) requires a preliminary showing that the discovery sought is unavailable elsewhere. Both arguments are incorrect.

The Government first asserts that "*Cheney* does not apply solely to PCP but rather to ***discovery directed at the White House generally***." Ex. 3 at 1. But *Cheney* contains no support for this expansive reading. *Cheney* at most stands for the proposition that a district court should not force the Executive to make a good-faith invocation of executive privilege in the face of "unbounded" discovery requests. 542 U.S. at 388. *Cheney* did ***not*** hold that separation-of-powers concerns arise any time a plaintiff seeks any information from the White House, even if such request does not implicate a plausible claim of privilege. And as the Supreme Court explained in *Nixon*, "[n]either the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." 418 U.S. at 706. Neither *Cheney* nor *Nixon* suggests that narrow requests seeking indisputably non-privileged information would set the judicial and Executive branches on a "collision course." *Cheney*, 542 U.S. at 389.

The Government next argues that it need not formally invoke the presidential communications privilege unless the requesting party makes a preliminary showing that the information sought is not available with due diligence from other sources—a requirement the Government calls the "exhaustion" requirement. Ex. 3 at 1. But an "exhaustion" rule also finds no support in *Cheney*, which, there can be no dispute, imposes no such requirement as a predicate to requiring the government to choose whether to invoke the privilege.

Because *Cheney* contains no "exhaustion" rule, the Government will likely argue that it derives from *Karnoski v. Trump*, in which the Ninth Circuit held that ***the plaintiffs in that case***, prior to forcing invocation of privilege, were required to "make a preliminary showing of need demonstrating 'that the evidence sought [is] directly relevant to issues that are expected to be central to the trial' and 'is not available with due diligence elsewhere.'" 926 F.3d 1180, 1205 (9th

6

Cir. 2019) (quoting *Sealed Case*, 121 F.3d at 754).[2] But to interpret *Karnoski* as establishing a blanket "exhaustion" rule, applicable to all discovery requests is wrong for at least four reasons.

*First*, *Karnoski* must be read in the context of the district court's order that the Ninth Circuit vacated on a petition for a writ of mandamus. The discovery order there concerned a specific and burdensome directive that required the Executive to, within 10 days, provide a "***specific, non-boilerplate*, . . . *document-by-document***" privilege invocation for 15,000 documents identified by the Executive. *Id.* at 1197. This voluminous trove of documents likely resulted from: (1) the plaintiffs' broad requests, which included several akin to the "everything under the sky" requests at issue in *Cheney*,[3] and (2) the failure to narrow those requests before requiring a particularized privilege claim for every one of the 15,000 responsive documents identified.

Consistent with *Cheney*'s guidance that "the Executive Branch [need not] bear the onus of critiquing . . . unacceptable discovery requests line by line," 542 U.S. at 388, the court in *Karnoski* ruled that the district court in that case had failed to "explor[e] other avenues" "short of forcing the Executive to invoke privilege," 926 F.3d at 1205. In so doing, *Karnoski* did not establish a bright-line rule that ***every*** plaintiff seeking discovery from the White House must make a "preliminary showing" of relevance and unavailability—*i.e.*, "that the evidence sought [is] directly

---

[2] The Ninth Circuit noted that "that this standard does not require Plaintiffs to pinpoint with precision what materials they are seeking"; "[s]o long as Plaintiffs' discovery requests are narrowly tailored to seek evidence that is directly relevant to central issues in the litigation and is not available with due diligence elsewhere, Plaintiffs have met their preliminary burden." *Id.* at 1205.

[3] The requests broadly sought, *e.g.*, "Documents and communications related to President Trump's consultation with employees, agents, contractors, or consultants of the United States Armed Forces regarding military service by transgender people," "Documents and communications relating to, and including all drafts of, the 2017 Memorandum [banning service by transgender people]," "Communications between President Trump and Congress concerning military service by transgender people," and "Documents relating to visits and communications between President Trump and his Evangelical Advisory Board." *Karnoski v. Trump*, 328 F. Supp. 3d 1156, 1159 (W.D. Wash. 2018), *mandamus granted, order vacated,* 926 F.3d 1180 (9th Cir. 2019).

relevant to issues that are expected to be central to the trial" and "is not available with due diligence

elsewhere." *Id.* Instead, the Court held that the plaintiffs in *Karnoski* must make such a showing

before the Executive should be compelled to provide document-by-document privilege claims for

all 15,000 records caught in the net of those plaintiffs' overly broad requests.[4]

    *Second*, reading *Karnoski* as establishing such a bright-line rule contradicts its own

recognition that the relevance-and-unavailability test came from the D.C. Circuit's decision in

*Sealed Case*, which applied the test only "***after*** the President had invoked the privilege" as a way

of evaluating whether the privilege could be "overcome." *Karnoski*, 926 F.3d at 1205. The court

in *Karnoski* therefore expressly recognized that a showing of relevance and unavailability is how

courts decide whether the privilege is defeated, and is not a *per se* prerequisite to its invocation.

    *Third*, the unavailability requirement ("available with due diligence elsewhere") is itself

specific to the context of ***criminal*** subpoenas that were at issue in both *Sealed Case* and *Nixon*. As

the district court in *Poindexter I* explained, "[w]hen a defendant requests the production pursuant

to subpoena of documents possessed both by a President or a former President and also by some

other entity, he is required first to attempt to secure the materials from the other entity before

resorting to coercion against the President. That is so because as a general matter, ***Rule [of***

***Criminal Procedure] 17(c)*** requires a party seeking a subpoena to demonstrate that the materials

'are not otherwise procurable' . . . ." 727 F. Supp. at 1509 (quoting *Nixon*, 418 U.S. at 699). In

---

[4] *Accord United States v. Poindexter* ("*Poindexter I*"), 727 F. Supp. 1501, 1504 (D.D.C. 1989) ("If no effort is made to narrow the subpoenas to the extent that this may legitimately be done, [President Reagan] will have to consider the privilege question with respect to many documents or excerpts from documents that might not in the course of events survive a 'cut' under the requirements of [Fed. R. Crim. P.] 17(c) itself—a somewhat wasteful and time-consuming process. On the other hand, by being able to concentrate on a possibly smaller number of documents following the narrowing of the subpoenas in accordance with the procedures announced herein, the former President or his counsel will be able to make their decisions regarding assertion or waiver of executive privilege that much more quickly.").

contrast, when asked to enforce a *civil* subpoena for the same tapes at issue in *Nixon*, the D.C. Circuit in *Dellums v. Powell* concluded that the former President's claim of executive privilege was overcome *without* requiring a showing that the materials sought were unavailable with due diligence elsewhere. 561 F.2d 242, 247–49 (D.C. Cir. 1977). Thus, the "available with due diligence elsewhere" requirement is a derivative of criminal subpoena practice in the context of privilege claims, and it would be error to graft those specific requirements onto requests made pursuant to the Federal Rules of Civil Procedure. *See id.* at 248–49; *United States v. Poindexter* ("*Poindexter II*"), 732 F. Supp. 142, 146–47 (D.D.C. 1990) (the government's argument that a requester must show that "a substitute from any other source would be inadequate . . . . would be extraordinary even in a case where executive privilege has been invoked").

*Fourth*, a blanket rule requiring that a party first seek documents from third parties before approaching the White House conflicts with *Sealed Case* itself, in which the D.C. Circuit ordered the production of a document that was in the possession of **both** the White House and a third party. In *Sealed Case*, the White House claimed the presidential communications privilege protected "document 63," which was a White House Counsel final investigative report concerning alleged kickbacks paid to former Secretary of Agriculture Mike Espy. 121 F.3d at 734–35. After the report was completed, the White House shared it with Espy's outside counsel. *Id.* at 741–42. Plainly, the report was available both from the White House and from a third party (Espy's counsel). But as there was no colorable claim of privilege over the report—the White House had "voluntarily revealed [it] to third parties outside the White House"—the D.C. Circuit ruled that executive privilege had been waived, and ordered that the **White House** produce the document. *Id.* at 742. *Sealed Case* therefore does not require a requesting party to first show that the information sought is unavailable from a third party before seeking the same information from the White House.

9

In sum, *Karnoski* does not erect a bright-line rule that for any civil discovery targeting the White House, a plaintiff must "make a preliminary showing of need demonstrating 'that the evidence sought [is] directly relevant to issues that are expected to be central to the trial' and 'is not available with due diligence elsewhere'" before the privilege can even be invoked. 926 F.3d at 1205. Such an interpretation also conflicts with the law of this Circuit and should not be followed. Regardless, as detailed below, the ABA meets this standard even if it applied here.

## III.    ARGUMENT

To prove its claims, the ABA seeks evidence of the Policy and its implementation, including retaliatory actions that the Government has taken and threatened to take against ABA members and their law firms for engaging in First Amendment protected activity. *See, e.g.*, *Perkins Coie LLP v. Dep't of Justice*, 783 F. Supp.3d 105, 157–62 (D.D.C. 2025) (granting summary judgment on firm's First Amendment claim based on finding that Executive Order against firm was motivated by retaliation for protected First Amendment activity).

The ABA's sixteen Requests therefore necessarily include requests for documents related to the development of the Policy, its contours, the reasons that firms were targeted with orders, the process of their implementation, and all resulting Agreements. The evidence sought by these Requests are indisputably relevant to issues that will be central at summary judgment and trial. And as described in detail below, to the extent *Cheney* applies at all—and *Cheney* does not apply to requests seeking non-privileged information—the Requests "specifically enumerate the relevant materials" they seek, and therefore pose no overbreadth issue under *Cheney*. 542 U.S. at 387 (cleaned up); *see Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. 25-cv-339 (JDB), 2025 WL 1129202, at *8 n.17 (D.D.C. Mar. 19, 2025) (rejecting defendants' separation

of powers argument and distinguishing *Cheney* on basis that the requests at issue were "properly, and narrowly, scoped" to target issues relevant to preliminary injunction motion).

Even so—and despite the Government's refusal to engage in any proposed narrowing— the ABA is willing to narrow these Requests even further in order to ensure that any invocation of the presidential communications privilege is as narrow as possible, to the extent it is invoked. These Requests are discussed in turn below.

**A.      There is no overbreadth concern in forcing the Government to respond to narrow requests seeking non-privileged information (RFP Nos. 1–7, 15).**

Requests 1–7 and 15 seek communications and documents exchanged with third parties outside the White House, including representatives of targeted law firms, other private non/governmental citizens (Boris Epshteyn and Steve Bannon), and social media organizations. To the extent any good faith claim of privilege may be asserted over information that the White House voluntarily reveals to private non-governmental entities, the only issue for decision here is whether the requests are sufficiently narrow under *Cheney*. They are.

Before turning to each specific request, the ABA notes at the outset that in *Cheney*, none of the requests sought information for which no good faith privilege claim could be made. *Cheney* therefore had no reason to consider whether any concern of inter-branch conflict-avoidance arises when a request facially seeks non-privileged information, and there is no reason it should. Undoubtedly, requests may be written to avoid solicitation of privileged information. For instance, because the presidential communications privilege applies only to those "documents 'solicited and received' by the President or his immediate White House advisers who have 'broad and significant responsibility for investigating and formulating the advice to be given the President,'" *Judicial Watch, Inc. v. Department of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (quoting *Sealed Case*, 121 F.3d at 752), requests may seek only documents falling outside that close circle of trust.

11

Similarly, requests may be drafted to seek only documents over which any claim of privilege has been waived—as for documents "voluntarily revealed to third parties outside the White House." *Sealed Case*, 121 F.3d at 742. That is the case with RFP Nos. 1–7 and 15, as detailed below.

**Request 1** and **Request 2** seek essentially the same information about communications with different third-party sources: Law Firms.[5]

> **Request 1** seeks "all communications on or after January 20, 2025 You sent to, received from, or participated in with: a. Covington & Burling; b. Jenner & Block; c. Perkins Coie; d. Susman Godfrey; and/or e. Wilmer Hale."

> **Request 2** seeks "all communications on or after January 20, 2025 relating to any possible issuance of any Executive Order against any law firm, or to any Agreement with any law firm and the government, that You sent to, received from, or participated in with: a. Paul Weiss b. Skadden c. Wilkie Farr d. Milbank e. Kirkland & Ellis f. Allen Overy g. Simpson Thatcher h. Latham i. Cadwalader."

The ABA suspects there will be few, if any, responsive documents for either request, as public reporting indicates the White House principally communicated with targeted law firms through intermediaries. Regardless, to the extent any such communications exist, there can be no plausible claim of privilege over them. Such communications are not privileged in the first instance because they are not "documents 'solicited and received' by the President or his immediate White House advisers." *Judicial Watch*, 365 F.3d at 1114. And even if they were privileged, any privilege has been waived as communications with private law firm representatives are definitionally "voluntarily revealed to third parties outside the White House." *Sealed Case*, 121 F.3d at 742.

The ABA cannot narrow these requests any further. They concern only those law firms that were sanctioned or targeted for sanctioning. And no further temporal limits can be imposed, as the ABA does not know if (or when) the White House communicated with any targeted firm.

---

[5] Defined terms in this brief have the same meaning as defined in the Requests. *See* Ex. 1 at 1–10.

**Request 3** and **Request 4** both seek communications with Boris Epshteyn, a private citizen with no official capacities, relating to the Law Firm orders and any Agreements with Law Firms:

> **Request 3** seeks "All Communications on or after January 20, 2025 with Boris Epshteyn relating to the possible issuance of any Executive Order against any Law Firm."

> **Request 4** seeks "All Communications on or after January 20, 2025 with Boris Epshteyn reflecting negotiations relating to any Agreements."

Public reporting indicates that most communications between the White House and Law Firms transpired through private, non-governmental intermediaries like Mr. Epshteyn.

Just as direct communications with Law Firms are not plausibly privileged, the same is true for indirect communications with Law Firms via an intermediary. *See Judicial Watch*, 365 F.3d at 1114; *Sealed Case*, 121 F.3d at 742. And to the extent any such communications also include direct communications between Mr. Epshteyn and the White House, those too are not privileged, as Mr. Epshteyn is a private citizen with no official governmental role. *See In re Subpoena of Ctr. for Mil. Readiness*, 2018 WL 6722247, at *10 (E.D. Mich. Nov. 6, 2018), *report and recommendation adopted sub nom. In re Ctr. for Mil. Readiness*, No. 18-mc-51013, 2019 WL 4733602 (E.D. Mich. Sept. 28, 2019) ("Since CMR is a private organization, documents reflecting communication between it and the government do not enjoy an executive . . . privilege.").[6]

Although no *Cheney* issue arises for these requests that seek non-privileged information, the ABA is willing to further narrow **Request 3** to specify the categories of materials sought: drafts of orders, deliberations about contemplated orders, communications with law firms and White House officials about possible orders and possible Agreements, targeting criteria, and

---

[6] Despite the fact that *Cheney* is not plausibly implicated for communications involving third party intermediaries, the ABA **has** sought responsive documents from Mr. Epshteyn directly via a third party subpoena. The Government's response to the ABA's attempt to seek responsive documents directly from an entity other than the White House was to move to quash the subpoena. *See* ECF No. 60, 60-1.

communications relaying information obtained from law firms. The ABA cannot, however, narrow **Request 4** as it already narrowly focuses only on communications about the nine Agreements that were actually negotiated with law firms.

**Request 5** and **Request 6** are identical to Request 3 and Request 4, except that the focus is on communications with Steve Bannon (another reported intermediary) instead of Boris Epshteyn. The ABA's arguments that these requests are not overbroad, and its narrowing proposal, are the same as for Requests 3 and 4.

**Request 7** seeks "All Agreements, created on or after January 20, 2025, between the Administration and any Settling Firm. To the extent that any Agreement is not memorialized in a single document, all records sufficient to show all terms of that Agreement." The term "Settling Firm" is defined to refer to those firms with which the Administration reached an agreement. *See* Ex. 1 at 7–8. There is no plausible claim of presidential communications privilege over Agreements with private third parties; they are definitionally non-privileged. And to the extent there is need to identify and produce documents other than the Agreements themselves (*e.g.*, if an Agreement is not memorialized in a single document), the request is more than adequately narrow by virtue of asking only for documents "sufficient to show all terms of [a given] Agreement."

**Request 15** seeks "Social media posts, and any direct messages, discussing or relating to any Law Firm Order or Agreement." There can be no plausible risk of privilege for such information, because the White House has waived any arguable claim of privilege over "external communications between [White House officials] and third-party social media platforms." *Missouri v. Biden*, No. 22-cv-1213, 2022 WL 4086539, at \*3–\*4 (W.D. La. Sept. 6, 2022) ("Plaintiffs are entitled to external communications by Jean-Pierre and Dr. Fauci in their capacities as White House Press Secretary and Chief Medical Advisor to the President to third-party social

14

media platforms. The White House has waived its claim of privilege in relation to specific documents that it voluntarily revealed to third parties outside the White House.").

Even so, the ABA is willing to further narrow this request. The ABA has not identified specific custodians for these posts and messages, because the ABA does not know the identity of those individuals responsible for the Law Firm orders or the negotiation of Agreements. The ABA has, however, sought the identity of such individuals via Requests 11 and 12 discussed below, and is willing to narrow Request 15 to identify no more than seven custodians to search for social media posts relating to any Law Firm Order or Agreement.

> **B.      The Requests for internal White House communications (RFP Nos. 9-13, 16) are narrowly tailored and central to the ABA's claims.**

The ABA also seeks a limited number of internal White House communications and documents that concern one central factual dispute of this case: the existence of the Policy. Each of these requests is narrowly tailored to the core factual dispute of this case. And again, despite the Government's refusal to engage in any proposed narrowing, the ABA remains willing to further narrow these Requests to ensure that any invocation of the presidential communications privilege is as narrow as possible, to the extent it is invoked.[7]

**Request 9** seeks "[a]ll records created on or after January 20, 2025, related to the issuance of any Law Firm Order." A total of five Law Firm Orders have issued, which necessarily cabins the scope of this Request and sets it apart from the "everything under the sky" approach at issue in *Cheney*. 542 U.S. at 387. Nor is the Request a fishing expedition. The single production the

---

[7] To the extent documents responsive to the Requests discussed in this Section III.B were sent beyond the President and his "immediate White House advisors," or sent to third parties entirely outside the White House, the presidential communication privilege cannot be invoked and is waived. To the extent the documents were *not* distributed beyond the White House, even if the Court determined that the ABA is required to make a "preliminary showing" that the ABA cannot obtain the documents elsewhere, *Karnoski*, 926 F.3d at 1205, that requirement would be met.

Government has made in this case so far confirms that it prepared memoranda concerning the law firms subject to the Executive Orders—for example, one such document is titled "Solving_Paul_Weiss_v2.docx." Ex. 4 at DOJ_00000012. Notwithstanding that Request 9 is already targeted to key documents, the ABA proposes the following narrowed version: The following records created on or after January 20, 2025 related to the issuance of any Law Firm Order: (1) all drafts of Law Firm Orders, including any redlines, edits, and comments thereto, however communicated, and including communications transmitting such drafts, redlines, edits, and comments; (2) emails that refer to any of the firms who received a Law Firm Order and the word "EO" (or other synonyms used to refer to an Executive Order); (3) all memoranda related to the issuance or prospective issuance of Law Firm Orders, including drafts thereof and communications transmitting and responding to such memoranda; (4) all notes from meetings at which the issuance of any Law Firm Orders was discussed. This narrowed version of the Request eliminates any possibility that the Government will be forced to collect, review, and log an overwhelming number of documents; targets only the categories of records that are most relevant to the ABA's claims; and is based on the scope of documents that the ABA is already aware exist.

The next three RFPs—Request Nos. 10, 11, and 12—are already narrow by virtue of the fact that they are "[d]ocuments sufficient to . . ." requests:

> **Request 10**: Documents sufficient to show all facts considered and information relied on in issuing any Law Firm Order.

This Request may be largely duplicative of the now-narrowed Request No. 9. However, to the extent there are "facts considered and information relied on" in issuing the Law Firm Orders that are not already reflected in documents responsive to Request No. 9, documents reflecting such facts and information reflect the motivation behind the Law Firm Orders and are therefore key to the ABA's claims. Nor does the Government have to perform any sweeping search for all

16

documents related to such facts or information, because the Request asks only for documents "sufficient to show" them.

**Requests 11** and **12** ask for "[d]ocuments sufficient to identify" (1) "all individuals who participated in the drafting, editing, publishing, review, or approval of Law Firm Orders, including who first proposed the idea, who drafted the orders, who reviewed them, and who approved them" (**Request 11**), and (2) "the members of 'President Trump's policy team' who are involved in 'executing on his directive to hold Big Law accountable for their weaponization of justice and their lies,' as referred to in the statements of White House Press Secretary Karoline Leavitt set forth in ¶ 146 of the Complaint" (**Request 12**). Documents sufficient to identify individuals involved in relevant conduct are among the narrowest and least burdensome categories of document requests because they can be fulfilled with minimal production. Such documents are also essential to provide the basic information required for the ABA to proceed through discovery efficiently. *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 867 (D.C. Cir. 2008) (distinguishing FOIA requests from *Cheney* on the basis that the request at issue "precisely identified and specifically enumerated the relevant materials," "focusing on very specific records," including "basic information" such as the names of relevant individuals).

Finally, **Request 16** asks for "[n]otes and communications related to any public statements, press release, signing ceremony, and/or media press interview related to any Law Firm Order or Agreement, including those cited in the Complaint at ¶¶9, 76, 77, 121-122, 138-140, 146, 149-153, 155-156, 160-161." Similarly, **Request 13** calls for "[d]ocuments of 'President Trump's policy team' relating to 'executing on [President Trump's] directive to hold Big Law accountable for their weaponization of justice and their lies,' as referred to in the statements of White House Press Secretary Karoline Leavitt set forth in ¶146 of the Complaint." RFP 16 calls for the

Government to search for and produce only those notes and communications that relate to specific public statements by Government officials. And the ABA is willing to narrow this request further to cover only those public statements identified in the Complaint and cross-referenced in the RFP—which include, for example, statements made during signing ceremonies for specific Law Firm Orders (*see, e.g.*, ¶¶76-77, 121-122, 150-151). The ABA is likewise willing to further narrow RFP 13 to cover (1) all memoranda related to President Trump's directive to "hold Big Law accountable for their weaponization of justice and their lies," including drafts thereof and communications transmitting and responding to such memoranda; (2) emails that refer to or discuss the President's directive; and (3) all notes from meetings at which the directive was discussed. Such memoranda, notes, and communications provide critical evidence of the Government's intent and the intended scope of the Law Firm Intimidation Policy and are therefore central to the ABA's claims.

> **C.    The ABA is willing to obtain responsive documents from other Defendants (RFP Nos. 8 and 14)—provided the Government actually intends to produce them.**

Two of the ABA's RFPs target documents that should be in the possession of both the White House and other Defendants. **Request 8** calls for "[a]ll records created on or after January 20, 2025 related to the terms of the Administration's Agreements with any Settling Firm, including all communication between or among the White House, the Office of Management and Budget ('OMB'), the EEOC, and/or the U.S. Department of Justice ('DOJ'), concerning the Agreements or terms thereof."[8] And **Request 14** calls for "[a]ll documents and communications exchanged with

---

[8] To the extent RFP 8 could be read to call for the production of "[a]ll records" related to the terms of Agreements with any Settling Firm regardless of who is involved, the ABA clarifies that it intends RFP 8 to cover only communications "between or among" the White House, OMB, the EEOC, and/or DOJ.

Agency Defendants relating to the implementation, interpretation, and/or enforcement of any Law Firm Order."

Because such documents by definition were sent to third parties outside of the White House and beyond the circle of "close presidential advisors" to whom the presidential communications privilege attaches, these Requests do not implicate the presidential communications privilege in the first place. *Judicial Watch*, 365 F.3d at 1120. That said, the ABA does not object to the production of documents responsive to RFPs 8 and 14 by other Defendants rather than the Executive Office of the President. However, the Government has yet to provide sufficient information for the ABA to understand whether all responsive documents can and will in fact be produced by other agency Defendants. Most critically, the Government as not confirmed (1) that other Defendants are in possession of all of the same responsive documents as the White House—in other words, that the ABA can in fact obtain the responsive discovery from a party other than the EOP; or (2) that those other Defendants will actually produce those responsive documents and not withhold them on the basis of some purported privilege or immunity. Given that counsel for the Executive Office of the President also represents the agency Defendants who are the alternative sources of documents responsive to RFPs 8 and 14, the Government should have no problem confirming these critical facts.

## IV.    CONCLUSION

The ABA respectfully requests that the Court enter an Order requiring the Government to (1) respond in full to the ABA's RFP Nos. 1–7 and 15, as narrowed above, which by their terms do not implicate the presidential communications privilege; (2) provide full responses to the ABA RFP Nos. 9–13, and 16, as narrowed above, including formally invoking the presidential communications privilege to the extent the Government has a good faith basis to assert it and

providing a privilege log with entries for each document withheld on the basis of such privilege; and (3) confirm that documents responsive to RFPs 8 and 14 are in fact fully available from other Defendants in this case and will be produced by those Defendants. A Proposed Order is attached.

Dated: July 7, 2026

*/s/ Steven M. Seigel*
Stephen Shackelford, Jr. (D.C. Bar #NY0443)
Beatrice Franklin (*Admitted pro hac vice)*
Jillian Hewitt (*Admitted pro hac vice)*
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Tel.: 212-336-8330
sshackelford@susmangodfrey.com
bfranklin@susmangodfrey.com
jhewitt@susmangodfrey.com

Neal Manne (D.C. Bar #357012)
Barry Barnett*
Harry Susman*
Justin A. Nelson (D.C. Bar#490347)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Tel.: 713-651-9366
nmanne@susmangodfrey.com
bbarnett@susmangodfrey.com
hsusman@susmangodfrey.com
jnelson@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel.: 310-789-3100
dbrook@susmangodfrey.com

Jordan Connors*
Steve Seigel (D.C. Bar#D00473)
Katherine Peaslee (Admitted *pro hac vice*)
SUSMAN GODFREY L.L.P.

20

401 Union Street, Suite 3000
Seattle, Washington 98101
Tel: 206-516-3880
jconnors@susmangodfrey.com
sseigel@susmangodfrey.com
kpeaslee@susmangodfrey.com

*pro hac vice* forthcoming

*Attorneys for Plaintiff American Bar Association*

21

## APPENDIX A

| No. | ABA Request for Production | Defendants' Objections |
|---|---|---|
| 1 | All communications on or after January 20, 2025 that You sent to, received from, or participated in with: a. Covington & Burling; b. Jenner & Block; c. Perkins Coie; d. Susman Godfrey; and/or e. Wilmer Hale. Please respond separately for each of (a), (b), (c), (d), and (e). | Overbreadth (*Cheney*); Exhaustion (may be available from ABA members) |
| 2 | All communications on or after January 20, 2025 relating to any possible issuance of any Executive Order against any law firm, or to any Agreement with any law firm and the government, that You sent to, received from, or participated in with: a. Paul Weiss b. Skadden c. Wilkie Farr d. Milbank e. Kirkland & Ellis f. Allen Overy g. Simpson Thatcher h. Latham i. Cadwalader. Please respond separately for each of (a), (b), (c), (d), (e), (f), (g), (h), and (i). | Overbreadth (*Cheney*); Exhaustion (may be available from ABA members) |
| 3 | All Communications on or after January 20, 2025 with Boris Epshteyn relating to the possible issuance of any Executive Order against any Law Firm. | Overbreadth (*Cheney*) |
| 4 | All Communications on or after January 20, 2025 with Boris Epshteyn reflecting negotiations relating to any Agreements. | Overbreadth (*Cheney*) |
| 5 | All Communications on or after January 20, 2025 with Steve Bannon relating to the possible issuance of any Executive Order against any Law Firm. | Overbreadth (*Cheney*) |
| 6 | All Communications on or after January 20, 2025 with Steve Bannon reflecting negotiations relating to any Agreements. | Overbreadth (*Cheney*) |
| 7 | All Agreements, created on or after January 20, 2025, between the Administration and any Settling Firm. To the extent that any Agreement is not memorialized in a single document, all records sufficient to show all terms of that Agreement. | Overbreadth (*Cheney*); Exhaustion (may be available from ABA members) |
| 8 | All records created on or after January 20, 2025 related to the terms of the Administration's Agreements with any Settling Firm, including all communications between or among the White House, the Office of Management and Budget ("OMB"), the EEOC, and/or the U.S. Department of Justice ("DOJ"), concerning the Agreements or terms thereof. | Overbreadth (*Cheney*) Exhaustion (may be available from other agencies) |
| 9 | All records created on or after January 20, 2025, related to the issuance of any Law Firm Order. | Overbreadth (*Cheney*) |
| 10 | Documents sufficient to show all facts considered and information relied on in issuing any Law Firm Order. | Overbreadth (*Cheney*) |

| 11 | Documents sufficient to identify all individuals who participated in the drafting, editing, publishing, review, or approval of Law Firm Orders, including who first proposed the idea, who drafted the orders, who reviewed them, and who approved them. | Overbreadth (*Cheney*) |
|---|---|---|
| 12 | Documents sufficient to identify the members of "President Trump's policy team" who are involved in "executing on his directive to hold Big Law accountable for their weaponization of justice and their lies," as referred to in the statements of White House Press Secretary Karoline Leavitt set forth in ¶146 of the Complaint. | Overbreadth (*Cheney*) |
| 13 | Documents of "President Trump's policy team" relating to "executing on [President Trump's] directive to hold Big Law accountable for their weaponization of justice and their lies," as referred to in the statements of White House Press Secretary Karoline Leavitt set forth in ¶146 of the Complaint. | Overbreadth (*Cheney*) |
| 14 | All documents and communications exchanged with Agency Defendants relating to the implementation, interpretation, and/or enforcement of any Law Firm Order. | Overbreadth (*Cheney*) |
| 15 | Social media posts, and any direct messages, discussing or relating to any Law Firm Order or Agreement. | Overbreadth (*Cheney*) |
| 16 | Notes and communications related to any public statements, press release, signing ceremony, and/or media or press interview related to any Law Firm Order or Agreement, including those cited in the Complaint at ¶¶ 9, 76, 77, 121-122, 138-140, 144, 146, 149-153, 155-156, 160-161. | Overbreadth (*Cheney*) |

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered participants.

*/s/ Steven M. Seigel*
Steven M. Seigel