**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BAR ASSOCIATION,<br>*Plaintiff*,<br>v.<br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br>*Defendants*. | Case No. 1:25-cv-01888-AHA |

**DEFENDANTS' NOTICE REGARDING**
**THE COURT'S AUGUST 3 MINUTE ORDER**

In its August 3, 2026 Minute Order, the Court ordered that Defendants "file a notice with the court identifying the names of the individuals at issue for Requests 11 and 12 and the custodians for Requests 13, 15, and 16," or to assert privilege over those names. Defendants strongly object to this order, which is contrary to the critical separation of powers principles articulated in *Cheney v. U.S. District Court for the District of Columbia*, where the Supreme Court recognized "that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it," particularly in contexts that would force the President to assert privilege over broad requests. 542 U.S. 367, 385 (2004). The ruling is all the more problematic in this case, where there is no basis for discovery *at all*.

Plaintiff the American Bar Association's (ABA's) requests take aim at the sitting President of the United States and his close advisers in a civil suit seeking to enjoin a future "Law Firm Order," but the last such order was issued nearly 18 months ago. And all those previous orders have already been permanently enjoined, and the validity of those injunctions are currently on

appeal in the D.C. Circuit. To the extent discovery is appropriate at all, it should not proceed against the White House, per *Cheney*—especially not since the ABA can still avail itself of information from its own members, public sources, agency defendants (which are still producing records), and third parties (which have only just begun to produce records). Although Defendants respectfully disagree with the Court's order, they provide the following response.

Defendants do not assert privilege over any public information, including public statements referenced in RFPs 15 and 16 as well as their custodians. But to the extent the ABA seeks and this Court has compelled Defendants to produce information identifying those involved in presidential decisionmaking, Defendants hereby formally assert the presidential communications privilege. Lawkowski Decl. ¶ 5 ("On behalf of the Office of the President, I hereby assert the presidential communications privilege with respect to the 'names of the individuals at issue for Requests 11 and 12 and the custodians for Requests 13, 15, and 16' who are (or were in communication with) high-ranking White House advisors and their staffs within the Executive Office of the President, who have the responsibility of advising, assisting, and implementing decisions of the President."). While executive privilege "is not to be lightly invoked," *United States v. Reynolds*, 345 U.S. 1, 7 (1953), Defendants have no choice because this Court has chosen the "collision course" that *Cheney* instructs "should be avoided whenever possible." 542 U.S. at 389-90.

**BACKGROUND**

On July 31, 2026, the Court held a hearing on the ABA's Motion to Compel as to its Requests for Production Nos. 1-16.[1] On August 3, this Court entered a Minute Order directing

[1] Defendants incorporate by reference herein all objections and limiting constructions set forth in their Objections and Responses to Plaintiff's First Set of Requests for Production to Defendants, ECF No. 61-2. In particular, the ABA cannot demonstrate its "need for information"
*Continued on next page.*

Defendants to "file a notice with the court identifying the names of the individuals at issue for Requests 11 and 12 and the custodians for Requests 13, 15, and 16." Minute Order, August 3, 2026 ("Minute Order"). The Court further ordered, "[t]o the extent Defendants believe any individual's or custodian's name is properly withheld pursuant to privilege, they shall explain the basis for the privilege, including the relevant legal authorities and required evidentiary basis to support the privilege." *Id.*[2]

**RESPONSES**

Defendants reiterate and preserve their arguments that discovery is inappropriate here, because the ABA has failed to state a claim, and because such intrusive discovery into the White House is inappropriate under *Cheney*. The ABA can obtain some of this information from public sources and discovery into agency defendants (which is still ongoing). To the extent the ABA requests and this Court orders Defendants to provide public information, Defendants provide that below. To the extent that the ABA seeks the identities of presidential advisers or the identity of non-public custodians, Defendants formally assert the presidential communications privilege over this information.

---

regarding the identities of the individuals related to RFPs 11 and 12 and the custodians of RFPs 13, 15, and 16, *Cheney*, 542 U.S. at 385.

[2] The Court's Minute Order states, "Defendants proposed providing the names of the individuals at issue for Requests 11 and 12 to narrow the requests." Minute Order. Respectfully, Defendants dispute this characterization. Defendants did not agree to provide names. *See*, *e.g.*, ECF No. 61-3 at 1; ECF No. 61-2 at 21 ("Defendant objects to this Request to the extent it seeks information or response more appropriately obtained through Interrogatories pursuant to Federal Rule of Civil Procedure 33."). Rather, Defendants objected to the form of the ABA's discovery request—a request for production as opposed to an interrogatory—as overbroad. *See id*. Defendants did not waive and now assert other defenses and privileges, namely, *Cheney* and the presidential communications privilege

## I. THE IDENTITIES OF INDIVIDUALS AT ISSUE IN RFPS 11 AND 12 ARE PROTECTED BY THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE.

The ABA requests and this Court's order seeks to compel Defendants to identify "all individuals who participated in the drafting, editing, publishing, review, or approval of Law Firm Orders, including who first proposed the idea" and "the members of 'President Trump's policy team' who are involved in 'executing on his directive to hold Big Law accountable." ECF No. 61 at 17; Minute Order. This highly intrusive request touches the core of presidential decisionmaking and those within "operational proximity to the President himself." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). For the reasons Defendants previously explained in their opposition to Plaintiff's motion to compel, these requests are foreclosed by *Cheney*. There, the Supreme Court considered inappropriate plaintiffs' numerous and overbroad requests seeking the identities of those involved in advising the President there. 542 U.S. at 387 (seeking "All documents identifying or referring to any staff, personnel, contractors, consultants or employees of the Task Force."); *see also id.* (also seeking identities of participants in Task Force and any Sub-Group). Here, the ABA's RFPs 11 and 12 seek the same. To the extent this Court rejects Defendants' *Cheney* argument and compels Defendants to identify the individuals at issue in RFPs 11 and 12, Defendants formally assert the presidential communications privilege. Lawkowski Decl. ¶ 5.

The presidential communications privilege applies to communications by and with the President as well as communications authored or solicited and received by close advisers to the President in furtherance of presidential decisionmaking. *In re Sealed Case*, 121 F.3d 729, 751-52 (D.C. Cir. 1997). Here, the ABA seeks to identify individuals who participated in the drafting, editing, publishing, review, or approval of Law Firm Orders. Those Executive Orders are indisputably presidential actions for purposes of the privilege. Further, the acts of drafting, editing,

publishing, reviewing, and approving Executive Orders are unquestionably in furtherance of those official presidential actions. Such advice provided to the President and his close advisers constitute the core of the presidential communications privilege. *Id.* at 752. The presidential communications privilege also applies to the identities of these individuals, for at least three reasons.

First, this follows from the contours of the privilege itself. Under black letter law, the presidential communications privilege, "unlike the deliberative process privilege … applies to documents in their entirety." *Id.* at 745. A record protected by the presidential communications privilege may therefore be withheld in full. Further, the privilege covers not just deliberations but also factual information and even post-decisional materials. *Id.* As a result, if the ABA sought any records concerning the drafts or other advice provided to the President, they would be subject to withholding in full; that would include information on the face of the records identifying who provided what advice. The ABA should not be able to pierce the privilege merely by reframing a request from "documents sufficient to show" the identities of the President's advisers, to a request for the identities themselves, when even under the original and overbroad request, the ABA would not have been entitled to this information. Every such record would be subject to withholding in full.

Second, and more fundamentally, revealing the identity of those whom the President chooses to consult would impermissibly provide insight into the nature and substance of the advice solicited and received. On this basis, courts have narrowly construed FOIA to exempt meetings at the White House and even agency meetings attended by White House advisers, in light of the separation of powers. *See Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 217 (D.C. Cir. 2013) (Garland, C.J.) (construing FOIA to exempt White House visitor logs "to avoid the significant

separation-of-powers concerns that would arise if the Act were construed in a way that effectively permitted requesters to reconstruct" White House visitors and meetings); *see also Prop. of the People, Inc. v. OMB*, 394 F. Supp. 3d 39, 47 (D.D.C. 2019) (explaining in context of OMB records that indirect access to White House calendars "would raise separation-of-powers concerns because it would threaten the ability of the President and his closest advisers to hold meetings and seek advice in confidence"). After all, if outsiders knew who was involved in particular meetings, drafts, or decisions, they could likely reconstruct from these facts the very deliberations that the privilege is meant to protect. *Compare* Lawkowski Decl. ¶ 9 ("Based on my experience, disclosure of the names of these individuals would allow outside observers to combine that information with other information available to the public to reconstruct or draw inferences about the structure of the presidential decision-making process in this matter, the identities of the White House advisors who participated in that confidential presidential decision-making process, and the nature of their advice."), *with Shapiro v. U.S. Dep't of Just.*, 944 F.3d 940, 941 (D.C. Cir. 2019) (explaining how "seemingly innocuous information …can be combined" to reveal secret information "even when the individual piece is not of obvious importance in itself") (quotations omitted). Revealing the identities of individuals involved in each aspect of the presidential actions at issue here—such as the ABA's request for "who first proposed the idea," RFP 11—squarely presents this problem.

Further, even in the context of the much weaker deliberative process privilege, the D.C. Circuit has held that the privilege applies to the identities of those who author memoranda, emails, and other records. *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980) ("If these agency records are indeed deliberative, it is appropriate to apply Exemption 5 to the documents themselves, as well as to the names of their authors."); *see also Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 388 F. Supp. 3d 29, 44 (D.D.C. 2019) ("Releasing the name of the attorney who was

consulted as a part of Defendant's decision-making process would necessarily reveal information about Defendant's decision-making process."); *Aaron v. U.S. Dep't of Just.,* No. 09-00831 (HHK), 2011 WL 13253641, *8 (D.D.C. July 15, 2011) ("This Circuit has recognized that if a document is deliberative in nature, the identity of the author is also privileged."); *Cofield v. City of LaGrange, Ga.*, 913 F. Supp. 608, 616 (D.D.C. 1996) ("this Circuit has recognized that if a document is deliberative in nature, the identity of the author is also privileged, because of the potential chilling effect and harm to the deliberative process"). It would be a strange result if the deliberative process applied to the identity of advisers at Federal agencies, but the presidential communications privilege did not cover the identities of the President's advisers. *See Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 886 (D.C. Cir. 2021) ("the presidential communications privilege is broader than its deliberative process cognate"). The presidential communications privilege must protect at least as much.

Third, and most importantly, revealing the identity of those whom the President consults would indisputably chill participation in further deliberations and thereby degrade the quality of advice the President receives. Lawkowski Decl. ¶ 10. As the D.C. Circuit recognized in its seminal decision on the presidential communications privilege, "[w]ithout protection for her sources of information, an adviser may be tempted to forgo obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability." *In re Sealed Case*, 121 F.3d at 751. After all, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974).

In *Nixon* itself, the Supreme Court identified among "the considerations justifying a presumptive privilege for Presidential communications" the "necessity for protection of the public

interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Id.* at 708. Specifically, "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way *many would be unwilling to express except privately*." *Id.* (emphasis added). If every presidential adviser might have to disclose that he worked on every particular issue, that would have two debilitating effects on presidential decisionmaking: first, many individuals might be reluctant to serve in government or even consult with the White House at all. The President would therefore be entirely deprived of their insights. *See Applicability of Executive Privilege to Presidential Communications with Private Advisers*, 50 Op. O.L.C. __, slip at 14 (2026) ("OLC Op.") ("individuals may be reluctant to provide advice on controversial or unpopular policies based on a fear of public disclosure or potential ramifications for their personal endeavors"). Second, and maybe worse, those who are willing to serve or meet with the President might be reluctant to work on certain issues or even selectively refuse to advise on policies they view as likely to be unpopular. But of course, those are the very policies where candid advice is most needed. And the President would be hamstrung if his closest aides were only willing to work on popular but not unpopular policies.

The Supreme Court reaffirmed these principles just two years ago. *Trump v. United States*, 603 U.S. 593, 612-13 (2024). Numerous lower court opinions have done so as well. *See, e.g.*, *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 77 (2d Cir. 2020) ("Compelled disclosure of the visitor logs would affect a President's ability to receive unfettered, candid counsel from outside advisors and leaders, both domestic and foreign, who were aware that their visits to the White House would be subject to public disclosure."); *In re Sealed Case*, 121 F.3d at 751 ("the President needs access to candid and informed advice if he is to exercise this control effectively"); *AAPS*, 997 F.2d at 906-07 ("requirement of public meetings would inhibit both candid discussion within

the Task Force and its presentation of advice to the President"). *Nixon*'s insight into "[h]uman experience," 418 U.S. at 705, is also consistent with how courts protect the identities of other individuals in diverse other contexts where the government has an interest in encouraging individuals to provide information "by preserving their anonymity." *Roviaro v. United States*, 353 U.S. 53, 59 (1957). Here, disclosing advisers' identities "would have a chilling effect on communications within the Executive Office of the President, making it more difficult for the President to obtain candid advice from and explore alternatives with a wider circle of senior advisors and their staffs." Lawkowski Decl. ¶ 10. That applies not just to this President but to all future Presidents. *Id.*

The last aspect of the presidential communications privilege is evaluating a plaintiff's need for the information and balancing this against the government's interest in obtaining candid advice. *In re Sealed Case*, 121 F.3d at 753. Here, the ABA cannot articulate any meaningful need for the identities of those involved in these Executive Orders. *Cf. Cheney*, 542 U.S. at 386 ("civil discovery here militates against respondents' position"). The existence or validity of any alleged law firm policy does not turn on the identity of any particular staffer or adviser. Moreover, to the extent the ABA is seeking the names of those involved in order to facilitate further discovery requests, any documents requested using this information would necessarily be covered by the presidential communications privilege, for the reasons explained above, and so would not yield information to further their claims. As best Defendants can tell, the only purpose of requiring the government to formally identify in court the names of those advisers involved in these deliberations is to name and shame them—but that is the very chilling effect that the presidential communications privilege is supposed to protect. This is *Nixon* distilled.

Finally, Defendants reiterate that to the extent the ABA seeks the substantive, underlying documents related to "the drafting, editing, publishing, review, or approval of Law Firm Orders," documents related to "members of 'President Trump's policy team' who are involved in 'executing on his directive,'" (which RFP 13 seeks on its face), or testimony from any members of "President Trump's policy team" about the development of any Executive Orders, such information is protected by one or more other components of executive privilege, such as the attorney-client privilege, deliberative process privilege, or state secret's privilege. To the extent that those privileges may also protect the identity of advisers, the information Plaintiff request is further privileged.

## II. THE IDENTITIES OF NON-PUBLIC CUSTODIANS AT ISSUE IN RFPS 13, 15, AND 16 ARE PROTECTED BY THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE.

Defendants do not assert privilege over any public information, such as public social media posts or other public statements requested in RFPs 15 and 16. To the extent the ABA requests and this Court orders Defendants to identify the custodians for RFPs 13, 15, and 16, Defendants provide custodians for those public posts and statements. But for the reasons given above, Defendants formally assert the presidential communications privilege over the identities of custodians for any non-public deliberations referenced in those Requests. Lawkowski Decl. ¶ 12.

RFP 13 requests "Documents of 'President Trump's policy team' relating to 'executing on [President Trump's] directive to hold Big Law accountable for their weaponization of justice and their lies,' as referred to in the statements of White House Press Secretary Karoline Leavitt set forth in ¶146 of the Complaint." This Court's Minute Order directs Defendants to provide the "custodians" for this request. For the reasons explained above, the presidential communications privilege applies to these deliberations, to any records reflecting these deliberations, and to the identities of those individuals. The ABA cannot circumvent these limitations by recasting their

RFP as a request for "custodians" rather than "identities." Revealing the custodians of these records would be coextensive with revealing the identities of those involved in these deliberations. Lawkowski Decl. ¶ 13 ("To the extent the requests for the names of the custodians of the documents and communications at issue in Requests 13, 15, and 16 seek custodians beyond the Office of Administration, the Office of Records Management, or the National Archives and Records Administration, such as the names of advisors and staff who created or received emails relating to the 'directive' at issue, those requests implicate the same concerns as the requests for the names of the individuals at issue in Requests 11 and 12 and function as a back door mechanism for identifying who was involved in advising the President and his senior staff."). This request is therefore covered by the presidential communications privilege.

RFP 15 seeks "[s]ocial media posts, and any direct messages, discussing or relating to any Law Firm Order or Agreement." ECF No. 61-1 at 16. As Defendants explained in their written objections, this request is unduly burdensome and "vague and ambiguous because it fails to identify what "social media posts" and "direct messages" are being sought, and all social media posts are themselves presumably public and available to the ABA, regardless. *See*, *e.g.*, ECF No. 61-2 at 25. In order to narrow the requests, consistent with their written objections (to which the ABA has not objected in writing), Defendants construe RFP 15 as applying only to official social media accounts of the White House.[3] Defendants thus identify the following custodians:

---

[3] Defendants object to "bear[ing] the burden of invoking executive privilege" with respect to identifying custodians of RFP 15. *See Cheney*, 542 U.S. at 388. The ABA does not cite in its complaint any official social media account that discusses or relates to "any Law Firm Order or Agreement." *See generally* Complaint. Instead, RFP 15 impermissibly puts "the onus" entirely on the Executive Branch to identify responsive social media posts or direct messages. *See Cheney*, 542 U.S. at 388. Moreover, Defendants further object to the extent that the requested information is already publicly available. *See* ECF No. 61-2 at 25. Even after narrowing RFP 15 to the

*Continued on next page.*

- X: https://x.com/whitehouse
- Instagram: https://www.instagram.com/whitehouse
- TikTok: https://www.tiktok.com/@whitehouse
- Truth Social: https://truthsocial.com/@whitehouse
- Facebook: https://www.facebook.com/whitehouse
- Youtube: https://www.youtube.com/@whitehouse

To the extent this Court's Minute Order requires, for purposes of this request, Defendants to search, identify, and collect messages of individual staffers, it is inconsistent with *Cheney*. To the extent this Court's minute order requires identifying who engaged in deliberations "discussing or relating to any Law Firm Order or Agreement," Defendants formally invoke the presidential communications privilege for the reasons explained above.

RFP 16, as narrowed by the ABA in its briefing, seeks "[n]otes and communications related to the "public statements identified in the Complaint and cross-referenced in the RFP." ECF No. 61 at 18; *see* Compl. ¶¶ 9, 76, 77, 121-122, 138-140, 144, 146, 149-153, 155-156, 160-161. The President or a close, Senior White House Advisor made each of the public statements at issue. *See* Compl. ¶¶ 9, 76, 121-122, 138-140, 144, 149, 155-156, 160-161 (statements from the President); *id.* ¶¶ 76, 121-22, 161 (Staff Secretary William Scharf); *id.* ¶¶ 146, 153 (Press Secretary Karoline Leavitt). The individuals making the statements are custodians of their own records. White House Office physical records are maintained by individual employees until transferred to the Office of Records Management and then the National Archives and Records Administration. White House

---

identification of custodians, the request remains overbroad and unduly burdensome under *Cheney* because searching and identifying appropriate custodians still requires going "line by line" to determine whether any particular official social media account contains any social media post or direct message "discussing or relating to any Law Firm Order or Agreement." *See id*.

Office electronic records are in the custody of the Executive Office of the President, Office of Administration, until transferred to the National Archives and Records Administration. Lawkowski Decl. ¶ 13. Defendants believe that this information satisfies the Court's Minute Order and what is reasonably required by Request No. 16 in light of Rule 26 and the teaching of *Cheney*. But to the extent the ABA or the Court disagrees, for the reasons stated above, Defendants assert the presidential communications privilege over the identification of any and all personnel not previously publicly identified in connection with these statements. Further, for the reasons stated above, any "notes and communications related to" the referenced public statements beyond the statements themselves are within the core of various executive privileges, in any event.

Dated: August 17, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
DIANE KELLEHER
Directors, Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

CHRISTOPHER M. LYNCH
JAMES R. POWERS
Chief Litigation Counsel, Federal Programs Branch

*/s/ Michael Velchik*__
MICHAEL VELCHIK (D.C. Bar. 187249)
Senior Counsel
JAMES J. WEN
M. JARED LITTMAN
ADAM S. FOX
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 860-8388
Email: michael.velchik@usdoj.gov
*Attorneys for Defendants*

**CERTIFICATION OF SERVICE**

I hereby certify that, on August 17, 2026, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Michael Velchik*
MICHAEL VELCHIK